Case № 23-3085

---

# United States Court of Appeals for the Sixth Circuit

---

Firexo, Incorporated,
Plaintiff-Appellant,

v.

Firexo Group Limited,
Defendant-Appellee.

---

**On Appeal from the Judgment of the United States District Court for the Northern District of Ohio at Toledo**

**(Honorable Jack Zouhary)**

---

District Court № 3:21-CV-2336

---

## APPELLANT'S BRIEF

---

Paul Belazis
*Attorney for Appellant*

Malone, Ault & Farrell
7654 W. Bancroft St.
Toledo, Ohio 43617
(419) 843–1333 tel
(419) 843–3888 fax
*belazis@maf-law.com*

## Corporate Disclosure Statement

Pursuant to 6TH CIR. R. 26.1, Firexo, Inc. makes the following disclosures:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    **No.**

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

    **No.**

# Table of Contents

Corporate Disclosure Statement ................................... i

Table of Contents.................................................... ii

Table of Authorities.................................................iv

Statement in Support of Oral Argument........................ 1

Statement of Jurisdiction ........................................ 1

Statement of the Issues ......................................... 2

Statement of the Case ........................................... 3

1.  About the Shareholder's Agreement between Scot Smith
    and Firexo Group Limited................................... 6

    1.1  Background. ........................................... 6

    1.2  The parties chose English law to govern
         the Shareholder's Agreement........................... 7

    1.3  The parties chose not to allow third party rights or obligations
         under the Shareholder's Agreement. ................... 8

    1.4  The parties omitted Firexo, Inc. as a signatory
         to the Shareholder's Agreement........................ 9

    1.5  Provisions of the Shareholder's Agreement relevant to this appeal. . 10

2.  Firexo, Inc. and FGL enter an oral distribution agreement................ 11

3.  Quality issues with FGL's products. ........................... 13

4.  Issues with the product claims that FGL made about its fire
    extinguishers and fire-extinguishing liquid. ................... 15

5.  Litigation begins. ........................................... 16

    5.1  Firexo, Inc. files suit in Ottawa County, Ohio against FGL............... 16

    5.2  FGL files suit in England against its joint venture partners. ............. 17

    5.3  Smith's federal securities fraud case.................................. 18

6.  **FGL files its motion to dismiss.** ................................................. 18

   6.1  FGL's and Firexo, Inc.'s written arguments...................................... 18

   6.2  The district court grants FGL's motion to dismiss............................ 22

**SUMMARY OF THE ARGUMENT** ............................................26

**ARGUMENT**........................................................................31

1.  **The district court failed to determine and apply a proper standard of review to address the disputed issue of fact FGL created.** . 33

2.  **Combining applicability and enforceability frustrated Smith's and FGL's choice of English law to govern their contract.** ...................... 36

   2.1  Other circuits have recognized two distinct analytical components, using the law of the contract to interpret and federal law to enforce forum-selection clauses. ..................................................... 37

   2.2  This Court should adopt two distinct components in its analysis of forum-selection clauses: applicability and enforceability.................... 45

   2.3  The forum-selection clause in Smith's and FGL's Shareholder's Agreement does not apply to Firexo, Inc. under English law............. 48

3.  **The forum-selection clause is unenforceable against Firexo, Inc. under the CRAF test.** ....................................... 52

   3.1  Firexo, Inc. and its claims are not "closely related" to the Shareholder's Agreement. ................................................. 52

   3.2  Even if Firexo, Inc. and its claims were "closely related," it was unforeseeable that FGL could invoke the clause against Firexo, Inc. . 58

**CONCLUSION**...............................................................61

**CERTIFICATE OF COMPLIANCE** ...........................................62

**CERTIFICATE OF SERVICE** ...............................................62

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**........63

**ADDENDUM** ................................................................64

## Table of Authorities

### Cases

*Abbott Laboratories v. Takeda Pharmaceutical Company Ltd.*,

476 F.3d 421 (7th Cir. 2007) ............................................................ 41

*Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 648 (4th Cir. 2010)........... 44, 45

*Associação Brasileira de Medicina v. Stryker Corp.*,

891 F.3d 615 (6th Cir. 2018) ...................................................... 33, 48

*Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102 (6th Cir. 1997) ........passim

*Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296 (5th Cir. 2016) ...................... 42, 44

*Brenner v. Nat'l Outdoor Leadership Sch.*, 20 F. Supp. 3d 709 (D. Minn. 2014)..... 39

*Collins v. Mary Kay, Inc.*, 874 F.3d 176 (3rd Cir. 2017)........................................ 39

*Dos Santos v. Bell Helicopter Textron, Inc.*, 651 F. Supp. 2d 550 (N.D. Tex. 2009). 29

*Drive Yourself Hire Co (London) Ltd v. Strutt*, [1954] 1 QB 250, (UKHC) ............ 29

*Dunlop Pneumatic Tyre Co. v. Selfridge and Co.*, [1915] A.C. 847 (UKHL)...... 48, 53

*Dunne v. Libbra*, 330 F.3d 1062 (8th Cir. 2003) ................................................... 39

*Dynamic CRM Recruiting Solutions, L.L.C. v. UMA Education, Inc.*,

31 F.4th 914 (5th Cir. 2022) ...................................................... 29, 44

*Erie R.R. Co v. Tompkins*, 304 U.S. 64 (1938) ....................................................... 47

*Franlink v. BACE Services, Inc.*, 50 F.4th 432 (5th Cir. 2022)........................passim

iv

*Grant v. State National Insurance Company, Inc.*,

    586 F. Supp. 3d 503 (D.S.C. 2022)................................................... 45

*Heil v. Nationwide Life Ins. Co.*,9 F.3d 107, 1993 WL 428861 (6th Cir. 1993)...... 34

*Hugel v. Corp. of Lloyd's*, 999 F.2d 206 (7th Cir. 1993)...................................passim

*IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.*,

    437 F.3d 606 (7th Cir. 2006) ............................................................ 41

*IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union*,

    512 F.3d 989 (7th Cir. 2008) ............................................................ 42

*In re McGraw-Hill Global Educ. Holdings LLC*, 909 F.3d 48 (3rd Cir. 2018) ......... 36

*Jackson v. Payday Financial, LLC*, 764 F.3d 765 (7th Cir. 2014) .................... 41, 42

*K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171 (6th Cir.1996) ......................... 34

*Kerobo v. Southwestern Clean Fuels, Corp.*, 285 F.3d 531 (6th Cir. 2002) ............... 34

*Lakeside Surfaces, Inc. v. Cambria Co. LLC*, 16 F.4th 209 (6th Cir. 2021)............. 33

*Lipcon v. Underwriters at Lloyd's London*, 148 F.3d 1285 (11th Cir. 1998)............ 57

*M/S Bremen v. Zapata*, 407 U.S. 1 (1972) ............................................................ 39

*Manetti-Farrow v. Gucci America, Inc.*, 858 F.2d 509 (9th Cir. 1988) ........ 39, 55, 56

*Marano Enterprises of Kansas v. Z-Teca Restaurants*,

    254 F.3d 753 (8th Cir. 2001) ............................................................ 57

*Martinez v. Bloomberg LP*, 740 F.3d 211 (2nd Cir. 2014)................................passim

*Melo v. Zumper, Inc.*, 439 F. Supp. 2d 683 (E.D. Va. 2020) .................................. 45

*Milanovich v. Costa Crociere, S.P.A.*, 954 F.2d 763 (D.C. Cir. 1992) .................... 39

*Petti v. Fraker*, 2020 WL 13460640 (N.D. Ohio 2020) ......................................... 57

*Phillips v. Audio Active Ltd.*, 494 F.3d 378 (2nd Cir. 2007) ........................... 31, 46

*Preferred Capital, Inc. v. Sarasota Kennel Club, Inc.*,

    489 F.3d 303 (6th Cir. 2007) .............................................................. 46

*Prevent USA Corp. v. Volkswagen AG*, 17 F.4th 653 (6th Cir. 2021) ..................... 31

*Reagan v. Maquet Cardiovascular U.S. Sales LLC*, Case No. 1:14-CV-548,

    2015 WL 521049 (N.D. Ohio 2015) ......................................................... 55, 59

*Riley v. Kingsley Underwriting Agencies*, 969 F.2d 953 (10th Cir. 1992) ................ 40

*Shell v. R.W. Sturge, Ltd.*, 55 F.3d 1227 (6th Cir. 1995) ....................................... 31

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988) ...................................... 43, 47

*Stone Surgical, LLC v. Stryker Corp.*, 858 F.3d 383 (6th Cir. 2017) ..................... 31

*Tacket v. M & G Polymers, USA, LLC*, 561 F.3d 478 (6th Cir. 2009) ................... 33

*Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) .......................... 47

*VTB Capital plc v Nutritek Int'l Corp.*, [2013] 2 A.C. 337 (UKSC) .................... 49

*Walker v. AMVAC Chemical Corporation*, 4:17-CV-17,

    2018 WL 5023417 (E.D. Tenn. 2018) ....................................................... 28, 37

*Wong v. Partygaming Ltd.*, 589 F.3d 821 (6th Cir. 2009) ......................31, 44, 45, 46

*Wong v. Partygaming Ltd.*, Case No. 1:06-CV-02376,

    2008 WL 4449436 (N.D. Ohio 2008)................................................................. 45

*Worth v. Tyer,* 276 F.3d 249 (7th Cir.2001) ........................................................ 34

*Yavuz v.61 MM, Ltd.*, 465 F.3d 418 (10th Cir. 2006)........................................... 40

## STATUTES

Contracts (Rights of Third Parties) Act 1999, § 1 (Eng.) .................................. 8, 50

Contracts (Rights of Third Parties) Act 1999, § 2 (Eng.) ..................................... 50

## OTHER AUTHORITIES

John F. Coyle & Robin J. Effron, Forum Selection Clauses, Non-Signatories, and

    Personal Jurisdiction, 97 NOTRE DAME L. REV. 187 (2021) ................... 3, 56

UK Law Commission,

    *Privity of Contract: Contracts for the Benefit of Third Parties*................................ 29

## RULES

Fed. R. Civ. P. 12 ................................................................................................ 20

Fed. R. Civ. P. 12(b)(3) ...................................................................................... 21

## TREATISES

CHITTY ON CONTRACTS (34th ed.2021) at § 20-147 ...................................... 49

## Statement in Support of Oral Argument

This Court should grant oral argument because this appeal raises unsettled legal issues of critical importance for commercial parties whose contracts often have both choice-of-law and forum-selection clauses. A growing trend (and circuit split) has emerged where, for policy and *Erie* reasons, courts are distinguishing between interpretation and enforcement, using the law of the contract to interpret and federal law to enforce a forum-selection clause. This Court will have to decide where it stands on that question. And, oral argument will help the Court assess these issues.

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. § 1332(a)(2) because the Defendant-Appellee removed this case under 28 U.S.C. § 1441(b). The Plaintiff-Appellant is a Florida corporation with its principal place of business in Ohio; the Defendant-Appellee is an English limited liability company with its principal place of business in the United Kingdom; and, the amount in controversy exceeds $75,000 exclusive of interests and costs.

The district court entered a final judgment dismissing this case on January 26, 2023.[1] The Plaintiff-Appellant timely appealed on February 1, 2023.[2]

This Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of the Issues

This appeal presents issues within the context of a forum-selection clause connected to a choice-of-law clause; standards for dealing with disputed facts; and the distinction between applicability and enforceability of forum-selection clauses.

The issues are:

1. When a moving party fails to cite the authority or standard for considering a pre-discovery motion to dismiss based on a forum-selection clause, what standard of review is the district court to employ in weighing the parties' submissions about disputed issues of fact;

2. When contractual parties select a body of law to govern their contract, does a federal court sitting in diversity apply the law of the contract or federal common law when determining the applicability—not the enforceability—of contractual provisions; and,

---

[1]   Judgment Entry, RE 20, Page ID # 508.

[2]   Notice of Appeal, RE 21, Page ID # 509.

3.  Can a forum-selection clause be foreseeable to a non-signatory whose claims do not derive from the agreement containing a forum-selection clause, when the forum-selection clause is inapplicable to that party under the law governing the contract?

## STATEMENT OF THE CASE

This appeal is a classic example of an often quoted saying: "The simplest things to say are the hardest things to do."

This appeal concerns partly the closely-related-and-foreseeable (CRAF) test, a mechanism courts employ to enforce a contractual provision against someone who didn't sign the agreement. Rooted in notions of fairness and judicial efficiency, the test is simple to say. However, when, how, and why to apply the test rest in the hardest-things-to-do category.[3]

The district court enforced a forum-selection clause contained in a Shareholder's Agreement that Appellant Firexo, Inc. did not sign[4] and could not enforce even if it

---

[3]  *See, e.g.,* John F. Coyle & Robin J. Effron, Forum Selection Clauses, Non-Signatories, and Personal Jurisdiction, 97 NOTRE DAME L. REV. 187, 200–05 (2021) (discussing the test's modern experience in the federal judiciary).

[4]  *See* Order Granting Mot. to Dismiss, RE 19, Page ID # 502.

wanted to.[5] By doing so, the district court dismissed Firexo, Inc.'s causes of action, none of which relied on or referenced the Shareholder's Agreement.[6] As alleged, Firexo's Inc.'s causes of action arose out of an oral, distribution agreement between it and Firexo Group Limited (FGL).[7] After FGL's motion to dismiss created a disputed issue of fact, Firexo, Inc. submitted a declaration outlining the circumstances surrounding the formation of the oral distribution agreement.[8] The district court however chose to enforce a no-oral-modification clause from the Shareholder's Agreement against Firexo, Inc., acknowledging but discounting the disputed issues of fact.[9]

The CRAF test is a settled federal law. Firexo, Inc. does not challenge it. Rather, in this appeal, Firexo, Inc. raises issues about the district court's analytical components and sequence. The district court should have (1) considered the *applicability*

---

[5]  *See* Shareholder's Agreement § 30.1, RE 15-1, Page ID # 234.

[6]  *See* Pl.'s Am. Compl., RE 9, Page ID ## 47–57.

[7]  *Id.* ¶¶ 8–16, RE 9, Page ID ## 48–49.

[8]  *See* Decl. of Scot Smith, RE 17-1, Page ID ## 271–73.

[9]  *See* Order Granting Mot. to Dismiss, RE 19, Page ID # 506 (relying on *Hugel v. Corp. of Lloyd's*, 999 F.2d 206 (7th Cir. 1993)).

of the forum-selection clause to Firexo, Inc. under the law of the contract before discussing the clause's *enforceability* under federal law; (2) weighed the parties' evidence concerning the oral agreement from which Firexo, Inc. alleges its claims derive;[10] and (3) properly analyzed this case's fact-intensive elements, which distinguish this case from the federal caselaw the district court cited.

To set the context, we begin with the Shareholder's Agreement between Scot Smith and FGL.

---

[10] *See, e.g., Martinez v. Bloomberg LP*, 740 F.3d 211, 216–17 (2nd Cir. 2014) (if motion is based on forum-selection clause and there are disputed factual questions, court must give deferential weight to facts contained in sworn statements provided by party opposing the application of the clause or conduct evidentiary hearing). An appellate court reviews a district court's determination as to the applicability of a forum selection clause *de novo*, unless there have been findings of fact incident to an evidentiary hearing. *Id.*

1.    **About the Shareholder's Agreement between Scot Smith and Firexo Group Limited.**

    1.1    *Background.*[11]

In August 2019, Scot Smith and FGL executed a Shareholder's Agreement between them.[12] Under the agreement, Smith purchased seventy shares (70%) of Firexo, Inc., a Florida corporation that David Breith, FGL'S CEO, had already set up.[13] The agreement read like any shareholder's agreement, discussing board composition, shareholder restriction, annual report frequency, dividend policy, share conversion and the like.[14] The agreement did not include details of the commercial relationship between Firexo, Inc. and FGL—things like the price of goods, the volume, the frequency, payment terms, exclusivity, etc. The only "commercial" refer-

---

[11]   To aid the Court, we provide a table with the relevant provisions of the Shareholder's Agreement between Scot Smith and FGL. *See infra* Section 1.5.

[12]   Joint Statement, RE 15, Page ID # 210; *see also* Exhibit A to the Joint Statement, RE 15-1, Page ID ## 213–37 (copy of the Shareholder's Agreement between FGL and Scot Smith). The Agreement was entitled "SHAREHOLDER'S AGREEMENT" on its cover and first page. *See id.* pp. 1, 4, RE 15-1, Page ID ## 214, 217. In the document's header, though, the agreement was termed "JOINT VENTURE AGREEMENT." *See id.*, RE 15-1, Page ID ## 213–37.

[13]   Shareholder's Agreement § 6.1, RE 15-1, Page ID # 221.

[14]   *Id.* §§ 5–10 (representative), RE 15-1, Page ID # 219–23.

ence was Section 2.1, which states: "The Business of the JVC [joint venture company] is the sale and distribution of FIREXO's fire extinguishing products within the Territory (**Business**)."[15]

### 1.2    *The parties chose English law to govern the Shareholder's Agreement.*

The parties, both sophisticated parties as FGL admitted,[16] selected the law of England and Wales to govern the contract and any disputes arising out of it.[17] The choice-of-law provision is wide in scope and clear in meaning: English law governed all questions of interpretation, including whether the agreement applied to another party.[18]

---

[15]  *Id.* § 2.1, RE 15-1, Page ID # 219 (emphasis and capitalization in original).

To describe this as "commercial" is charitable. To an objective reader, Section 2.1 simply memorializes the parties' intent that Firexo, Inc. should be used only for selling and distributing FGL's products in the United States. But, the agreement authorized "changing the nature of the JVC's business or commencing any new business…." Shareholder's Agreement Sch. 1, Item 5, RE 15-1, Page ID # 236.

[16]  *See* Decl. of Peter Coyle ¶ 4, RE 16-1, Page ID # 259. Firexo, Inc. agrees with FGL's characterization here.

[17]  Shareholder's Agreement § 33.1, RE 15-1, Page ID # 235.

[18]  *Id.*

1.3    *The parties chose not to allow third party rights or obligations under the Shareholder's Agreement.*

FGL and Scot Smith bargained to keep the Shareholder's Agreement personal to them. In Section 30.1, the agreement provides: "This agreement is made for the benefit of the parties and their successors and permitted assigns and is not intended to benefit, or be enforceable by, anyone else."[19] This is a reasonable choice by sophisticated parties. It is one that has implications under English law. As Firexo, Inc. noted in its memorandum in opposition: Under English law, "third parties have no rights or obligations under a contract to which they are not a party unless the contract expressly provides otherwise."[20]

---

[19]    Shareholder's Agreement § 30.1, RE 15-1, Page ID # 234.

[20]    Pl.'s Mem. in Opp'n to Def.'s Mot. Challenging the Court's Jurisdiction § C, RE 17, Page ID ## 268–70 (citing Contracts (Rights of Third Parties) Act 1999 §§ 1(a), 1(b), 2, 3 (Eng.)) *available at* http//www.legislation.gov.uk/ukpga/1999/31/contents (last visited March 23, 2023)).

### 1.4   *The parties omitted Firexo, Inc. as a signatory to the Shareholder's Agreement.*

Although it existed in August 2019, Firexo, Inc. was not a party to the Shareholder's Agreement.[21] In fact, Firexo, Inc. is mentioned only once in the agreement.[22] To that point, according to Mr. Smith, he and "FGL did not intend to bind Firexo, Inc. to any provision of the Shareholder's Agreement or to confer any rights on Firexo, Inc. under that Agreement."[23]

This was FGL's standard practice: it bifurcated the investment from the distribution.[24] This meant territories could have two parties (an investor and a distributor) or one party (an investor who is also a distributor).[25] Regardless, each territory had two components (and two agreements): investment and distribution.[26]

---

[21] Whether Firexo, Inc. became a party to the agreement would have been a question for David Breith as he was the sole shareholder of Firexo, Inc. until seventy shares were transferred to Scot Smith as provided in the Shareholder's Agreement. *See* Joint Statement § 1.A, RE 15, Page ID # 209 ("The original incorporator and sole original shareholder of [Firexo,] Inc. was David Breith....").

[22] *See* Shareholder's Agreement § 3.1, RE 15-1, Page ID # 220.

[23] Decl. of Scot Smith ¶ 7, RE 17-1, Page ID # 273.

[24] *Id.* ¶ 3, RE 17-1, Page ID # 271.

[25] *Id.*

[26] *Id.*

1.5    *Provisions of the Shareholder's Agreement relevant to this appeal.*

To summarize, four sections of the Shareholder's Agreement between Scot Smith

and FGL are relevant to this appeal. They are:

| SECTION NO. | FULL TEXT OF PROVISION |
| --- | --- |
| Section 23.1[27] | No variation of this agreement shall be effective unless it is in writing and signed by the parties (or their authorised representatives). |
| Section 30.1[28] | This agreement is made for the benefit of the parties and their successors and permitted assigns and is not intended to benefit, or be enforceable by, anyone else. |
| Section 33.1[29] | This agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the laws of England and Wales. |
| Section 33.2[30] | Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement or its subject matter or formation. |

---

[27]    Shareholder's Agreement § 23.1, RE 15-1, Page ID # 232.

[28]    *Id.* § 30.1, RE 15-1, Page ID # 234.

[29]    *Id.* § 33.1, RE 15-1, Page ID # 235.

[30]    *Id.* § 33.1, RE 15-1, Page ID # 235.

## 2.    Firexo, Inc. and FGL enter an oral distribution agreement.

After executing the Shareholder's Agreement (joint venture investment), the parties resolved to discuss distribution, i.e., the commercial relationship between Firexo, Inc. and FGL.[31]

To discuss distribution possibilities, the parties (Smith for Firexo, Inc. and Breith for FGL) met in Port Clinton, Ohio in mid-August 2019.[32] Before Firexo, Inc. could become the US distributor, Mr. Breith "wanted to be satisfied that Firexo, Inc. had

---

[31]    Decl. of Scot Smith ¶ 4, RE 17-1, Page ID # 271–72.

[32]    *Id.* ¶¶ 4–5, RE 17-1, Page ID # 271–72. The record does not address why the parties did not reduce the distribution component to a written agreement. According to Smith, the parties discussed and agreed to terms such as the price of products, storage, consumer sale, and logistics. *Id.* They further discussed these matters after Breith returned to England. *Id.* Without providing any detail on Mr. Breith's trip to Port Clinton, or explaining how the fundamental terms related to a commercial distribution relationship would have otherwise been established, FGL simply disputed, without further explanation, that any separate distribution agreement existed, stating that the Shareholder's Agreement is "the only agreement Group ever entered regarding the distribution of its products in the United States." *See, e.g.,* Decl. of Peter Coyle ¶ 5, RE 16-1, Page ID # 259; Def.'s Answer to Pl.'s First Am. Compl. ¶¶ 8–9, RE 11, Page ID # 60.

access to adequate warehouse space for storage and distribution of FGL's fire extinguishing products."[33] Mr. Breith's weeklong visit satisfied him, leading to the oral distribution agreement between Firexo, Inc. and FGL.[34]

For the rest of 2019, Firexo, Inc. cordoned off warehouse space, hired employees and established relationships with potential American buyers.[35] Using its own funds, Firexo, Inc. ordered products from FGL,[36] marketing those products to American buyers.[37] It received the first product shipment from FGL in early 2020.[38] All was well until August 2020.

---

[33]  Decl. of Scot Smith ¶ 4, RE 17-1, Page ID # 272.

[34]  *Id.*

[35]  Decl. of Scot Smith ¶ 5, RE 17-1, Page ID # 272.

[36]  FGL admits that Firexo, Inc. "paid to purchase fire extinguishers for distribution and sale in the United States." Def.'s Answer to Pl.'s First Am. Compl. ¶ 44, RE 11, Page ID # 64.

[37]  *Id.* Mr. Smith was quite clear in his declaration that Firexo, Inc. was the party financing all distribution efforts in the United States. Decl. of Scot Smith ¶ 5, RE 17-1, Page ID # 272. No funds from either FGL or himself personally (after any initial investment capital). *See also* Pl.'s Am. Compl. ¶¶ 15–34, RE 9, Page ID ## 49–51.

[38]  Pl.'s Am. Compl. ¶¶ 15–17, RE 9, Page ID # 49.

### 3.    Quality issues with FGL's products.

Firexo, Inc. stored its fire extinguisher inventory in its Port Clinton warehouse. In August 2020, Firexo, Inc. staff detected "corrosion on the threaded portion of the top spray assembly" of certain classes of FGL fire extinguishers.[39] This corrosion could weaken the connection between an extinguisher's nozzle and body, possibly causing the top to pop off violently. Firexo, Inc. sent pictures and reports to FGL.[40] Back-and-forth discussions ensued, without resolution. "Rather, FGL attempted to minimize the problem and insisted that Firexo [, Inc.] should continue selling its products throughout the United States."[41]

On January 19, 2021, Firexo, Inc. was notified of the first American field failure of FGL's product. A customer reported hearing a "popping" sound during the night; the next morning, the customer found the top assembly jammed into a ceiling tile.[42] The next day ( January 20, 2021), Firexo, Inc. notified its distributors, retailers and

---

[39]  *Id.* ¶ 21, RE 9, Page ID # 50.

[40]  *Id.* ¶ 22, RE 9, Page ID # 50.

[41]  *Id.* ¶ 25, RE 9, Page ID # 50.

[42]  Pl.'s Am. Compl. ¶ 30, RE 9, Page ID # 51.

known retail clients of the issue, requesting that all end users discontinue using the products and return the products to Firexo, Inc.[43]

More field failures came in. Given the reports, Firexo, Inc. hired counsel to complete a formal report with the Consumer Product Safety Commission (CPSC).[44] Throughout this time, FGL failed to engage meaningfully with Firexo, Inc. in its efforts to recall FGL's products.[45] Firexo, Inc. bore all the costs including attorney's fees for the recall.[46]

After Firexo, Inc. filed its CPSC recall report, FGL did agree to repair the extinguishers in Firexo, Inc.'s inventory, picking them up via common carrier at Firexo, Inc.'s Port Clinton, Ohio warehouse.[47] But, FGL never returned the fire extinguishers to Firexo, Inc.[48]

---

[43] *Id.* ¶ 33, RE 9, Page ID # 51.

[44] *Id.* ¶¶ 35–42, RE 9, Page ID ## 51–52.

[45] *Id.*

[46] Pl.'s Am. Compl. ¶ 45, RE 9, Page ID # 52.

[47] *Id.* ¶ 42, RE 9, Page ID # 52.

[48] *Id.* ¶ 43, RE 9, Page ID # 52. To this date, Firexo, Inc. does not know where its purchased extinguishers are or whether FGL repaired the extinguishers. *See* Pl.'s Am. Compl. ¶¶ 42–43, RE 9, Page ID # 52.

4.    **Issues with the product claims that FGL made about its fire extinguishers and fire-extinguishing liquid.**

The product failures also led to concern about FGL's product-specific claims. Acting on that concern, Firexo, Inc. inquired into whether FGL's products had the European certification (EN-3) FGL claimed.[49] Firexo, Inc. also questioned the environmental claims FGL made about its fire-extinguishing liquid.[50]

Problems with the product claims alarmed Firexo, Inc. For one, based on FGL's repeated representations, Firexo, Inc. had notified its distributors and retailers that EN-3 certification had been secured and that United Laboratories (UL) certification was imminent.[51] Most (if not all) commercial and wholesale clients will only purchase fire extinguishers with UL certification, which was imperative to growing the American market.[52] By the time of the product recall in 2021, the UL certification

---

[49]  Pl.'s Am. Compl. ¶¶ 19, 52, RE 9, Page ID ## 49, 53; *see also* Decl. of Scot Smith, ¶ 6, RE 17-1, Page ID # 272. As a Firexo, Inc. shareholder and as a FGL shareholder, Scot Smith was **personally** concerned about these claims. For his individual concerns, he has brought an individual securities fraud case in the US. He also has pending breach-of-contract and conspiracy claims against FGL and David Breith in the English High Court. Joint Statement, RE 15, Page ID # 211.

[50]  Pl.'s Am. Compl. ¶ 49, RE 9, Page ID # 53.

[51]  *Id.* ¶ 19, RE 9, Page ID # 49.

[52]  *Id.* ¶¶ 11–12, RE 9, Page ID # 48–49.

process was in tatters, suffering from delays and missteps that Firexo, Inc. attributed to FGL's misrepresenting "its expertise and capacity to develop fire extinguishing products capable of securing UL certification."[53]

## 5. Litigation begins.

### 5.1 *Firexo, Inc. files suit in Ottawa County, Ohio against FGL.*

Unable to resolve its disputes with FGL, Firexo, Inc. filed suit in state court in October 2021.[54] In the complaint, Firexo alleged four causes of action:

1. Breach of the oral distribution agreement between Firexo, Inc. and FGL;

2. Breach of the warranties of merchantability and fitness;

3. Breach of the duty of good faith and fair dealing; and,

4. Fraud and misrepresentation.[55]

---

[53]  *Id.* ¶ 51, RE 9, Page ID # 53.

[54]  Pl.'s Comp., RE 1-1, Page ID ## 9–18.

[55]  *Id.* ¶¶ 64–67, RE 1-1, Page ID # 17. In Plaintiff's Amended Complaint, Firexo, Inc. reduced its causes of action to three, removing the third original cause of action (breach of good faith and fair dealing). *See* Pl.'s Am. Compl. ¶¶ 64–67, RE 9, Page ID # 56.

Firexo, Inc. alleged no cause of action related to or arising out of Smith's and FGL's Shareholder's Agreement. The entire complaint was predicated on Firexo, Inc.'s oral agreement with FGL,[56] which removed the case to federal court.[57]

### 5.2   *FGL files suit in England against its joint venture partners.*

Around mid-2021, FGL communicated to its only joint venture partners—Scot Smith in the US and a Swedish company, Rafax AB, in the Nordics—that FGL was imminently planning an initial public offering on the Nasdaq.[58] A dispute arose about the consideration due to the joint venture parties if FGL made a public offering.[59] Despite back-and-forth correspondence, they did not resolve the dispute.

In July 2021, FGL filed suit in the English High Court against Smith and Rafax.[60] FGL did not name Firexo, Inc. in its complaint. FGL sought an expedited declaratory judgment that the relevant section of both agreements entitled Smith and Rafax to a smaller share of FGL's post-IPO shares.

---

[56]   Pl.'s Compl. ¶¶ 8–19, RE 1-1, Page ID # 10–11.

[57]   Notice of Removal, RE 1, Page ID ## 1–4.

[58]   Joint Status Report § F, RE 12, Page ID ## 71–2.

[59]   *Id.*

[60]   *Id.* § F.ii, RE 12, Page ID # 72. The English High Court is akin to a district court in the federal system.

FGL's original claims have been resolved—in Smith's and Rafax's favor.[61] In June 2022, the High Court granted summary judgment to Smith and Rafax on their interpretation of the agreements at issue (including the Shareholder's Agreement).

Firexo, Inc. is not involved in the English High Court case, which is still pending.

### 5.3   *Smith's federal securities fraud case.*

In December 2021, Scot Smith filed a securities fraud case in the Northern District of Ohio.[62] In that case, Smith alleged Ohio and federal securities violations arising out of his purchase of FGL shares. That case remains pending. Firexo, Inc. is not a party to that litigation.

### 6.   FGL **files its motion to dismiss.**

### 6.1   *FGL's and Firexo, Inc.'s written arguments.*

In August 2022, FGL asked the district court to dismiss this case.[63] FGL argued that Firexo, Inc., a non-signatory to the Shareholder's Agreement whose claims did

---

[61]   *Id.* § F, RE 12, Page ID # 71. To date, the English High Court, under its cost-shifting rules, has ordered FGL to pay Smith and Rafax over $200,000 to compensate for their legal fees in defending the English case. *See* Joint Status Report, § F.ii, RE 12, Page ID # 73.

[62]   *See* Joint Status Report § F.ii, RE 12, Page ID # 73.

[63]   Def.'s Mot. to Dismiss Pl.'s Am. Compl. for Lack of Jurisdiction, RE 16, Page ID ## 247–59.

not arise out of that agreement, was nevertheless bound by the agreement's forum-selection clause[64] and therefore must bring its claims in the courts of England & Wales.[65]

According to FGL, the forum-selection clause was (1) enforceable against Firexo, Inc. because its dispute with FGL was "closely related" to the Shareholder's Agreement; and, (2) Firexo, Inc.'s alleged oral distribution agreement was inoperable because it neither altered the forum-selection clause's enforceability nor could it modify the Shareholder's Agreement due to that agreement's no-modifications clause.[66]

To support its position, FGL provided a one-page declaration from Peter Coyle, FGL's general counsel.[67] Mr. Coyle's declaration did not address the circumstances under which FGL and Firexo, Inc. agreed to terms and conditions surrounding the distribution of FGL products. Instead, Mr. Coyle addressed Firexo, Inc.'s al-

---

[64]  Shareholder's Agreement § 33.2, RE 15-1, Page ID # 235

[65]  Def.'s Mot. to Dismiss Pl.'s Am. Compl. for Lack of Jurisdiction, RE 16, Page ID # 247.

[66]  *Id.* § II, RE 16, Page ID ## 248–55.

[67]  *See id.* Ex. 1, RE 16-1, Page ID # 259.

leged formation of an oral agreement in one sentence, stating: "The JVA [Shareholder's Agreement] is the only agreement Group [FGL] ever entered regarding the distribution of its products in the United States."[68]

In its motion, FGL dismissed the oral agreement by saying "there is no evidence the terms of the purported oral agreement differ from the written [Shareholder's Agreement]."[69] That was the first instance in which FGL raised an evidentiary challenge to the oral, distribution agreement between Firexo, Inc. and FGL. By appending Mr. Coyle's declaration to its motion, FGL created a disputed issue of fact underlying the motion.[70]

---

[68] *Id.* ¶ 5, RE 16-1, Page ID # 259.

[69] *See* Def.'s Mot. to Dismiss, RE 16, Page ID # 254.

[70] This becomes critical when one considers what type of motion FGL filed. It was captioned a "Motion to Dismiss … for Lack of Jurisdiction" but did not cite under what authority the motion derived. Was it under FED. R. CIV. P. 12 as implied in the Joint Status Report filed on June 30, 2022? *See* Joint Statement, RE 12, Page ID # 70. If it was a Rule 12 motion, was it based on deficiencies with subject matter jurisdiction (Rule 12(b)(1)), venue (Rule 12(b)(3)), or failure to state claim upon which relief can be granted (Rule 12(b)(6))? Neither FGL nor the district court resolved this latent ambiguity. *See* Order on Mot. to Dismiss, RE 19, Page ID # 502 (noting only that "FGL moves to dismiss for lack of jurisdiction").

In its response, Firexo, Inc. first noted that the district court should consider this a motion to dismiss for improper venue under Fed. R. Civ. P. 12(b)(3) where "the court must consider the pleadings and affidavits in a light most favorable to the plaintiff."[71]

Turning to the merits, Firexo, Inc. responded that (1) the Shareholder's Agreement was inapplicable to Firexo, Inc. under English law; (2) the agreement was unenforceable under the CRAF test;[72] and, (3) the oral distribution agreement between Firexo, Inc. and FGL governed this dispute—not Smith's and FGL's Shareholder's Agreement.[73] As FGL created a disputed issue of fact with Mr. Coyle's declaration, Firexo, Inc. likewise provided a declaration from Scot Smith, in which he outlined the circumstances surrounding the formation of the oral distribution agreement with FGL.[74] Following the execution of the Shareholder's Agreement, Smith (acting for Firexo, Inc.) and Breith (acting for FGL) met in person in Port Clinton, Ohio where

---

[71]  Pl.'s Mem. in Opp'n to Def.'s Mot. Challenging the Court's Jurisdiction n.1, RE 17, Page ID # 261.

[72]  The closely-related-and-foreseeable test.

[73]  Pl.'s Mem. in Opp'n to Def.'s Mot. Challenging the Court's Jurisdiction, RE 17, Page ID ## 260–73.

[74]  *See* Decl. of Scot Smith ¶¶ 3–6, RE 17-1, Page ID ## 271–72.

they separately discussed and agreed to distribution between Firexo, Inc. and FGL.[75]

As Smith noted: "Over the course of these discussion, I was directly involved but acted solely as a director of Firexo, Inc. I did not act in any individual capacity."[76]

### 6.2   *The district court grants FGL's motion to dismiss.*

For the district court, whether Firexo, Inc. is bound by the terms of the Shareholder's Agreement "turn[ed] on whether Firexo[, Inc.] is 'closely related' to the [Shareholder's Agreement] and the resulting contract dispute."[77]

The district court recognized that courts in the Sixth Circuit apply "a common sense, totality of the circumstances approach"[78]—in other words a fact-intensive inquiry—when deciding whether to *enforce* forum selection clauses against non-signatories. It then adopted the four factors that the Fifth Circuit articulated in *Franlink v. BACE Services, Inc.*:[79] (1) common ownership between the signatory and non-signa-

---

[75]   *Id.*

[76]   *Id.* ¶ 4, RE 17-1, Page ID # 272.

[77]   Order Granting Mot. to Dismiss p. 2, RE 19, Page ID # 503.

[78]   *Id.*

[79]   50 F.4th 432, 442 (5th Cir. 2022); *see also id.* 50 F.4th at 439–441 (discussing sister circuits' use of the CRAF test).

tory; (2) non-signatory's direct benefit from the contract at issue; (3) the non-signatory's knowledge of the agreement generally; and, (4) its awareness of the forum selection clause particularly.[80]

Before starting its analysis, the district court noted Firexo, Inc.'s two arguments "in its attempt to sidestep the forum-selection clause: (1) the [Shareholder's Agreement] is not binding because Firexo, Inc. was not a party to that agreement [applicability]; and (2) an oral exclusive distributorship agreement between Firexo, Inc. and FGL controls this dispute" [disputed issue of fact].[81] It did not address the applicability component or the effect of choice-of-law provision in the Shareholder's Agreement. Instead, it went directly to enforceability, collapsing its analysis into that sole component, using the CRAF test as a framework.[82]

---

[80] Order Granting Mot. to Dismiss p. 3, RE 19, Page ID # 504.

[81] *Id.* (cleaned up).

[82] *Id.* p. 3–6, RE 19, Pages ID ## 504–507.

To apply the CRAF test, the district court: (1) cited six undisputed facts[83] derived from the Joint Statement[84] and (2) wrote that "[t]hese undisputed facts check each of the four [*Franlink*] factors listed above ...."[85]

The order moved to Firexo, Inc.'s argument that FGL and Smith, as sophisticated parties, intended the Shareholder's Agreement to be only personal to them by including this express language: "This agreement is ... not intended to benefit, or be enforceable by, anyone else."[86] Without considering whether English law should govern this interpretation question,[87] the district court assumed that "anyone else"

---

[83] *Id.* The district court incorrectly described the first undisputed fact. It wrote: "The JVA [Shareholder's Agreement] created Firexo [, Inc.], the joint venture between Smith and FGL." *Id.* However, Firexo, Inc. "was an existing Florida corporation" when Smith and FGL executed the shareholder's agreement, to which Firexo, Inc. was not a signatory. Joint Statement § I.B, RE 15, Page ID # 210.

[84] Joint Statement, RE 15, Page ID # 209–11.

[85] Order Granting Mot. to Dismiss p. 4, RE 19, Page ID # 505. The district court's analysis consisted of 27 words, including reciting the four factors. In contrast, the Fifth Circuit in applying its four factors to the two non-signatories in *Franlink* utilized 670 words. *See Franlink*, 50 F.4th at 442–43.

[86] Shareholder's Agreement § 30.1, RE 15-1, Page ID # 234

[87] English law governed the Shareholder's Agreement between FGL and Smith. Shareholder's Agreement § 33.1, RE 15-1, Page ID # 235

meant "third-party beneficiary," and moved on.[88] It then turned to the disputed issue of fact, the oral distribution agreement.

While Firexo, Inc. alleged a separate "sole distributorship agreement … corroborated by an affidavit from Smith that states he and Breith met … and verbally agreed to all of the essential terms of distribution, including ordering, warehousing, and pricing", the district court believed the oral agreement "fare[d] no better."[89] Without noting the factual dispute FGL created, the court held that Shareholder's Agreement's no-oral-modification clause controls, relying on the Seventh Circuit's *Hugel* opinion. In *Hugel*, the Seventh Circuit rejected a non-signatory's argument "that a separate oral agreement, made by their director, governed their dispute."[90] Because the oral agreement in *Hugel* "was so 'intertwined with the [written agreement]' … it could not 'be considered a separate unrelated contract.'"[91] "Although Smith and

---

[88]  Order Granting Mot. to Dismiss p. 4, RE 19, Page ID # 505, ("But multiple courts have held that a party need not be a third-party beneficiary in order to be bound by a forum-selection clause.").

[89]  Order Granting Mot. to Dismiss p. 5, RE 19, Page ID # 506.

[90]  *Id.*

[91]  *Id.* (citing *Hugel*, 99 F.2d at 209).

Breith may have discussed specifics [at their Port Clinton meeting], the [Shareholder's Agreement] covered the entire scope of dealings between the parties."[92]

It therefore erroneously dismissed the case because Firexo, Inc. was "so 'closely related' to the dispute between Smith and FGL, it was 'foreseeable' that it will be bound by the [Shareholder's Agreement's] forum-selection clause."[93]

<div align="center">

### Summary of the Argument

</div>

As the district court noted: this case "stems from a business deal gone bad."[94] But the operative question is: *which business deal between which parties governed by which contract analyzed under which standard of review?*

FGL did not classify the nature of its motion or what standard of review the court should have employed. True, FGL discussed factors related to *forum non conveniens* but offered nothing on the court's standard of review. This is critical, especially since FGL introduced a contested issue of fact by adding Peter Coyle's declaration.

---

[92] *Id.* p. 6, RE 19, Page ID # 507. The Shareholder's Agreement does cover the dealing between FGL and Smith—just not between FGL and Firexo, Inc.

[93] Order Granting Mot. to Dismiss p. 6, RE 19, Page ID # 507 (citing *Hugel*, 999 F.2d at 209).

[94] *Id.* p. 1, RE 19, Page ID # 502.

Firexo, Inc. noted the lack of standard in its memorandum in opposition. Whatever standard the district court ought to have employed, its Order neither presented nor adopted any standard of review. This error is not harmless because FGL created a disputed issue of fact—one the court should have resolved before proceeding to discussions of enforceability.

The district court's order had a one-component inquiry into one contract and one set of parties: whether the forum-selection clause in Smith's and FGL's Shareholder's Agreement was enforceable against Firexo, Inc. That one-component inquiry oversimplified the analysis. The district court should have addressed two distinct components—not just one—as other courts in this Circuit and in other circuits have: (1) the applicability of the Shareholder's Agreement to Firexo, Inc. and its claims using the law of the contract; then, (2) the enforceability of that clause under the CRAF test using federal law.

**APPLICABILITY.** The applicability of a forum-selection clause to the parties and claims is a separate and independent inquiry using the law of the contract.[95]

---

[95] This Court has not yet spoken on what law should apply when considering applicability. Circuits that have spoken have mandated using the law of the contract (whether state or foreign) to interpret a contract. *See, e.g., Martinez v. Bloomberg LP*, 740 F.3d 211 (2nd Cir. 2014). District courts in this Circuit have used the

Firexo, Inc. invited the district court to consider applicability.[96] Had the district court accepted Firexo, Inc.'s invitation, this case would be pending in that court, not a court of appeals. Why? The Shareholder's Agreement does not apply to Firexo, Inc.

As two sophisticated commercial parties, Smith and FGL foreclosed Firexo, Inc.'s legal connection to their Shareholder's Agreement by:

1. agreeing that their Shareholder's Agreement was "not intended to benefit, or be enforceable by, anyone else; and,

2. excluding Firexo, Inc. (an existing entity that Mr. Breith controlled at the time of contract) as a signatory to the Shareholder's Agreement; and

3. including a choice-of-law clause selecting English law to govern the "agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation."

Points (1) and (2) closed the door to binding non-signatories under Point (3).

---

law of the contract. *See Walker v. AMVAC Chemical Corporation*, 4:17-CV-17, 2018 WL 5023417, at *4 (E.D. Tenn. 2018).

[96]  *See* Pl.'s Mem. in Opp'n to Mot. to Dismiss, RE 17, Page ID # 268 ("A court must determine whether a forum selection clause is applicable to a non-signatory before it can determine whether the clause should be enforced.").

Under English law, contracts are not enforceable by or against non-signatories.[97]

Smith and FGL did not intend the Shareholder's Agreement to be enforceable by

third parties and Firexo, Inc. is not a signatory to the Shareholder's Agreement.

Therefore, under English law, Firexo, Inc. cannot activate the Shareholder's Agree-

ment—only Smith and FGL can. If Firexo, Inc. cannot activate the agreement, it

seems hardly possible for the agreement *to be activated against* Firexo, Inc.

**ENFORCEABILITY**. The CRAF test is settled federal law. Unsettled, though, is

what "closely related" means.[98] The district court adopted the Fifth Circuit's four

*Franlink* factors. (*Franlink* itself did not address issues of applicability.[99]) Its analysis

of *Franlink* and the other CRAF enforceability cases was flawed. The district court

---

[97] *See, e.g., Drive Yourself Hire Co (London) Ltd v. Strutt*, [1954] 1 QB 250, 272 (UKHC) *cited in* UK Law Commission, *Privity of Contract: Contracts for the Benefit of Third Parties* §1.1, RE 17-2, Page ID # 306 (**UK Law Commission Report**).

[98] *See, e.g., Dos Santos v. Bell Helicopter Textron, Inc.*, 651 F. Supp. 2d 550, 556 (N.D. Tex. 2009) (noting the CRAF test sits in "an area of the law dominated by generalized statements that provide little guidance").

[99] *Franlink*, 50 F.4th at 438–41; *see Dynamic CRM Recruiting Solutions, L.L.C. v. UMA Education, Inc.*, 31 F.4th 914, 917–18 (5th Cir. 2022) (applying the law of the forum, i.e., the law of the contract, to issues of interpretation). The court noted that the parties' choice-of-law provision mandated the law of the forum, Texas. *Id.* at 918.

discounted (1) key factual disputes (i.e., the oral distribution agreement), (2) the source of Firexo, Inc.'s claims, which neither rely nor depend on the Shareholder's Agreement, (3) Firexo, Inc.'s posture (i.e., a non-signatory having the clause *invoked against* it), and (4) the limited, indirect benefit, if any at all, Firexo, Inc. received from the Shareholder's Agreement. These factors distinguish Firexo, Inc. from the non-signatories in the cases the district court cited. Rather, like this Court held in *Baker v. LeBoeuf*,[100] Firexo, Inc. was not "closely related" to the Shareholder's Agreement.

In sum, the district court failed to identify any standard of review, discounted disputed issues of fact material to a proper analysis of Firexo, Inc.'s claims, improperly collapsed applicability and enforceability into one inquiry, failed to recognize or apply English law to construe the parties' shareholder agreement, and misapplied the federal CRAF enforceability cases on which it relied.

Due to the Order's infirmities in framing and analysis, this Court should reverse the Order and remand this case for additional proceedings.

---

[100]  *Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102, 1105–06 (6th Cir. 1997)

## ARGUMENT

"The enforceability of a forum selection clause is a question of law that [this Court] reviews *de novo*."[101] As to reviewing the applicability of a forum-selection clause to the resisting party and that party's claims, this Court has not yet ruled. But the Court has held that it "review[s] de novo any decisions concerning choice-of-law and forum-selection clauses."[102] Other circuits review a forum-selection clause's applicability, a matter of contract interpretation, *de novo*.[103]

Finally, as this Court may construe FGL's motion as one grounded in *forum non conveniens* (despite the motion caption), this Court gives "substantial deference to district court decisions that **get the process right**—that account for all of the relevant public and private interest factors. Fresh review applies to questions of law, such as whether an adequate alternative forum exists."[104]

---

[101] *Baker*, 105 F.3d at 1104 (citing *Shell v. R.W. Sturge, Ltd.*, 55 F.3d 1227, 1229 (6th Cir. 1995)); *Wong v. Partygaming Ltd.*, 589 F.3d 821, 826 (6th Cir. 2009) ("We review the enforceability of a forum selection clause de novo.").

[102] *Stone Surgical, LLC v. Stryker Corp.*, 858 F.3d 383, 388 (6th Cir. 2017).

[103] *See, e.g., Franlink*, 50 F.4th at 438 ("Matters of contract interpretation are reviewed *de novo*."); *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2nd Cir. 2007) (same).

[104] *Prevent USA Corp. v. Volkswagen AG*, 17 F.4th 653, 658 (6th Cir. 2021) (cleaned up) (emphasis added).

This Court should reverse the district court's judgment for three reasons:

(1)  The district court erred by:

    a.  not identifying a standard for the motion or for the disputed issue of fact FGL created in the motion; and, then,

    b.  not analyzing the parties' evidentiary submissions under an appropriate standard to make a finding of fact about the oral distribution agreement;

(2)  The district court collapsed its analysis into one component: *enforceability*, declining Firexo, Inc.'s invitation (and recent federal case law) to determine if the forum-selection clause even applied to Firexo, Inc. under the law of the contract (English law); and,

(3)  The district court analyzed the forum selection clause's enforceability using the CRAF test but without giving attention to Firexo, Inc.'s claims (not arising under the Shareholder's Agreement), posture (a non-signatory plaintiff against whom another invoked the clause), and non-foreseeability (given the Shareholder's Agreement clearly did not apply to Firexo, Inc. under English law).

We explain each reason below. But Firexo, Inc. would note that the reasons for reversal are independent, not necessarily cumulative. This Court could reverse the

district court's judgment based on any one of the foregoing reasons, all of which both separately and cumulatively evidence reversible error.

### 1. The district court failed to determine and apply a proper standard of review to address the disputed issue of fact FGL created.

FGL captioned its motion as one "to dismiss … for lack of jurisdiction."[105] It did not specify what type of jurisdiction, subject matter or personal. It did not cite a rule statute, or doctrine from which its motion derived its authority. It did not suggest the standard of review for the district court to employ when considering the disputed issue of fact FGL created.[106]

---

[105] Def.'s Mot. to Dismiss, RE 16, Page ID # 247. FGL's motion appears predicated on *forum non conveniens*. If so, it wasn't about a "lack of jurisdiction." Dismissal under *forum non conveniens* is discretionary, where a court declines to exercise the jurisdiction it has. *Associação Brasileira de Medicina v. Stryker Corp.*, 891 F.3d 615, 618 (6th Cir. 2018) (Under *forum non conveniens*, "a federal trial court may **decline** to exercise its jurisdiction, even though the court has jurisdiction and venue….") (emphasis added).

[106] This matters because motions under Rule 12 and motions under *forum non conveniens* oblige different standards of review. *Compare Tacket v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (noting when and upon what notice the district court may convert a Rule 12(b)(6) motion into one for summary judgment) *with Lakeside Surfaces, Inc. v. Cambria Co. LLC*, 16 F.4th 209, 215 (6th Cir. 2021) (noting that with a valid and enforceable forum-selection clause, courts only weigh the public factors).

Firexo, Inc. objected to FGL's motion to dismiss for lack of jurisdiction by specifically noting that a "challenge to place of filing based on a forum selection clause is an issue of proper venue rather than jurisdiction" and therefore the court "must consider the pleadings and affidavits in a light most favorable to the plaintiff."[107] Firexo, Inc. put the district court on notice of that issue. While this Court foreclosed the use of FED. R. CIV. P. 12(b)(3) in *Kerobo*,[108] the district court was obligated to determine the proper standard of review after determining the proper basis for the underlying motion. It failed to carry out these duties in deciding the motion.[109]

The district court did not mention its standard of review or, importantly, how it would deal with the disputed issue of fact FGL created when it appended Mr. Coyle's

---

[107] Pl.'s Memo. of Law in Opp'n n.1, RE 17, Page ID # 261.

[108] *Kerobo v. Southwestern Clean Fuels, Corp.*, 285 F.3d 531, 536 (6th Cir. 2002) (holding that Rule 12(b)(3) is improper vehicle for dismissal if state case is properly removed to the district designated in 28 U.S.C. § 1441).

[109] *See, e.g., Heil v. Nationwide Life Ins. Co.*,9 F.3d 107 at *3, 1993 WL 428861 (6th Cir. 1993) (noting "[i]t was the district court's duty to determine … what standard of review is appropriate"); *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir.1996) (standard of review is a determination that the court makes for itself); *Worth v. Tyer,* 276 F.3d 249, 262 n. 4 (7th Cir.2001) ("[T]he court, not the parties, must determine the standard of review, and therefore, it cannot be waived.").

declaration to its motion.[110] After recognizing Firexo, Inc. provided corroborative detail via Smith's Declaration refuting Mr. Coyle's Declaration, the district court made no fact findings and failed to meaningfully consider the disputed fact issues. Instead, the court focused on the Shareholder's Agreement between Smith and FGL.[111] Citing the no-oral-modification clause, the district court relied on *Hugel*'s perceived similarity and held that "the [shareholders agreement] covered the entire scope of dealings between the parties" and that "any oral agreement was so intertwined with the written agreement that it could not be considered a separate unrelated contract."[112] That line of inquiry failed to consider whether, for purposes of the motion, the oral distribution agreement existed based on the competing declarations.[113] Given the critical role disputed issues of fact can play, other courts of appeals have held that a district court must have an evidentiary hearing when presented with contested factual issues.[114]

---

[110] *See* Order Granting Mot. to Dismiss, RE 19, Page ID ## 502–07.

[111] Order Granting Mot. to Dismiss, RE 19, Page ID # 506.

[112] *Id.* (cleaned up).

[113] *See* Tr. 15:22–18:2, RE 23, Page ID # 526–28 (district court's discussion about the oral distribution agreement).

[114] *See Martinez*, 740 F.3d at 216–17.

The district court erred by not meaningfully addressing the disputed issue of fact. This Court should reverse its judgment on that ground alone.[115]

## 2. Combining applicability and enforceability frustrated Smith's and FGL's choice of English law to govern their contract.

The district court oversimplified its analysis by focusing completely on the question of enforceability.[116] Collapsing applicability and enforceability together is out-of-line with the growing trend among federal courts,[117] which independently assess applicability to give effect to parties' legitimate intent when forming their contract. Although this Court has never mandated a distinct applicability step—or a set analytical framework, its *Baker* opinion recognized that the "first inquiry is whether the forum selection clause [in the contract] **even applies** ...."[118]

---

[115] *Id.*

[116] Order Granting Mot. to Dismiss pp. 3–4, RE 19, Page ID # 504–05.

[117] *See In re McGraw-Hill Global Educ. Holdings LLC*, 909 F.3d 48, 58 (3rd Cir. 2018) ("The question of the scope of a forum selection clause is an analytically distinct concept from the enforceability of that clause.").

[118] *Baker*, 105 F.3d at 1105 (emphasis added). The *Baker* Court analyzed the contract at issue under federal law without suggesting it must, presumably because the choice of law was not an issue in the case and, as the Court noted, the law of the forum state was the same as federal law. *Id.* at 1105–06.

In the hearing below, FGL asserted that "no court in the United States has ever conducted" an analysis of applicability under the law of the contract before proceeding to enforceability.[119] Not so. In fact, many circuits routinely employ that analysis, as have district courts in this Circuit.[120]

### 2.1 *Other circuits have recognized two distinct analytical components, using the law of the contract to interpret and federal law to enforce forum-selection clauses.*

The Second Circuit, for example, concluded that applicability raises issues involving contract interpretation where a court's task is to "ensure that the meaning given to a forum selection clause corresponds with the parties' legitimate expectations" and therefore, "courts must apply the law contractually chosen by the parties to interpret the contract."[121] The *Martinez* court discussed the policy reasons and *Erie* considerations supporting its decision.[122] It noted that for *Erie* purposes: "Contract

---

[119] Tr. 28:24–29:7, Re 23, Page ID ## 539–40.

[120] *See, e.g., Walker v. AMVAC Chemical Corporation*, 4:17-CV-17, 2018 WL 5023417, at *4 (E.D. Tenn. 2018) ("[A]fter considering the development of federal law in this area, the Court finds a forum selection clause's contractual validity to be an issue separate from, and preliminary to, the enforceability issue.").

[121] *Martinez*, 740 F.3d at 220.

[122] *Id.* at 220–22.

law—including rules governing contract interpretation—is quintessentially substantive for *Erie* purposes, and therefore primarily the realm of the states."[123] And, if the contract selects foreign law, like in *Martinez*, the conclusion remains because that court could "find no authority for federal courts to generate general rules of contract interpretation where the contracting parties have expressly selected another body of law …."[124]

*Martinez* described the four-step framework and the law governing each:[125]

| STEP | ACTION | GOVERNING LAW |
|------|--------|---------------|
| 1 | Determine whether the clause was reasonably communicated to the party resisting enforcement. | Federal law |
| 2 | Determine whether the clause is "mandatory" or "permissive". | Law of the contract: parties' choice or state law |
| 3 | Determine whether the *claims* and *parties* involved in the suit are subject to the forum selection clause. | Law of the contract: parties' choice or state law |

---

[123] *Id.* at 221.

[124] *Id.* at 221–22.

[125] *Martinez*, 740 F.3d at 217.

| STEP | ACTION | GOVERNING LAW |
|------|--------|---------------|
| | ➤ If the forum selection clause (1) was communicated to the resisting party, (2) has mandatory effect, and (3) covers the claims and parties in the dispute, then it is presumptively enforceable.<br><br>➤ Next, consider step four, where the resisting party bears the burden. | |
| 4 | Determine whether resisting party made a "sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause is invalid for such reasons as fraud or overreaching."[126] | Federal law |

Other circuits have also recognized two separate components, where state law applies in interpreting the forum-selection clauses and agreements in which they appear.[127]

---

[126] *Id.* (quoting *M/S Bremen v. Zapata*, 407 U.S. 1, 15 (1972)).

[127] See, e.g., *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 185 (3rd Cir. 2017); *Dunne v. Libbra*, 330 F.3d 1062, 1064 (8th Cir. 2003); *Milanovich v. Costa Crociere, S.P.A.*, 954 F.2d 763, 767 (D.C. Cir. 1992); *Brenner v. Nat'l Outdoor Leadership Sch.*, 20 F. Supp. 3d 709, 718 (D. Minn. 2014). *But see Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 513 (9th Cir. 1988) (choosing to use federal law to interpret forum selection clauses).

While the Tenth Circuit has mandated federal for questions of enforceability,[128] it has applied the law of the contract to resolve interpretive questions (like whether a clause is "mandatory" or "permissive").[129] In *Yavuz v. 61 MM Ltd.*, the Tenth Circuit was faced with an agreement that contained a combined choice-of-law and forum-selection clause pointing to Swiss law and Switzerland.[130] Before analyzing the lower court's motion, it had to determine what effect to give the choice-of-law provision. Working through the Supreme Court's reasoning in a line of cases related to enforcing provisions in international commercial agreements,[131] the Tenth Circuit ended at the same conclusion in the choice-of-law context: "[W]e now hold that under federal law the courts should ordinarily honor an international commercial agreement's forum-selection provision as construed under the law specified in the agreement's choice-of-law provision."[132]

---

[128] *See Riley v. Kingsley Underwriting Agencies*, 969 F.2d 953, 957 (10th Cir. 1992).

[129] *Yavuz v.61 MM, Ltd.*, 465 F.3d 418, 431 (10th Cir. 2006) (directing the district court on remand to interpret contract under Swiss law, the law the parties chose).

[130] *Id.* at 427.

[131] *Id.* at 428–31.

[132] *Id.* at 430. The *Wong* court cited *Yavuz*. This fact does not mean the *Wong* court declined to adopt *Yavuz*'s two-components approach because applicability was not an issue before the *Wong* court. *See infra* note 153.

In the Seventh Circuit, for "contracts containing a choice of law clause … the law designated in the choice of law clause would be used to determine the validity of the forum selection clause."[133] In *Abbott Laboratories v. Takeda Pharmaceutical Company Ltd.*, the Seventh Circuit considered an agreement "governed by the laws of the State of Illinois," first noting that the court must determine whether federal or state law governs the validity and interpretation of forum-selection clauses.[134] Writing for the court, Judge Posner discussed the advantages and disadvantages of using federal law and state law. In the end, he noted that:

> Simplicity argues for determining the validity and meaning of a forum selection clause, in a case in which interests other than those of the parties will not be significantly affected by the choice of which law is to control, by reference to the law of the jurisdiction whose law governs the rest of the contract in which the clause appears.[135]

---

[133] *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 775 (7th Cir. 2014).

[134] *Abbot Laboratories*, 476 F.3d 421, 423 (7th Cir. 2007) (noting that the Court left this question unanswered in a prior case, *IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.*, 437 F.3d 606, 609 (7th Cir. 2006)).

[135] *Id.* at 423 (Posner, J.).

Later Seventh Circuit cases have followed suit, concluding that questions of interpretation are governed under the law the parties' chose (or state law), and questions of enforceability under federal law.[136]

In 2016, the Fifth Circuit discussed this tension between the law governing *applicability* and the law governing *enforceability*.[137] In *Barnett v. DynCorp International, L.L.C.*, the Fifth Circuit considered whether applying federal or Texas choice-of-law rules to a contract with choice-of-law (Kuwaiti) and forum-selection (Kuwait) clauses.[138] "Neither the Supreme Court nor [the Fifth Circuit] has said what source of law governs the 'validity' of a forum-selection clause."[139]

The court discussed the options. For one, that court has never drawn a distinction between "validity" and "enforceability," treating them as two sides of the same

---

[136] *See, e.g., IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union*, 512 F.3d 989, 991 (7th Cir. 2008); *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 776 (7th Cir. 2014)("In contracts containing a choice of law clause, therefore, the law designated in the choice of law clause would be used to determine the validity of the forum selection clause.").

[137] *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 301–03 (5th Cir. 2016).

[138] *Barnett*, 831 F.3d at 300–01.

[139] *Id.* at 301.

coin.[140] It then discussed potential tension with the Supreme Court's decision in

*Stewart Organization, Inc. v. Ricoh Corp.*, where the Supreme Court reversed a district

court's decision denying enforcement of a forum-selection clause because Alabama

law disfavored them.[141] Although *Stewart* is arguably distinguishable because it in-

volved a transfer under 28 U.S.C. §1404(a), the Fifth Circuit noted *Stewart*'s rea-

soning.[142] On the other hand, it noted, other circuits had separated applicability and

enforceability. And, the appellee "provide[d] no satisfying theoretical explanation for

excepting forum-selection clauses from the general rule that state law governs con-

tractual 'validity[.]'"[143] In the end, because it didn't control the case, the *Barnett*

court left the issue for another day.[144]

That day came in April 2022. In *Dynamic CRM Recruiting Solutions, L.L.C. v.

UMA Education, Inc.*, the Fifth Circuit held that "[a]lthough the enforceability of a

forum selection clause in a diversity case such as this one is governed by federal law,

---

[140]  *Id.*

[141]  *See Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30–31 (1988).

[142]  *Barnett*, 831 F.3d at 303.

[143]  *Id.*

[144]  *Id.* at 304.

the clause's interpretation is governed by the law of the forum state …."[145] Though decided after *Dynamic CRM*, *Franlink* does not affect *Dynamic CRM*'s holding because *Franlink* analyzed the forum-selection clause as the sole basis of personal jurisdiction over the non-signatories,[146] a distinction this Court also noted applied between its *Wong* and *Preferred Capital* opinions.[147]

Finally, the Fourth Circuit applied the law governing the contract (English law) to determine whether a forum-selection clause was "mandatory" or "permissive."[148] This is curious since the Fourth Circuit earlier in the opinion wrote that a federal court "interpreting a forum selection clause must apply federal law in doing so."[149] Nevertheless, the Fourth Circuit used English law (which differed from federal law[150]) to "give effect to the parties' selection" and proceeded to enforceability using

---

[145]  31 F.4th 914, 917–18 (5th Cir. 2022).

[146]  *Franlink*, 50 F.4th at 442–44.

[147]  *See Wong*, 589 F.3d at 828 n.6.

[148]  *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 648, 650–51 (4th Cir. 2010).

[149]  *Id.* at 650.

[150]  The interpretive question concerned whether the clause was "mandatory" or "permissive". Under English law, the clause was "mandatory;" under federal common law it was "permissive."

federal common law.[151] Perhaps, as *Martinez* noted, the confusion arises from "courts' tendency to blur the distinction between *enforceability* and *interpretation*."[152]

### 2.2 *This Court should adopt two distinct components in its analysis of forum-selection clauses: applicability and enforceability.*

At the outset, we note that *Wong* does not prevent this Court from adopting two distinct components. Firstly, the parties in *Wong* did not present any issues of clause applicability—only enforceability.[153] Secondly, this Court's *Wong* opinion implicitly recognized the distinction by citing cases from its sister courts that employ two distinct components and use the parties' choice, if any, for applicability and federal law for enforceability.[154] For example, this Court cited *Phillips v Audio Active Ltd.*, where

---

[151] *Albemarle Corp.*, 629 F.3d at 650–51. This inconsistency in the Fourth Circuit's opinion has caused issues in its district courts. *See, e.g., Grant v. State National Insurance Company, Inc.*, 586 F. Supp. 3d 503, 510 (D.S.C. 2022) (applying federal law even though *Albemarle Corp.* did not); *but see Melo v. Zumper, Inc.*, 439 F. Supp. 2d 683, 696–701 (E.D. Va. 2020) (applying Virginia to contract formation interpretative issues but federal law to forum-selection clause interpretative issues).

[152] *Martinez*, 740 F.3d at 222.

[153] *Wong v. Partygaming Ltd.*, Case No. 1:06-CV-02376, 2008 WL 4449436, at *1 (N.D. Ohio 2008) ("Plaintiffs acknowledge that they agreed to the forum selection clause.").

[154] *See Wong*, 589 F.3d at 827 n.5.

Second Circuit opinion noted as dicta: "Without the benefit of briefing by the parties on this issue, we cannot understand why the interpretation of a forum selection clause should be singled out for application of any law other than that chosen to govern the interpretation of the contract as a whole."[155] Thirdly, *Wong* only spoke of the important factors relating to the procedural aspect of the forum-selection clause, where federal interests are at their zenith.[156] And, finally, *Wong* has already recognized a non-enforceability-related distinction: state law governs interpretation when the forum-selection clause is the sole basis for personal jurisdiction.[157] On this last point, there is a conflict between *Wong* and *Franlink* (whose four factors the district court used). In *Franlink*, the forum-selection clause served as the sole basis for personal jurisdiction against the non-signatories, where the Fifth Circuit used *federal* law in analyzing that issue.[158]

---

[155] *Phillips v. Audio Active Ltd.*, 494 F.3d at 386.

[156] *Wong*, 589 F.3d at 827.

[157] *Id.* at 828, n.6 (noting that enforceability under *Wong* does not affect the analysis outlined in *Preferred Capital, Inc. v. Sarasota Kennel Club, Inc.*, 489 F.3d 303 (6th Cir. 2007)).

[158] *Franlink*, 50 F.4th at 442–44; *see also Wong*, 589 F.3d at 828 n.6 (noting that *Wong* did not affect its holding in *Preferred Capital*, where this Court applied Ohio law when the forum-selection clause was the sole basis of personal jurisdiction).

Policy issues and *Erie* considerations support this Court's recognizing two distinct components: applicability and enforceability. This approach "reconciles respect for contracting parties' legitimate expectations with other important federal policies."[159] It also does not run afoul of the Supreme Court's strong public policy of supporting the enforcement of forum-selection clauses to preserve orderliness, predictability, and uniformity, especially in international contexts.[160] And, importantly, it comports with the "constitutional architecture in which the federal judiciary's common-law-making power is confined to 'restricted' areas where 'a federal rule of decision is necessary to protect uniquely federal interests' or where 'Congress has given the courts the power to develop substantive law.'"[161] *Erie* makes clear that courts should avoid creating a "federal general common law" of contracts.[162] What a contractual provision *means* and its *effect* are substantive; how federal courts

---

[159] *Martinez*, 740 F.3d at 218.

[160] *See, e.g., Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (Kennedy, J., concurring).

[161] *Martinez*, 740 F.3d at 221 (quoting *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)).

[162] *Erie R.R. Co v. Tompkins*, 304 U.S. 64, 78 (1938).

decide to *enforce* those provisions to decline exercising their jurisdiction is procedural.[163]

This Court should join the Second Circuit (and the Tenth, Eighth, Seventh, Fifth and Fourth Circuits) by recognizing two components concerning forum-selection clauses: applicability governed by the law of the contract and enforceability governed by federal law.

Had the district court first considered applicability under English law (law of the contract), this case would be still on its active docket because the Shareholder's Agreement did not apply to Firexo, Inc. under English law.

### 2.3   *The forum-selection clause in Smith's and FGL's Shareholder's Agreement does not apply to Firexo, Inc. under English law.*

Writing in 1915, the House of Lords stated: "[I]n the law of England certain principles are fundamental. One is that only a person who is a party to a contract can sue on it."[164] More recently, in 2013, the UK Supreme Court has underscored this bedrock principle:

---

[163] *See, e.g., Associação Brasileira de Medicina v. Stryker Corp.*, 891 F.3d 615, 618 (6th Cir. 2018) (under *forum non conveniens*, "a federal trial court may **decline** to exercise its jurisdiction, even though the court has jurisdiction and venue….") (emphasis added).

[164] *Dunlop Pneumatic Tyre Co. v. Selfridge and Co.*, [1915] A.C. 847, 853 (UKHL).

> Subject to some other rule (such as that of undisclosed principal), where B and C are the contracting parties and A is not, there is simply no justification for holding A responsible for B's contractual liabilities to C simply because A controls B and has made misrepresentations about B to induce C to enter into the contract.[165]

The authoritative treatise on English contract law, CHITTY ON CONTRACTS, puts it very simply: "The general rule is that a contract binds only the parties to it. This rule is regarded as an aspect of the doctrine of privity; … A and B cannot by a contract between them impose an obligation to perform duties arising under that contract on C."[166]

So unbending is this principle that the UK parliament had to enact legislation to soften it. Under the Contracts (Rights of Third Parties) Act 1999, a third party may

---

[165] *VTB Capital plc v Nutritek Int'l Corp.*, [2013] 2 A.C. 337, 387 ¶¶ 139–140 (UKSC) (Lord Neuberger, J.).

[166] CHITTY ON CONTRACTS (34th ed.2021) at § 20-147.

enforce a contract to which it is not a party when "the term purports to confer a benefit on him,"[167] **unless** "it appears that the parties **did not intend** the term to be enforceable by the third party."[168]

As sophisticated parties, both Smith and FGL would have reasonably understood this truism. When they selected English law to govern the Shareholder's Agreement, Smith and FGL, *as a matter of law*, precluded binding Firexo, Inc. Binding Firexo, Inc. would have been simple. They could have done it with the a few keystrokes: including Firexo, Inc. as a signatory. (At the time of contracting, Firexo, Inc. was still wholly owned by David Breith, FGL's CEO.[169]) As an English company, FGL reasonably knew or should have known the consequence of selecting English law and precluding Firexo, Inc. as a signatory. That decision rendered the Shareholder's Agreement inapplicable to Firexo, Inc.

---

[167] Contracts (Rights of Third Parties) Act 1999, § 1 (Eng.) *available at https://www.legislation.gov.uk/ukpga/1999/31/contents* (last visited March 27, 2023). Of note, that Act does not suggest that a third-party may be bound by an agreement it did not sign. *See, e.g.,* UK Law Commission Report § 14.5 p. 161, RE 17-2, Page ID # 466.

[168] Contracts (Rights of Third Parties) Act 1999, § 2 (Eng.) (emphasis added).

[169] Pl.'s Memo. of Law in Opp'n, RE 17, Page ID ## 261–62; Joint Statement, RE 15, Page ID # 209 ("The original incorporator and sole original shareholder of [Firexo, Inc.] was David Breith.").

To sum up, this Court should follow the growing trend by recognizing that applicability and enforceability are two separate and independent components. Applicability, an interpretative exercise, should use the law governing the contract. Enforceability, as discussed in *Wong*, should use federal law.[170] As the Second Circuit noted, it boils down to this: "Applying federal law to construe a forum selection clause could frustrate the contracting parties' expectations by giving a forum selection clause broader or narrower scope in a federal court than it was intended to have."[171] And, that is exactly what happened in the district court's order.

Only two sophisticated parties—Scot Smith and FGL—executed the Shareholder's Agreement. Firexo, Inc. did not. Could it have? Yes. But, Smith and FGL did not include it. That Shareholder's Agreement was "not intended to benefit, or be enforceable by, anyone else."[172] English law governed the Shareholder's Agreement.[173] And, under English law, the Shareholder's Agreement could not bind Firexo, Inc. By concluding differently, the district court expanded the scope of the forum-selection clause beyond Smith's and FGL's objective intent.

---

[170] *See Wong*, 589 F.3d at 828.

[171] *Martinez*, 740 F.3d at 220.

[172] Shareholder's Agreement § 30.1, RE 15-1, Page ID # 234.

[173] *Id.* § 33.1, RE 15-1, Page ID # 235.

The inquiry should have ended with applicability. Supposing it does not, though, the forum-selection clause is unenforceable under the CRAF test.

## 3. The forum-selection clause is unenforceable against Firexo, Inc. under the CRAF test.

### 3.1 *Firexo, Inc. and its claims are not "closely related" to the Shareholder's Agreement.*

Although citing other cases in passing, the district court relied primarily on, in its view, the "nearly identical case, *Hugel v. Corp. of Lloyds*."[174] It found dispositive similarity because "the two companies of which Hugel was president, chairman, and majority shareholder—asserted that the forum-selection clause [that Hugel signed] was not binding on them."[175] Also, in *Hugel*, "the non-signatory plaintiffs argued that a separate oral agreement governed their dispute."[176] And the Seventh Circuit held that any oral agreement was "intertwined with the [written agreement]" so that it could not be "considered a separate unrelated contract."[177]

Despite the district court's reliance, *Hugel* is distinguishable for three reasons.

---

[174] Order Granting Mot. to Dismiss for Lack of Jurisdiction, RE 19, Page ID # 505 (citing *Hugel v. Corp. of Lloyds*, 999 F.2d 206 (7th Cir. 1993)).

[175] *Id.*

[176] *Id.*, RE 19, Page ID # 505.

[177] *Id.*, RE 19, Page ID # 506 (citing *Hugel*, 999 F.2d at 209).

- Firstly, in *Hugel*, the non-signatory companies' claims arose out of Hugel's and Lloyd's agreement, which contained the forum-selection clause;[178] Firexo, Inc.'s claims do not and could not because, under English law, Firexo cannot activate that agreement.[179] The same is true under federal law because the agreement made abundantly clear that it could be enforced only by Smith and FGL. Furthermore, Firexo's Amended Complaint does not reference or rely on the Shareholder's Agreement to support any claim. Simply, "the [Shareholder's Agreement was] not implicated by plaintiff's claims."[180]

- Secondly, Hugel injected the two non-signatory companies into his relationship with Lloyd's.[181] Notably, the court in *Hugel* undertook a detailed analysis of the agreement containing the forum selection clause and concluded that its terms bore directly on the resolution of Hugel's claims.[182] Here, Firexo, Inc.

---

[178] *Hugel*, 999 F.2d at 207 (Plaintiffs "filed suit … seeking damages from Lloyd's alleged breach of contract, breach of fiduciary duty, invasion of privacy….").

[179] *See* Pl.'s Am. Compl., RE 9, Page ID ## 47–56; *see, e.g., Dunlop Pneumatic Tyre Co. v. Selfridge and Co.*, [1915] A.C. 847, 853 (UKHL).

[180] Pl.'s Mem. in Opp'n, RE 17, Page ID # 268.

[181] *Id.* at 210 ("Hugel alone involved his two controlled corporations and supplied information allegedly belonging to those corporations.").

[182] *Hugel*, 999 F.2d at 208–09.

never invoked the Shareholder's Agreement at Scot Smith's (or anyone else's) direction—for good reason: the Shareholder's Agreement is, well, a shareholder's agreement "broadly address[ing] corporate governance by shareholders…" providing no basis for Firexo, Inc.'s claims.[183] Similarly, the district court failed to identify any term of the Shareholder's Agreement that served as a predicate for resolution of any claim asserted by Firexo, Inc. in its Amended Complaint.

- Finally, although Smith was Firexo, Inc.'s president and majority shareholder, Smith was not "closely related" to Firexo, Inc.'s *dispute* with FGL. Said differently, removing both Smith and the Shareholder's Agreement would not alter the nature or viability of Firexo, Inc.'s claims against FGL. True, he would be a fact witness; but his control and ownership had no connection whatsoever with Firexo, Inc.'s claims in this case. FGL and the district court made hay from Scot Smith being "the majority shareholder and Executive Officer of Firexo, [Inc.] and directing this lawsuit."[184] In connection with Firexo, Inc.'s

---

[183] Pl.'s Mem. in Opp'n, RE 17, Page ID # 267 ("In short, the [Shareholder's Agreement] does nothing more than define the rights and obligations of the signatories as shareholders.").

[184] Order Granting Mot. to Dismiss, RE 19, Page ID # 504; Mot. to Dismiss for Lack of Jurisdiction, RE 19, Page ID # 251–52.

dispute with FGL, Smith was acting as a corporate officer in Firexo, Inc.'s best interests by filing suit after attempts to resolve the dispute failed.[185] He was not acting as a Firexo, Inc. investor seeking to sidestep his Shareholder's Agreement with FGL.

The other cases that the district court cited are likewise inapposite, especially using a "common sense, totality of the circumstances approach."[186]

The district court cited *Manetti-Farrow, Inc. v. Gucci America, Inc.* as support.[187] But in *Manetti-Farrow*, the non-signatories' (Gucci subsidiaries and family members) alleged conduct was the lynchpin, being so closely related to the contract containing the forum-selection clause (a franchise and development agreement between Manetti-Farrow and Gucci Parfums).[188] Furthermore, the *Manetti-Farrow* court

---

[185] *See* Decl. of Scot Smith, RE 17-1, Page ID # 273 (describing all the activities Firexo, Inc. undertook in its own name, using employees, like Smith).

[186] *Reagan v. Maquet Cardiovascular U.S. Sales LLC*, Case No. 1:14-CV-548, 2015 WL 521049, at * 3 (N.D. Ohio 2015).

[187] Order Granting Mot. to Dismiss, RE 19, Page ID # 505 (citing *Manetti-Farrow v. Gucci America, Inc.*, 858 F.2d 509, 514 n.4 (9th Cir. 1988)).

[188] *Id.*

stated explicitly that "[w]hether a forum selection clause applies to tort claims depends on whether resolution of the claims related to interpretation of the contract [containing the forum selection clause]."[189]

Here, the non-signatory's conduct, that of Firexo, Inc., bears no relationship to the Shareholder's Agreement—Firexo, Inc.'s claims arose out of FGL product faults, where the claims derived from a separate, distribution agreement, which Firexo, Inc. pled from the start.[190] What's more, the non-signatories in *Manetti-Farrow* **invoked** the forum-selection clause.[191] Firexo, Inc. never did. "It is one thing to expand the scope of a forum selection clause to encompass individuals who are actively seeking its benefits. It is quite another to expand the scope … to bind unwilling, non-signatories who want nothing to do with it."[192]

---

[189] *Id.* at 514. *See also Hugel*, 999 F.2d at 208–209 (rejecting plaintiff's contention that his claims did not require interpretation of the agreement containing a forum selection clause and analyzing in detail the terms of the agreement that bore on the resolution of those claims).

[190] *See* Pl.'s Am. Compl. ¶¶ 21–43, RE 9, Page ID # 50–52.

[191] *Manetti-Farrow*, 858 F.2d at 511–12.

[192] John F. Coyle & Robin J. Effron, *supra* note 3, at 209–10; *see also Franlink*, 50 F.4th at 440–41 (noting that critical comments about CRAF test).

As for the other cases the district court cited, the following are distinguishable because in each instance the plaintiff's claims arose out of and were predicated upon the agreement with the forum-selection clause:

- *Petti v. Fraker*, 2020 WL 13460640, at *12 (N.D. Ohio 2020) ("Most of the pending claims allege in some form or fashion a breach of the distributorship agreements.");

- *Marano Enterprises of Kansas v. Z-Teca Restaurants*, 254 F.3d 753, 754 (8th Cir. 2001) (claims were predicated on a breach of the franchise and development agreement containing forum-selection clause); and,

- *Lipcon v. Underwriters at Lloyd's London*, 148 F.3d 1285, 1288–89, 1299 (11th Cir. 1998) (plaintiffs-signatories brought claims arising out of the agreement containing forum-selection clause).

As for invoked-*by*-the-non-signatory cases, the district court discussed (and dismissed) one—*Baker*. In *Baker*, this Court stopped a non-signatory from invoking the forum-selection clause because the plaintiff's dispute arose out of legal representation for US tax purposes—nothing to do with the underlying agreement containing the forum-selection clause.[193] Even though the law firm had a power of attorney from

---

[193] *Baker*, 105 F.3d at 1105–06.

Lloyd's (a signatory), the law firm was out of luck because the plaintiff's claim did not allege that the law firm committed acts "as agents of Lloyd's;"[194] thus, the plaintiff's claim did not seek any relief touching the agreement containing the forum-selection clause. It is the same here: Firexo, Inc.'s claims here are not "integrally related" to the Shareholder's Agreement. Yes, that agreement mentioned Firexo, Inc. but it contained no basis for Firexo, Inc. to claim relief, assuming for argument's sake, it, as a non-signatory, could even look to that agreement. *Baker* got it right then and now.

### 3.2    *Even if Firexo, Inc. and its claims were "closely related," it was unforeseeable that FGL could invoke the clause against Firexo, Inc.*

To be bound, "closely related" is one part. The other is "foreseeability" of the forum-selection clause.[195] Adopting the Fifth Circuit's *Franlink* factors, the district court wrote that the undisputed[196] facts it cited "check each of the four factors."[197] But that missed the point about awareness.

---

[194]  *Id.* at 1106.

[195]  Order Granting Mot. to Dismiss, RE 19, Page ID # 504 (quoting *Franlink*, 50 F.4th at 442).

[196]  *See supra* note 83 (noting the district court's first "undisputed" fact was incorrect).

[197]  *Id.*, RE 17, Page ID # 505.

Firexo, Inc. may have indeed been aware of the forum-selection clause in the Shareholder's Agreement. Even so, its awareness was couched by the simple fact that, under black-letter English law, the forum-selection clause did not apply to it.[198] That was as the parties to the Shareholder's Agreement intended. And, moreover, how could being aware of an inapplicable contractual provision under the law of the contract make its invocation against you foreseeable?[199] Applying a "common sense, totality of the circumstances approach," it would not.[200] In circuits employing two distinct components of analysis for forum-selection clauses (applicability and enforceability), the inquiry would stop well before the Fifth Circuit's *Franlink* factors became relevant—like it would in the Fifth Circuit itself.[201]

---

[198] *See supra* notes 240–42.

[199] Nor was it foreseeable that Firexo, Inc., a separate corporate entity incorporated in the United States, acting under a separate contract for the distribution and sale of FGL products only in the United States, marketing and selling to retailers, consumers and others solely in the United States, subject solely to consumer and product safety laws of the United States, and maintaining offices, employees, and warehousing facilities solely in the United States, would be bound by a forum selection clause requiring it to litigate claims in the United Kingdom predicated on a shareholder's agreement to which it was not a party, from which it received no direct beneficial right or interest, and under which no claims have been or could be asserted in support of the relief sought in this litigation.

[200] *Reagan*, 2015 WL 521049 at *3.

[201] *See supra* note 145.

Having the Shareholder's Agreement's forum-selection invoked (and enforced) against it was an unforeseeable consequence to Firexo, Inc. The district court therefore erred in holding otherwise.

## Conclusion

For these reasons, this Court should reverse the judgment of the district court and remand this case for further proceedings.

To guide the district court on remand, this Court should hold that: (1) the district court must define its standard of review for adjudicating FGL's motion; (2) two distinct components arise in analyzing whether to bind a non-signatory with a forum-selection clause: applicability governed by the law of the contract and enforceability governed by federal common law; and (3) this analysis is a predicate in determining whether to decline exercising otherwise proper jurisdiction and venue.

Respectfully submitted,

*/S/ Paul Belazis*

Paul Belazis

Malone, Ault & Farrell
7654 W. Bancroft Street
Toledo, Ohio 43617
(419) 843–1333 TEL
(419) 843–3888 FAX
*belazis@maf-law.com*

*Attorney for Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared in 14-point Equity, a proportionally-spaced typeface. This brief contains 12,273 words, as calculated by my word processing software, excluding statements and other content specified in FEDERAL RULE OF APPELLATE PROCEDURE 32(f) and 6TH CIR. R. 32(b).

/S/ Paul Belazis
_____
PAUL BELAZIS

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2023, a copy of this brief was served on counsel of record for all parties through the Court's CM/ECF system.

/S/ Paul Belazis
_____
PAUL BELAZIS

## Designation of Relevant District Court Documents
### Case Nᵒ 3:21-CV-2336

| DESCRIPTION | RECORD ENTRY NO. | PAGE ID # RANGE |
|---|---|---|
| Notice of Removal | 1 | 1–18 |
| Plaintiff's Amended Complaint | 9 | 47–57 |
| Defendant's Answer to Plaintiff's the First Amended Complaint | 11 | 59–68 |
| Joint Stipulations | 14 | 83–87 |
| Joint Statement | 15 | 209–211 |
| Shareholder's Agreement between Firexo Group Limited (FGL) and Scot Smith | 15-1 | 213–237 |
| Defendant's Motion to Dismiss the Amended Complaint for Lack of Jurisdiction | 16 | 247–257 |
| Declaration of Peter Coyle | 16-1 | 259 |
| Plaintiff's Memorandum in Opposition to Defendant's Motion Challenging the Court's Jurisdiction | 17 | 260–270 |
| Declaration of Scot Smith | 17-1 | 271–273 |
| UK Law Commission, *Privity of Contract: Contracts for the Benefit of Third Parties* | 17-2 | 298–500 |
| Order Granting Motion to Dismiss | 19 | 502 – 507 |
| Judgment Entry | 20 | 508 |
| Notice of Appeal | 21 | 509–510 |
| Transcript of Motion to Dismiss Proceedings | 23 | 512–541 |

# Addendum

| DESCRIPTION | PAGE |
|---|---|
| *Drive Yourself Hire Co (London) Ltd v. Strutt*, [1954] 1 QB 250, (UKHC) | A001–A030 |
| *Dunlop Pneumatic Tyre Co. v. Selfridge and Co.*, [1915] A.C. 847 (UKHL) | A031–A049 |
| *VTB Capital plc v Nutritek Int'l Corp.*, [2013] 2 A.C. 337 (UKSC) | A050–A127 |
| CHITTY ON CONTRACTS § 20-147 | A128–A129 |

250    QUEEN'S BENCH DIVISION.    [**1954**]

C. A.

1953

HOUGHTON
*v.*
TRAFALGAR
INSURANCE
CO. LD.

ROMER L.J.    I also agree.    I think that it would be most regrettable if a provision of this kind were held to have the force for which the defendants contend.    It would be a serious thing for a motorist involved in a collision if he were told that the particular circumstances of the accident excluded him from the benefit of the policy.    I think that any clause or provision that purports to have that effect ought to be clear and unambiguous so that the motorist knows exactly where he stands.    This provision is neither clear nor unambiguous.    If applied to a private motor-car I have not the least idea what it means.    Accordingly, for that reason, and the reasons which my Lords have given, I agree that the appeal should be dismissed.

*Appeal dismissed.*

Solicitors: *R. I. Lewis & Co.; Hewitt, Woollacott & Chown.*

A. W. G.

---

1953
*Mar.* 9, 30.

Lynskey J.

C. A.

*Oct.* 28, 29,
30; *Nov.* 2,
3, 4, 24.

Somervell,
Denning and
Romer L.JJ.

DRIVE YOURSELF HIRE CO. (LONDON) LD. *v.*
STRUTT AND ANOTHER.

[1952 D. No. 332.]

*Landlord and Tenant—Rent restriction—Claim for possession—Lease—Covenant not to assign without consent—Sublease with consent of landlord—Assignment of sublease with consent of superior landlord to a company for the use and occupation of a named person—Assignment to that person with consent only of sublessor—Whether assignee a lawful subtenant entitled to protection of Rent Acts—Restrictive covenant—Contract—Benefit to third party—Third party's right to sue—Covenant respecting property—Increase of Rent and Mortgage Interest (Restrictions) Act, 1920 (10 & 11 Geo. 5, c. 17), ss. 12 (1) (f) (g), 15 (3)—Rent and Mortgage Interest Restrictions (Amendment) Act, 1933 (23 & 24 Geo. 5, c. 32), s. 3 (1) and Sch. I, paras. (a) and (d).*

A lease for a term of 20 years from November 11, 1931, contained a covenant not to assign, underlet or part with possession of the premises without the consent of the landlord.    In April, 1932, the landlord granted a licence to the first defendant, the tenant under the lease, for the creation of a sublease to expire on November 10, 1951, one day before the expiry of the headlease.    The licence provided that the sublease should contain a covenant that the sublessee

[Reported before Lynskey J. by Mrs. E. M. WELLWOOD,
Barrister-at-Law.]

**1 Q.B.**              QUEEN'S BENCH DIVISION.                    251

should not assign without the consent of the superior landlord. The sublease, containing the covenant, was duly executed. The superior landlord was not a party to the sublease and the power of re-entry and determination of the sublease for breach of covenant was reserved to the first defendant alone. In January, 1937, with the consent of the first defendant and the superior landlord, the sublessee assigned the remainder of the term of the sublease to a company. In February, 1951, the first defendant permitted the company to assign the balance of the sublease to the second defendant. The consent of the superior landlord to the assignment was not asked for or obtained. The second defendant continued in occupation of the premises after the expiry of the sublease and of the headlease.

The plaintiffs, the successors in title of the original superior landlord, brought proceedings for possession against both defendants, who relied on section 15 (3) of the Increase of Rent and Mortgage Interest (Restrictions) Act, 1920 :—

*Held*, by Lynskey J., that the second defendant became the tenant under section 15 (3) and was entitled to the protection of the Act.

On appeal by the plaintiffs :—

*Held*, that the definition of subtenant in section 15 (3) should be construed as covering an assignee of a subtenant; that the second defendant was therefore a subtenant, but in order to claim the protection of section 15 (3) he must establish that all the steps which led up to the assignment to him were lawful; and that there having been a breach, either by the first defendant or by the company, of the covenant, inserted for the protection of the superior landlord in the sublease, not to sublet without the consent of the superior landlord being first obtained, the assignment to the second defendant was not lawful; and that the plaintiffs were entitled to possession.

*Per* Denning L.J. It was an implied term of the contract between the superior landlord and the first defendant that she should not release the subtenants from the obligation to obtain the consent of the superior landlord to any assignment. If she did release the company from that obligation she was herself acting unlawfully. If there was no such term to be implied the action of the company in breach of the covenant in their sublease was unlawful. They deliberately broke a covenant which was inserted for the benefit of the superior landlord. Such a breach was unlawful, although the superior landlord was not a party to the instrument. The case seems to me to fall precisely within the words of section 56 of the Law of Property Act, 1925, which says that " A " person may take . . . the benefit of any . . . covenant . . . respect-" ing land or other property, although he may not be named as a " party to the . . . instrument," and did away with the rule in *Tweddle* v. *Atkinson* (1861) 1 B. & S. 393 in cases respecting property.

Decision of Lynskey J. [1953] 2 W.L.R. 953; [1953] 1 All E.R. 1036 reversed.

*Right margin:*

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

252                    QUEEN'S BENCH DIVISION.             **[1954]**

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

ACTION for possession.

The plaintiffs' predecessor in title, one A. S. R. Payne, leased a first-floor flat, No. 1, Chester Close, London, S.W.1, to the first defendant, Miss Emily Strutt, for a term of 20 years from November 11, 1931, at a rental of £150 per annum. The lease contained a covenant by which the first defendant undertook not to assign, underlet or part with possession of the premises without the consent of the landlord, such consent not to be unreasonably withheld. The lease also contained a power of re-entry on any breach of covenant. On April 20, 1932, the first defendant granted a sublease of the premises to a Mrs. Dorothy Sykes for a term of 10 years, which was later extended so as to make the term of the sublease expire on November 10, 1951, the day before the expiry of the headlease. The rental payable under the sublease was £200 per annum. The superior landlord gave his consent to the creation of that sublease in a licence which provided that the sublease should contain a covenant by the sublessee not to assign, underlet or part with possession of the premises without the consent of the superior landlord; that the licence was to be restricted to the sublease then created; and that the covenant in the headlease against assignment or underlettings should remain in full force and effect. The sublease duly contained the covenant against assignment as directed by the licence. The superior landlord was not a party to the sublease and the power of re-entry and determination for breach of covenant was reserved only to the first defendant.

On January 26, 1937, Mrs. Sykes assigned the sublease to Wroxall Estates Ld., a company which had been formed to manage the estates of the second defendant, Commander James George Grenville Dugdale, who was the managing director of the company. The superior landlord consented to that assignment by a licence which provided specifically for the use and occupation of the premises by the second defendant. In 1950, when it was proposed to wind up the company, solicitors for the second defendant informed the first defendant that Wroxall Estates Ld. wished to assign the sublease to the second defendant and inquired whether it was necessary under the terms of her lease to obtain the permission of the superior landlords—then the Drive Yourself Hire Company (London) Ld., the plaintiffs. The first defendant considered that the superior landlords' consent was not necessary and this was confirmed by her solicitors in a letter dated January 1, 1951. On February 28,

**1 Q.B.**              QUEEN'S BENCH DIVISION.                    253

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

1951, the first defendant granted a licence to the company consenting to their assignment to the second defendant of the unexpired residue of the term of the sublease and the assignment was duly executed on May 21, 1951. The second defendant remained in occupation of the premises after the expiry of the sublease on November 10, 1951, and after the expiry of the headlease on November 11, 1951.

The plaintiffs brought proceedings against both defendants alleging that the first defendant had failed to deliver up possession on the expiry of the term of her lease and that the premises were wrongfully occupied by the second defendant. The first defendant, in her defence, contended that having, with the licence in writing of the plaintiffs' predecessor in title, created a sublease which was lawfully assigned to Wroxall Estates Ld. and thereafter lawfully assigned by that company to the second defendant, who resided in the premises, the second defendant was entitled to the protection of the Rent and Mortgage Interest (Restrictions) Acts, 1920–39; that upon the expiry of the subterm on November 10, 1951, he had retained possession of the premises as statutory tenant for one day against the first defendant as his immediate landlord, and after the expiry of the first defendant's term against the plaintiffs as reversioners; that he still retained possession of the premises and that she was thereby prevented by the operation of the Rent Acts from delivering up possession of the premises to the plaintiffs. The second defendant, in his defence, relied on the facts set out above and claimed the protection of section 15 (3) of the Increase of Rent and Mortgage Interest (Restrictions) Act, 1920.[1]

By their reply the plaintiffs alleged that the assignment by Wroxall Estates Ld. to the second defendant was unlawful as it had been made without their consent as superior landlords and in breach of an express or implied agreement contained in, or to be inferred from, the licence to sublet by the first defendant, not to consent to the assignment of the sublease without enforcing the covenant in the sublease which required the sublessee to obtain the plaintiffs' consent to any assignment of that sublease.

---

[1] Increase of Rent and Mortgage Interest (Restrictions) Act, 1920, s. 15 (3): " Where the interest of a tenant " of a dwelling-house to which this " Act applies is determined, either as " the result of an order or judgment " for possession or ejectment, or for " any other reason, any subtenant to " whom the premises or any part " thereof have been lawfully sublet " shall, subject to the provisions of " this Act, be deemed to become the " tenant of the landlord on the same " terms as he would have held from " the tenant if the tenancy had " continued."

254            QUEEN'S BENCH DIVISION.        **[1954]**

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.
———

The plaintiffs further contended that if the Rent Acts applied they were entitled to possession under section 3 (1) and paras. (*a*) and (*d*) of the First Schedule to the Rent and Mortgage Interest Restrictions (Amendment) Act, 1933.

*L. J. Belcourt* for the plaintiffs.
*D. J. Hyamson* for the first defendant.
*Montague Waters* for the second defendant.

*Cur. adv. vult.*

March 30.  LYNSKEY J.  The plaintiffs' title to the reversion of the lease, as successors in title to Arthur Samuel Roberts Payne, was admitted by both defendants.  The questions, therefore, which I have to consider are : (1) Was the second defendant in lawful occupation of the premises on November 11, 1951? (2) If so, was he a tenant to whom the premises had been lawfully sublet?

If the answers to both these questions were in the affirmative, with the result that the Rent Acts would apply to the occupancy of the second defendant, further questions would arise, namely : (3) Had there been a breach or non-performance of the obligations of the lease or the sublease?    (4) Had the premises been let without the consent of the landlord?    (5) Would it be reasonable to make an order for possession in all the circumstances?

[His Lordship stated the facts and continued :]    The first question which I have to consider is whether the second defendant was in lawful possession of the premises on November 10, 1951. That he was in lawful occupation of the premises seems clear. The terms of the licence to assign, dated January 26, 1937, signed by both Miss Strutt and Mr. Payne, consent to the assignment of the sublease to Wroxall Estates Ld. " for the use and occupa- " tion of the second defendant."    But was he in such occupation lawfully as a subtenant?  This must depend primarily on whether the assignment to him was a valid assignment, being made as it was without the consent of the plaintiffs, although with the consent of the first defendant.

The original lease of October 27, 1931, by Mr. Payne to Miss Strutt contained a covenant on the part of Miss Strutt not to underlet without consent.  The licence of Mr. Payne to Miss Strutt to create the underlease to Mrs. Dorothy Sykes was a conditional one.  The condition was that such underlease was to contain a covenant by the underlessee not to assign, let or part with the

**1 Q.B.**          QUEEN'S BENCH DIVISION.                    255

possession of the premises without the warrant of the superior
landlord or those claiming under him.  The sublease to Mrs. Sykes
in fact contained the covenant not to assign, underlet or part with
the possession of the premises without the written consent of the
landlady, Miss Strutt, and the superior landlord.  The sublease,
therefore, was in compliance with the terms of the licence.  It
seems clear that Mr. Payne, as the superior landlord, desired and
intended to retain control of any assignment of the sublease by
the sublessor and to prevent such assignment without his consent,
but by the terms of his licence and the covenant in the sublease
did he succeed in doing so?

The subtenant is not a party to the superior lease and the
superior landlord is not a party to the sublease.  The sublessee's
covenants are with the sublessor and can only be enforced by her :
*Williamson* v. *Williamson.*[2]  If the sublessor chooses not to
enforce the covenant requiring the sublessee to obtain the superior
landlord's consent, the superior landlord cannot enforce this
covenant in the sublease.  Consequently, if the superior landlord
desires to exercise a control over future dealings by the sublessee,
he can, in general, only do so by making his licence for the under-
lease expressly conditional on the insertion therein of a provision
restricting the underlessee from assigning without the superior
landlord's consent and by requiring his lessee, that is, under-
lessor, to bind himself or herself to enforce the covenant, or by
making it a term of the licence that he, the superior lessor, is
a party to her underlease containing such a covenant : see *Foa's
Landlord and Tenant*, 7th ed., p. 257, note (*e*), and *Mackusick*
v. *Carmichael.*[3]

In this case the superior landlord was not made a party to the
sublease and did not expressly require the sublessor to bind herself
to enforce the covenant by the sublessee.  It was argued, on
behalf of the plaintiffs, that I should imply such a term from the
licence by Mr. Payne, on April 19, 1932, to Miss Strutt to create
the sublease and the granting, by Miss Strutt, of the sublease
under the licence.  It was said that as Miss Strutt had granted
the sublease on the terms of the licence, she impliedly agreed to
enforce the covenant in the sublease that there should be no
assignment without the superior landlord's consent.  This does
not seem to me to be a necessary implication and would of course
impose serious obligations on Miss Strutt.  It might compel her
to re-enter for breach of covenant and to determine the sublease

<div style="text-align:right">
1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

Lynskey J.
</div>

[2] (1874) L.R. 9 Ch. 729, 732, 736.     [3] [1917] 2 K.B. 581, 586.

256                    QUEEN'S BENCH DIVISION.                **[1954]**

1953

DRIVE
YOURSELF
HIRE Co.
(LONDON)
LD.
v.
STRUTT.

Lynskey J.

when the superior landlord refused his consent, although the proposed assignee was, in her view, a suitable and a proper person, and might compel her to lose the benefit she had obtained from the sublease at the increased rent. I am of opinion that I ought not to imply such a term. It is not necessary to give business efficacy to the licence and to the grant of the sublease. If Miss Strutt had agreed to such a term it might have been very unbusinesslike on her part so to do.

The result is that, in my view, it was for Miss Strutt to enforce the covenant in the sublease not to assign without the consent of the superior landlord, or not, as she thought fit. If she thought fit to consent to such an assignment of the sublease, without the consent of the superior landlord, such an assignment would appear to have been quite valid and lawful. While it is clear that Miss Strutt consented to the assignment of the lease from Wroxall Estates Ld. to the second defendant, I have to consider whether she did so without requiring Wroxall Estates Ld. to obtain the consent of the plaintiffs.

The letter written to her by the second defendant's solicitors on November 30, 1950, in terms only inquired if it was necessary, under the terms of the headlease, for Miss Strutt to obtain the permission of the superior landlord to her consent to an assignment of the underlease. Miss Strutt's reply of December 4, 1950, answers this question in the negative. Miss Strutt's solicitors' letter of January 1, 1951, on the other hand, states: "There "appears to be no necessity to obtain the permission of our "client's superior landlords to grant your clients, Wroxall Estates "Ld., a licence to assign to Mr. Dugdale." This was a statement, general in terms, that no permission from the superior landlords was necessary. At this time Miss Strutt's solicitors, Farrer & Co., were in correspondence with the superior landlords, or their representatives, upon the question of outside repairs and, judging from their letter of February 27 to the plaintiffs, Farrer & Co. had the terms of the sublease before them. Farrer & Co.'s letter of March 27, 1951, to the second defendant's solicitors, Child & Child, makes this equally clear.

On behalf of the plaintiffs it was contended before me that all that Miss Strutt, or her representatives, were saying was that no consent was required from the superior landlords by the terms of the headlease and that she did not consent to the assignment of the sublease to the second defendant, on the terms that the sublessors need not obtain the consent of the superior landlords.

**1 Q.B.**          QUEEN'S BENCH DIVISION.                    257

Miss Strutt did not give evidence before me and no evidence was called on her behalf. I have, therefore, to decide what is the proper inference to be drawn from the correspondence. If the only letter was that from Miss Strutt of December 4, 1950, I should have been left in some doubt, but, in view of the letter of her solicitors, Farrer & Co., of January 1, 1951, and of the fact that they had the terms of the sublease before them and that they drafted the licence to assign and agreed its terms in a formal way with the second defendant's solicitors, I am satisfied that Miss Strutt and her advisers were prepared to, and did consent to, the assignment of the sublease from Wroxall Estates Ld. to the second defendant, without requiring the company to obtain the consent of the plaintiffs to the assignment.

In the result, I am of opinion that the sublease was lawfully assigned by the Wroxall Estates Ld. to the second defendant; that thereafter the second defendant was lawfully in occupation as a subtenant of the premises.

That brings me to the second question, namely, whether the second defendant was a subtenant to whom the premises had been lawfully sublet, within the meaning of section 15 (3) of the Rent and Mortgage Interest (Restrictions) Act of 1920. The premises were originally lawfully sublet to Mrs. Dorothy Sykes, who assigned her interest to Wroxall Estates Ld., who in turn assigned, lawfully, as I have found, that interest to the second defendant. The premises were not actually sublet to the second defendant. By section 12 (1) (g) of the Rent Act, 1920, the expressions " tenant " and " tenancy " in the Act include subtenant and subtenancy and the expression " let " means sublet. By section 12 (1) (f) of the same Act the expression " tenant " includes any person deriving title under the original tenant. As a result of these two provisions, the word " subtenant " in section 15 (3) of the Act includes any person lawfully deriving title under the original subtenant and would, therefore, include the second defendant.

If this be right, I now have to consider whether section 15 (3) of the Rent Act of 1920 applies to the circumstances of this case. That section provides: " Where the interest of a tenant of a " dwelling-house to which this Act applies is determined, either as " the result of an order or judgment for possession or ejectment, " or for any other reason, any subtenant to whom the premises " or any part thereof have been lawfully sublet shall, subject to " the provisions of this Act, be deemed to become the tenant " of the landlord on the same terms as he would have held from

1953
——
DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
v.
STRUTT.
——
Lynskey J.
——

258                QUEEN'S BENCH DIVISION.        **[1954]**

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

Lynskey J.

" the tenant if the tenancy had continued.'' If that subsection had stood alone, it would not appear to apply to the facts of this case, as the second defendant's subtenancy expired on the day before the first defendant's tenancy expired.

In construing subsection (3) of section 15 of the Rent Act of 1920, one must have regard to the provisions of subsection (1) of the same section. Subsection (1) provides that a tenant (which by virtue of section 12 (1) (*g*) includes a subtenant) " who by " virtue of the provisions of this Act retains possession of any " dwelling-house to which this Act applies shall, so long as he " retains possession, observe and be entitled to the benefit of all " the terms and conditions of the original contract of tenancy, " so far as the same are consistent with the provisions of this " Act . . .'' The effect of section 15 (1) operates, in my view, to continue the subtenancy of the second defendant as against the first defendant for November 11, 1951, and thereafter as against the superior landlords, the plaintiffs.

Reading these two subsections together, in my view the words determined " for any other reason '' in section 15 (3) include determination by effluxion of time and, further, a subtenant who becomes a statutory tenant, under section 15 (1), is entitled to the benefit conferred upon subtenants by section 15 (3). The benefit conferred by section 15 (3) would, therefore, enure for the benefit of a subtenant retaining possession of a dwelling-house to which the Act applied so long as he retained possession. It is admitted that the premises are premises to which the Rent Acts apply and it is, of course, obvious that the subtenant is retaining possession of those premises. In my view, therefore, the second defendant must be deemed to have become the tenant of the plaintiffs on the same terms as those on which he would have held his subtenancy from Miss Strutt if her lease had not determined, and is entitled to the protection which the Rent Acts give to his occupancy.

Further questions now arise whether an order for possession should be made notwithstanding the fact that the occupancy of the second defendant is protected by the Rent Acts. Before determining these further questions it is necessary for me to decide whether, on the pleadings as they at present stand, it is open to the plaintiffs to ask for an order for possession if the Rent Acts apply. A preliminary objection was made by the second defendant that the plaintiffs, in their statement of claim, only claimed possession of the premises on the ground that the second defendant was in wrongful possession of the premises, and upon

the basis that no claim, or other proceedings, would arise in the action out of the Rent Acts or any provisions thereof. The plaintiffs proceeded in this way in reliance on the decision of McCardie J. in *Gunter* v. *Davis*,[4] and notwithstanding the provisions of section 17 (1) and (2) of the Rent Restriction Act of 1920.

On April 7, 1952, the plaintiffs applied to remit this action to the county court, but this was resisted by the second defendant on the ground that the claim was not a claim within the terms of section 17, and the master refused to remit the action. On May 19, 1952, on the summons for directions, the master apparently took a different view and made an order remitting the action to the county court. Against that order the second defendant appealed to Donovan J. in chambers, who reversed the order of the master. On February 3, 1953, the plaintiffs applied for leave to amend their reply by including therein what, in effect, was a claim for an order for possession under the provisions of the Rent Acts if, contrary to the plaintiffs' contention, the Rent Acts applied to the occupancy of the second defendant. The second defendant resisted that application on the ground that the amendment sought would be a departure from the statement of claim as raising a new ground of claim in the reply, contrary to the provisions of Ord. 19, r. 16. The master allowed the amendment and, after the amendment was made, the second defendant applied to the master on February 17, 1953, to strike out the amendment as a departure, but the master refused that application. Thereupon the second defendant appealed to Parker J. in chambers against the master's refusal. That appeal was heard on February 25, 1953, the day before the case was in the list for hearing, and Parker J. made no order, leaving the question to be raised at the trial. The second defendant took the objection before me as a preliminary point.

The plaintiffs' contention was that there was no departure, as their claim for possession was under their common law right to possession and, even although the Rent Acts applied, the provisions of those Acts were simply restrictive of their common law rights and any order for possession, even under the provisions of the Rent Acts, was made by virtue of those common law rights. I cannot accept this contention. In my view the law was correctly stated by Scrutton L.J. in *Russoff* v. *Lipovitch*[5] as follows: "It is contended on behalf of the landlord that the

[4] [1925] 1 K.B. 124.

[5] [1925] 1 K.B. 628, 636.

260                    QUEEN'S BENCH DIVISION.        **[1954]**

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

Lynskey J.

" claim to recover possession is a claim arising, not out of the
" Rent Restrictions Act, but out of the common law.    That
" contention is, to my mind, not merely very technical, but also
" inaccurate," and later he said : " It is not, in my opinion,
" accurate to say that the claim in the present case arises out
" of the common law. . . .   The original common law right to
" possession has been modified by the Rent Restrictions Act in
" the case of houses to which the Act applies, and a claim for
" the possession of such a house cannot any longer be made
" under the common law, for the common law has gone."

In my view, a claim for possession of premises to which the
Rent Acts apply is not a claim made at common law, but a
claim made under the provisions of the Rent Restriction Acts.
It follows from this that the plaintiffs' reply raises a new ground
of claim in addition to that contained in the statement of claim
and is irregular.   I indicated, however, at the trial, that should
I be of opinion that the reply was irregular, I would give the
plaintiffs leave to amend their statement of claim by including in
it an alternative claim for possession under the Rent Restrictions
Acts.   I give that leave now, but I will determine the question
of costs after this judgment.

I have now to consider the claim for possession under the
Rent Restriction Acts.    Section 3 (1) of the Act of 1933 pro-
vides : " no order or judgment for the recovery of possession of
" any dwelling-house to which the principal Acts apply or for
" the ejectment of a tenant therefrom shall be made or given
" unless the court considers it reasonable to make such an order
" or give such a judgment, and either—*(a)* the court has power
" so to do under the provisions set out in the First Schedule to
" this Act."    By the First Schedule the court has power to make
such order or give such judgment if " *(a)* any rent lawfully due
" from the tenant has not been paid, or any other obligation of
" the tenancy (whether under the contract of tenancy or under
" the principal Acts) . . . has been broken or not performed "
and " *(d)* the tenant without the consent of the landlord has at
" any time after September 1, 1939, assigned or sublet the whole
" of the dwelling-house."

On behalf of the plaintiffs it was submitted that an obliga-
tion of the subtenancy had been broken or not performed.   The
alleged breach or non-performance was the assignment by
Wroxall Estates Ld. to the second defendant without obtaining
the written consent of the plaintiffs, the superior landlords.   For
reasons already stated, I am of opinion that there was no breach

**1 Q.B.**        QUEEN'S BENCH DIVISION.        261

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

Lynskey J.

of the covenant in the sublease not to assign or part with the possession of the premises without the consent of the landlady and the superior landlords. The first defendant consented to this assignment to the second defendant and did not require Wroxall Estates Ld. to obtain the consent of the superior landlords, the plaintiffs, as a term of her consent. Although there was no breach of that covenant there was, in one sense, a non-performance of that covenant. I have to consider whether such a non-performance, although it does not amount to a breach of obligation under the tenancy, can still be a non-performance within the meaning of para. (*a*) of the schedule to the Rent Act of 1933. The words of para. (*a*) " other obligation of the " tenancy " must mean obligations imposed by the tenancy under which the tenant holds at the time of the non-performance of the obligation. In this case the tenancy under which Wroxall Estates Ld. held, and the second defendant held, was the subtenancy and, even after November 11, 1951, the second defendant still held upon the terms of that subtenancy, so far as they were applicable. There was, therefore, no failure of performance of which the plaintiffs could take advantage, as there was no failure of performance of any obligation owed to the plaintiffs. Apart from this view, I am of opinion that the words " non-perform- " ance " in para. (*a*) of the schedule mean a non-performance which amounts to a breach of obligation under the tenancy, and that the words " has been broken or not performed " mean no more than an active or passive breach of obligation, a breach either by action or by inaction.

In the result, the plaintiffs have failed to satisfy me that I have power under para. (*a*) of the schedule to make an order or a judgment for possession of the premises in question.

There next comes the plaintiffs' contention that I have power, under para. (*d*) of the schedule, on the ground that the tenant, without the consent of the landlord, has at any time after September 1, 1939, assigned or sublet the whole of the dwelling-house. It is true, and it is admitted, that Wroxall Estates Ld. assigned their interest in the sublease and thereby assigned the whole of the dwelling-house to the second defendant, without the consent of the plaintiffs. But were the plaintiffs the landlords of Wroxall Estates Ld. at the time of such assignment? In my view they were not. The landlord of Wroxall Estates Ld., at that time, was the first defendant, Miss Strutt, and she in fact gave her consent to the assignment. I must, therefore, reject the plaintiffs' contention on this ground also.

262                        QUEEN'S BENCH DIVISION.                **[1954]**

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

Lynskey J.

The final question, whether I consider that it would be reasonable to make such an order if I was satisfied that I had, by reason of para. (*a*) or para. (*d*) of the schedule of the Act of 1933, power to make such order or give such judgment, does not arise. In case, however, another court may differ from me and consider that this question does arise, and as it is a matter for my discretion, I will state my views on the question and the facts I find in relation thereto.

The second defendant, Commander Dugdale, is the owner of estates in Wroxall, Warwickshire, of the value of approximately £70,000. He has a residence at " Salterton," Middle Woodford, Salisbury, Wiltshire. He has business interests in Johannesburg and in the Bahamas, and these interests take him abroad during January, February and March in each year. When in this country, from May to December, he resides, when not in London, at his residence at " Salterton." He is in London on four or five days a week, and when in London he stays at the demised premises, No. 1, Chester Close. He has furniture there and a woman goes in daily to clean and look after the premises during the whole year. It is clear that the effect of the assignment of the sublease to Commander Dugdale was to give his occupancy the protection of the Rent Restriction Acts, which would not have been available to him if Wroxall Estates Ld. had remained the subtenants. If the plaintiffs had been asked to give their consent, I am satisfied that they would have refused to do so, as they want the demised premises for occupation as a residence for one of their employees and also as a means of more convenient access to some nine rooms, at present not in use, which they say they require for the purpose of their business. Although Commander Dugdale is, no doubt, a respectable and responsible person, the plaintiffs would not, in my view, have been acting unreasonably in refusing their consent to the assignment of the sublease to him, as such an assignment would give his occupancy the protection of the Rent Restriction Acts which he would otherwise not have had (*Swanson* v. *Forton* [6]). If, therefore, contrary to my view, there was a non-performance of an obligation, within the meaning of para. (*a*) of the schedule to the Rent Act of 1933, or an assignment without the consent of the landlord under para. (*d*) of that schedule, by the assignment of the sublease to Commander Dugdale, I should have held, in all the circumstances of this case, that it would be reasonable to make

[6] [1949] Ch. 143; 65 T.L.R. 178; [1949] 1 All E.R. 135.

**1 Q.B.**        QUEEN'S BENCH DIVISION.        263

an order for possession against the second defendant. Taking
the view, however, which I do, there must be judgment for both
the defendants.

*Judgment for defendants.*

The plaintiffs appealed.

*L. J. Belcourt* for the plaintiffs. The Wroxall Estates Co.,
being a limited company, could not as subtenants claim the pro-
tection of subsection (3) of section 15 of the Increase of Rent and
Mortgage Interest (Restrictions) Act, 1920. It is suggested that
the assignment to the second defendant, Commander Dugdale, a
director of the company, was a deliberate device to attempt to
secure that protection. It is submitted, however, that section
15 (3) does not apply to or protect an assignee, and the second
defendant is not a " subtenant to whom the premises were sub-
" let." The context requires that the only subtenant to be
considered is an original subtenant, because the words of section 12
(1) (*f*) and (*g*) are inapt to cover an assignee. If the draughtsman
had intended to cover assignees he would have said so. If the
words can be construed as covering an assignee, then it is sub-
mitted that to obtain the protection afforded by section 15 (3) not
only must the assignment to Commander Dugdale be lawful, but
all the steps leading up to that assignment must be lawful. The
assignment to him was unlawful, because there was a breach of
the covenant, inserted in the original lease to the first defendant
and the subsequent subleases to Mrs. Sykes and the Wroxall
Estates Co., requiring the consent of the head-landlord to be
obtained. Arising out of the licence to sublet granted by the
head-landlord to Miss Strutt there was an implied obligation on
her not to release the subtenants, Wroxall Estates Co., from the
covenant not to sublet without first obtaining the head-landlord's
consent. If, as is alleged, she did release the company from that
obligation, then she was in breach of that covenant. If she
did not release the company from that obligation, then Wroxall
Estates Co. were in breach. The covenant was inserted for the
protection of the head-landlord and he is entitled to take advan-
tage of it. In either case the breach of the covenant rendered
the assignment unlawful and the second defendant is not entitled
to the protection of section 15 (3). The subsection must be
construed strictly because it takes away the rights of the head-
landlord.

[DENNING L.J. This covenant seems to me to be distinctly
within the words of section 56 of the Law of Property Act, 1925,

C. A.

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

264                    QUEEN'S BENCH DIVISION.              **[1954]**

C. A.
1953
───
DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.
───

so as to enable the superior landlord to take the benefit of it. The width of that section is shown by the recent decision of Danckwerts J. in *Stromdale and Ball* v. *Burden.*[7]]

[ROMER L.J.   Support for that view is to be found from the preceding covenant as to loss by fire.   It would be strange if the superior landlord could not take advantage of that covenant.]

The covenant in the sublease was intended for the superior landlord's benefit and comes within the dicta of Lord Greene in *White* v. *Bijou Mansions.*[8]

*L. A. Blundell* and *D. J. Hyamson* for Miss Strutt (first defendant).   The first defendant is not interested in the question of possession, but resists the plaintiffs' claim for damages for breach of contract.

*Montague Waters* for the second defendant.   Miss Strutt, through her solicitors, consented to the assignment to the second defendant with full knowledge that the consent of the head-landlord had not been obtained, and not requiring that it should be obtained.   In that way she waived that consent.   As the head-landlord was not a party to the sublease he cannot rely on the fact that his consent was neither sought nor obtained for the assignment to the second defendant.   Miss Strutt, even if she knew that the head-landlord would refuse his consent, had a right to release her sublessees from the covenant, and the judge so held.   He held that the head-landlord, not being party to the sublease to Wroxall Estates Co., could not enforce the covenants in it; that Miss Strutt alone could enforce them; and if she thought fit to release Wroxall Estates from the obligation the head-landlord could not complain.   Commander Dugdale is entitled to the protection of section 15 (3).   Section 56 of the Law of Property Act, 1925, is of very limited application.   In *White* v. *Bijou Mansions*[8] Simonds J. confined it to persons " with whom " a covenant is purported to be made.

[SOMERVELL L.J.   I doubt whether the section is so limited. There may be many cases where a person is within the benefit of the covenant although it is not in terms expressed to be " with " him."]

*Stromdale and Ball* v. *Burden*[9] was a case of the grant of an " interest in land."

[SOMERVELL L.J.   But Danckwerts J. also put it on the ground of an " agreement respecting land."]

───

[7] [1952] Ch. 223; [1952] 1 All E.R. 59.

[8] [1937] Ch. 610, 625; [1937] 3 All E.R. 269.

[9] [1952] Ch. 223.

**1 Q.B.**          QUEEN'S BENCH DIVISION.                    265

C. A.

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

[The following cases were also referred to by counsel in argument: *Mackusick* v. *Carmichael* [10]; *Williamson* v. *Williamson* [11]; *Lord Strathcona S.S. Co.* v. *Dominion Coal Co.* [12]; *In re Spark's Lease, Berger* v. *Jenkinson* [13]; *Mackley* v. *Nutting* [14]; *Norman* v. *Simpson* [15]; *Malcy* v. *Fearn* [16]; *Dalrymple's Trustees* v. *Brown* [17]; *Lord Hylton* v. *Neal* [18]; *Oak Property Co.* v. *Chapman and Another* [19]; *Regional Properties Co.* v. *Frankenschwerth* [20]; *Keeves* v. *Dean* [21]; *R.M.R. Housing Society* v. *Combs* [22]; *Haywood* v. *Silber* [23]; *Dyson* v. *Foster* [24]; *In re Schebsman* [25]; *Smith and Snipes Hall Farm* v. *River Douglas Catchment Board* [26]; *Swanson* v. *Forton* [27]; *Glossop* v. *Ashley,* [28] and *Wilkes* v. *Goodwin.* [29]]

                                                      *Cur. adv. vult.*

November 24.   The following judgments were read.

SOMERVELL L.J., having stated the facts, and read the material licences and subleases, and section 15 (3) of the Act of 1920, continued: The first point submitted on behalf of the plaintiffs is that subsection (3) of section 15 does not apply to or protect assignees of subleases.   In considering the argument one must bear in mind the definitions under section 12 (1) (*f*). The expression " tenant " includes any person from time to time deriving title under the original agreement.   Under section 12 (1) (*g*) the expression " tenant " and " tenancy " include " subtenant " and " subtenancy," and the expression " let " includes " sublet."   These, I think, are the relevant definitions which govern the construction of the subsection unless the context otherwise requires.   It is clear, I think, that the second defendant is a subtenant.   The fact that he is an assignee does not prevent his being a subtenant, but it is said that he is not a subtenant " to whom the premises were sublet," the subletting

[10] [1917] 2 K.B. 581; 33 T.L.R. 497.
[11] (1874) L.R. 9 Ch. 729.
[12] [1926] A.C. 108.
[13] [1905] 1 Ch. 456.
[14] [1949] 2 K.B. 55; 65 T.L.R. 255; [1949] 1 All E.R. 413.
[15] [1946] K.B. 158; 62 T.L.R. 113; [1946] 1 All E.R. 74.
[16] (1946) 62 T.L.R. 693; [1946] 2 All E.R. 583.
[17] 1945 S.C. 190.
[18] [1921] 2 K.B. 438.
[19] [1947] K.B. 886.

[20] [1951] 1 K.B. 631; [1951] 1 All E.R. 178.
[21] [1924] 1 K.B. 685.
[22] [1951] 1 K.B. 486; [1951] 1 T.L.R. 1; [1949] 1 All E.R. 16.
[23] (1885) 30 Ch.D. 404.
[24] [1909] A.C. 98.
[25] [1944] Ch. 83; 60 T.L.R. 128.
[26] [1949] 2 K.B. 500; 65 T.L.R. 628; [1949] 2 All E.R. 179.
[27] [1949] Ch. 143; 65 T.L.R. 178; [1949] 1 All E.R. 135.
[28] [1922] 1 K.B. 1.
[29] [1923] 2 K.B. 86.

266                     QUEEN'S BENCH DIVISION.        **[1954]**

C. A.

1953

DRIVE
YOURSELF
HIRE Co.
(LONDON)
LD.
*v.*
STRUTT.

Somervell L.J.

was to Mrs. Sykes. The context therefore, it is said, requires that the only subtenant to be considered is an original subtenant, because the words are inapt to cover an assignee.

There is, I think, force in this, and I doubt whether the legislature directed its attention to the position of assignees. Having regard, however, to the definition in section 12 (1) (*f*) and the purpose of the section to be gathered from its terms, I have come to the conclusion that it should be construed as covering assignees. Leaving aside for the moment the meaning of "lawfully," it would seem clear that if the assignee is to get the protection of the section the assignment to him must be "lawful." One could imagine a case where the head-landlord was a party to the sublease which required his consent for an assignment. In such a case he must plainly be able to rely on the unlawfulness of an assignment made without his consent. It is, I think, equally clear that he must be able to rely on the unlawfulness, if it exists, of the original subletting. One, therefore, has to expand the words after subtenant so as to read " to " whom the premises, or any part thereof, have been lawfully " assigned by or under a subtenant to whom they have been " lawfully sublet."

I will now turn to the meaning of "lawful." In *Norman* v. *Simpson* [1] the court took the view that premises were unlawfully sublet if the head-lessor had a subsisting right of re-entering. That formula was considered in *Maley* v. *Fearn.* [2] In that case a tenant had sublet in breach of a covenant which required that there should be no subletting except with the consent of the landlord. It was held that the part sublet had not been lawfully sublet, but the court doubted whether, if the subletting was contrary to the terms of the covenant, it would be necessary to show that it gave rise to a right of re-entry. Morton L.J. was a party to both decisions, and in the latter decision he expressed the opinion that a right of re-entry was not a necessary condition of unlawfulness. I agree with this.

It is said here, in the first place, that as the head-landlord was not a party to the sublease he cannot rely on the fact that his consent was neither sought nor obtained. It is said, in the second place, that the first defendant had a right to release Wroxall Estates from the provision which required the head-landlord's consent, and that she did so. I think that the first

[1] [1946] K.B. 158; 62 T.L.R. 113; [1946] 1 All E.R. 74.

[2] (1946) 62 T.L.R. 693; [1946] 2 All E.R. 583.

**1 Q.B.**          QUEEN'S BENCH DIVISION.                    267

question to be considered is whether there was any implied
obligation arising out of the licence.  It was suggested in the
pleadings that the first defendant impliedly undertook to impose
the term upon and, if necessary, enforce the term against the
underlessee and her successors in title.  I think that this is
putting the obligation too widely.  It has been said countless
times that terms cannot be implied unless it is necessary to give
efficacy to the agreement.  It is suggested here, on behalf of
the defendants, that Miss Strutt, even if she knew that the
head-landlord would object if approached, could release her sub-
lessee from the term requiring the head-landlord's consent.  If
this were right the agreement which the licence document
evidences would, it seems to me, have no efficacy at all.  The
position would be precisely the same as if the first defendant's
consent only was required.  I think, therefore, that under this
contract the first defendant impliedly undertook not to release
or waive her right to require the superior landlord's consent.

Though I do not myself think that it would have affected
the result, I will deal here with the suggestion that the first
defendant, through her solicitors, waived or purported to waive
the position with regard to the superior landlord's consent.  The
solicitors concerned did not give evidence, so the matter turns
on inferences from letters.  On November 30, 1950, the solicitor
for Wroxall Estates wrote to Miss Strutt: " Your tenants Messrs.
" Wroxall Estates Ld. wish to assign the lease to their managing
" director, Mr. James Dugdale.  We are therefore writing to ask
" for permission for the assignment of the premises to Mr. Dug-
" dale.  We do not know whether you will require references
" having regard to Mr. Dugdale's position in the company, but
" if you do require them please let us know and we will forward
" them.  Do you know whether under your own lease it is
" necessary for you to obtain the permission of your own land-
" lord to an assignment of the underlease?  If so, it will be
" necessary to get the permission of the Drive Yourself Hire
" Company (London) Limited who, we understand, are the
" superior landlords."

Miss Strutt herself sent an answer to that: " I do not think
" it is necessary for me to get permission for me to grant an
" assignment of 1A Chester Street.  I should like references as
" per usual.  I have been laid up for weeks with a concussion,
" owing to falling on my head, and am only allowed any urgent
" business.  I will get someone to speak to my lawyer.  I see
" no reason against Mr. Dugdale having the lease.  Yours truly,

C. A.

1953

DRIVE
YOURSELF
HIRE Co.
(LONDON)
LD.
v.
STRUTT.

Somervell L.J.

268                QUEEN'S BENCH DIVISION.            **[1954]**

C. A.

1953

———

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

———

Somervell L.J.

———

"Emily Strutt." The matter was referred to her solicitors, and they wrote on January 1: "We act for Miss Emily Strutt "and she has now forwarded to us your letter to her of Novem- "ber 30, with instructions. She regrets that this letter has not "been answered before, but this has been through the illness "of our client. We think it as well for the usual references to "be submitted of Mr. Dugdale and perhaps you will kindly let "us have these at your convenience. There appears to be no "necessity to obtain the permission of our client's superior "landlords to grant your clients, Wroxall Estates Limited, a "licence to assign the lease to Mr. Dugdale." I read this last letter as dealing with the question put in the first, namely, as to the headlease. Those are the letters, and the consent given by the first defendant was dated February 28. It contains a fairly long recital, which unfortunately omits any reference to the clause of the sublease which deals with assignments.

The judge thought that the letter of January 1 ought to be treated as a consent to the assignment of the sublease without requiring Wroxall Estates Ld. to obtain the consent of the plaintiffs. He relied, I think, on contemporary references to the sublease dealing with repairs as evidence that the solicitors had the terms of the sublease before them. The only explanation, to my mind, of these and some later letters consistent with honesty, which everyone accepts, is that both firms of solicitors had completely failed to remember or remind themselves of paragraph 2 (x). There was therefore a breach of that provision. The question is whether that prevents the assignment being lawful within section 15 (3) having regard to the fact that it is the superior landlord, who was not a party, who is seeking to say that the assignment was unlawful.

The provision here was, I think, an unusual one. It may well be that as a general rule breaches of provisions in a sublease . of which the sublessor can take advantage would be irrelevant in considering the position of a subtenant or assignee in cases where the head-landlord was the plaintiff. The provision which was broken here was, however, one inserted for his protection under an agreement by the first defendant with him, with the terms and implications of which I have already dealt. I have come to the conclusion that in those circumstances there was not a lawful assignment to the second defendant within section 15 (3), as construed to bring assignees within its ambit. I should, per- haps, have mentioned that the plaintiffs' objection to the second defendant is not personal, but based on the fact that the assignor,

**1 Q.B.**          QUEEN'S BENCH DIVISION.                                    269

being a limited company, could not have claimed the protection of the Acts.

Various other points were argued which it is not necessary to consider. It was submitted that if the second defendant was within section 15 (3) the plaintiffs could maintain that there had been a breach of paragraph (d) of the Schedule to the Act of 1933, which deals, inter alia, with cases where the whole of the premises have been assigned or sublet. If that were right it would give the court jurisdiction to make an order, if the court thought it were reasonable to do so. The judge came to the conclusion that the submission failed, though he indicated that if the plaintiff had brought himself within that sub-paragraph he would have thought it reasonable to make an order. I express no opinion on this point, which had better be left over until it is necessary to decide it.

The point on which I differ from the judge is a narrow one. The word " lawful " is not an easy one to construe and apply, but for the reasons which I have given I think that in the special circumstances which existed in this case the defence fails. I would allow the appeal.

DENNING L.J.  The first question is whether in section 15 (3) of the Act of 1920 the word " subtenant " includes not only the original subtenant, but also an assignee of a subtenant. I think that it does: but, if this is done, I think that the words " lawfully sublet " must be expanded so as to include the process by which the assignee becomes subtenant. They include, not only the original subletting, but also the assignment. All the steps by which the subtenant becomes a subtenant have to be lawful before he can get the benefit of section 15 (3). This means at any rate that they must not be in breach of contract: for to break a contract is an unlawful act: see *South Wales Miners' Federation* v. *Glamorgan Coal Co.*[3]

In the present case all the steps by which Commander Dugdale became subtenant were clearly lawful except the last step by which Wroxall Estates Ld. assigned the sublease to him. The sublease contained a specific covenant that the subtenant would not assign the premises " without the consent of the land- " lady (Miss Strutt) and the superior landlord, such consent " not to be unreasonably withheld in the case of a respectable " and responsible person." In so far as the covenant required

[3] [1905] A.C. 239; 21 T.L.R. 441.

C. A.

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
v.
STRUTT.

Somervell L.J.

270                              QUEEN'S BENCH DIVISION.                    **[1954]**

C. A.

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

Denning L.J.

the superior landlord's consent, it was inserted at the express request of the superior landlord and for his benefit. Indeed, he insisted on it. When Wroxall Estates Ld. assigned the sub-lease to Commander Dugdale, they ignored that obligation. They obtained the consent of the landlady, Miss Strutt, but did not obtain the consent of the superior landlords. If Wroxall Estates Ld. had asked the superior landlords for their consent, the superior landlords could quite reasonably have refused to give consent; because Commander Dugdale would have become a protected tenant, whereas Wroxall Estates Ld. were unprotected: *Lee* v. *K. Carter Ld.*[4]

Notwithstanding the fact that Wroxall Estates Ld. did not obtain the consent of the superior landlord in accordance with the covenant, the judge has held that the assignment to Commander Dugdale was lawful. The reason he gave was that the superior landlords were not parties to the sublease and could not enforce the covenants in it. It was, he held, for Miss Strutt alone to enforce it, and if she thought fit to release Wroxall Estates Ld. from the obligations of it, the superior landlords could not complain.

There is, I think, one short and decisive answer to this reasoning: when Mr. Payne, the predecessor of the superior landlords, gave his consent, giving Miss Strutt, the tenant, permission to grant a sublease, he insisted that the underlease should contain a covenant by the underlessee not to assign the premises without the warrant of the superior landlord, and those claiming under him. The consent thus given by Mr. Payne to Miss Strutt became a contract between them as soon as it was acted upon. It was clearly an implied term of that contract that Miss Strutt, the tenant, should not release the subtenants from the obligation to get the superior landlord's consent: and the benefit of this implied term ran, I think, with the reversion so that not only Mr. Payne, but also his successors in title, could take advantage of it: see *Smith and Snipes Hall Farm Ld.* v. *River Douglas Catchment Board,*[5] and *Boyer* v. *Warbey.*[6] If Miss Strutt did release the subtenants (Wroxall Estates Ld.) she herself was acting unlawfully, because she was breaking the implied term. If she did not release the subtenants, then the subtenants (Wroxall Estates Ld.) were acting unlawfully in that

[4] [1949] 1 K.B. 85; 64 T.L.R. 536; [1948] 2 All E.R. 690.
[5] [1949] 2 K.B. 500; sub nom. *Smith* v. *River Douglas Catchment Board*, 65 T.L.R. 628; [1949] 2 All E.R. 179.
[6] [1953] 1 Q.B. 234; [1953] 1 All E.R. 269.

they assigned in breach of their obligation to her to obtain the
superior landlord's consent. In either case the process was
unlawful.

If I am wrong, however, in holding that there was such an
implied term—and if the correct view is that Miss Strutt fulfilled
all her obligations to the superior landlord by inserting the
covenant in the sublease, which is what the judge thought—then
I am still of opinion that the action of Wroxall Estates Ld. was
unlawful. They deliberately broke a covenant which was inserted
for the benefit of the superior landlords. Such a breach was, I
believe, unlawful although the superior landlord was not a party
to the instrument. I say this because the case seems to me to
fall precisely within the words of section 56 of the Law of
Property Act, 1925, which says that " A person may take . . . the
" benefit of any . . . covenant . . . respecting land or other
" property, although he may not be named as a party to the . . .
" instrument."

In the course of the argument Romer L.J. drew attention
to the preceding covenant in the sublease whereby the subtenant,
in case of the premises being destroyed by fire, agreed in certain
circumstances to pay to the superior landlord the loss thereby
occasioned to him. Surely the superior landlord could under
section 56 take the benefit of that covenant. So, also, under this
covenant about assigning the superior landlord can, I think,
take the benefit of it by requiring his consent to be obtained.
I do not say that for breach of it the superior landlord could
forfeit the sublease. He clearly could not do so, because the
proviso for re-entry was not inserted for his benefit. Only the
covenant was for his benefit. But he is at least entitled to say
that an assignment in breach of the covenant is unlawful. It
should be noticed that in *Haywood* v. *Silber* [7] this court insisted
on such a covenant being inserted in a sublease for the benefit of
the superior landlord : and they would not have done so if they
had thought that it was no good to him.

Mr. Montague Waters argued, however, that section 56 must
be limited to persons " with whom some agreement or covenant
" is purported to be made," relying on the observations of
Simonds J. in *White* v. *Bijou Mansions Ld.* [8] If the covenant had
been formally expressed to be " with " the superior landlord, it
would, he said, have been enforceable by the superior landlord,
although he was not a party : but as it was not so expressed,

C. A.

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

Denning L.J.

[7] (1885) 30 Ch.D. 404.    [8] [1937] Ch. 625; [1937] 3 All E.R. 269.

272                    ·    QUEEN'S BENCH DIVISION.           **[1954]**

C. A.

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

Denning L.J.

it was not enforceable. But, as Somervell L.J. pointed out in the course of the argument, that may be too narrow an interpretation to place on the words used by Simonds J. Enforceability does not depend on the form of the obligation, but on the substance of it. A covenant is, for this purpose, sufficiently made " with " a person if it is, on the face of it, made directly for his benefit in such circumstances that it was intended to be enforceable by him. In support of this view, I would refer to the recent case of *Stromdale & Ball* v. *Burden*,[9] where Danckwerts J., as one ground of his judgment, held that an option to purchase was enforceable by a company as an " agreement respecting land," although the company was not a party to the instrument and the agreement was not expressed in terms to be " with " the company.

Much of the difficulty that has surrounded section 56 has arisen from an inadequate knowledge of the history of the subject. It is often said to be a fundamental principle of our law that only a person who is a party to a contract can sue on it. I wish to assert, as distinctly as I can, that the common law in its original setting knew no such principle. Indeed, it said quite the contrary. For the 200 years before 1861 it was settled law that, if a promise in a simple contract was made expressly for the benefit of a third person in such circumstances that it was intended to be enforceable by him, then the common law would enforce the promise at his instance, although he was not a party to the contract. That was clearly laid down by the Court of Exchequer Chamber in 1677 in *Dutton* v. *Poole*.[10] One hundred years later it was so well accepted that Lord Mansfield said that it was a matter of surprise how a doubt could have arisen about it, *Martyn* v. *Hind*[11]; and Buller J. said quite categorically that " if one person makes a promise to another for " the benefit of a third person, that third person may maintain " an action on it ": see *Marchington* v. *Vernon*.[12] Finally, in 1823, the Court of King's Bench, then in its golden age, including as it did Abbott C.J., Bayley and Holroyd JJ., specifically so held: see *Carnegie* v. *Waugh*.[13] And in 1844 Joseph Chitty, in his highly authoritative work on Pleading, treated the law as settled accordingly: see the 7th ed., vol. 1, pp. 4 to 5. He would be a bold man who would say that a principle supported

[9] [1952] Ch. 223; [1951] 2 T.L.R.
1192; [1952] 1 All E.R. 59.
[10] (1678) 2 Lev. 210.

[11] (1776) Cowp. 437, 443.
[12] (1787) 1 Bos. & P. 101n.
[13] (1823) 2 Dowl. & Ry. 277.

**1 Q.B.**          QUEEN'S BENCH DIVISION.                    273

C. A.

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
v.
STRUTT.

Denning L.J.

by the names I have mentioned did not represent the law of England, especially when it is so eminently just and reasonable.

So much for simple contracts. It was different with contracts under seal, as Abbott C.J. himself pointed out in *Carnegie* v. *Waugh*.[13] There was an inflexible rule that no one could sue on an indenture inter partes unless he was named as a party to it. Numerous examples of this rule will be found from *Gilby* v. *Copley*[14] in 1684 to *Chesterfield & Midland Silkstone Colliery Co. Ld.* v. *Hawkins*[15] in 1865. But that rule was strictly confined to indentures made between parties, that is, indentures which specifically named the parties to it in a formal way, as by saying " This indenture made between John " Doe of the one part and Richard Roe of the other part ": see Chitty, ibid., at p. 3. The rule never applied to a deed poll or to an indenture which was not expressed to be made between parties. The result was that if the indenture did not specifically name the parties in formal fashion, but started off simply by saying that " This Indenture witnesseth that John " Doe and Richard Roe have agreed as follows," stating their agreement and followed by their signatures, then the common law allowed a third party to sue on a covenant contained therein which was made expressly for his benefit. This was laid down in 1673 in *Cooker* v. *Child*,[16] and was applied in striking fashion recently by Vaisey J. in *Chelsea and Walham Green Building Society* v. *Armstrong*.[17]

Such was the state of the law in 1845 when Parliament passed section 5 of the Real Property Act, 1845. That section abolished the technical rule about indentures so far as land was concerned. It enabled a person to take the benefit of a covenant over or respecting land, although he was not named as a party to the indenture. Naturally enough, that section only applied to indentures, because in 1845 they were the only documents in which the law needed to be remedied. In all other cases at that time a third party could sue.

In 1861, however, came the unfortunate case of *Tweddle* v. *Atkinson*,[18] in which the Court of Queen's Bench departed from the law as it had been understood for the previous 200 years and held quite generally that no stranger could take advantage of a contract, though made for his benefit: and that was assumed, without argument, to be the law by the House of Lords in

[13] 2 Dowl. & Ry. 277.
[14] (1684) 3 Lev. 138, 140.
[15] (1865) 3 H. & C. 677.
[16] (1673) 2 Lev. 74.

[17] [1951] Ch. 853; [1951] 2 T.L.R. 312; [1951] 2 All E.R. 250.
[18] (1861) 1 B. & S. 393.

C. A.

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

Denning L.J.

*Dunlop Pneumatic Tyre Co. Ld.* v. *Selfridge & Co. Ld.*[19]  I do not pause to consider whether this new rule was legitimately introduced into the law. Incidentally, the courts of the United States have not adopted this new rule. They have followed the original common law, which is much more in accord with the needs of a civilized society. So is the Scots law. But what I do suggest is that the rule in *Tweddle* v. *Atkinson*[20] was itself greatly modified by section 56 of the Law of Property Act, 1925. Just as the 1845 Act modified the old technical rule about indentures, so the 1925 Act modified the new technical rule about contracts generally. Section 56 applies, not merely to indentures, but to any instrument of agreement: and it applies not only to land, but to any property, real or personal. It says that " A " person may take . . . the benefit of any . . . covenant . . . " respecting land or other property, although he may not be " named as a party to the . . . instrument." I can think of no words more apt to do away with the rule in *Tweddle* v. *Atkinson*,[20] leaving the courts free, in cases respecting property, to go back to the old common law, whereby a third party can sue on a contract made expressly for his benefit; and rid also of the old rule about deeds inter partes.

In support of this view I would like to give some modern instances: first, there is the important decision which I have already mentioned of Vaisey J. in *Chelsea and Walham Green Building Society* v. *Armstrong*.[21] A man who had mortgaged a house sold it to a purchaser. In the deed of transfer (which was not inter partes) the purchaser covenanted that he would pay the future instalments to the building society. The building society was not a party to the transfer, but Vaisey J. held that the building society could enforce the covenant by direct action against the purchaser. For this purpose he went back to the old case of *Cooker* v. *Child*,[22] but he could not have done this unless the rule in *Tweddle* v. *Atkinson*[20] had been done away with so as to permit him to go back to the old common law. If it is permissible to go back to *Cooker* v. *Child*,[22] why not also go back to *Dutton* v. *Poole*[23] in the same volume of Levinz, especially as it has never been over-ruled by any court of competent authority?

Next there is the recent decision of Danckwerts J. in *Stromdale & Ball* v. *Burden*.[24] A deed of licence (which was inter

[19] [1915] A.C. 847; 31 T.L.R. 399.
[20] 1 B. & S. 393.
[21] [1951] Ch. 853.

[22] 2 Lev. 74.
[23] 2 Lev. 210.
[24] [1952] Ch. 223.

QUEEN'S BENCH DIVISION.

partes) gave an option to purchase to a company which was not a party to the deed. The company could not have sued at common law because the deed was inter partes. But by virtue of section 56 it was held entitled to do so. Finally, in regard to simple contracts, I would refer to the cases which I mentioned in *Smith and Snipes Hall Farm* v. *River Douglas Catchment Board*,[25] namely, commercial credits, pension agreements, and household insurances. No court would, I fancy, deny the third party a remedy in such cases: and the remedy is to be found by recourse to the old common law.

My conclusion is, therefore, that section 56 applies so as to entitle the superior landlord to take the benefit of this covenant although he was not named as a party to the underlease in which it was contained. The assignment to Commander Dugdale was unlawful because the consent of the superior landlord was not obtained. He is therefore not protected by section 15 (3) of the Act of 1920.

In these circumstances there is no reason to consider paragraphs (a) and (d) of the schedule to the Act of 1933, and I do not do so. I agree with my Lord that this appeal should be allowed.

ROMER L.J. I agree. The first question to consider is whether the protective provisions of section 15 (3) of the Act of 1920 extend to an assign from a sublessee or whether they are confined to sublessees themselves. The subsection refers in terms only to subtenants to whom premises have been sublet, and it is not altogether easy to fit assignees into the language which the draftsman used. Nevertheless, a person to whom a sublease is assigned undoubtedly becomes the subtenant of the immediate reversioner, and it would be a curious intention to attribute to Parliament that an original sublessee is protected, but not an assignee from him, in cases, for example, where the head-lessor has expressly approved both the sublease and the assignment thereof. In my opinion assignees of underleases are in fact within the subsection, not merely as a matter of expectation, but by virtue of the definitions of " tenant " in section 12 (1) (f) and (g) of the Act. The difficulty of applying the language of section 15 (3) to undertenants by assignment is not such, in my judgment, as to oust these definitions from the subsection by reason of the excluding preface to section 12 (1) " except

[25] [1949] 2 K.B. 515.

C. A.

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
v.
STRUTT.

Denning L.J.

276                    QUEEN'S BENCH DIVISION.                **[1954]**

C. A.

1953

DRIVE
YOURSELF
HIRE Co.
(LONDON)
LD.
*v.*
STRUTT.

Romer L.J.

"where the context otherwise requires." I think that section
15 (3) may reasonably be read as applying both to sublessees and
their assigns, but so that no assign can invoke it unless both
the sublease and the assignment thereof are "lawful" in relation
to the superior lessor or lessors who would, but for the sub-
section, be entitled to possession of the premises subdemised.
Whether the word "lawfully" has an even wider scope it is
not, for present purposes, necessary to consider.

On the construction which I have attributed to section 15
(3) the second defendant, Commander Dugdale, is entitled to rely
upon it, provided that the assignment to him by Wroxall Estates
Ld. was valid not only as against Miss Strutt but as against the
head-lessors when Miss Strutt's lease fell in, on which date this
defendant was in possession (in reliance on section 15 (3)) of
*the whole of the premises demised.*

Was, then, this defendant's assignment "lawful" as against
the head-lessors? To answer this question it is necessary to
inquire as to the relevant rights which Mr. Payne acquired in
relation to the property and to which the plaintiffs have, at all
material times, been entitled as his successors. Mr. Payne was
the freeholder of the property and it is clear that, when he
leased it to Miss Strutt, he attached considerable importance
to retaining control over the persons who might from time to time
occupy the premises under a title deriving from her. Such
control could in fact only be achieved with certainty by his
insisting upon being a party himself to all subsequent disposi-
tions of the property by way of assignment or sublease. After
the grant of the lease to Miss Strutt there was a variety of ways
in which the property might change hands during the term of
the demise. Miss Strutt might, for example, assign the term
and subsequent assignments might follow; or she might grant
a sublease and other persons might acquire an interest by assign-
ment or underlease from the sublessee. Mr. Payne might have
so arranged matters when he granted the head-lease that none
of these subsequent devolutions could be validly effected except
by instruments which imposed upon the taker of each successive
interest a covenant contractually enforceable by the head-lessor,
against assigning or subletting except with his own consent.

This course, however, is somewhat burdensome, especially in
the case of a large estate, and, whether for this reason or some
other, Mr. Payne did not think proper to adopt it; instead, he
introduced into the licence to Miss Strutt a condition, the effect
of which was that her sublessee should covenant with her not

**1 Q.B.**          QUEEN'S BENCH DIVISION.                    277

C. A.

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
*v.*
STRUTT.

Romer L.J.

to assign or further sublease without both her consent and his, and this condition was duly incorporated by way of covenant in the underlease which Miss Strutt, in pursuance of such licence, granted to Mrs. Sykes.. It was contended before us, on behalf of the second defendant, that in these circumstances, Miss Strutt, the covenantee, could at any time, and without the head-lessor's consent, and, indeed, without reference to him at all, release Mrs. Sykes and any person, claiming through or under her, from the burden of this covenant. Whether in fact she released Wroxall Estates Ld. from their obligation to her to obtain the plaintiffs' consent, when the company assigned the sublease to the second defendant, depends on the effect of the letters which passed at the time and is a matter which may be open to question; but, if she did, I am satisfied that she had no right, as against the plaintiffs, so to do. I quite agree with my Lords that the licence which Mr. Payne granted to Miss Strutt to sublet gave rise to an implied promise by this lady not to release from its operation any person claiming through her who became bound by covenant. Such a release would render the condition upon which the licence was given altogether useless and abortive to the head-lessor.

If Miss Strutt had not agreed to accept the condition she would not have got the licence at all; the condition was, in fact, the consideration for the licence, and it would be against conscience that she should take the benefit and disregard the obligation. I do not for one moment suggest that this was what she intended to do when the company asked for her consent to assign to the second defendant, for neither she nor, apparently, her solicitors had any appreciation of the plaintiffs' rights; but had the plaintiffs ascertained that it was proposed to effect an assignment without their own consent I have no doubt but that the court would, on their intervention, have restrained the company from acting in disregard of such consent and Miss Strutt from purporting to authorize them to do so. The plaintiffs did not, however, hear of the assignment to the second defendant in time to apply to the court, and it was accordingly carried through without their knowledge.

It is in these circumstances that the question arises whether the second defendant can claim that the assignment was "lawful" and thus defeat the claim which the plaintiffs have brought for possession of the premises. In my opinion this question must be answered in the negative. So far as Miss Strutt and Wroxall Estates Ld. and Commander Dugdale are

278.                    QUEEN'S BENCH DIVISION.                    **[1954]**

C. A.

1953

DRIVE
YOURSELF
HIRE Co.
(LONDON)
LD.
*v.*
STRUTT.

Romer L.J.

concerned it may well be that the assignment was perfectly valid. Miss Strutt gave her consent to it and at no time subsequently challenged it in any way. The company acted in breach of their covenant with Miss Strutt, but I think myself that it would have been difficult for her to have made this the subject of legal complaint in view of the letters which passed, and in any event, as I have said, she never attempted to do so. Nor could either Miss Strutt or the company set up any invalidity in the assignment as against Commander Dugdale. In my judgment, however, the matter by no means rests there. One of the results of section 15 (3) is undoubtedly to foist upon landlords, in many cases, tenants whom they do not wish to have and whose right of occupation may be of unforeseeable duration. This effect of the subsection was presumably known to the legislature, and I think that the word "lawfully," which was inserted for the protection of the landlord, should be given a reasonably wide construction.

It seems to me that the mere fact that a sublease or an assignment thereof is "lawful" as between the parties thereto does not of itself render it lawful as against a superior lessor. Now, when Wroxall Estates Ld. took their assignment from Mrs. Sykes the position would appear to be (though the point was not argued before us and I do not wish to be taken as expressing any definite opinion upon it) that the company were entitled to see the head-lease to Miss Strutt as well as the sublease by her to Mrs. Sykes (*Gosling* v. *Woolf* [26]), but not the licence which Mr. Payne gave to Miss Strutt (Law of Property Act, 1925, s. 45 (3)). It may be that notwithstanding section 44 (5) of the Act, the company had constructive notice of the licence, but the position as to this is somewhat obscure and it would be unsafe to deal with the case on the footing that they had. Even on the assumption, however, that the company neither knew nor had notice of the licence, and of the implied obligation upon Miss Strutt arising thereout, they knew of the covenant in the sublease requiring the head-lessor's consent; they knew also that when they took their own assignment this covenant was duly observed in that Mr. Payne's written consent thereto was obtained as well as that of Miss Strutt; and they must surely have known, as a matter of ordinary common sense, that the covenant was introduced solely for the benefit of the head-lessor, and not for the benefit of anybody else.

[26] [1893] 1 Q.B. 39.

**1 Q.B.**         QUEEN'S BENCH DIVISION.                    279

As to Miss Strutt (who played an essential part in the trans-
action, for it could not lawfully have gone through without her
consent) she knew, or must be taken to have known, of her
obligation to her own reversioner which was implicit in the
licence, and it is nothing to the purpose that it had escaped her
mind when she acted (if, in fact she did so act) in disregard of
it.  In view of all of these considerations it is not possible to say,
in my judgment, that the assignment was " lawful " within the
meaning and intendment of section 15 (3) of the Act of 1920.  It
was in fact executed in plain breach of the rights of the plaintiffs,
who had, and have, a greater interest in the property than any
of the parties who were engaged in the transaction.  The second
defendant cannot, therefore, in my opinion, rely as against the
plaintiffs upon the assignment as being a lawful document of
title, and I agree that the appeal must be allowed.

On this view of the matter it becomes unnecessary to decide
any of the other points which were argued before us (some of
which, at least, I think are difficult), and I prefer to express no
concluded opinion upon them.

C. A.

1953

DRIVE
YOURSELF
HIRE CO.
(LONDON)
LD.
v.
STRUTT.

Romer L.J.

> *Appeal allowed.*
> *Leave to appeal to House of Lords refused.*

Solicitors: *Merton Naydler; Farrer & Co.; Child & Child.*

A. W. G.

REGINA *v.* ALGAR.

*Criminal Law—Evidence—Witnesses—Competency—Husband and wife
— Nullity — Voidable marriage — Criminal offences committed by
husband during coverture—Nullity decree—Prosecution—Whether
wife competent to give evidence against former husband.*

C. C. A.

1953
Nov. 2, 9,
16.

Lord Goddard
C.J.,
Croom-Johnson
and
Glyn-Jones JJ.

Where a marriage has been lawfully contracted but is voidable
at the suit of one of the parties and a decree of nullity is subse-
quently pronounced, one former spouse is not thereafter competent
to give evidence against the other in respect of criminal offences
committed by that other spouse during coverture.

A wife who had been lawfully married obtained a decree of
nullity on the ground of her husband's impotence.  After the
decree had been pronounced she was called as a witness for the

[Reported by Mrs. E. M. WELLWOOD, Barrister-at-Law.]

**A-031**

[HOUSE OF LORDS.]

DUNLOP PNEUMATIC TYRE COMPANY, | APPELLANTS;    H. L. (E.)*
LIMITED . . . . . . . . . . . . }                        1915
                     AND                                 ~~~
SELFRIDGE AND COMPANY, LIMITED   .   RESPONDENTS.       *April 26.*

*Contract—Construction—Principal and Agent—Undisclosed Principal—Want*
*of Consideration moving from Principal.*

In 1911 D. & Co., who were motor accessory factors, agreed with the
plaintiffs, who were motor tyre manufacturers, in consideration of the
plaintiffs' allowing them certain discounts off their list prices, to buy a
given quantity of the plaintiffs' goods within a specified time ; also not
to sell or offer the plaintiffs' goods to any person at less than the plain-
tiffs' list prices, except that D. & Co. were to be at liberty to allow to
genuine trade customers a limited discount off such list prices, and in
case of any such sale they agreed, as the plaintiffs' agents, to obtain
from the trader a similar undertaking that he would observe the plain-
tiffs' list prices and to forward such undertaking to the plaintiffs.   The
plaintiffs exacted similar agreements from all their trade purchasers,
and this was known to the defendants, who were large storekeepers and
sold tyres by retail to the public.

In January, 1912, the defendants ordered tyres of the plaintiffs' make
from D. & Co., and by an agreement purporting to be made between
the defendants and D. & Co., in consideration of D. & Co.'s allowing
them certain discounts off the plaintiffs' list prices, they agreed (inter
alia) not to sell or offer any motor tyres of the plaintiffs' make to any
private customer at less than the list prices.   The plaintiffs sued the
defendants for breach of this contract:—

*Held,* assuming that the plaintiffs were undisclosed principals, that
no consideration moved from them to the defendants, and that the
contract was unenforceable by them.

*Per* Lord Parmoor: The claim of the plaintiffs to be treated as
undisclosed principals was inconsistent with the terms of the contract.

Decision of the Court of Appeal [1914] W. N. 59 affirmed.

APPEAL from an order of the Court of Appeal (1) reversing a
judgment of Phillimore J.

The appellants were manufacturers of motor tyres, covers,
and tubes, and substantially the whole of their business in these
articles was done through the trade.   The system of business

* *Present :* VISCOUNT HALDANE L.C., LORD DUNEDIN, LORD ATKINSON,
LORD PARKER OF WADDINGTON, LORD SUMNER, and LORD PARMOOR.

(1) [1914] W. N. 59.

H. L. (E.)
1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.
——

adopted by the appellants was as follows: They allowed trade purchasers from them certain trade discounts off the list prices of the goods and in consideration thereof they insisted that such trade purchasers should enter into contracts with them whereby the said trade purchasers agreed not to sell to private customers at less than the appellants' current list prices or to trade customers at less than the current list prices after deducting certain discounts, and further agreed, as agents of the appellants, to obtain from sub-purchasers, being trade customers, similar undertakings to observe the appellants' list prices.

The respondents were retailers and storekeepers in Oxford Street, and part of their business consisted in retailing to the public motor tyres, covers, and tubes of various manufacturers (including the appellants). The respondents were aware of the appellants' system of conducting business.

Messrs. A. J. Dew & Co. carried on business in Endell Street, London, as factors and dealers in motor tyres and tubes and other motor accessories.

By an agreement in writing dated October 12, 1911, between Messrs. A. J. Dew & Co. and the appellants, Messrs. A. J. Dew & Co., in consideration of the appellants' allowing them a trade discount of 10 per cent. for prompt monthly payments off their list prices for motor tyres, covers, tubes, and repairs current from time to time, and 25 per cent. off their list prices current from time to time for motor tyre sundries, agreed to purchase Dunlop motor tyres, covers, tubes, and sundries to the net value of 2000*l.* before the expiration of September, 1912, and if the net value of Messrs. A. J. Dew & Co.'s purchases during the above named period amounted to 2000*l.* they were to be allowed a rebate of 9 per cent. on the net amount of cash paid by them. And Messrs. A. J. Dew & Co. further agreed as follows:—

Not to sell or offer any Dunlop motor tyres, covers, tubes, or sundries to any private customer or to any co-operative society at prices below the appellants' list prices current at the time of sale nor give to any such customer or society any cash or other discounts or advantage reducing the same.

Not to sell or offer any Dunlop motor tyres, covers, tubes, or sundries to any other person, firm, or company at prices less

than the said list prices, but they were to be at liberty to allow to persons legitimately engaged in the motor trade (other than co-operative societies and persons included in the next succeeding clause) a discount not exceeding 10 per cent. off such list prices plus the appellants' authorized scale of rebates on the net value of purchases of such goods, and in the case of any sale of such tyres, covers, or tubes by A. J. Dew & Co. to any such trader they agreed, as agents for the appellants in that behalf, to obtain from such trader a written undertaking that he would similarly observe the appellants' list prices, terms, and conditions of sale current at the time of sale in any resales by him, and they further agreed to forward all such undertakings to the appellants on demand and not to allow such trade discounts to any such person without previously obtaining such written undertaking.

Not to supply any Dunlop goods to any person whose supplies the appellants requested them to suspend.

To pay the sum of 5l. for each tyre, cover, or tube sold or offered in breach of the conditions of the contract as liquidated damages and not as penalty and without prejudice to any other rights of the appellants under the contract.

On December 22, 1911, the respondents accepted an order from Captain Eustace Jameson for a Dunlop grooved cover at the price of 5l. 10s., and on January 1, 1912, they accepted an order from a Mr. Strauss for a Dunlop steel studded cover at the price of 4l. 10s. These prices were below the prices mentioned in the appellants' current price list. On January 2 the respondents ordered these covers from Messrs. A. J. Dew & Co., who obtained them from the appellants and delivered them to the respondents on the same day. Together with the covers Messrs. A. J. Dew & Co. sent to the respondents a letter enclosing a price maintenance agreement which they requested the respondents to sign. This agreement provided (so far as material) as follows :—

" PRICE MAINTENANCE AGREEMENT

To be entered into by Trade Purchasers of Dunlop Motor Tyres.

" Messrs. Selfridge & Co. to Messrs. A. J. Dew & Co.

" 2nd Jan. 1912.

" Dear Sir,

" In consideration of your allowing us a trade discount

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.

H. L. (E.)
1915
DUNLOP
PNEUMATIC
TYRE
COMPANY
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.
——

of 10 per cent. for prompt monthly payments off the list prices for motor tyres, covers, tubes and repairs contained in the Dunlop Pneumatic Tyre Co.'s list current from time to time . . . .

" (2.) We will not sell or offer any Dunlop motor tyres, covers or tubes to any private customers or to any co-operative society at prices below those mentioned in the said price list current at the time of sale, nor give to any such customer or society any cash or other discounts or advantages reducing the same. We will not sell or offer any Dunlop motor tyres, covers or tubes to any other person, firm or company at prices less than those mentioned in the said price list.

" (5.) We agree to pay to the Dunlop Pneumatic Tyre Co., Ltd., the sum of 5*l*. for each and every tyre, cover or tube sold or offered in breach of this agreement, as and by way of liquidated damages and not as a penalty, but without prejudice to any other rights or remedies you or the Dunlop Pneumatic Tyre Co., Ltd., may have hereunder."

The agreement was signed about a week later by the respondents' manager and returned to Messrs. A. J. Dew & Co.

In the meantime, namely, on January 3, the respondents delivered to Captain Jameson the cover he had ordered at the price agreed upon.

The respondents subsequently informed Mr. Strauss that they were unable to deliver the cover ordered by him except at the list price of 4*l*. 17*s*. 3*d*., and this cover was debited by the respondents to him at that price on January 22, 1912, and delivered to him on or about that date.

On February 9, 1912, the appellants commenced an action against the respondents for an injunction and damages in respect of the breach of the agreement of January 2, which they claimed to be an agreement made between the respondents and the appellants through Messrs. A. J. Dew & Co. as their agents.

The respondents by their re-amended defence alleged inter alia that the agreement was made between the respondents and A. J. Dew & Co. on their own account and not as agents for the appellants, and that the respondents never contracted with the appellants at all.

A. C.                       AND PRIVY COUNCIL.                       851

Phillimore J. gave judgment for the appellants for 10*l.*, the liquidated damages in respect of the two breaches above mentioned, and granted an injunction restraining the respondents from selling Dunlop motor tyres, covers, or tubes below the appellants' current list prices.

The Court of Appeal (Vaughan Williams, Kennedy, and Swinfen Eady L.JJ.) reversed this decision and gave judgment for the respondents. They held that the contract of January 2 was not a contract between the appellants and the respondents at all, but was a contract between Messrs. A. J. Dew & Co. and the respondents only, and that Messrs. A. J. Dew & Co. were not legally competent at one and the same time to make a contract with the respondents by themselves as principals and as agents of the appellants. They therefore held that the action was not sustainable.

1915. March 23, 25. *Younger, K.C.*, and *Disturnal, K.C.*, for the appellants. 1. The appellants are undisclosed principals. Although the agreement sued on was addressed to A. J. Dew & Co. they were acting as agents of the appellants and were known by the respondents to be so acting. The fact that the expressed consideration is to be paid by A. J. Dew & Co. does not preclude them from saying that they are agents. An agent may make a payment under a contract out of his own pocket without losing his character as agent : *Phelps* v. *Prothero.* (1)

2. There was in fact a consideration moving from the appellants to the respondents, and this consideration may be proved by parol evidence. These price maintenance agreements deal with proprietary articles, and A. J. Dew & Co., as the respondents well knew, were under contract to the appellants not to supply these articles to trade customers on trade terms except on condition of exacting from those customers an undertaking to observe the appellants' list prices.

The consideration moving from the appellants to the respondents is that the appellants, with the knowledge of the respondents, permit A. J. Dew & Co. to sell tyres to the respondents on favourable terms and that the respondents take advantage of

(1) (1855) 16 C. B. 370.

<div style="text-align:right">

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

</div>

HOUSE OF LORDS                      **[1915]**

H. L. (E.)  those terms. But for the intervention of the appellants the
1915    respondents could not have got the goods on those terms at all.
‾‾‾‾    And if there is this additional consideration in fact parol evidence
DUNLOP  of it is admissible, for such evidence does not contradict the con-
PNEUMATIC  tract: *Frith* v. *Frith* (1), approving *Clifford* v. *Turrell*. (2)
TYRE
COMPANY,    *Sir Robert Finlay, K.C., Sanderson, K.C.,* and *Herbert L. Tebbs,*
LIMITED  for the respondents, were not called on.
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.    The House took time for consideration.

April 26. VISCOUNT HALDANE L.C. My Lords, in my opinion
this appeal ought to fail.

Prior to January 2, 1912, Messrs. Dew had entered into a
contract with the appellants to purchase a quantity of tyres and
other goods from them at the prices in their list, in consideration
of receiving certain discounts. As part of their contract Messrs.
Dew undertook, among other things, not to sell to certain classes
of customer at prices below the current list prices of the appel-
lants. They were, however, to be at liberty to sell to a class of
customer that included the respondents at a discount which was
substantially less than the discount they were themselves to
receive from the appellants, but in the case of any such sale they
undertook, as the appellants' agents in this behalf, to obtain from
the customer a written undertaking that he similarly would
observe the terms so undertaken to be observed by themselves.
This contract was embodied in a letter dated October 12, 1911.

On January 2 the respondents contracted with Messrs. Dew,
in terms of a letter of that date addressed to them, that, in con-
sideration of the latter allowing them discounts on goods of the
appellants' manufacture which the respondents might purchase
from Messrs. Dew, less, in point of fact, than the discount
received by the latter from the appellants, the respondents,
among other things, would not sell the appellants' goods to
private customers at prices below those in the appellants' current
list, and that they would pay to the appellants a penalty for
every article sold in breach of this stipulation.

The learned judge who tried the case has held that the respon-

(1) [1906] A. C. 254.          (2) (1841) 1 Y. & C. Ch. 138.

A. C.    AND PRIVY COUNCIL.    853

H. L. (E.)
1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.

Viscount
Haldane L.C.

dents sold goods of the appellants' manufacture supplied through Messrs. Dew at less than the stipulated prices, and the question is whether, assuming his finding to be correct, the appellants, who were not in terms parties to the contract contained in the letter of January 2, can sue them.

My Lords, in the law of England certain principles are fundamental. One is that only a person who is a party to a contract can sue on it. Our law knows nothing of a jus quaesitum tertio arising by way of contract. Such a right may be conferred by way of property, as, for example, under a trust, but it cannot be conferred on a stranger to a contract as a right to enforce the contract in personam. A second principle is that if a person with whom a contract not under seal has been made is to be able to enforce it consideration must have been given by him to the promisor or to some other person at the promisor's request. These two principles are not recognized in the same fashion by the jurisprudence of certain Continental countries or of Scotland, but here they are well established. A third proposition is that a principal not named in the contract may sue upon it if the promisee really contracted as his agent. But again, in order to entitle him so to sue, he must have given consideration either personally or through the promisee, acting as his agent in giving it.

My Lords, in the case before us, I am of opinion that the consideration, the allowance of what was in reality part of the discount to which Messrs. Dew, the promisees, were entitled as between themselves and the appellants, was to be given by Messrs. Dew on their own account, and was not in substance, any more than in form, an allowance made by the appellants. The case for the appellants is that they permitted and enabled Messrs. Dew, with the knowledge and by the desire of the respondents, to sell to the latter on the terms of the contract of January 2, 1912. But it appears to me that even if this is so the answer is conclusive. Messrs. Dew sold to the respondents goods which they had a title to obtain from the appellants independently of this contract. The consideration by way of discount under the contract of January 2 was to come wholly out of Messrs. Dew's pocket, and neither directly nor

H. L. (E.)
1915
DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

Viscount
Haldane L.C.

indirectly out of that of the appellants. If the appellants enabled them to sell to the respondents on the terms they did, this was not done as any part of the terms of the contract sued on.

No doubt it was provided as part of these terms that the appellants should acquire certain rights, but these rights appear on the face of the contract as jura quaesita tertio, which the appellants could not enforce. Moreover, even if this difficulty can be got over by regarding the appellants as the principals of Messrs. Dew in stipulating for the rights in question, the only consideration disclosed by the contract is one given by Messrs. Dew, not as their agents, but as principals acting on their own account.

The conclusion to which I have come on the point as to consideration renders it unnecessary to decide the further question as to whether the appellants can claim that a bargain was made in this contract by Messrs. Dew as their agents; a bargain which, apart from the point as to consideration, they could therefore enforce. If it were necessary to express an opinion on this further question, a difficulty as to the position of Messrs. Dew would have to be considered. Two contracts— one by a man on his own account as principal, and another by the same man as agent—may be validly comprised in the same piece of paper. But they must be two contracts, and not one as here. I do not think that a man can treat one and the same contract as made by him in two capacities. He cannot be regarded as contracting for himself and for another uno flatu.

My Lords, the form of the contract which we have to interpret leaves the appellants in this dilemma, that, if they say that Messrs. Dew contracted on their behalf, they gave no consideration, and if they say they gave consideration in the shape of a permission to the respondents to buy, they must set up further stipulations, which are neither to be found in the contract sued upon nor are germane to it, but are really inconsistent with its structure. That contract has been reduced to writing, and it is in the writing that we must look for the whole of the terms made between the parties. These terms cannot, in my opinion consistently with the settled principles of English law, be

A. C.                    AND PRIVY COUNCIL.                    855

construed as giving to the appellants any enforceable rights as against the respondents.

I think that the judgment of the Court of Appeal was right, and I move that the appeal be dismissed with costs.

LORD DUNEDIN. (1) My Lords, I confess that this case is to my mind apt to nip any budding affection which one might have had for the doctrine of consideration. For the effect of that doctrine in the present case is to make it possible for a person to snap his fingers at a bargain deliberately made, a bargain not in itself unfair, and which the person seeking to enforce it has a legitimate interest to enforce. Notwithstanding these considerations I cannot say that I have ever had any doubt that the judgment of the Court of Appeal was right.

My Lords, I am content to adopt from a work of Sir Frederick Pollock, to which I have often been under obligation, the following words as to consideration : " An act or forbearance of one party, or the promise thereof, is the price for which the promise of the other is bought, and the promise thus given for value is enforceable." (Pollock on Contracts, 8th ed., p. 175.)

Now the agreement sued on is an agreement which on the face of it is an agreement between Dew and Selfridge. But speaking for myself, I should have no difficulty in the circumstances of this case in holding it proved that the agreement was truly made by Dew as agent for Dunlop, or in other words that Dunlop was the undisclosed principal, and as such can sue on the agreement. None the less, in order to enforce it he must show consideration, as above defined, moving from Dunlop to Selfridge.

In the circumstances, how can he do so ? The agreement in question is not an agreement for sale. It is only collateral to an agreement for sale ; but that agreement for sale is an agreement entirely between Dew and Selfridge. The tyres, the property in which upon the bargain is transferred to Selfridge, were the property of Dew, not of Dunlop, for Dew under his agreement with Dunlop held these tyres as proprietor, and not as agent. What then did Dunlop do, or forbear to do, in a question with Selfridge ? The answer must be, nothing. He did not do

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

(1) Read by Lord Atkinson.

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Dunedin.

anything, for Dew, having the right of property in the tyres, could give a good title to any one he liked, subject, it might be, to an action of damages at the instance of Dunlop for breach of contract, which action, however, could never create a vitium reale in the property of the tyres. He did not forbear in anything, for he had no action against Dew which he gave up, because Dew had fulfilled his contract with Dunlop in obtaining, on the occasion of the sale, a contract from Selfridge in the terms prescribed.

To my mind, this ends the case. That there are methods of framing a contract which will cause persons in the position of Selfridge to become bound, I do not doubt. But that has not been done in this instance; and as Dunlop's advisers must have known of the law of consideration, it is their affair that they have not so drawn the contract.

I think the appeal should be dismissed.

LORD ATKINSON. My Lords, the action out of which this appeal arises was brought by the appellants against the respondents to restrain the latter from selling or offering for sale certain goods manufactured by the appellants, on terms other than those specified in a certain agreement dated January 2, 1912, alleged to have been entered into between the respondents and the appellants through Messrs. A. J. Dew & Co. as the agents of the latter; and to recover the liquidated damages made recoverable by the terms of this agreement in respect of the breaches thereof complained of, and for an account of the goods sold in violation of the same.

The main facts of the case are undisputed. The appellants are large and well-known manufacturers of motor tyres, covers, and tubes, which are sold to the users of motor cars and other vehicles through their factors, and also through manufacturers of motor cars. Messrs. A. J. Dew & Co. were one of these agents or factors. They, like all the appellants' other agents or factors, entered into an agreement with them styled a price maintenance agreement. The particular agreement in the case of Dew & Co. bore date October 12, 1911. It, in substance, provided that in consideration of being allowed 10 per cent.

A. C.　　　　AND PRIVY COUNCIL.　　　　857

discount off the appellants' list prices for motor tyres, covers, and tubes current from time to time, for prompt monthly payment, and a discount of 25 per cent. off appellants' price list for certain other goods therein named, Dew & Co. agreed to purchase from them before the expiration of the month of September, 1912, goods of the above-mentioned character of the net value of 2000*l.*, with a further provision that if these purchases should, during the above-mentioned period, amount to 2000*l.* and all the conditions of the contract be observed by Dew & Co., the appellants should allow them a rebate of 9 per cent. on the net amount of cash paid by them.

The only conditions of the contract necessary to refer to are first, a provision that Dew & Co. should not sell or offer for sale any Dunlop motor tyres, covers, or tubes to any other person, firm, or company at prices less than these list prices; but should be at liberty to allow to persons legitimately engaged in the motor trade (other than co-operative societies) a discount not exceeding 10 per cent. off such list prices, plus the authorized scale of rebates on the net values of the purchases of the aforesaid goods, and further, that in case of any sale of any of the said goods to any such traders as aforesaid, Dew & Co. should, as the appellants' agents, obtain from each trader a written undertaking that he would similarly observe the list prices, terms, and conditions of sale on any resales made by him, whether to private customers or other traders, would forward these undertakings to the appellants on demand, and would not allow such trade discounts to any of the persons aforesaid without previously obtaining such a written undertaking; and, second, a condition that Dew & Co. should pay 5*l.* for every tyre, cover, or tube sold or offered for sale in breach of the conditions of the contract.

Now this agreement was an agreement for the sale and purchase of the appellants' goods, with certain contractional restrictions on the purchaser's right of resale. Dew & Co., unless restrained by injunction, could sell the goods they had purchased from the appellants to any sub-vendee on any terms they pleased, subject to this, that they exposed themselves to an action for breach of contract at the appellants' suit if they did not observe the terms of the agreement. But they did not

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Atkinson.

H. L. (E.)
1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Atkinson.

require the special consent of the appellants to any particular resale made in conformity with the terms of the agreement. That consent was given in anticipation the moment the agreement was entered into. Dew & Co. were then clothed with absolute authority to resell on the terms specified in the agreement. The appellants had no power to prohibit or restrain them from doing so. I think it may be fairly assumed that the respondents were aware of the nature of this agreement between Dew & Co. and the appellants.

When one turns to the contract relied upon, namely, the letter dated January 2, 1912, drawn up by Dew & Co., and signed on behalf of the respondents by A. Horsfield, it is clear that Dew & Co. did introduce into it, in substance, all the stipulations they were bound by their contract with their principals to introduce. They did nothing which that contract did not authorize. They merely exercised their right to resell on the terms prescribed. It was contended by the appellants' counsel, as I understood them, that the discount of 10 per cent. having been given to the respondents, it must be taken that the appellants gave a specific and special consent to this particular contract with the respondents, and that that special consent constituted a consideration, moving from the appellants to the respondents, sufficient to support the contract contained in the letter of January 2, 1912 as a contract between the appellants and the respondents. In my opinion that contention is entirely unsustainable.

It was also urged on behalf of the appellants that it was competent for the latter to show that Dew & Co. entered into this contract of January 2, 1912, as agents for undisclosed principals, namely, the appellants in the present action.

Even if that were so, and the appellants were to be treated as parties to the contract contained in this letter, it does not get over the difficulty. The contract is as to them a nudum pactum, since no consideration moves from them to the respondents, or to any other person or body at the respondents' request.

I confess that the inclination of my opinion is that this case comes within the principle of the decision in *Humble* v. *Hunter* (1), and that consistently with the terms of the letter itself the

(1) (1848) 12 Q. B. 310.

appellants cannot claim to be principals on whose behalf Dew & Co. contracted as their agents.  Kennedy L.J. has pointed out in his judgment the different stipulations in the contract which are irreconcilable with the supposition that Dew & Co. did not contract as principals.  But however this may be, it is, I think, clear that no consideration moved from the appellants to support any contract made with them and the respondents, and I prefer to base my judgment on that ground.

I think, therefore, that the judgment appealed from was right, and this appeal should be dismissed with costs here and below.

LORD PARKER OF WADDINGTON. (1)  My Lords, even assuming that the undertaking upon which this action is founded was given by the respondents to Messrs. A. J. Dew & Co. as agents for the appellants, and was intended to enure for their benefit, the appeal cannot succeed unless the undertaking was founded on a consideration moving from the appellants, and in my opinion there was no such consideration.  The appellants did not give or give up anything on the strength of the undertaking. They had sold tyres to Messrs. A. J. Dew & Co. on the terms that the latter should not resell them at prices less than those specified in the appellants' price list, except that Messrs. A. J. Dew & Co. were to be at liberty to allow to persons legitimately engaged in the motor trade a certain discount off such price list, if they, as agents for the appellants, obtained from such persons a written undertaking such as that upon which this action is founded.  In reselling these tyres to the respondents, and obtaining from the respondents the undertaking in question, Messrs. A. J. Dew & Co. admittedly committed no breach of contract.  The sale was, of course, a good consideration for the undertaking moving from Messrs. A. J. Dew & Co., but the appellants, in whose favour the undertaking was given, being in the position of volunteers not parties to the contract of sale, cannot sue on it.  The case was argued on behalf of the appellants as though what was done by Messrs. A. J. Dew & Co. would have been unlawful but for the leave and licence of the

(1) Read by Lord Sumner.

H. L. (E.)
1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Atkinson.

H. L. (E.)
1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Parker of
Waddington.

appellants, and that such leave and licence, though general in form, must be taken as given on the occasion of each sale, in consideration of the undertaking. I cannot accept this contention. In the first place, it is wrong to speak of an exception from a restrictive contract as importing any leave or licence at all. But for any contract to the contrary, Messrs. A. J. Dew & Co. were entitled to resell the goods supplied to them by the appellants upon any terms they might think fit, and in reselling as they did there was no breach of any restrictive contract. Even, however, if the sale can be considered as lawful only by licence of the appellants, the licence was given once for all in their contract to Messrs. A. J. Dew & Co., and was not given as part of the terms upon which any particular sale was allowed.

The appeal fails on this ground and should be dismissed with costs.

LORD SUMNER. My Lords, there are two instances of sale and delivery complained of in this case. The steps in the Jameson transaction are as follows. Those in the other, the Strauss transaction, are similar, and need not be analysed. On October 12, 1911, Messrs. Dew & Co., motor accessory factors, contracted with the appellants, the Dunlop Pneumatic Tyre Company, in terms of the latter's price maintenance agreement then current. By this contract Messrs. Dew & Co. became bound, inter alia, to buy from the Dunlop Company motor tyres, covers, tubes, and sundries to the net value of 2000*l.* before the expiration of September, 1912, and the appellants became bound, if the contract continued to subsist, as it did, to sell and deliver such goods up to that value, whenever reasonably required to do so.

On December 21, 1911, a Captain Jameson thought fit to ask the respondents, Messrs. Selfridge & Co., Limited, who are described as wholesale and retail merchants, for their lowest price for a Dunlop motor tyre, grooved and non-skid, 815 by 105. Their answer was that, on receipt of his order, such a tyre would be procured and the price would be 5*l.* 18*s.* 2*d.*, which was the appellants' list price, less 7½ per cent.

On January 1, 1912, Captain Jameson sent to the respondents

an order for the tyre, and also the money for it, and on the same day the order was accepted, and delivery of the tyre was promised for the following day. In fact, on January 2 the respondents ordered this tyre from Messrs. Dew & Co. by telephone. Messrs. Dew & Co., in turn, ordered it by telephone from the appellants; it was delivered by them to Messrs. Dew & Co., and they sent it to the respondents. These were the events of January 2. On the next day the respondents delivered it to Captain Jameson. Of course the respondents did not mention Captain Jameson to Messrs. Dew & Co., nor did Messrs. Dew & Co. mention the respondents to the appellants.

So far the respondents had signed no price maintenance agreement. They had been pressed to do so, and no doubt knew that the reason why they were being pressed by Messrs. Dew & Co. was because the appellants, in turn, strictly required them to obtain these agreements from those of their customers to whom they sold. Within two or three days of January 3 they did sign such an agreement, dating it January 2, and delivering it to Messrs. Dew & Co., to whom it was addressed, a week or so afterwards. It is for breach of this agreement that the appellants sued.

The parties have been desirous of knowing their reciprocal rights and duties, if any, arising out of this agreement, and have accordingly raised two broad questions : (1.) Is there any agreement between these parties at all? (2.) If so, is there any consideration moving from the appellants to support it and make it bind the respondents to them? But for this there would have been a good deal to be said for the proposition that a bargain and sale, clearly complete before this agreement was signed or dated, could be no breach of it, and that the performance of that bargain by delivery of the goods after the price maintenance agreement was made could hardly be a ground for the grant of an injunction.

My Lords, let it be assumed without discussion that the agreement which the respondents signed speaks from its date, January 2. Let it be assumed also that evidence was admissible to add an unexpressed consideration moving from the appellants to the expressed consideration moving from Messrs. Dew & Co. Let it be assumed further (though this is a large assumption) that

<div align="right">

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY
LIMITED.

Lord Sumner.

</div>

862                          HOUSE OF LORDS                    **[1915]**

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Sumner.

the terms of the instrument do not so designate Messrs. Dew & Co. as the principals and the only contracting parties as to shut out proof that the appellants were their undisclosed principals. After all, what consideration moved from the appellants?

As the point is not insisted on that Messrs. Dew & Co. sold and delivered to the respondents first, and procured their written undertaking only afterwards, I think that Messrs. Dew & Co. exactly performed the conditions of their agreement with the appellants. The firm of Selfridge & Co. was the "trader" within that agreement, and Messrs. Dew & Co. duly obtained that firm's written undertaking to the intent therein described. The undertaking was in the appellants' own form, and Messrs. Dew & Co. did not contract even by implication that the undertaking which they would obtain should be binding.

The respondents signed what they were asked to sign, but nothing precluded them from saying afterwards that it was nudum pactum. At first they thought and said that they were bound, but this did not alter their position or the appellants', or supply a consideration where none existed before. They made no request for the tyre to the appellants, for they did not know that Messrs. Dew & Co. had not got it in stock, or, if they knew, they did not constitute Messrs. Dew & Co. their agents to ask the appellants for it. Messrs. Dew & Co. asked for it by virtue of their agreement to buy up to 2000*l.* worth of goods, and so it was that the appellants delivered it.

Messrs. Dew & Co. did not mention to the appellants that so far no written undertaking had been signed by their customer, and the appellants, knowing nothing, waived nothing. The appellants, as alleged promisees, neither did nor suffered nor forbore anything, nor promised to do any of these things or anything at all, in exchange for the undertaking purporting to be given by the respondents. It was contended that consideration might be found in the fact that the appellants, who could sell or not sell their own proprietary products, as they chose, only enabled the respondents to get the tyres by agreeing to supply Messrs. Dew & Co., and only agreed to supply them on the restrictive terms in question. This breaks down as soon as it is examined. To this transaction the respondents were

strangers. It happened before they received or gave any order. The delivery of the tyres by the appellants was in performance of an obligation unknown to the respondents (though I daresay they could have surmised it if it had been any business of theirs) and prior to their appearance on the scene. In this transaction nothing moved from the appellants to the respondents. It would have been the same if the other firm had not existed. The appellants have sued on a nudum pactum.

My Lords, the appellants' " distributing organization " has been before your Lordships' House before, and I do not suppose you have heard the last of it now. I think it better, accordingly, to express no opinion on any of the other questions that have been raised, since this one decides the case, and the others may occur again. Much may be said both ways on the right of the appellants to come forward as undisclosed principals upon the contract in question. I express no opinion except that I do not wish to be supposed entirely to assent to the broad proposition, apparently suggested in some of the judgments of the Lords Justices, that a contract, in which one and the same party contracts both on his own behalf and for an undisclosed principal, is a legal impossibility. So stated I think the proposition somewhat too wide. If no more is meant than what Swinfen Eady L.J. puts, " where a party contracts in his own name, an undisclosed principal cannot sue on the contract, if the terms are such as import that the person so signing is the real and only principal," it is not open to objection.

I think that the appeal should be dismissed.

LORD PARMOOR. My Lords, the main question in this appeal is whether it is competent for the appellants to bring an action to enforce certain conditions in a contract made between the respondents and Messrs. A. J. Dew & Co. The appellants are manufacturers and Messrs. A. J. Dew & Co. are factors and dealers in motor tyres, covers, or tubes. It is the object of the appellants to enforce and maintain certain general conditions and prices in the sale of their motor tyres, covers, or tubes, and it may be assumed that it is important for their business to attain this object.

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Sumner.

864                            HOUSE OF LORDS                    **[1915]**

H. L. (E.)    The appellants are not in form parties to the contract which

1915    they seek to enforce. They claim to be undisclosed principals.

Dunlop    If they can prove this, they get over the first difficulty. Unless
Pneumatic
Tyre    the appellants can prove that they are undisclosed principals, they
Company,
Limited    fail at the outset, since the stipulations which they seek to enforce
v.    are not of such a character that a person, not a party to the con-
Selfridge
and    tract, has a right to bring an action to enforce them.

Company,
Limited.    There is no question that parol evidence is admissible to

———    prove that the plaintiff in an action is the real principal to a
Lord Parmoor.
———    contract; but it is also well established law that a person cannot

claim to be a principal to a contract, if this would be inconsistent

with the terms of the contract itself.

Kennedy L.J. in his judgment in the Court of Appeal states

his conclusion that it would be inconsistent with the terms of ·

the contract itself to admit the claim of the appellants to be

regarded as undisclosed principals with a consequent right to

bring an action to enforce certain of its conditions. I agree

with this conclusion, and it is sufficient to dispose of the case.

A further difficulty in the way of the appellants is that, apart

from any question of form, they cannot show that there is any

consideration sufficient to support a contract as between them-

selves and the respondents. On October 12, 1911, the appellants

entered into a contract with Messrs. A. J. Dew & Co. that in

consideration of discounts and rebates being allowed off the

appellants' current price list they would purchase from the

appellants goods to the quantity therein mentioned. There were

several conditions attached to the contract, among them the

following : "We will, as your agents in this behalf, in the case

of any sale of your tyres, covers, or tubes to a trader obtain

from such trader a written undertaking that he will similarly

observe your list prices, terms, and conditions of sale current at

the time of sale in any resales by him."

In accordance with this obligation, Messrs. A. J. Dew & Co.

did make a contract with the respondents that they would

similarly observe the appellants' prices, terms, and condi-

tions of sale current at the time of any sale by them. There

is no dispute that the respondents did not observe the conditions

attached to their contract with Messrs. A. J. Dew & Co. The

appellants, in their action, claimed an injunction and damages at the rate of 5*l*. for each and every tyre, cover, or tube sold by the respondents in breach of the said agreement.

I understood Mr. Younger, in his argument on behalf of the appellants, to say that the appellants, under the contract between themselves and Messrs. A. J. Dew & Co. of October 12, 1911, reserved some control over the sale of their goods by Messrs. A. J. Dew & Co. to third parties, and that in this respect there was consideration moving from the appellants to the respondents sufficient to support a contract.

I am of opinion that no such control was reserved to the appellants, and that Messrs. A. J. Dew & Co., without any further authority or licence from the appellants, had a full right, as factors or dealers in the appellants' goods, to sell them to the respondents. It may well be that the appellants under their contract with Messrs. A. J. Dew & Co. have the power to prevent the supply of the appellants' goods to any person whose supplies the appellants request Messrs. A. J. Dew & Co. to suspend, but this is a wholly different proposition from a claim to be entitled to bring an action against the purchasers of goods sold by Messrs. A. J. Dew & Co. in the course of their business.

If Messrs. A. J. Dew & Co. had full power to sell the goods in question to the respondents, as factors or dealers, it is, I think, clear that the appellants were not in a position to give, and did not give, any consideration which could support a contract between themselves and the respondents, and that the action fails.

I abstain from discussing what remedy Messrs. A. J. Dew & Co. might have on their contract with the respondents, or whether the appellants might not have attained their object in some other way; it is sufficient to say that the appellants cannot succeed in their present action and that the appeal fails.

*Order of the Court of Appeal affirmed and appeal dismissed with costs.*

*Lords' Journals*, April 26, 1915.

Solicitors for appellants: *John B. & F. Purchase.*
Solicitors for respondents: *Nunn, Popham & Starkie.*

H. L. (E.)

1915

DUNLOP PNEUMATIC TYRE COMPANY, LIMITED
*v.*
SELFRIDGE AND COMPANY, LIMITED.

Lord Parmoor.

A                                Supreme Court

# VTB Capital plc *v* Nutritek International Corpn and others

## [2013] UKSC 5

B

2012  Nov 12, 13, 14;          Lord Neuberger of Abbotsbury PSC, Lord Mance,
2013  Feb 6                    Lord Clarke of Stone-cum-Ebony,
                               Lord Wilson, Lord Reed JJSC

*Company — Corporate personality — Piercing corporate veil — Claimant induced to
    enter loan agreement with company by representations made by third parties —
    Company controlled by third parties — Claimant alleging representations
    dishonest — Whether appropriate to pierce corporate veil — Whether third
    parties liable with company for breach of agreement*

C

*Practice — Claim form — Service out of jurisdiction — Application to set aside
    permission to serve out of jurisdiction — Action in tort by English claimant
    against Russian defendants arising from failure to repay loan — Torts allegedly
    committed in England and governed by English law — Whether English court
    clearly appropriate forum for trial of action — Whether service out of
    jurisdiction to be permitted — CPR r 6.36, Practice Direction 6B, para 3.1(9)(a)*

D

   The claimant bank, which was incorporated, registered and regulated in
England, was the subsidiary of a Russian state-owned bank based in Moscow.
Following detailed negotiations and credit analyses conducted principally through
the Russian bank, the claimant entered into a facility agreement in London with a
Russian company, RAP, for a loan to enable RAP to purchase six Russian dairy
companies and associated enterprises from the first defendant, a company
incorporated in the British Virgin Islands with operations in Russia, and controlled

E

through the second and third defendants, companies incorporated in the British
Virgin Islands and Russia respectively, and the fourth defendant, an international
businessman living in Russia. The facility agreement, and an accompanying interest
rate swap agreement, provided for English law to be the governing law and for the
English courts to have non-exclusive jurisdiction, or, at the claimant's option, for
arbitration to be based in London. RAP defaulted on the loan after making three
payments of interest. The claimant brought an action for damages in deceit and

F

conspiracy, alleging that it had been induced to enter the facility agreement by the
misrepresentations of the first defendant, acting in concert with the other defendants
for which they were jointly and severably liable; that the fourth defendant had at all
times been the controller and principal beneficial owner of the three defendant
companies and of RAP and that he had approached the claimant and the Russian
bank to initiate and promote the acquisition scheme. The misrepresentations alleged
were that RAP and the first defendant were not in common control so that the sale of

G

the dairy companies to RAP was a genuine arm's length transaction and that the
stated value of the dairy companies was greatly in excess of their true worth. On the
claimant's application under CPR r 6.36[1] and paragraph 3.1(9)(a) of Practice
Direction 6B supplementing CPR Pt 6, the master granted it permission to serve the
proceedings out of the jurisdiction and service was effected on the first, second and
fourth defendants. When the defendants applied to set service aside, the claimant
sought to amend its particulars of claim to plead an additional claim in contract that

H

they were to be held liable for breach of the agreements on the basis that, as entities

---

   [1] CPR r 6.36: "the claimant may serve a claim form out of the jurisdiction with the
permission of the court if any of the grounds set out in paragraph 3.1 of Practice Direction 6B
apply."
   Practice Direction 6B supplementing CPR Pt 6, para 3.1(9): "A claim is made in tort where
(a) damage was sustained within the jurisdiction . . ."

© 2013 The Incorporated Council of Law Reporting for England and Wales

behind the borrowing, the corporate veil of RAP could be pierced. The judge, having          A
adopted a two-stage test on the question of the appropriate forum for trial of the
claims, concluded that Russian law was the proper law and that Russia was the
appropriate forum, and accordingly set aside service and refused the claimant's
application to amend. On the appeal, the Court of Appeal held that the judge had
erred in his adoption of a two-stage test in respect of the forum issue but, having
re-exercised the discretion, concluded that, despite his error, the judge had ultimately
reached the right decision as to the proper law and the appropriate forum and          B
dismissed the appeal.

On the claimant's appeal—

*Held*, (1) that permission to serve out of the jurisdiction should only be granted
where the court was satisfied that England was the proper place in which to bring the
claim; that the onus lay on the claimant to establish that the courts of that jurisdiction
were clearly the appropriate forum for trial of the action; that where a judge had
made an evaluative judgment as to whether England was the appropriate forum an
appellate court should refrain from interfering with the decision unless satisfied that a          C
significant error had been made; and that (per Lord Neuberger of Abbotsbury PSC,
Lord Mance, Lord Clarke of Stone-cum-Ebony and Lord Wilson JJSC) since the
judge's erroneous adoption of a two-stage test had not affected his ultimate
conclusion, that error was insignificant and did not justify an appellate court
re-exercising the discretion whether to permit service out of the jurisdiction (post,
paras 12, 13, 18, 44, 68, 80, 96–99, 156, 164, 190, 229–230).

(2) Dismissing the appeal in respect of permission to serve out of the jurisdiction          D
(Lord Clarke of Stone-cum-Ebony and Lord Reed JJSC dissenting), that although the
fact that the governing law of the alleged torts was English law was in general a
positive factor in favour of trial in England, that factor had less force where the issues
were factual rather than legal; that the place of commission of the torts was a relevant
starting point, rather than a presumption, in determining the appropriate forum for a
tort claim and would, viewed in isolation, normally establish a prima facie basis for
being treated as the appropriate jurisdiction; but that, in the context of an          E
international transaction, its significance might be overshadowed by countervailing
factors; that, although the judge and the Court of Appeal had both been in error in
holding that the governing law was Russian rather than English, that error had not
been decisive to the court's conclusion and did not justify intervention by an
appellate court; that the jurisdiction clauses in the agreements in favour of the
English courts was not a strong factor in support of an English forum; that, although
the alleged torts had been committed in England under English law, the fundamental          F
focus was on Russia and the Russian witnesses; that, since the transaction had been
introduced, pursued and approved predominantly in Moscow, and since the bulk of
the evidence on both sides would come from Russian witnesses, the Russian
connection was of such strength that the claimant could not discharge the onus of
establishing that England was clearly the appropriate forum for trial; and that,
accordingly, permission to serve out of the jurisdiction had correctly been set aside
(post, paras 7–10, 45–51, 54–55, 62, 65–66, 68–71, 74, 98, 100–101, 105, 111, 113,          G
149, 151, 153–154, 156).

*Cordoba Shipping Co Ltd v National State Bank, Elizabeth, New Jersey (The
Albaforth)* [1984] 2 Lloyd's Rep 91, CA considered.

(3) Dismissing the appeal in respect of permission to amend the particulars of
claim, that (per Lord Neuberger of Abbotsbury PSC, Lord Mance, Lord Wilson and
Lord Reed JJSC) it would be contrary to authority and principle to extend such
jurisdiction as the court might have to pierce a company's corporate veil in such a          H
way that, as sought by the claimant's proposed amendment, a person in control of the
company would be liable as if he were a co-contracting party with the company to a
contract to which he was not a party and to which none of the parties had intended
that he should be; that, in any event, such an extension was unnecessary in order to
enable the claimant to seek redress from the fourth defendant; and that it was not

339
[2013] 2 AC                VTB Capital plc v Nutritek International Corpn (SC(E))

A    appropriate in the circumstances to pierce RAP's corporate veil and the proposed
     amendment had rightly been refused (post, paras 72, 131–143, 145–148, 151, 158,
     238, 243).
         *Antonio Gramsci Shipping Corpn v Stepanovs* [2012] 1 All ER (Comm) 293
     disapproved.
         *Per* Lord Neuberger of Abbotsbury PSC, Lord Mance, Lord Clarke of Stone-
     cum-Ebony and Lord Reed JJSC. (i) Judges hearing applications for service out of the
B    jurisdiction or for a stay should invoke their management powers to ensure that the
     evidence and argument are kept within proportionate bounds and do not get out of
     hand. The essentially relevant factors should generally be capable of being identified
     relatively simply and uncontroversially (post, paras 73, 83, 89, 228, 240).
         (ii) A defendant challenging the jurisdiction of the court is entitled to put the
     claimant to proof of his case, but if he is wholly reticent about his case he can have no
     complaint if the court does not take into account what points he may make or
C    evidence he may call at any trial; he should therefore indicate his case in general
     terms, shortly and concisely (post, paras 36, 39, 73, 90–91, 228, 240).
         *Quaere.* Whether, absent statutory authority, the court can pierce the veil of
     incorporation in any circumstances (post, paras 72, 130, 158, 238).
         Decision of the Court of Appeal [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep
     313 affirmed on different grounds.

     The following cases are referred to in the judgments:

D    *Adams v Cape Industries plc* [1990] Ch 433; [1990] 2 WLR 657; [1991] 1 All ER
         929, CA
     *Alliance Bank JSC v Aquanta Corpn* [2011] EWHC 3281 (Comm); [2012] 1 Lloyd's
         Rep 181; [2012] EWCA Civ 1588; [2013] 1 All ER (Comm) 819; [2013]
         1 Lloyd's Rep 175, CA
     *Antonio Gramsci Shipping Corpn v Stepanovs* [2011] EWHC 333 (Comm); [2011]
         Bus LR D117; [2012] 1 All ER (Comm) 293; [2011] 1 Lloyd's Rep 647
E    *Atlas Maritime Co SA v Avalon Maritime Ltd (No 1)* [1991] 4 All ER 769; [1991]
         1 Lloyd's Rep 563, CA
     *Barcelona Traction, Light and Power Co Ltd (Second Phase), Case concerning
         (Belgium v Spain)* [1970] ICJ Rep 3
     *Ben Hashem v Al Shayif* [2008] EWHC 2380 (Fam); [2009] 1 FLR 115
     *Berezovsky v Michaels* [2000] 1 WLR 1004; [2000] 2 All ER 986, HL(E)
     *Cherney v Deripaska (No 2)* [2009] EWCA Civ 849; [2010] 2 All ER (Comm) 456,
F        CA
     *Company, In re A* [1985] BCLC 333, CA
     *Continental Transfer Technique Ltd v Federal Government of Nigeria* [2009]
         EWHC 2898 (Comm)
     *Cordoba Shipping Co Ltd v National State Bank, Elizabeth, New Jersey (The
         Albaforth)* [1984] 2 Lloyd's Rep 91, CA
     *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 All
G        ER (Comm) 237
     *Daimler Co Ltd v Continental Tyre and Rubber Co (Great Britain) Ltd* [1916] 2 AC
         307, HL(E)
     *Darby, In re; Ex p Brougham* [1911] 1 KB 95
     *Diamond v Bank of London and Montreal Ltd* [1979] QB 333; [1979] 2 WLR 228;
         [1979] 1 All ER 561, CA
     *Distillers Co (Biochemicals) Ltd v Thompson* [1971] AC 458; [1971] 2 WLR 441;
H        [1971] 1 All ER 694, PC
     *Dornoch Ltd v Mauritius Union Assurance Co Ltd* [2005] EWHC 1887 (Comm);
         [2006] Lloyd's Rep IR 127; [2006] EWCA Civ 389; [2006] 2 All ER (Comm) 385;
         [2006] 2 Lloyd's Rep 475, CA
     *Fiona Trust & Holding Corpn v Privalov* [2010] EWHC 3199 (Comm)
     *Friis v Colburn* [2009] EWHC 903 (Ch)

© 2013 The Incorporated Council of Law Reporting for England and Wales

*Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734

*Gilford Motor Co Ltd v Horne* [1933] Ch 935, CA

*Global Partners Fund Ltd v Babcock & Brown Ltd* [2010] NSWCA 196; 79 ACSR 383

*Goss v Chilcott* [1996] AC 788; [1996] 3 WLR 180; [1997] 2 All ER 110, PC

*H (Restraint Order: Realisable Property), In re* [1996] 2 All ER 391, CA

*Jones v Lipman* [1962] 1 WLR 832; [1962] 1 All ER 442

*Kensington International Ltd v Republic of the Congo* [2005] EWHC 2684 (Comm); [2006] 2 BCLC 296

*Kroch v Rossell et Cie Société des Personnes à Responsibilité Limitée* [1937] 1 All ER 725, CA

*La Générale des Carrières et des Mines v FG Hemisphere Associates LLC* [2012] UKPC 27; [2013] 1 All ER 409, PC

*Limit (No 3) Ltd v PDV Insurance Co* [2005] EWCA Civ 383; [2005] 2 All ER (Comm) 347, CA

*Lonrho plc v Fayed* [1992] 1 AC 448; [1991] 3 WLR 188; [1991] 3 All ER 303, HL(E)

*Lubbe v Cape plc* [2000] 1 WLR 1545; [2000] 4 All ER 268, HL(E)

*Merchandise Transport Ltd v British Transport Commission* [1962] 2 QB 173; [1961] 3 WLR 1358; [1961] 3 All ER 495, CA

*Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 QB 391; [1989] 3 WLR 563; [1989] 3 All ER 14, CA

*Morin v Bonhams & Brooks Ltd* [2003] EWCA Civ 1802; [2004] 1 All ER (Comm) 880; [2004] 1 Lloyd's Rep 702, CA

*Mujur Bakat Sdn Bhd v Uni.Asia General Insurance Bhd* [2011] EWHC 643 (Comm); [2011] Lloyd's Rep IR 465

*Novus Aviation Ltd v Onur Air Tasimacilik AS* [2009] EWCA Civ 122; [2009] 1 Lloyd's Rep 576, CA

*OBG Ltd v Allan* [2007] UKHL 21; [2008] AC 1; [2007] 2 WLR 920; [2007] Bus LR 1600; [2007] 4 All ER 545, HL(E)

*Pakistan v Zadari* [2006] EWHC 2411 (Comm); [2006] 2 CLC 667

*R (Al-Jedda) v Secretary of State for Defence* [2006] EWCA Civ 327; [2007] QB 621; [2006] 3 WLR 954, CA

*Roerig v Valiant Trawlers Ltd* [2002] EWCA Civ 21; [2002] 1 WLR 2304; [2002] 1 All ER 961; [2002] 1 Lloyd's Rep 681, CA

*Salomon v A Salomon & Co Ltd* [1897] AC 22, HL(E)

*Sawyer v Atari Interactive Inc* [2005] EWHC 2351 (Ch); [2006] IL Pr 129

*Schapira v Ahronson* [1999] EMLR 735, CA

*Sim v Robinow* (1892) 19 R 665, Ct of Sess

*Smith v Hancock* [1894] 2 Ch 377, CA

*Smith v Hughes* (1871) LR 6 QB 597

*Snook v London and West Riding Investments Ltd* [1967] 2 QB 786; [1967] 2 WLR 1020; [1967] 1 All ER 518, CA

*Spiliada Maritime Corpn v Cansulex Ltd (The Spiliada)* [1987] AC 460; [1986] 3 WLR 972; [1986] 3 All ER 843, HL(E)

*Tjaskemolen (now Visvliet), The* [1997] 2 Lloyd's Rep 465

*Trafigura Beheer BV v Kookmin Bank Co* [2006] EWHC 1450 (Comm); [2006] 2 All ER (Comm) 1008; [2006] 2 Lloyd's Rep 455

*Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177; [2001] 3 All ER 987

*Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148, CA

*Wood Preservation Ltd v Prior* [1969] 1 WLR 1077; [1969] 1 All ER 364, CA

*Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90; 1978 SLT 159, HL(Sc)

*Yukong Line Ltd of Korea v Rendsburg Investments Corpn of Liberia (No 2)* [1998] 1 WLR 294; [1998] 4 All ER 82

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    The following additional cases were cited in argument:

*AIG Capital Partners Inc v Republic of Kazakhstan (National Bank of Kazakhstan intervening)* [2005] EWHC 2239 (Comm); [2006] 1 WLR 1420; [2006] 1 All ER 284; [2006] 1 All ER (Comm) 1; [2006] 1 Lloyd's Rep 45
*Agnew v Lansförsäkringsbólagens AB* [1996] 4 All ER 978
*Allcard v Skinner* (1887) 36 Ch D 145, CA
*Bugle Press Ltd, In re* [1961] Ch 270; [1960] 3 WLR 956; [1960] 3 All ER 791, CA

B    *Caltex Singapore Pte Ltd v BP Shipping Ltd* [1996] 1 Lloyd's Rep 286
*DHN Food Distributors Ltd v Tower Hamlets London Borough Council* [1976] 1 WLR 852; [1976] 3 All ER 462, CA
*Dadourian Group International Inc v Simms* [2006] EWHC 2973 (Ch)
*Dimbleby & Sons Ltd v National Union of Journalists* [1984] 1 WLR 427; [1984] ICR 386; [1984] 1 All ER 751, HL(E)

C    *Forum Craftsman, The* [1985] 1 Lloyd's Rep 291, CA
*Hubbard v Woodfield* (1913) 57 SJ 729
*ISC Technologies Ltd v Guerin* [1992] 2 Lloyd's Rep 430
*Jennings v Crown Prosecution Service* [2008] UKHL 29; [2008] AC 1046; [2008] 2 WLR 1148; [2008] 4 All ER 113, HL(E)
*Keighley Maxsted & Co v Durant* [1901] AC 240, HL(E)
*King v Lewis* [2004] EWCA Civ 1329; [2005] EMLR 45, CA

D    *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349; [1998] 3 WLR 1095; [1998] 4 All ER 513, HL(E)
*Lennon v Scottish Daily Record and Sunday Mail Ltd* [2004] EWHC 359 (QB); [2004] EMLR 332
*Linsen International Ltd v Humpuss Sea Transport Pte Ltd* [2011] EWHC 2339 (Comm); [2012] Bus LR 1649
*Linsen International Ltd v Humpuss Sea Transport Pte Ltd* [2011] EWCA Civ 1042, CA

E    *Littlewoods Mail Order Stores Ltd v McGregor* [1969] 1 WLR 1241; [1969] 3 All ER 855, CA
*Lloyds Bank Ltd v Chartered Bank of India, Australia and Chnia* [1929] 1 KB 40, CA
*Markel International Insurance Co Ltd v La Republica Cia Argentina de Seguros* [2004] EWHC 1826 (Comm); [2005] Lloyd's Rep IR 90
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500; [1995] 3 WLR 413; [1995] 3 All ER 918, PC

F    *Peng Yan, The* [2009] 1 HKLRD 144
*Prest v Prest* [2012] EWCA Civ 1395; [2013] 2 AC 415; [2013] 2 WLR 557; [2013] 1 All ER 795, CA
*R v Grainger* [2008] EWCA Crim 2506, CA
*R v K* [2005] EWCA Crim 619; [2006] BCC 362, CA
*R v Seager* [2009] EWCA Crim 1303; [2010] 1 WLR 815, CA

G    *Rayner (JH) (Mincing Lane) Ltd v Department of Trade and Industry* [1989] Ch 72; [1988] 3 WLR 1033; [1988] 3 All ER 257, CA
*Reddaway v Banham* [1896] AC 199, HL(E)
*Revenue and Customs Comrs v Total Network SL* [2008] UKHL 19; [2008] AC 1174; [2008] 2 WLR 711; [2008] 2 All ER 413, HL(E)
*Rickshaw Investments Ltd v Nicolai Baron von Uexkull* [2006] SGCA 39; [2007] 1 Sing LR 377

H    *Samrose Properties Ltd v Gibbard* [1958] 1 WLR 235; [1958] 1 All ER 502, CA
*Shogun Finamce Ltd v Hudson* [2003] UKHL 62; [2004] 1 AC 919; [2003] 3 WLR 1371; [2004] 1 All ER 215; [2004] 1 All ER (Comm) 332; [2004] 1 Lloyd's Rep 532, HL(E)
*Siu Yin Kwan v Eastern Insurance Co Ltd* [1994] 2 AC 199; [1994] 2 WLR 370; [1994] 1 All ER 213, PC

© 2013 The Incorporated Council of Law Reporting for England and Wales

*South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien" NV*
   [1987] AC 24; [1986] 3 WLR 398; [1986] 3 All ER 487, HL(E)                      A
*TSB Private Bank International SA v Chabra* [1992] 1 WLR 231; [1992] 2 All ER
   245
*Trade Indemnity plc v Försäkringsaktiebólaget Njord* [1995] 1 All ER 796
*Tunstall v Steigmann* [1962] 2 QB 593; [1962] 2 WLR 1045; [1962] 2 All ER 417,
   CA
*Wallersteiner v Moir* [1974] 1 WLR 991; [1974] 3 All ER 217, CA                  B
*Xin Yang, The* [1996] 2 Lloyd's Rep 217
*Yenidje Tobacco Co Ltd, In re* [1916] 2 Ch 426, CA

**APPEAL** from the Court of Appeal
   By a claim form issued on 23 December 2010, the claimant, VTB Capital
plc, claimed damages in deceit and conspiracy against the defendants,
Nutritek International Corpn, Marshall Capital Holdings Ltd, Marshall           C
Capital LLC and Konstantin Malofeev.  By his order dated 11 May
2011 Chief Master Winegarten granted the claimant permission, pursuant to
CPR r 6.36 and paragraph 3.1(9)(a) of Practice Direction 6B supplementing
CPR Pt 6, to serve the claim form and particulars of claim on the defendants
out of the jurisdiction.  Service was not effected on the third defendant.  On
25 July and 28 September 2011 the first, second and fourth defendants          D
applied to set aside the master's order.  On 5 August 2011 Roth J granted the
claimant's application, made without notice, for a worldwide freezing order
against the fourth defendant up to the sum of US$200m and on
14 September 2011 Vos J continued the order.  On 18 October 2011 the
claimant applied to amend its particulars of claim to add a claim in contract
against the second to fourth defendants.  On 18 October 2011 the fourth
defendant applied for the discharge of the freezing order and on 19 October    E
2011 the claimant applied for the continuance of the order.  By his order
dated 29 November 2011 Arnold J [2011] EWHC 3107 (Ch) refused the
claimant permission to amend the particulars of claim and set aside the
master's order for permission to serve out of the jurisdiction, but continued
the freezing order until the hearing of an appeal to preserve the status quo.
The judge granted permission to appeal in respect of the claimant's
application to amend the claim.                                                 F
   On 5 December 2011 and 19 January 2012, the Court of Appeal granted
permission to appeal on the issues relating to service out of the jurisdiction
and the freezing order.  The claimant appealed.  By orders dated 22 June
2012, the Court of Appeal (Lloyd, Rimer and Aikens LJJ) [2012] 2 Lloyd's
Rep 313 dismissed the appeal but stayed its order to enable the claimant to
apply to the Supreme Court, and continued the freezing order on terms until    G
determination by the Supreme Court of any permission application.
   On 26 July 2012 the Supreme Court (Lord Phillips of Worth
Matravers PSC, Lord Mance and Lord Dyson JJSC) granted permission to appeal
and directed that a temporary freezing order remain in force until the
determination of the appeal by the Supreme Court.  The claimant appealed.
The issues for the Supreme Court on the appeal, as stated in the statement of
facts and issues agreed by the parties, were, inter alia, (1) whether there was  H
a presumption that England was the appropriate forum for establishing that
a tort had substantially taken place in the jurisdiction of the English court;
(2) if so, what was the nature of the presumption, its strength and effect;
(3) whether the Court of Appeal ought to have found that English law

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   governed the claims in tort and whether it had erred in its understanding of sections 11 and 12 of the Private International Law (Miscellaneous Provisions) Act 1995; (4) whether the Court of Appeal had erred by holding, if it had found that English law applied to the tort claims, that the choice of law for the tort claims would not weigh heavily in making England the appropriate forum for determining the issues between the parties; and

B   (5) whether the Court of Appeal had been correct to hold that there was such a principle as piercing the corporate veil in English law and, if so, whether the principle was engaged in the present case so that the claimant should be allowed to claim in contract under, inter alia, the facility agreement as against the second, third and fourth defendants on the basis that they were to be treated as parties to the agreements and/or otherwise subject to the obligations of a contracting party, and to remedies against them to enforce

C   the terms of the agreements.

The facts are stated in the judgments of Lord Mance and Lord Clarke of Stone-cum-Ebony JJSC.

*Mark Howard QC, Paul McGrath QC, Iain Pester* and *Tony Singla* (instructed by *Herbert Smith Freehills LLP*) for the claimant.

D   The conclusion that the place where the tort was in substance committed was the natural forum can only be displaced by the strongest factors pointing away from it. If a defendant has committed a wrong in England, there is a strong presumption that he ought to answer for it in England. That is particularly so in a case of fraud, having regard to the need to deter fraud and to ensure that its victims in this jurisdiction have the proper opportunity for obtaining restitution. The presumption is that the defendant ought to

E   answer for his wrongs in the place where he committed the actions constituting the tortious conduct. Incidental factors taking place elsewhere, which amount to a background narrative to the commission of the tort, do not displace the central factor of the place of commission. That factor cannot readily be displaced by peripheral issues, such as administrative convenience: see *Cordoba Shipping Co Ltd v National State Bank, Elizabeth, New Jersey (The Albaforth)* ]1984] 2 Lloyd's Rep 91, 94, 96;

F   *Distillers Co (Biochemicals) Ltd v Thompson* [1971] AC 458, 467–468; *Berezovsky v Michaels* [2000] 1 WLR 1004, 1014; *Kroch v Rossell et Cie Société des Personnes à Responsibilité Limitée* [1937] 1 All ER 725; *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 QB 391, 484, 488–489; *Diamond v Bank of London and Montreal Ltd* [1979] QB 333; *The Forum Craftsman* [1985] 1 Lloyd's Rep 291, 297; *ISC Technologies Ltd*

G   *v Guerin* [1992] 2 Lloyd's Rep 430, 435; *Global Partners Fund v Babcock & Brown Ltd* (2010) 79 ACSR 383; *Lennon v Scottish Daily Record and Sunday Mail Ltd* [2004] EMLR 332, para 36(ii) and Adrian Briggs, "The subtle variety of jurisdiction agreements" [2012] LMCLQ 364, 370. *Caltex Singapore Pte Ltd v BP Shipping Ltd* [1996] 1 Lloyd's Rep 286 and *The Xin Yang* [1996] 2 Lloyd's Rep 217 are in point. The presumption is not inconsistent with *Spiliada Maritime Corpn v Cansulex Ltd (The*

H   *Spiliada)* [1987] AC 460. The Court of Appeal was wrong to reject the existence of that presumption.

The presumption is not only important as a matter of justice, that the wrongdoer should be answerable in the place where the wrong was committed, but also to give greater certainty to enable a prospective litigant

© 2013 The Incorporated Council of Law Reporting for England and Wales

to bring his claim and expect that, the jurisdiction having been assessed, it A
will be maintained.  With regard to economic torts where the acts are
committed across international boundaries, the presumption operates when
the substance of the alleged tort took place in the jurisdiction.  It does not
depend on all the elements of the tort doing so.  In respect of a claim for
inducing a breach of contract, the alleged acts of inducement could have
taken place anywhere, but the intended damage could have happened only B
in England and so the place of damage was treated as the key element giving
rise to the presumption: see the *Metall und Rohstoff* case [1990] 1 QB 391.
There is good reason for the presumption: the jurisdiction in which events
take place should be able to exercise jurisdiction over them and rule on
questions of liability arising from them.  The victim of a tort committed in
England ought to be able to bring his claim in England and expect that the
English court will adjudicate on it. C

The substance of the torts was committed in England, since the key
elements of the receipt of the representations, reliance and loss, all occurred
in England.  That gives rise to a strong presumption that it was manifestly
just to try the case in England.  Since there were no substantial factors which
were as important individually or in their total as the fact that the torts were
committed in England, the facts do not displace the presumption in favour of D
England being the natural forum: *Spiliada Maritime Corpn v Cansulex Ltd*
[1987] AC 460, 477, 480.

On the question as to the proper law of the torts, section 11(1)(c) of the
Private International Law (Miscellaneous Provisions) Act 1995 requires
examination of the claimant's pleaded case to determine the significant
elements of the torts: see *Dornoch Ltd v Mauritius Union Assurance Co Ltd*
[2006] Lloyd's Rep IR 127; [2006] 2 Lloyd's Rep 475 and *Morin v Bonhams* E
*& Brooks Ltd* [2004] 1 All ER (Comm) 880.  On the facts alleged, despite
some geographical links outside the United Kingdom, the significant
elements of the torts of deceit and conspiracy, and in particular the relevant
reliance for the purposes of the claim, occurred in England and no significant
elements occurred outside England which could have led to the conclusion
that English law might not apply.  The Court of Appeal was right to
conclude that under that provision the applicable law of the torts was F
English law.  It correctly emphasised that the place where the
misrepresentations were received and acted upon and the loss suffered were
of central importance in identifying the proper law and the appropriate
forum.  However it was then wrong to say that its conclusion was tentative;
there was no basis for its finding that the arguments as to the location of
the torts were "evenly" and "very evenly balanced."  It should have G
found that the test under section 11(2)(c) was satisfied and that English
law applied.

In those circumstances the Court of Appeal should only have disapplied
that choice of law under section 12 if it was "substantially more
appropriate" for the law to be that of another country.  That can only be
done where something significantly tips the balance, but the general rule is
not dislodged easily: see *Roerig v Valiant Trawlers Ltd* [2002] 1 WLR 2304, H
2310; *R (Al-Jedda) v Secretary of State for Defence* [2007] QB 621,
paras 103–104 and *Dicey, Morris & Collins, The Conflict of Laws*, 15th ed
(2012), para 35-147.  In the present case, the Court of Appeal should not
have found that "the centre of gravity" of the torts was in Russia.  Just as the

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    most significant events constituting the torts occurred in England with the
consequence that they were likely to give rise to litigation, so the immediate
recipient of the moneys procured by the fraud (RAP) was likely to be the
primary defendant. Such litigation would be subject to English law and the
English court's jurisdiction under the facility agreement in clauses 34 and 35
to which RAP was a contracting party as well as a party to the torts of deceit
and conspiracy. That strongly suggested that the joint tortfeasors with RAP
B    who had induced the facility agreement should be subject to the same law as
RAP, namely English law. That factor is so powerful that there could be no
question of English law being disapplied. A further highly material factor,
demonstrating why it was not substantially more appropriate to apply
Russian law, is that, on the basis that a fraud was committed, the defendants
procured the entry into a suite of agreements subject to English law as the
C    instrument of the fraud. In consequence English law was the proper law of
the torts under section 11 of the 1995 Act; there was no basis to disapply
section 11 since the section 12 test was not satisfied. If, by contrast, Russian
law was the proper law, it should be disapplied under section 12.

A properly incorporated company is a legal person separate from its
corporators and controllers, with its own rights and liabilities (see *Salomon
v A Salomon & Co Ltd* [1897] AC 22) and the principle of separate
D    corporate personality is a privilege intended to encourage investment in
business by presenting a shield, protecting shareholders and those
controlling the company from the potential open-ended liabilities it incurred
in carrying on business. But in defined circumstances particular fraudulent
conduct is not to be afforded the shelter of the principle and acceptance of
the doctrine of lifting or piercing the corporate veil supports and strengthens
E    its proper application: see *The Tjaskemolen (now Visvliet)* [1997] 2 Lloyd's
Rep 465; *Atlas Maritime Co SA v Avalon Maritime Ltd (No 1)* [1991] 4 All
ER 769; *Ben Hashem v Al Shayif* [2009] 1 FLR 115; *Kensington
International Ltd v Republic of the Congo* [2006] 2 BCLC 296; *R v Grainger*
[2008] EWCA Crim 2506; *In re H (Restraint Order: Realisable Property)*
[1996] 2 All ER 391; *Jennings v Crown Prosecution Service* [2008] AC
F    1046; *Snook v London and West Riding Investments Ltd* [1967] 2 QB 786;
*Gower & Davies, Principles of Modern Company Law*, 9th ed (2012),
pp 208–212; *Palmer's Company Law* (looseleaf ed), vol 1,
paras 2.1533–2.1544 and *Farrar's Company Law*, 4th ed (1998), pp 69–78.

It is inaccurate to describe the process of lifting the corporate veil as
ignoring the separate status of the company. That status remains untouched.
G    Thus, remedies typically are granted against the puppeteer and the puppet
company. What is lifted is the protection from liability afforded to those
operating behind the veil so that a puppeteer is no longer entitled to the
protection afforded in respect of conduct carried out through the use of
the corporate entity. Lifting the veil does not involve any finding that the
company was a sham in the sense of not being validly incorporated. If
the term "sham" applies at all it is more appropriately used in respect of the
H    impugned transaction. When the veil is lifted, it is only for the limited
purpose of remedying the particular wrong: see the *Ben Hashem* case and
*Dadourian Group International Inc v Simms* [2006] EWHC 2973 (Ch). But
the remedy is available despite alternatives also being so: see *Gilford Motor
Co Ltd v Horne* [1933] Ch 935.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A

In the present case, since the Court of Appeal found the facts relied on by the claimant to be at least arguable, the corporate veil of RAP should be lifted to expose, in particular, the second to fourth defendants (the "contract defendants") to enforcement of the claimant's claims under the terms of the facility agreement. Only if corporate veil were to be lifted, and the extent and nature of the fraudulent conduct exposed, would it be possible to determine the appropriate legal response. Then RAP's conduct, in carrying out the fraud by entering the facility agreement with the claimant, will be identified as also having been effected by the contract defendants and they will be treated as having entered into the contract with the claimant and will be bound by its terms. The abuse would be not merely the company's entering into a fraudulently induced contract with a counter-party, but the puppeteer's abuse of the company's corporate structure to disguise its own involvement and thereby perpetrate a fraud through the mechanism of the contract: see *Antonio Gramsci Shipping Corpn v Stepanovs* [2011] Bus LR D117; *Alliance Bank JSC v Aquanta Corpn* [2012] 1 Lloyd's Rep 181; *Linsen International Ltd v Humpuss Sea Transport Pte Ltd* [2012] Bus LR 1649 and *Kensington International Ltd v Republic of the Congo* [2006] 2 BCLC 296. Contrast *Yukong Line Ltd of Korea v Rendsberg Investments Corpn of Liberia (No 2)* [1998] 1 WLR 294.

B

C

D

The claimant accordingly seeks to amend its pleaded case to assert that the contract defendants should be treated as being jointly and severally liable with RAP for the claimed breaches of the contractual arrangements. On the basis that contractual relief is available as against those defendants, as parties to the facility agreement, they can sue and be sued on its terms; any independent attempt to bring a claim by them under the agreement would have to overcome the policy against reliance on one's own wrongdoing to support a claim and, as regards being sued, the defences which would otherwise be available to RAP would also be available to them in any contract claim made by the claimant.

E

The Court of Appeal correctly accepted that, in principle, the doctrine of lifting or piercing the corporate veil exists and that it operates where a company is fraudulently used as a device or façade to conceal the involvement of the puppeteer so as to avoid personal liability. However, it was wrong to reject the claimant's claim on the grounds that such relief would be (i) an unwarranted restriction on the availability of potential relief arising on the lifting of the veil and run counter to the policy aims on which the doctrine was based, and (ii) inconsistent with its interpretation of the leading case law: see *Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90; *Adams v Cape Industries plc* [1990] Ch 433; *In re Bugle Press Ltd* [1961] Ch 270; *Linsen International Ltd v Humpuss Sea Transport Pte Ltd* [2011] EWCA Civ 1042; *Prest v Prest* [2013] 2 AC 415; *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177; *Ben Hashem v Al Shayif* [2009] 1 FLR 115; *Gilford Motor Co Ltd v Horne* [1933] Ch 935; *Jones v Lipman* [1962] 1 WLR 832; *In re Darby, Ex p Brougham* [1911] 1 KB 95; *Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734; *Kensington International Ltd v Republic of the Congo* [2006] 2 BCLC 296; *Snook v London and West Riding Investments Ltd* [1967] 2 QB 786 and *R v Seager* [2010] 1 WLR 815. [Reference was made to *South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien" NV* [1987] AC 24.]

F

G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

[2013] 2 AC                    VTB Capital plc v Nutritek International Corpn (SC(E))
Argument

A    The importance of avoiding pre-conceived restrictions on the relief available on lifting the veil is evident given that fraudulent conduct is involved.  Fraud is notoriously difficult to define (see *Allcard v Skinner* (1887) 36 Ch D 145) and infinite in variety (see *Reddaway v Banham* [1896] AC 199) because it is not a freestanding activity: rather it is the manner in which otherwise legitimate commercial activity is carried out.  The response

B    must accordingly remain flexible.  Accordingly the veil can be lifted and relief imposed irrespective of whether the original obligations, which existed before the veil is lifted, vest in the puppet or the puppeteer.  In the present case, unlike the factual bases of many authorities referred to by the Court of Appeal, those obligations vest in the puppet company, RAP, and the consequence of lifting the veil is to impose those obligations on the contract defendants.  Although only *Antonio Gramsci Shipping Corpn v Stepanovs*

C    [2011] Bus LR D117 and *Kensington International Ltd v Republic of the Congo* [2006] 2 BCLC 296 are directly in point, other authorities, despite certain differences, if properly understood, support the claimant's position: see *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177; *Gilford Motor Co Ltd v Horne* [1933] Ch 935; *Jones v Lipman* [1962] 1 WLR 832; *In re Darby, Ex p Brougham* [1911] 1 KB 95; *Gencor ACP Ltd v Dalby* [2000]

D    2 BCLC 734 and *Ben Hashem v Al Shayif* [2009] 1 FLR 115.
    The Court of Appeal erred in rejecting the relevance to be derived from the analogy with the law relating to undisclosed principals: see *Siu Yin Kwan v Eastern Insurance Co Ltd* [1999] 2 AC 199; *Keighley Maxsted & Co v Durant* [1901] AC 240, 261–262; *JH Rayner (Mincing Lane) Ltd v Department of Trade and Industry* [1989] Ch 72, 189 and *Bowstead & Reynolds on Agency*, 19th ed (2010), para 8-071.

E    If the appeal is upheld on the question of piercing the corporate veil, England will be the appropriate forum for the resolution of the proceedings because the defendants are parties to contracts containing English jurisdiction clauses and the claims fall within the scope of those clauses; alternatively, the fact that the claims will be before the English court in relation to the contractual issues will be a compelling factor rendering the

F    English court forum conveniens in relation to the tortious claims.
    Since the judge discharged the worldwide freezing order, his order should be set aside if the claimant wins.  The only fair and just approach is to preserve the position as it was before the Court of Appeal.  The matter could then go back to the Court of Appeal or to the High Court, or the order could be continued to trial or further order.  If the claimant loses, obviously, the order would be discharged.

G
    *Michael Lazarus* and *Christopher Burdin* (instructed by *S J Berwin LLP*) for the second defendant.
    The fourth defendant's submissions, post, pp 351–353, is adopted on all forum and related issues.
    The claimant's case on the proposed amendment to bring a claim in contract is based on the assumption that there is a principle in English law

H    known as "lifting the corporate veil" which can be engaged whenever certain facts are established.  However the law knows no such principle and the courts below were correct to refuse any such amendment.  At most, the phrase "lifting the corporate veil" is a label applied to various different ways in which the court will give relief in certain factual situations despite the

involvement of a company. The phrase is more apt to describe the outcomes A
of such cases than any part of the reasoning by which they were reached; but
the phrase is misleading because it suggests that the outcome might be
different on identical facts provided only that no company was involved and
it may mask the court's real process of reasoning. In only a small number of
cases it has led the court to decide the case on the basis that on proof of
certain facts it is appropriate to "lift the corporate veil" and grant relief.

The existence of such a principle would be contrary to the Companies Act B
as interpreted in *Salomon v A Salomon & Co Ltd* [1897] AC 22. It would
produce arbitrary and unprincipled distinctions between the rights and
obligations of legal and natural persons. The proposition that a duly
incorporated company has the same rights and obligations as a natural
person is enshrined in the definition of "person" in Schedule 1 to the
Interpretation Act 1978. *Salomon's* case establishes that a company must be C
treated like any other independent person with its own rights and liabilities
appropriate to itself. No principle entitles the court to lift the veil of
personality of an individual person to make another liable instead of or in
addition to him. Equally it is impossible for it to do so in relation to a duly
incorporated company on otherwise identical facts.

Leaving aside cases where the separate personality of a company is
overridden by statute, the court can only disregard the involvement of a D
company in a transaction or other activity where it could disregard the
equivalent involvement of an individual. When the cases on lifting the
corporate veil are considered, the question is whether the outcome would be
any different if, in place of the wrongdoer's corporate creature, there was a
human puppet? The answer is obviously "No": and it follows that the
outcome cannot be based on any special principle that applies only to E
companies. The court is no more lifting the veil of incorporation than it
could lift the veil of human personality.

It is important to distinguish cases where legal personality is abrogated or
overridden by statute from cases at common law, including equity, where the
court has decided that it is appropriate to lift the corporate veil: see
*Dimbleby & Sons Ltd v National Union of Journalists* [1984] 1 WLR 427,
435. Cases involving statutes are straightforward exercises in statutory F
interpretation which turn on the construction of the particular provision in
question and therefore provide no juridical basis for a freestanding principle
of lifting the corporate veil as a matter of common law. The question, which
may be the same in relation to a contract, is whether, properly construed the
relevant provision wholly or partly abrogates the separate legal personality
of a company: see *Wood Preservation Ltd v Prior* [1969] 1 WLR 1077. G

Where the relevant rule is one of common law, including equity, the
general law applied to the facts may produce a result which appears to
disregard the separation between the legal personality of a company and that
of another, whether a company or an individual. But the result ought to be
the same whether the relevant legal person is a company or an individual.
Any distinction would be contrary to *Salomon v A Salomon & Co Ltd*
[1897] AC 22 and so contrary to the Companies Act. The only justification H
for lifting the veil in such cases is that the relevant rule of law is sufficiently
flexible to enable the court to grant a remedy that prevents the defendant
obtaining an advantage by utilising the separate legal personality conferred
on a company by its incorporation. Whether the relevant rule of law enables

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    the court to grant the remedy is again a question of construction of the rule:
see *Meridian Global Funds Management Asia Ltd v Securities Commission*
[1995] 2 AC 500.

When properly analysed, the cases show no support for the existence of a
freestanding principle of lifting the corporate veil: see *In re Darby;
Ex p Brougham* [1911] 1 KB 95; *Gilford Motor Co Ltd v Horne* [1933] Ch
935; *Jones v Lipman* [1962] 1 WLR 832; *Smith v Hancock* [1894] 2 Ch 377;
B    *Hubbard v Woodfield* (1913) 57 SJ 729; *Tunstall v Steigmann* [1962] 2 QB
593; *Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90; *Daimler
Co Ltd v Continental Tyre and Rubber Co (Great Britain) Ltd* [1916] 2 AC
307; *TSB Private Bank International SA v Chabra* [1992] 1 WLR 231;
*Merchandise Transport Ltd v British Transport Commission* [1962] 2 QB
173; *Linsen International Ltd v Humpuss Sea Transport Pte Ltd* [2012]
C    Bus LR 1649, paras 143–152; *In re Yenidje Tobacco Co Ltd* [1916] 2 Ch
426; *Samrose Properties Ltd v Gibbard* [1958] 1 WLR 235; *Wood
Preservation Ltd v Prior* [1969] 1 WLR 1077; *Littlewoods Mail Order
Stores Ltd v McGregor* [1969] 1 WLR 1241; *Wallersteiner v Moir* [1974]
1 WLR 991; *In re A Company* [1985] BCLC 333; *Gencor ACP Ltd v Dalby*
[2000] 2 BCLC 734; *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177;
*Kensington International Ltd v Republic of the Congo* [2006] 2 BCLC 296;
D    *DHN Food Distributors Ltd v Tower Hamlets London Borough Council*
[1976] 1 WLR 852; *Adams v Cape Industries plc* [1990] Ch 433; *Snook v
London and West Riding Investments Ltd* [1967] 2 QB 786; *R v K* [2006]
BCC 362 and *Goss v Chilcott* [1996] AC 788. Contrast *Yukong Line Ltd of
Korea v Rendsberg Investments Corpn of Liberia (No 2)* [1998] 1 WLR 294.
[Reference was made to *South Carolina Insurance Co v Assurantie
E    Maatschappij "De Zeven Provincien" NV* [1987] AC 24.]

Some cases which are suggested as the juridical basis for such a principle
are, on analysis, not so. Rather, they exemplify the court's particular
construction of the relevant rule to determine whether liability attached to
one legal or natural person in addition to or in substitution of another and
are in any event explicable on grounds other than a supposed principle of
lifting the corporate veil. The few cases supporting the existence of the
F    principle and actually applying it are not soundly based in authority: see
*Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734; *Trustor AB v Smallbone
(No 2)* [2001] 1 WLR 1177 and *Kensington International Ltd v Republic of
the Congo* [2006] 2 BCLC 296. They misunderstand the previous decisions
on which they rely and which, properly understood, do not support such a
principle: see *Tunstall v Steigmann* [1962] 2 QB 593; *Woolfson v Strathclyde
G    Regional Council* 1978 SC (HL) 90 and *Daimler Co Ltd v Continental Tyre
and Rubber Co (Great Britain) Ltd* [1916] 2 AC 307. Further, they overlook
the distinction between statutory and non-statutory cases: see the *Gencor*
case and *In re H (Restraint Order: Realisable Property)* [1996] 2 All ER 391.
None of the subsequent cases that analyse lifting the corporate veil purports
to develop the law: they apply principles said to have been laid down in those
cases: see *Ben Hashem v Al Shayif* [2009] 1 FLR 115.
H    The claimant's proposed claim in contract, based on the supposed
principle of lifting the corporate veil, is not supported by any authority prior
to *Antonio Gramsci Shipping Corpn v Stepanovs* [2011] Bus LR D117;
[2012] 1 All ER (Comm) 293, and that case itself is not supported by any
prior authority. The cases relied on in the *Gramsci* case do not support it: see

© 2013 The Incorporated Council of Law Reporting for England and Wales

*Gilford Motor Co Ltd v Horne* [1933] Ch 935; *Jones v Lipman* [1962]   A
1 WLR 832 and *Dadourian Group International Inc v Simms* [2006] EWHC
2973 (Ch). Other cases, relied on by the claimant, in particular, *Gencor ACP
Ltd v Dalby* [2000] 2 BCLC 734; *Trustor AB v Smallbone (No 2)* [2001]
1 WLR 1177 and *Kensington International Ltd v Republic of the Congo*
[2006] 2 BCLC 296, do not assist: see *Linsen International Ltd v Humpuss
Transportasi Kimia* [2011] EWCA Civ 1042 at [136]; *Continental Transfert
Technique Ltd v Federal Government of Nigeria* [2009] EWHC 2898   B
(Comm) at [29] and *AIG Capital Partners Inc v Republic of Kazakhstan
(National Bank of Kazakhstan intervening)* [2006] 1 WLR 1420,
paras 27–29. The *Gramsci* case was rightly overruled by the Court of Appeal.

To impose contractual liability on the defendants conflicts with the
unchallenged decision in *Salomon v A Salomon & Co Ltd* [1897] AC 22 and
with the fundamental principles of the law of contract. The claimant cannot   C
make the defendants liable under the facility agreement under the objective
principle of contract formation: see *Smith v Hughes* (1871) LR 6 QB 597.
The claimant's attempt to introduce additional parties to the facility
agreement in contradiction of its terms conflicts with the parol evidence rule:
see *Shogun Finance Ltd v Hudson* [2004] 1 AC 919, para 49. The
imposition of contractual liability on the defendants on the ground of their   D
involvement in fraud would impermissibly confuse contract and tort.
Making them liable in contract would impose a liability whose juridical
basis was the consent of the parties and the promise to perform, though the
claimant and defendants never consented to contract with each other and the
defendants never promised to perform. In effect the claimant would make
the fraudsters the deemed guarantors of the performance of contracts they
had fraudulently induced. If the claimant can pursue a claim against the   E
defendants in contract, its claim would increase from a claim for damages in
tort to a claim for moneys due under the facility agreement. The doctrine of
undisclosed principal is judicially recognised as being anomalous and it does
not assist in the present case: see *Welsh Development Agency v Export
Finance Co Ltd* [1992] BCLC 148, 173; *OBG Ltd v Allan* [2008] AC 1,
paras 103–106; *Lloyds Bank Ltd v Chartered Bank of India, Australia and
China* [1929] 1 KB 40 and *Bowstead & Reynolds on Agency*, 19th ed,   F
para 8-071.

There is no justification in policy or principle for the touchstone of
liability alleged by the claimant, namely that the alleged fraudsters have
concealed their involvement in the fraud by using the company to make the
contract. The claimant cannot rely on the contention that as a matter of law,
on the occurrence of particular facts, the court has power to deem a person   G
to be an additional party to the contract when, under ordinary contractual
principles, he would not be a party. It would not represent a legitimate
judicial development of the common law, but would amount to
impermissible judicial law-making: see *Kleinwort Benson Ltd v Lincoln City
Council* [1999] 2 AC 349, 378. [Reference was made to *The Tjaskemolen
(now Visvliet)* [1997] 2 Lloyd's Rep 465, 469 and *TSB Private Bank
International SA v Chabra* [1992] 1 WLR 231, 237, 238.]   H

*Mark Hapgood QC, Stephen Rubin QC* and *James McClelland*
(instructed by *S J Berwin LLP*) for the fourth defendant.
The second defendant's argument on lifting the corporate veil is adopted.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A        The Court of Appeal did not err in law in declining to hold that the commission of a tort within the jurisdiction creates a presumption, as opposed to a prima facie position, in favour of England being the appropriate forum. The concept of a formal "presumption" is not supported by authority and decision-making is not assisted by it. The approach, which is flexible, has been to treat the place of the tort as the starting point, but no more, in what, ultimately, is a multi-factorial analysis: see *Cordoba Shipping*

B        *Co Ltd v National State Bank, Elizabeth, New Jersey (The Albaforth)* [1984] 2 Lloyd's Rep 91, 94, 96; *Berezovsky v Michaels* [2000] 1 WLR 1004, 1014, 1031, paras 140–145; *Distillers Co (Biochemicals) Ltd v Thompson* [1971] AC 458, 463, 467–468; *The Forum Craftsman* [1985] 1 Lloyd's Rep 291; *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 QB 391, 484, 488–489; *Caltex Singapore Pte Ltd v BH*

C        *Shipping Ltd* [1996] 1 Lloyd's Rep 286; *The Xin Yang* [1996] 2 Lloyd's Rep 217; *Trade Indemnity plc v Försäkringsaktiebólaget Njord* [1995] 1 All ER 796; *Markel International Insurance Co Ltd v La Republica Cia Argentina de Seguros* [2005] Lloyd's Rep IR 90, paras 29–30; *King v Lewis* [2005] EMLR 45, paras 24, 26–27; *Rickshaw Investments Ltd v Nicolai Baron von Uexkull* [2007] 1 Sing LR 377 and *The Peng Yan* [2009] 1 HKLRD 144, paras 25, 28.

D        The fundamental question is: where can the case most suitably be tried in the interests of all the parties and for the ends of justice? The fact that a tort has been committed and/or loss has been suffered in a particular jurisdiction is a connecting factor of some weight pointing towards that jurisdiction being the natural forum and should be brought into account as part of a wider examination of where the case can be most suitably tried: see *Spiliada*

E        *Maritime Corpn v Cansulex Ltd* [1987] AC 460. But the weight properly to be attributed to those considerations in any given case will depend on the particular circumstances and the other connecting factors.

         Since the test in the *Spiliada* case specifically requires the court to consider whether the parties can obtain substantial justice in another jurisdiction and, if not, to make service not available on that ground, the claimant's policy concerns, that the victim of fraud should have a proper opportunity of

F        obtaining restitution, are anticipated and addressed by the common law rules on jurisdiction. In any event the claimant confuses the considerations applicable to criminal and private law. The requirement to hold fraudsters to account is the language of the criminal law, where crimes are wrongs against the state and must accordingly be answered within its domestic courts. Torts are not crimes, but civil wrongs for which victims may seek

G        redress. English law does not require them to bring the claim in the domestic jurisdiction. If an alternative forum exists, subject to that forum's own jurisdictional rules, they may bring it there.

         In the present case, policy considerations point against the claim being brought here. There is a strong public policy against encouraging courts to permit claims to proceed on the strength of an inflexible presumption when they have little connection here.

H        If the claimant's argument on the presumption issue is rejected, there is no basis for reopening the Court of Appeal's evaluation of the forum issue. If its argument succeeds, the appeal should still be dismissed since whichever test the Court of Appeal adopted, whether a presumption or a prima facie test, the court still had to weigh the significance of the connecting factors.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A presumption could only be provisional, as a rebuttable presumption of fact: see *Dennis, The Law of Evidence*, 4th ed (2010), para 12.25; *Phipson on Evidence*, 17th ed (2009), para 6-17 and *Cross & Tapper on Evidence*, 12th ed (2010), p 13. Its effect is merely to identify that a conclusion may be drawn once the basic facts are established. It does not predetermine that conclusion and does not prevent the court from considering the wider countervailing considerations. Since there was no misdirection by the Court of Appeal in weighing the factors, there is no basis for revisiting its decision.

The question whether the Court of Appeal misdirected itself on the presumption issue has no bearing on its analysis of section 11(2)(c) of the Private International Law (Miscellaneous Provisions) Act 1995, identifying where the significant events occurred, rather than the weight to be attached to the geographical connection. There is accordingly no basis for the Supreme Court to revisit the issue.

With regard to the tort of deceit, the Court of Appeal was entitled to consider that the most significant factual elements were reliance and loss and to decide the section 11(2(c) point in the claimant's favour. There were, however, significant factual elements which occurred in Russia: the representations were made there in respect of facts which took place there and the "deceitful mind" was ex hypothesi in Russia. It was therefore quite proper for the Court of Appeal to conclude that the matter was balanced. The deceit claim against the second to fourth defendants is advanced solely on the basis of liability as joint tortfeasors acting pursuant to a common design. Since the courts below found that the relevant combination between the defendants occurred in Russia, the extent to which the deceit claim is predicated on the joint tortfeasorship provides a significant element which necessarily occurred, if anywhere, in Russia: see *Revenue and Customs Comrs v Total Network SL* [2008] AC 1174. Similarly the courts below found that the conspiracy, if any, must have been hatched in Russia. Even if the claimant's assertion that it was "carried out" in England were correct, it fails to address the relevant requirement in section 11(2)(c) as to where the events actually happened. But the Court of Appeal was therefore entitled to comment that, with regard to conspiracy, the section 11(2)(c) test was very evenly balanced. That was generous to the claimant, since, in fact, the balance fell in the opposite direction. The Court of Appeal's disapplication of the general rule under section 12 was based on strong, if not overwhelming, factual considerations and, were it necessary to revisit that assessment, the Supreme Court should take into account the same considerations and reach the same result.

The proper law is one of many matters relevant to determining whether England is clearly or distinctly the appropriate forum and it should not be given too great a prominence in arguments over forum. The common law rules of forum conveniens consist of simple and well established propositions which are intended to be sufficiently flexible to accommodate the wide variety of disputes coming before the court. When considering whether to grant or set aside service, the court must consider the circumstances as a whole. The fundamental question is to identify the forum in which the case can be suitably tried in the interests of all the parties and for the ends of justice: see *Spiliada Maritime Corpn v Cansulex Ltd* [1987] AC 460, 480 and *Sim v Robinow* (1892) 19 R 665. The centre of gravity lies

A

B

C

D

E

F

G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

A overwhelmingly with Russia and the applicable law, while of modest weight, tips the scales still further in that direction.

It is also necessary to focus on any future trial of the claims. Having regard to the key issues of fact which will arise and that virtually all the witnesses of fact will come from Russia, the case for concluding that England is not clearly or distinctly the appropriate forum is overwhelming:

B see *Markel International Insurance Co Ltd v La Republica Cia Argentina de Seguros* [2005] Lloyd's Rep IR 90 and *Trade Indemnity plc v Försäkringsaktiebólaget Njord* [1995] 1 All ER 796. [Reference was made to *Agnew v Lansförsäkringsbølagens AB* [1996] 4 All ER 978.]

*Rubin QC* following.

If the claimant's appeal fails, the worldwide freezing order against the fourth defendant should be discharged immediately. Even if the claimant's

C appeal is successful the freezing order should be discharged. Quite apart from the facts that there are no risks of dissipation and that, in obtaining the order without notice, the claimant has been guilty of serious non-disclosure, it was discharged long ago by the judge on jurisdictional grounds as well as on the merits. Its continuance, on a holding basis, pending the appeal to the Court of Appeal, and the temporary order made by the Supreme Court, has

D been protracted and is wrong. Any suggestion for its further continuance is unsustainable. It has been an oppressive restraint on the fourth defendant's economic activities which continues to cause him considerable prejudice. It is repugnant to justice that an order with its draconian effect should stay in operation for so long when the judge has held that it should not have been made in the first place, and no other court has concluded otherwise. The

E fairness and utility of a salutary jurisdiction risks being brought into disrepute.

*Howard QC* replied.

The court took time for consideration.

6 February 2013. The following judgments were handed down.

F
**LORD MANCE JSC**

*Introduction*

1   The appellant, VTB Capital plc ("VTB"), is incorporated and registered, and authorised and regulated as a bank, in England. It is

G majority-owned by JSC VTB Bank ("VTB Moscow"), a state-owned bank based in Moscow. The first, second and fourth respondents are, respectively, Nutritek International Corpn ("Nutritek"), Marshall Capital Holdings Ltd ("Marcap BVI"), both British Virgin Islands companies, and Mr Konstantin Malofeev, a Russian businessman resident in Moscow said to be the ultimate owner and controller of both, as well as of the third respondent, Marshall Capital LLC ("Marcap Moscow"), a Russian company which has not been

H served.

2   The present case arises from a facility agreement dated 23 November 2007 ("the facility agreement") entered into between VTB and a Russian company, Russagroprom LLC ("RAP"), under which VTB advanced some US$225,050,000 to RAP. The advance was primarily to enable RAP to buy

© 2013 The Incorporated Council of Law Reporting for England and Wales

six Russian dairy companies and three associated companies ("the dairy   A
companies") from Nutritek.  After making three interest payments (and no
payments of capital), RAP defaulted on the loan in November 2008.  VTB
believes the security provided for the loan to be worth only in the region of
US$32m to US$40m.

3   VTB's case is that it was induced in London to enter into the facility
agreement, and an accompanying interest rate swap agreement, by
misrepresentations made by Nutritek, for which the other respondents are   B
jointly and severally liable.  The misrepresentations alleged are, first, that
RAP and Nutritek were not under common control, and second, that the
value of the dairy companies was much greater than they were in fact worth.
VTB's case is that the misrepresentations were fraudulent.

4   In order to bring proceedings in tort in England against any of the
respondents, VTB required permission to effect service on them out of the   C
jurisdiction.  Permission was obtained from Master Winegarten on 11 May
2011.  The first, second and fourth respondents were served, and applied to
set aside the service.  In response, VTB applied for leave to amend its
particulars of claim to add a contractual claim, seeking to hold the
respondents liable for breach of the facility agreement and interest rate
swap, on the basis that RAP's corporate veil could in the circumstances be
pierced and the respondents held liable as persons behind the borrowing.   D
The respondents' application to set aside succeeded and VTB's application
to amend failed before Arnold J [2011] EWHC 3107 (Ch), and the Court of
Appeal upheld his decision on both points, albeit by reasoning in some
respects different.

5   As to service out, it is common ground, in the light of the decisions
below, that VTB has a serious issue to be tried in tort against each of the   E
respondents, and a good arguable case that its tort claims fall within
paragraph 3.1(9)(a) of Practice Direction 6B Supplementing CPR Pt 6, on
the basis that they led to VTB sustaining damage within the jurisdiction.  But
both courts below held that VTB failed to show that England was clearly or
distinctly the appropriate forum for resolution of VTB's tort claims.  As to
piercing the corporate veil, both courts have held that, although such a
principle exists, no basis exists in the present circumstances for applying it to   F
hold the respondents liable on a facility agreement or interest rate swap, into
which they are alleged to have induced VTB to enter by deceit.

6   VTB now appeals by permission of the Supreme Court on both points,
which I will consider in turn.

*Appropriate forum—the basis of the claims*   G

7   Both the alleged misrepresentations on which VTB relies originated in
Russia, but they reached VTB in London (very probably via VTB Moscow),
and were relied upon by VTB there when it gave formal agreement to the
facility agreement and interest rate swap there.  Further, VTB sustained its
loss by disbursing money in and from London, although, as will appear, it
was in fact covered by VTB Moscow against any loss which it might
otherwise make on the loan.  In these circumstances, I address the question   H
of the appropriate forum on the basis that, contrary to the conclusion of the
judge and Court of Appeal, the law governing the alleged tort of deceit is
English rather than Russian law.  In summary, this is because England is the
place where the events constituting the tort occurred, within the meaning of

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    section 11(1) of the Private International Law (Miscellaneous Provisions) Act 1995 and the respondents have not shown under section 12 that the significance of the factors connecting the tort with Russia is such that it is substantially more appropriate for Russian rather than English law to apply to determine the issues arising in this case. Whether the same applies to the alleged tort of conspiracy was not the focus of detailed submissions on this appeal and appears to me more doubtful. The conspiracy was to commit the

B    deceit, but since both are based on a common design allegedly formed in Russia, that is a point that cuts both ways. I am however content to proceed on the basis that the conspiracy was, like the deceit, governed by English law, since ultimately in my view it makes no difference to the result.

    8    It is relevant in the light of the above to examine the pleaded basis for the allegations of deceit and conspiracy. Each of these alleged torts depends

C    upon an allegation that the first respondent, Nutritek, made false representations as part of a common design and conspiracy with the other respondents to defraud VTB: amended particulars of claim, para 27(f)(g). They "acted in concert pursuant to a common design": amended particulars of claim, para 67(a). The nominal owner of Nutritek was the second respondent, Marcap BVI. Marcap BVI through another company owned and controlled Marshall Capital LLC ("Marcap Moscow"), and it is pleaded

D    that "Marcap through Marcap BVI had de facto control of and beneficially owned in part Nutritek" (amended particulars of claim, para 68(a); see also para 55) and that "The whole transaction under which VTB was defrauded was co-ordinated by Marcap": para 68(d). "Marcap" is defined as "the Marshall Capital group of companies": para 3. These pleaded formulations no doubt point to the reality that the affairs of Nutritek were controlled in

E    Moscow, by Marcap Moscow through Marcap BVI, and, consistently with this, Marcap Moscow's offices and personnel feature prominently in the history of the transaction: see e g amended particulars of claim, paras 30 and 69 and para 19 below.

    9    It follows that, even though the tort of deceit was itself committed in England, the alleged tortious responsibility of all the respondents depends upon its being established that they were party to a common design. On the

F    facts of this case, it is also clear that any common design is alleged to have been and must have been formed in Russia. That is where Mr Malofeev and Marcap Moscow are based and it is "Marcap" who co-ordinated the transaction under which the fraud allegedly occurred and through Mr Malofeev as Marcap BVI's agent that the Court of Appeal held that there was a good arguable case against Marcap BVI: see judgment, para 127. As

G    to Nutritek that was, like Marcap BVI, a British Virgin Islands company, but it was principally owned by two Russian companies (see amended particulars of claim, para 2(a)), it was managed in Russia, no doubt through Marcap Moscow, and the approach relating to the proposed sale and facility agreement was made on its behalf to VTB Moscow by Mr Malofeev. The principal witnesses from all three respondents who have been served in relation to the alleged torts will come from Russia.

H    10    The conclusion that the alleged tort of deceit is governed by English law is very relevant to the question of the appropriate forum, and I am prepared to assume that the alleged tort of conspiracy is also governed by English law. However, assuming English law to govern both alleged torts, no one suggests that this is decisive of the appropriate forum. For reasons

© 2013 The Incorporated Council of Law Reporting for England and Wales

I have already indicated, the common design on which VTB's tortious claims depend is thoroughly Russian.

*The legal principles regarding appropriate forum*

11    The appeal was originally presented to the Supreme Court as raising a significant issue regarding the nature and extent of the relevance of the governing law and the way in which this should be expressed. The suggestion was that a conclusion that the tort was committed in England gave rise to a "strong presumption" in favour of an English forum. It was submitted that the Court of Appeal had unjustifiably diluted this. It appears clear that it was only before the Court of Appeal that the suggestion was evidently first advanced. The judge's judgment makes no reference at all to the line of authority represented by *Cordoba Shipping Co Ltd v National State Bank, Elizabeth, New Jersey (The Albaforth)* [1984] 2 Lloyd's Rep 91, to which so much significance is now attached. VYB's skeleton argument before the Court of Appeal raises the point, but does not in any way criticise the judge for not mentioning it—again indicating that the different counsel representing VTB at that stage had not relied upon it.

12    The locus classicus in relation to issues of appropriate forum at common law is *Spiliada Maritime Corpn v Cansulex Ltd (The Spiliada)* [1987] AC 460, where Lord Goff of Chieveley gave the leading speech. He identified as the underlying aim in all cases of disputed forum, "to identify the forum in which the case can be suitably tried for the interests of all the parties and for the ends of justice": p 480G. But he also identified the important distinction in the starting point and onus of proof between cases where permission is required to serve proceedings out of the jurisdiction and situations where service is possible without permission: p 480G–H. The present case falls into the former category. In cases within that category, permission was not to be granted under the former rules of court "unless it shall be made sufficiently to appear to the court that the case is a proper one for service out" (RSC Ord 11, r 4(2)), and, as Lord Goff noted, the jurisdiction being exercised "may be 'exorbitant' ": p 481A–D. On this basis, Lord Goff concluded, at p 481E, that: "The effect is, not merely that the burden of proof rests on the plaintiff to persuade the court that England is the appropriate forum for the trial of the action, but that he has to show that this is clearly so."

13    Lord Goff went on to explain that caution was necessary in respect of the word "exorbitant"—caution that explains his statement that the jurisdiction to serve out "may" be exorbitant. He noted, at pp 481–482, that the circumstances in which permission to serve out may be granted

"are of great variety, ranging from cases where, one would have thought, the discretion would normally be exercised in favour of granting leave (e g, where the relief sought is an injunction ordering the defendant to do or refrain from doing something within the jurisdiction) to cases where the grant of leave is far more problematical. In addition, the importance to be attached to any particular ground invoked by the plaintiff may vary from case to case. For example, the fact that English law is the putative proper law of the contract may be of very great importance . . . or it may be of little importance as seen in the context of the whole case. In these circumstances, it is, in my judgment, necessary to

© 2013 The Incorporated Council of Law Reporting for England and Wales

357

[2013] 2 AC    VTB Capital plc v Nutritek International Corpn (SC(E))
Lord Mance JSC

A    include both the residence or place of business of the defendant and the relevant ground invoked by the plaintiff as factors to be considered by the court when deciding whether to exercise its discretion to grant leave; but, in so doing, the court should give to such factors the weight which, in all the circumstances of the case, it considers to be appropriate."

B    The modern rules reflect more precisely Lord Goff's statement of general principle, in providing that permission is not to be given unless the court is "satisfied that England and Wales is the proper place in which to bring the claim": CPR r 6.37(3).

14    In the present case, VTB relies upon words of Robert Goff LJ in an earlier Court of Appeal case: *Cordoba Shipping Co Ltd v National State Bank, Elizabeth, New Jersey (The Albaforth)* [1984] 2 Lloyd's Rep 91, and the acceptance of that case as consistent with *The Spiliada* by the House of Lords in the later case *Berezovsky v Michaels* [2000] 1 WLR 1004. In *The Albaforth* [1984] 2 Lloyd's Rep 91, 96 Robert Goff LJ deduced from earlier case law that:

C

"where it is held that a court has jurisdiction on the basis that an alleged tort has been committed within the jurisdiction of the court, the test which has been satisfied in order to reach that conclusion is one founded on the basis that the court, so having jurisdiction, is the most appropriate court to try the claim, where it is manifestly just and reasonable that the defendant should answer for his wrongdoing. This being so, it must usually be difficult in any particular case to resist the conclusion that a court which has jurisdiction on that basis must also be the natural forum for the trial of the action. If the substance of an alleged tort is committed within a certain jurisdiction, it is not easy to imagine what other facts could displace the conclusion that the courts of that jurisdiction are the natural forum. Certainly, in the present case, I can see no factors which could displace that conclusion."

D

E

15    In *Berezovsky v Michaels* [2000] 1 WLR 1004 a challenge to the consistency of this approach with *The Spiliada* was rejected by Lord Steyn in a speech with which the other two members of the majority agreed: speaking of a line of authority in which the approach taken in *The Albaforth* had been followed, he said, at p 1014:

F

"The express or implied supposition in all these decided cases is that the substance of the tort arose within the jurisdiction. In other words the test of substantiality as required by *Kroch v Rossell* [1937] 1 All ER 725 was in each case satisfied. Counsel for Forbes argued that a prima facie rule that the appropriate jurisdiction is where the tort was committed is inconsistent with *The Spiliada* [1987] AC 460. He said that *The Spiliada* admits of no presumptions. The context of the two lines of authority must be borne in mind. In *The Spiliada* the House examined the relevant questions at a high level of generality. The leading judgment of Lord Goff of Chieveley is an essay in synthesis: he explored and explained the coherence of legal principles and provided guidance. Lord Goff of Chieveley did not attempt to examine exhaustively the classes of cases which may arise in practice, notably he did not consider the practical problems associated with libels which cross national borders. On the other hand, the line of authority of which *The Albaforth* is an example

G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

was concerned with practical problems at a much lower level of
generality. Those decisions were concerned with the bread and butter
issue of the weight of evidence. There is therefore no conflict. Counsel
accepted that he could not object to a proposition that the place where in
substance the tort arises is a weighty factor pointing to that jurisdiction
being the appropriate one. This illustrates the weakness of the argument.
The distinction between a prima facie position and treating the same
factor as a weighty circumstance pointing in the same direction is a rather
fine one. For my part the *Albaforth* line of authority is well established,
tried and tested, and unobjectionable in principle."

16   *Kroch v Rossell et Cie Société des Personnes à Responsabilité Limitée*
[1937] 1 All ER 725 was a case in which a foreigner describing himself as
"a gentlemen of no occupation" claimed that he had been libelled in *Le Soir*,
a publication with a daily circulation in Paris of about a million and a half,
and in London of well under 50. He failed to establish any English
reputation or connection, save temporary presence here to start the
proceedings. Not surprisingly, the Court of Appeal thought that any breach
here was technical and of no substance. It described the principles governing
permission as requiring an examination of the circumstances to identify
where the action should be better tried, in terms which foreshadowed Lord
Goff's approach in *The Spiliada*.

17   *Berezovsky v Michaels* was concerned with an alleged libel of a
Russian businessman in a magazine with sales of 785,000 in the USA, 1,900
in England and 13 in Russia. But, in contrast with the position in *Kroch v
Rossell*, the claimant had significant connections with and reputation to
protect in England. On the basis that the English tort was a separate one, for
the pursuit of which England was prima facie the appropriate forum on the
approach taken in *The Albaforth*, the majority in the House upheld the
Court of Appeal's conclusion that England was the appropriate forum for its
pursuit.

18   *The Albaforth* line of authority is no doubt a useful rule of thumb or
a prima facie starting point, which may in many cases also prove to give a
final answer on the question whether jurisdiction should appropriately be
exercised. But the variety of circumstances is infinite, and the *Albaforth*
principle cannot obviate the need to have regard to all of them in any
particular case. The ultimate over-arching principle is that stated in *The
Spiliada*, and, if a court is not satisfied at the end of the day that England is
clearly the appropriate forum, then permission to serve out must be refused
or set aside.

*The history of the transaction*

19   In the present case, there are two elements of the deceit by which
VTB claims that it was deceived into entering into the facility agreement: the
first goes to the ownership of the buyers, RAP; the second goes to the
financial position of the dairy enterprises being sold to RAP. A large part of
the evidence on these aspects by which VTB obtained permission to serve out
of the jurisdiction on 11 May 2011 consisted of statements from
Mr Konstantin Tulupov and Mr Vadim Muraviev, both of Moscow. There
was further evidence in support of the application for permission to serve

© 2013 The Incorporated Council of Law Reporting for England and Wales

359

A   out, all from other Russian witnesses: see Arnold J's judgment [2011] EWHC 3107 at [191], quoted in para 41 below.

    20   Mr Tulupov was until October 2008 employed at VTB Moscow as a director within the Investment Business Acquisition and Leverage Finance Team in Moscow. Mr Muraviev had no personal involvement in events but was when he made his statement in April 2011 the Head of the Division of Distressed Debt Settlement at VTB Moscow and made his statement on the

B basis of a series of interviews had on 1 February 2011 with various staff members of VTB, namely Colin Magee, VTB's then general counsel, Julia Ferris, director at VTB's legal counsel department, Peter Yates, VTB's head of credit portfolio management and administration and Martin Pasek, managing director of structuring at VTB.

    21   Mr Tulupov explains that he was the project manager in respect of

C the facility agreement between VTB and RAP, a transaction that "was both high risk but offered potentially significant benefits for VTB and VTB Moscow": para 8. As such he would attend meetings with and obtain information from potential borrowers, draft proposed terms of any loan to submit to VTB Moscow's credit committee, liaise with VTB where it was to be the lender of record, deal with any matters raised by VTB Moscow's credit

D committee, have the conduct of matters arising after any loan was made, although where VTB was the lender of record "the performance of the loan was also monitored by it" and in all these matters report to his managing director, Mr Konstantin Ryzhkov, and at times also to his superior, one of two senior vice presidents, Mr Vassily Kirpichev and Mr Alexander Yastrib, who in turn reported to the deputy president, Mr Levin. During the course of the present transaction, Mr Ryzhkov also became head of the investment

E business acquisition and leverage finance team of VTB in London (according to Mr Muraviev from 1 September 2007).

    22   Mr Tulupov in para 8 deals with the two bases of the present claim. He states that the value of the shareholding and cash flow of the dairy companies was of considerable importance to VTB and VTB Moscow, since it represented the only real security of value, and for this reason they wanted an independent valuation and relied upon that provided by Ernst & Young

F dated September 2007. As to the alleged representation regarding ownership of RAP, he said:

> "G. Whilst it was entirely a matter for the credit committee of VTB Moscow, if VTB Moscow had known that the proposal for the sale by Nutritek was to a company under common control, it is likely VTB
G Moscow would have approached the proposal differently. In particular, I believe that it is likely to have viewed the proposal as one seeking asset finance rather than acquisition finance. Amongst one of the many additional matters that would have been considered (and to which I will briefly refer later in this statement) would be the provision of additional security;
>
> "H. Given that it was disclosed to VTB Moscow at the outset that
H Nutritek was controlled by Marcap, which I understood was a family of funds controlled by Mr Konstantin Malofeev . . . then Marcap was the obvious target to provide that security. This was particularly the case, when it was known to VTB Moscow that Nutritek urgently needed to raise funds to pay certain credit linked notes ('CLN') and that some of the

© 2013 The Incorporated Council of Law Reporting for England and Wales

moneys raised by the sale of the dairy companies were being used to pay     A
them.  It would have been noteworthy if Marcap refused to provide
security for the risk that VTB and VTB Moscow were taking."

23    Mr Tulupov proceeds at some length to set out the history of the
transaction, starting with a meeting in Moscow where the proposed
transaction was explained to Mr Ryzhkov and Mr Tulupov by Mr Malofeev
and a Mr Provotorov, following which Mr Tulupov on about 18 July 2007     B
engaged Mr Johnston of Dewey & LeBoeuf, London to draw up finance
documentation for a loan to an unknown borrower who Mr Malofeev and
Mr Provotorov said they had in mind to approach to buy the dairy
companies.  VTB's director, Ms Bragina, responsible for investment business
acquisition and leverage finance at VTB, was copied into the e-mail and a
party to the conference call by which Mr Tulupov instructed Mr Johnston.     C
A subsequent inquiry by Mr Johnston of Mr Tulupov as to the identity of any
borrower led to the answer, that "the potential purchaser is controlled by a
group of individuals with whom, Marcap assures, you can't have any conflict
of interest".  Mr Johntson described this as evasive and said that VTB would
need to do a KYC (know your customer) clearance on the borrower.

24    Arnold J's judgment records, at para 14, that Mr Tulupov had a
further meeting with Mr Provotorov and Mr Leonov in Moscow in late July,     D
after which he e-mailed them with two versions of a term sheet, copying in
Mr Malofeev, Mr Ryzhkov and Ms Bragina.

25    A third Moscow meeting involving Mr Tulupov, Mr Malofeev,
accompanied by Mr Provotorov and probably also by Mr Yuri Leonov, took
place at Marcap Moscow's offices in early October, when Mr Malofeev
identified RAP as the potential buyer and borrower.  But, according to
Mr Tulupov, nothing was said to suggest that the sale would be to anything     E
other than an independent third party, and that it would have been apparent to
Mr Malofeev and his colleagues that what was being discussed was
acquisition finance, rather than a balance sheet loan.  A third term sheet was
e-mailed by Mr Tulupov to the previous recipients, but not on this occasion
copied to Ms Bragina.  It identified VTB as the lender and recorded that
additional commission was to be earned through a derivative tied to the shares     F
and there was to be an interest rate swap to hedge interest and currency risks.

26    VTB was commonly lender of record on such transactions, because it
could offer more sophisticated lending structures and because English law
offers greater protection in the event of default, but in such cases VTB
Moscow would lend the relevant moneys to VTB, as here, under a 100%
participation agreement, although, in addition VTB was in this case itself
involved in providing the interest rate swap agreement.  In these     G
circumstances, from an early stage, Mr Tulupov also worked with his
counterpart at VTB, Ms Bragina, copying her into e-mails.

27    Mr Tulupov's role was thereafter to obtain, check and distribute the
information required by the various departments of VTB Moscow, to obtain
their reports and opinions, to draw these together in a "deal description" and
"draft credit committee decision", to have these documents signed and     H
approved by Mr Ryzhkov and then submitted to the credit committee of
VTB Moscow, after approval by which

"the decision would still need to be reviewed by both the managing
board of VTB Moscow given the size of the loan and VTB as both the

A
lender of record and the party entering into the interest rate swap agreement": para 34.

In performing his role, Mr Tulupov liaised principally with Mr Leonov, but also with Mr Provotorov and Ms Tyurina and in relation to Nutritek with Mr Skuratov, all in Moscow. One of the documents obtained in this process was the Ernst & Young report of 2007 on the dairy companies.

B
28   A draft deal description and draft credit committee decision were prepared with the assistance of Dewey & LeBoeuf for VTB/VTB Moscow and of Clifford Chance for RAP and were then signed off by Mr Yastrib, Mr Ryzhkov and Mr Tulupov, before being reviewed and approved on 31 October 2007 at a meeting of VTB Moscow's credit committee, attended by Mr Novikov, Mr Yu, Mr Belov, Mr Kuzmenko, Mr Yastrib, Mr Shipilov,

C
Mr Krasnoselsky and Mrs Bozhaeva. The approval recorded that the committee had, after taking "into consideration a good financial situation of the borrower" classified the debt as "quality category 1".

29   The approval was subject to conditions. These included the provision of "a report for the assessment of the market value of the shares and stakes", a reference to the Ernst & Young report already provided, a further copy of which was provided by RAP and Mr Leonov on 7 November

D
2007 (and circulated by Mr Tulupov to Ms Bragina and Mr Magee, albeit in Russian, on 12 November). They also included further approval of the proposal by VTB Moscow's management board and VTB. Mr Tulupov recites that these approvals were obtained, the former by a formal board resolution, and that he was not involved in the latter, although he says that it was apparent from his discussions with Mr Ryzhkov and Ms Bragina that

E
"they relied upon the false representations when approving the loan".

30   This refers to the Ernst & Young report of 2007, but it can hardly refer to any representation relating to the ownership of RAP, since Mr Tulupov goes on to say that, "once approval to the credit line had been obtained from VTB and VTB Moscow", steps were taken to implement the conditions precedent which "clearly included confirming the beneficial

F
ownership of RAP as is apparent from the e-mails of 6 and 8 November" which are exhibited to his statement. None of the conditions precedent is, however, explicitly directed to obtaining such confirmation (even though one of them required the provision to VTB and VTB Moscow of the decisions of the authorised management bodies of RAP approving the acquisition).

31   As to the e-mails to which Mr Tulupov refers, these are from Ms Bragina, reporting to various colleagues in VTB (including Mr Yates) and

G
copying to Mr Ryzhkov and Mr Tulupov, information that RAP's beneficiary and 90% shareholder (with the other 10% being owned by "his management team") was a Mr Vladmir Alginin, and giving some details of his recent business career. These e-mails are also relied upon by Mr Tulupov as an example of the involvement of Ms Bragina, who has left VTB and whose whereabouts cannot now apparently be ascertained. However, it

H
seems clear that all they show is that Ms Bragina was passing on internally information which she had herself received from another unidentified source. VTB's very unspecific plea is that this was "information provided to VTB and VTB Moscow by the management of Nutritek": amended particulars of claim, para 51. There is no indication that Ms Bragina had any direct contact

with the management of Nutritek, and the substantial likelihood must be $\quad$ A
that any information which reached her came from VTB Moscow.

32   VTB Moscow's management board approved the transaction on
13 November, and an application was signed by Ms Bragina and Mr Thunem
on behalf of VTB for credit facilities. The application recorded that RAP had
approached VTB Moscow for the debt financing of its proposed acquisition
of the dairy companies, and that under the proposed structure VTB was to $\quad$ B
act as lender of record, but VTB Moscow was to "fully fund the transaction
and fully undertake the credit risk under the transaction" in accordance with
the participation agreement. It also recorded that the market value of the
dairy company shares had been determined by Ernst & Young. On
19 November a similar application was signed off by Ms Wooi, Mr Yates and
Mr Manning on behalf of VTB in respect of the interest rate swap. It
however recorded the structure risk as "potentially high, but acceptable", on $\quad$ C
the basis that the transaction was considered unsecured, and the security
package (RAP's shares in the dairy companies) of little tangible value, the
financial risk as high, on the basis that, according to the historical balance
sheets, the price being paid for the companies appeared to be significantly
above the book value of the assets. As to ownership risk, it recorded that no
formal information could be found confirming that Mr Alginin was RAP's $\quad$ D
beneficial owner "as IB [investment banking] have advised", that they were
requesting formal proof as a condition precedent to drawdown, and to make
the ownership risk medium. There is no indication that this point was
followed up, even in relation to the interest rate swap, and it is not part of
VTB's case in respect of the loan that it relied upon any later representation
regarding RAP's ownership or Mr Alginin.

33   Mr Tulupov continued to be the means by which the transaction was $\quad$ E
progressed, and sent VTB's mandate letter, updated term sheet and fee letter
to RAP for signature on 16 November. On 23 November 2007, the facility
agreement was completed, being signed for VTB by Mr Ryzhkov as
"managing director, head of acquisition and leveraged finance" and by
Ms Bragina as "director, acquisition and leveraged finance". The interest
rate swap agreement was completed on 28 November, being signed for VTB $\quad$ F
by Mr Ryzhkov as "managing director" and by Mr Steve Humphries as
"senior manager operations". The 100% funded participation agreement
between VTB and VTB Moscow was completed on the same date.
Mr Thunem, then head of global markets at, but no longer with, VTB and
Mr Ianovski signed for VTB. Under it, VTB's liability to repay any sum
funded by VTB Moscow was limited to any amount that it received from
RAP (or any other obligor under the loan facility). All these agreements $\quad$ G
were subject to English law, and included provisions recognising England as
an appropriate forum in the event of any dispute.

34   Mr Muraviev's second-hand account of the history in his statement
is understandably shorter. But, having spoken to Mr Yates, because both
Ms Bragina and Mr Thunem had left, he understood that:

"A. Once the decision had been taken by VTB Moscow to enter into $\quad$ H
the participation agreement, there was no need for the matter to be
decided by the credit committee of [VTB];

"B. Instead, it was sufficient for the loan to proceed if the proposed
transaction had been approved by Mr Ryzhkov, given his senior position

© 2013 The Incorporated Council of Law Reporting for England and Wales

A     within both [VTB] and JSC VTB, and the ACF [advance credit facility] dated 13 November 2007 was signed off by the appropriate authorised signatories;

"C. Mr Ryzhkov approved the transaction and indeed he signed the facility agreement together with Ms Bragina on behalf of [VTB]; . . .

"H. Notwithstanding the position taken by credit risk in the ACF

B     dated 15 November 2007 that 'credit risk consider this transaction as unsecured as the security package has little tangible value', in granting the loan and approving the ISA, [VTB] did rely heavily on the representations that had been made as to:

"(i) the past financial performance of the dairy companies and the forecast performance;

"(ii) the 2007 E & Y 2007 valuation of the dairy companies based

C     upon those figures, and

"(iii) The SPA representing a commercial transaction between two separate entities, namely RAP and Nutritek. It was entirely unaware that they were under the common control of Marshall Capital Group of Companies and believed them to be under separate control based on the information that had been provided by Nutritek."

D     35   Mr Muraviev concluded by saying, at para 11:

"Having spoken to Mr Yates, Colin Magee, Julia Ferris and Martin Pasek I am informed that and believe that if [VTB] had known that RAP and Nutritek were under the common control of Marshall BVI or that the representations identified above and contained in the 2007 E & Y valuation were false then it would not have entered into the facility

E     agreement or the ISA or permitted the draw down of the Tranche A moneys."

*The issues*

36   Numerous judicial statements establish that it is incumbent on a defendant challenging the jurisdiction "so far as possible to identify the

F     issues concerned and to state as clearly as possible how they arise or may arise in the proceedings": see e g *Limit (No 3) Ltd v PDV Insurance Co* [2005] 2 All ER (Comm) 347, 366, para 72, per Clarke LJ; *Dicey, Morris & Collins, The Conflict of Laws*, 15th ed (2012), para 11-143.

37   In the present case, the basic issues were in my view established by the evidence and submissions adduced below. The respondents deny that

G     false representations were made, deny that they were party to any that were made, deny that any reliance was placed on any that were made and, for good measure, rely upon the participation agreement as showing that VTB, as opposed to VTB Moscow, did not suffer any loss. The last point was strongly argued in the courts below, as showing that VTB had no good arguable case in respect of which it could properly seek permission to serve out of the jurisdiction, but the Supreme Court refused permission to re-argue

H     the point before it. The case must therefore be considered on the basis that the claim is properly arguable, but that this defence is among those that the respondents will advance to it. It is however essentially a point of law, in relation to which there is no reason to think that the answer would be any different in Russia to here.

© 2013 The Incorporated Council of Law Reporting for England and Wales

364
VTB Capital plc v Nutritek International Corpn (SC(E))                    [2013] 2 AC
Lord Mance JSC

38   All the points mentioned in the previous paragraph were treated as
issues in the courts below.  In relation to one respondent, Marcap BVI,
Arnold J concluded that there was no serious issue to be tried.  But in
relation to Nutritek and Mr Malofeev he concluded that VTB had a real
prospect of establishing deceit, despite issues argued before him as to the
incurring of any loss, the making of any false representations and reliance.
The Court of Appeal considered that, even in respect of Marcap BVI, a
serious issue to be tried existed, while setting aside service on all three
respondents on the ground that England was not the appropriate forum.

39   A suggestion that the respondents should have advanced a positive
case to support their denial of any involvement in the alleged deceit appears
to me to go too far.  Even where jurisdiction is established, a defendant is
entitled to deny involvement in or liability for an alleged deceit, without
advancing a positive explanation as to why he was not party to an alleged lie
or conspiracy or as to how assets acquired proved, without any prior
knowledge on his part, to be worth so much less than independent
accountants had valued them as being.  Further, no suggestion or objection
appears to have been made below to the case being argued, as it was, on the
basis that all the issues were properly raised by the respondents' general
denials.  On the other hand, there may be particular points, in relation to
which, in the absence of any positive case from a defendant's side, it is not
possible to conclude that any evidence will be called by the defence.  That
may in turn preclude bringing into account the convenience or otherwise of
adducing in England or Russia any such evidence from the defence side as
might be supposed to exist on such points, had any positive case been raised
on them.

40   It is also clear, from such material as the court has before it in
relation to the issue regarding the worldwide freezing order, that VTB has
been given a considerable understanding by Mr Malofeev himself of the
nature of his case regarding the discrepancy between the position indicated
by the Ernst & Young report of 2007 and the position as it materialised not
very long after the completion of the transaction.  Mr Michaelson, partner at
SJ Berwin acting for Mr Malofeev recorded in his tenth statement of
18 October 2011 (paras 38–42) that Nutrinvestholding (Nutritek's parent)
had at Mr Malofeev's instance instructed Ernst & Young to prepare a
further report dated 26 February 2010, to determine precisely what
accounting practices and transactions were taking place within the Nutritek
business and that the report does not implicate Mr Malofeev.
Mr Michaelson went on to refer to "the obvious inconsistency between
Mr Malofeev commissioning the report and at the same time being
responsible for any wrongdoing identified": para 43.

*The judgments below*

41   Arnold J addressed the question of the appropriate forum [2011]
EWHC 3107 at [186]–[195]:

    "186. *Stage I.* The factors that may be taken into account in
    determining which is the natural forum for the action include: (a) the
    personal connections which the parties have to the countries in question;
    (b) the factual connections which the events relevant to the claim have

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   with those countries; (c) factors affecting convenience or expense such as the location of the witnesses or documents; and (d) the applicable law.

"187. Counsel for VTB submitted that England was the natural forum because (i) VTB is English, (ii) the misrepresentations were relied upon in England, (iii) the money was lent and the loss sustained in England, (iv) the facility agreement, ISA, the participation agreement and the SPA contain English law and English jurisdiction or arbitration clauses and
B   (v) the applicable law is English law. I do not consider that any of these factors points strongly to England being the natural forum in the present case. So far as (i) is concerned, VTB is controlled by VTB Moscow. As to (ii), as explained above, it seems to me that VTB's reliance was wholly secondary to that of VTB Moscow. In relation to factor (iii), the loss was sustained because Russian assets provided inadequate security. As to
C   (iv) and (v), the English law clauses are immaterial once it is concluded, as I have, that the law applicable to the tort is Russian law. The English jurisdiction and arbitration clauses are a pointer to England, but not a strong one given that the claim is a tort claim not a contract claim.

"188. Counsel for the defendants submitted that the following factors pointed to Russia being the natural forum. First, the connections of the parties to Russia. VTB is controlled by VTB Moscow, which is Russian.
D   Furthermore, the litigation is being managed by VTBDC, which is also Russian. MarCap Moscow and Mr Malofeev are Russian. It is common ground that Nutritek was managed from Russia, and VTB's case is that Mr Malofeev controls both Nutritek and MarCap BVI. Furthermore, it is VTB's case that Mr Malofeev orchestrated the fraud, primarily through MarCap Moscow.

E   "189. Secondly, the connections of the events constituting the torts to Russia. The transaction was introduced to VTB Moscow at meetings between Russian individuals in Russia. The negotiations mainly took place in Russia. The misrepresentations were made and mainly received in Russia. The more important misrepresentation concerned the performance of the dairy companies, which are Russian companies. The 2007 E & Y valuation was a valuation by Ernst & Young's Moscow office
F   and was based on information provided by Nutritek's Russian management. The misrepresentations were primarily relied upon by VTB Moscow acting through its credit committee and management board in Russia. It was VTB Moscow and VTBDC which primarily dealt with RAP's default and enforcing the security. The secured assets were in Russia. The discovery of the fraud took place in Russia. Although the
G   loss was sustained by VTB in England, as discussed above the ultimate economic impact is in Russia.

"190. Thirdly, most of the witnesses are Russian and many of the documents are in Russian and located in Russia. So far as the witnesses are concerned, there are a considerable number of relevant Russian witnesses from VTB Moscow, VTBDC, Ernst & Young, Nutritek (Mr Skuratov and the managers of the dairy companies), MarCap
H   Moscow (Mr Leonov, Mr Provotorov, Ms Tyurina and Mr Popov as well as Mr Malofeev) and RAP (Ms Kremneva and Mr Pankov). Other potential Russian witnesses include Mr Sazhinov and Mr Alginin. By contrast, there are relatively few material witnesses from VTB. The two most important ones appear to be Ms Bragina and Mr Ryzhkov. Both

© 2013 The Incorporated Council of Law Reporting for England and Wales

have left VTB (as has Mr Thunem). It appears that Mr Ryzhkov is in Russia, while VTB's evidence is that Ms Bragina is 'believed to be' in England. Although Mr Ryzhkov has been contacted about the matter, it does not appear that Ms Bragina had been.

"191. As counsel for the defendants pointed out, it is striking that all of VTB's witness statements in support of its application for permission to serve out, other than one from its solicitor, were made by Russian witnesses. In addition to the statements of Mr Tulupov and Mr Chernenko, these consisted of: (i) a statement made by Andrey Puchkov, deputy chairman of VTB Moscow, which among other matters dealt with VTB Moscow's reliance on the misrepresentations alleged, Mr Puchkov having been present at the management board meeting on 13 November 2007 at which the transaction was approved; (ii) a statement made by Vadim Muraviev, head of the division of distressed debt settlements at VTB Moscow, who gave evidence as to VTB's reliance on the misrepresentations alleged based on interviews with four English employees of VTB including Mr Magee and Mr Pasek; and (iii) a statement made by Denis Zemlyakov, general director of VTBDC, who gave evidence concerning RAP's default and the enforcement of the security.

"192. In addition, VTB relied on two draft statements from Alexander Buryan and Irina Leonova, who were employed by RAP as vice-president and chief accountant. Furthermore, since then a number of statements have been made by Arthur Klaos of VTBDC, in the most recent of which Mr Klaos relays information provided to him by (among others) Mr Ryzhkov and Alexander Yastrib (at the time senior vice president of VTB Moscow and now a board member of the Bank of Moscow).

"193. While the four VTB employees interviewed by Mr Muraviev are evidently material witnesses to VTB's claim (although Mr Magee and Mr Yates appear to have had more involvement in the transaction than Mr Pasek or the fourth employee Julia Ferris), it is clear that they are of secondary importance compared to Ms Bragina and Mr Ryzhkov, let alone Mr Tulupov and his colleagues in Moscow. If the claim is tried in England, witnesses located in Russia will not be compellable except by means of letters rogatory. Even if they are prepared to give evidence voluntarily, they may not be prepared to come in person, necessitating evidence being given by video link. Even if they are prepared to come in person, they are likely to require interpreters. As for the documents, many of these have required or will require translation. It is true that the agreements are mainly in English, and that these are important documents, but these and other documents in English form a relatively small proportion of the relevant documents even at this stage of the proceedings.

"194. Fourthly, counsel for the defendants submitted that the applicable law was not a strong factor in favour of England even if it was English law. It is clear from the expert evidence before the court (as to which, see below) that the Russian courts can receive expert evidence as to English law. Furthermore, the key issues in the case are likely to be factual rather than legal. In the event, of course, I have concluded that the applicable law is Russian law, which supports the conclusion that Russia is the natural forum.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    "195. In my judgment, taking all the factors considered above into account, the natural forum is Russia."

**42**    The Court of Appeal, before which reliance was, for the first time, placed on the suggested presumption arising from *The Albaforth* [1984] 2 Lloyd's Rep 91 (see para 14 above)—dealt with the issue of appropriate forum as follows [2012] 2 Lloyd's Rep 313, paras 164–168:

B    "164. We have already commented that the judge may have erred in his interpretation of the test adumbrated in *The Spiliada*. Instead of asking first whether England was the 'natural forum' and then, even if it is not, asking whether England is nevertheless the appropriate forum for other reasons, there is only one overall question to be answered: has VTB established that England is clearly or distinctly the appropriate forum?

C    "165. In our view the judge was correct to conclude that VTB has failed to do so. The steps leading to our conclusions are as follows: first, we will assume (based on our discussion above) that the fact that VTB has sustained its loss resulting from the torts in England raises a prima facie case that England is the appropriate forum in which to try the disputes. Secondly, however, we have to take account of all the other factors identified by both sides in order to determine whether VTB has satisfied
D    the court that England is clearly or distinctly the appropriate forum.

"166. Thirdly, in that regard, we have concluded, on the basis of the material presently before us, that the applicable law of the torts is Russian law. That cannot be a concluded view. Wherever a trial takes place, it can be challenged. But that point works both ways. Even if we had concluded that the applicable law of the torts was English law, this would
E    not have been a factor that would weigh heavily in making England the appropriate forum, precisely because if the defendants wished to allege and plead that the applicable law was Russian law, both sides would have had to prepare for a trial on that basis. If the case were to be heard in England, both sides would have to prepare expert evidence on Russian law; and, doubtless, the obverse would be so if the case were to be heard
F    in Russia. This is not a case, such as we think Lord Goff of Chieveley contemplated in *The Spiliada* at p 481G, where the law of the contract is a known certainty. In this case the applicable law of the torts remains very much in issue. Moreover, there was no serious challenge to the judge's view (at para 194) that the key issues in the case are likely to be factual rather than legal.

G    "167. Fourthly, we have to give due weight to all the other factors (apart from those where we have found the judge erred) which the judge took into account and which have not been challenged on appeal. These are set out at paras 188 and 189 of the judgment and, as we have indicated in relation to the applicable law point, we think that these indicate that the centre of gravity of these disputes is in Russia, not England. Fifthly, VTB has not challenged the judge's conclusion that
H    VTB had failed to show that there was a real risk that it would not obtain substantial justice in Russia for any of the reasons it advanced before him.

"168. Accordingly, the judge was correct to set aside Chief Master Winegarten's order granting VTB permission to serve the proceedings on Nutritek, Marcap BVI and Mr Malofeev out of the jurisdiction."

© 2013 The Incorporated Council of Law Reporting for England and Wales

*The factors relevant to the appropriate forum*                                    A

43    I turn therefore to consider the appropriate forum and the relevant factors.  The first question is whether there is any basis for regarding the judge's or the Court of Appeal's conclusion as flawed in any way which would require this court as a second appellate court to revisit the exercise of the discretion to give permission for service out of the jurisdiction.  The second question, if there is any such basis, is what conclusion this court       B
should reach on the issue as to the appropriate forum.

44    The Court of Appeal re-exercised the discretion, because it believed that Arnold J had erred in his interpretation of Lord Goff's speech in *The Spiliada*.  It said that he had adopted a two-stage approach instead of recognising that, in a service out case, there was a single burden on a claimant to show that England was clearly or distinctly the appropriate       C
forum: paras 128–131, 164; and see *The Spiliada* [1987] AC 460, 481D–E.  But the two-part approach was the one which Lord Goff identified as appropriate in cases where service is effected within the jurisdiction, so that the claimant starts with the advantage of having achieved a legitimate basis for jurisdiction without leave, and it is for the defendant to show that some other country is the appropriate forum: see *The Spiliada*, p 476F.  Any error therefore favoured VTB as claimant.  Any error, if error there was, does not       D
in any event impact on the force and weight of the judge's analysis in the paragraphs quoted above.  Further, the way the judge answered his two-part test shows that he could not conceivably have come to any conclusion other than that the claimant had failed to show (clearly or at all) that England was the appropriate forum.  He expressed his conclusion, at stage 1 of the two-part test which he (wrongly) adopted, as being that Russia was the natural       E
forum (para 195) before going on at stage 2 to reject any suggestion that substantial justice could not be obtained in Russia: para 196 to the conclusion at para 222.  Once one concludes that Russia is the natural forum, where there is no risk that substantial justice cannot be obtained, it is really impossible to conclude that England is clearly the appropriate forum.  The Court of Appeal itself held that the judge was correct to conclude that VTB had failed to establish that England was clearly or distinctly the       F
appropriate forum: para 165.  However, it itself fell into error in my view in its treatment of the governing law.

(a) *Governing law*

45    The Court of Appeal was wrong to regard Russian law as governing the alleged torts, but it acknowledged that possibility and it dealt with the       G
alternative, that English law governed them.  However, in relation to this alternative, it was in my opinion also wrong to approach the matter on the basis that it made no difference which law governed, because each side would have in any event to prepare evidence on both legal systems in whichever country the case was tried.

46    The governing law, which is here English, is in general terms a positive factor in favour of trial in England, because it is generally       H
preferable, other things being equal, that a case should be tried in the country whose law applies.  However, that factor is of particular force if issues of law are likely to be important and if there is evidence of relevant differences in the legal principles or rules applicable to such issues in the two

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  countries in contention as the appropriate forum.    Neither of these
considerations here applies.

47  VTB's claims are for deceit and for conspiracy.   The conspiracy
alleged is to obtain finance by the deceit.  Accepting that the governing law
of both alleged torts is, to English legal eyes, English, there is nothing to
show that Russian law would reach any different conclusion.  Parties are
able to plead and rely on English law in Russian courts.  But, even if there
B  were reason to think that a Russian court would regard Russian law as
governing the alleged torts, there is nothing to suggest that Russian law does
not recognise and impose tortious liability for deceit, and for conspiracy to
commit a deceit, on bases for material purposes equivalent to those which
would be recognised under English law.  It is unlikely that it does not, and no
evidence has been adduced that it does not.  It would have been for VTB to
C  adduce evidence on all these points, if it could, in support of its case that
England was the appropriate forum.

48  Although Arnold J wrongly concluded Russian law governed the
alleged torts, he also considered the exercise of his discretion on an opposite
basis, namely that English law applied, and, as I understand him, accepted
the submission that this would not be a strong factor in favour of England, as
well as saying that it was clear that the Russian courts could if necessary
D  hear evidence of English law: see judgment, para 194, quoted above.  His
judgment therefore addresses the position on a correct hypothesis.

49  Even if, contrary to my view, the judge's conclusion as to the
appropriate forum was limited by an assumption that Russian law governed
the alleged torts, I cannot conceive, in the light of what he said in para 194,
that it would have made any difference to his conclusion if he had concluded
E  that English law governed.  The key issues in this litigation will on the face of
it be factual not legal.

*(b) Place of commission of tort*

50  For reasons already given, I proceed on the basis that this was
London in relation to the claim in deceit, and that the conspiracy, being to
commit the same deceit, should be regarded as effectively ancillary.  But
F  I also note that, Mr Ryzhkov as managing director of VTB's acquisition
department was the first signatory of the facility agreement for VTB, and he
was based in Moscow.  It may well be that his signature was sent or collected
electronically from Moscow.  Even if that were so, he is in Russia, and on
any view an important potential witness.

51  The place of commission is a relevant starting point when
G  considering the appropriate forum for a tort claim.   References to a
presumption are in my view unhelpful.  The preferable analysis is that,
viewed by itself and in isolation, the place of commission will normally
establish a prima facie basis for treating that place as the appropriate
jurisdiction.  But, especially in the context of an international transaction
like the present, it is likely to be over-simplistic to view the place of
commission in isolation or by itself, when considering where the appropriate
H  forum for the resolution of any dispute is.  The significance attaching to the
place of commission may be dwarfed by other countervailing factors.

52  Here the common design on which the respondents' tortious
responsibility is based was formed in Russia.  Further, both the alleged
representations emanated from Russia, in the form of the Ernst & Young

© 2013 The Incorporated Council of Law Reporting for England and Wales

2007 report and the information that Mr Alginin was the effective beneficial      A
owner of RAP. The history of the transaction which I have set out indicates
that the transaction was introduced, pursued and approved predominantly
in Moscow. It is difficult to avoid the conclusion that VTB was effectively
following suit on decisions taken there. Further, significant aspects of the
facts which are said to have rendered the representations untrue existed in
Russia: particularly, the dairy companies' businesses and financial positions,      B
but also, presumably, the factual control which Mr Malofeev is said to have
exercised directly or through Marcap Moscow over RAP.

53    VTB, as a London based bank, must have had to go through some
formal decision-making processes, or it would not have been party to the
facility agreement at all. However, it did not need to put the loan proposal
through its own credit committee, once it had been through VTB Moscow's
credit committee: para 34 above. Further, the main documents emanating      C
from VTB, the two credit applications of 13 and 15 November, date from
well after the matter was approved by VTB Moscow's credit committee on
31 October and are contemporaneous with the approval of 13 November by
VTB Moscow's management board. Finally, no formal record of any
decision-making or approval by VTB itself exists, save in the form of
Mr Ryzhkov's and Ms Bragina's signatures on the facility agreement. All      D
this is however unsurprising when the transaction was effectively negotiated
and decided upon in Moscow, and the funding and credit risk in respect of
the loan was being fully assumed by VTB Moscow.

54    Arnold J was not referred to *The Albaforth* [1984] 2 Lloyd's Rep 91,
but in my view his approach in paras 186–195, cited above, was consistent
with the proper application of the overriding principles of *The Spiliada*
[1987] AC 460 by which he correctly directed himself. It is true that at an      E
earlier point in his judgment, when determining the governing law of the
alleged torts to be Russian, he wrongly identified Russia as their place of
commission: paras 134–135. But, as I have already said, in para 187 he also
considered the exercise of the discretion to serve out on the opposite
hypothesis, namely that English law governed the torts. Had he had cited to
him *The Albaforth*, I do not see how it could or should, in the light of the      F
other factors that he correctly identified, have led him to any different result
than that to which he in fact came. It is clear that in his view the other
factors pointed very powerfully towards Russia as the natural forum for
resolution of the issues.

55    Further, the Court of Appeal, before which *The Albaforth* was relied
upon, did not regard it decisive in the circumstances of this case: para 166 et
seq. It erred in treating Russian law as governing the alleged torts, but went      G
on largely to eliminate the significance of this error by treating it as irrelevant
which law governed. It should have treated English law as governing the
torts and have recognised this as one factor generally tending to favour
English jurisdiction. But, for reasons explained in paras 46–49 above, it was
in this case a factor of very little if any real potency. Had the Court of Appeal
approached the potential relevance of the governing law on a correct basis, it      H
is in my view clear that it would in this case also have made no difference to
its ultimate conclusion.

56    The Supreme Court is, in these circumstances, being asked to
re-exercise the discretion exercised at two stages below in the light of points

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  made about their reasoning of no real significance, which it is clear would not have altered the decision in either court.

### (c) The factual focus

57   VTB's case is that deceitful representations emanated from the respondents in Russia, but were communicated to VTB, and relied upon by
B  VTB, in London where VTB also suffered its loss. This analysis is important when considering where the tort was committed and what law governs it. But a wider view is necessary when considering the appropriate forum. The respondents' denials of any liability raise as issues whether the representations were inaccurate, whether, if so, any or all of the respondents knew of their inaccuracy and whether they joined together by "common design" to make the alleged representations and what impact any inaccuracy
C  of such representations had.

58   Taking the Ernst & Young 2007 report, the factual focus will be on the dairy companies and on the respondents' understanding of their affairs and financial position, matters which are clearly likely to be more appropriately examined in Russia, where the companies, their records and any relevant company witnesses are. Ernst & Young examined the
D  companies through their Moscow office, and the same is probably true of VTB's expert accountants, Deloittes. It is clear (para 40 above) that Mr Malofeev's case is that he was as unaware as Ernst & Young of the financial inaccuracy of their report. Secondly, relevance may attach to the impact which the Ernst & Young report had on those to whom it was first presented in Moscow.

59   As to the ownership of RAP, the plan, which VTB has produced
E  showing Mr Malofeev's alleged connection with and/or control of RAP, shows an international picture. On many aspects of the plan, evidence about the alleged corporate and personal links could be adduced as easily in England as in Russia. But any evidence from Mr Malofeev, who is said to have been in control of a web of interlinking companies as shown on the plan, would more conveniently be heard in Russia. The judge noted,
F  however, the respondents did not adduce before him any positive case challenging VTB's contention that Mr Malofeev ultimately controlled RAP as well as Nutritek. That does not mean that this is not in issue. But it does mean that, in the absence of any positive challenge, the convenience or otherwise of Mr Malofeev giving evidence on it in England or Russia can be put on one side.

60   On the other hand, the issue relating to reliance is one on which VTB
G  will clearly have to adduce the relevant evidence from its side. Again, it is likely that the relevant evidence will come in large measure from Russia and Russian witnesses. The informality of the alleged representation regarding RAP's ownership and regarding Mr Alginin, and the apparent failures to follow it up by obtaining more formal confirmation, is striking. It is likely to lead to questions as to how much, if any, weight was placed upon any such representation by VTB or VTB Moscow.

H  61   Ms Bragina cannot now be located and is not shown to have remained in England, and the representations said to be evidenced by her two e-mails in November 2007 seem, as already stated, likely to have come to her via VTB Moscow: see amended particulars of claim, para 51 and para 31 above, by a process which is obscure. The impact or lack of impact

© 2013 The Incorporated Council of Law Reporting for England and Wales

which it had on those to whom it was first presented in Moscow is thus likely     A
to be a very relevant subject of examination in the litigation, on the basis that
the substantial decision-making process took place in Moscow, with VTB
following in very large measure suit.

### (d) Witnesses

62   This is a factor at the core of the question of appropriate forum. It     B
was covered fully and helpfully by Arnold J in the course of considering the
"natural forum" in paras 188–195 of his judgment, set out in full above. In
summary, it is clear that the issues and evidence will be focused
overwhelmingly on matters which happened in and concern Russia, and that
the oral and documentary evidence, on both factual and expert matters, is
likewise likely to be overwhelmingly Russian and to be found in Russia,
where it could be heard in Russian without translators.                          C

### (e) Aim of the alleged torts

63   The alleged torts were designed to induce VTB to enter into a facility
agreement with RAP which was subject to English law and an agreement
(for the benefit of VTB only) that the courts of England should have
non-exclusive jurisdiction and be the most appropriate and convenient         D
forum: clause 35.1. The purpose of the facility agreement was in turn to
fund RAP's purchase of the dairy companies from the first respondent,
Nutritek International Corpn.

64   I am inclined to agree with Arnold J [2011] EWHC 3107 at [187]
that the fact that the facility agreement was subject to English law is not
relevant. He discounted it because of his view, erroneous on the basis on     E
which I approach the case, that the tort claims were subject to Russian law.
But, in my view, even though the tort claims are subject to English law, it
bears scarcely—if at all—on the appropriateness of the forum for their
resolution that they were designed to induce another English law contract.
No issue arises about the interpretation of the facility agreement.

65   On the other hand, the fact that the alleged torts were designed to
induce the making of a loan facility agreement, under which England was      F
accepted as the most appropriate and convenient forum is a potentially
relevant factor. It links with and reinforces the fact that, if there was any
such deceit and/or conspiracy as alleged, the same were directed at VTB in
London. But it is a factor which Arnold J did take into account: para 187.
He saw it as "a pointer to England, but not a strong one given that the claim
is a tort claim not a contract claim". I agree with this balanced view. But,    G
even if it understates the significance of the pointer, it does so only slightly
and not in a way which can, in my view, possibly justify this court in
interfering with the judge's conclusion.

66   There is certainly general attraction in a conclusion that persons
committing deceit should answer in the jurisdiction which is not merely that
where their deceitfulness manifested itself, but also a jurisdiction agreed to
be appropriate under the contract which they are by such deceit inducing.       H
But that formulation, by omitting the word "allegedly", begs the question
where the issue whether any such deceit occurred and induced the loan
should most appropriately be determined. All that has been established at
this stage is that there is a serious issue to be tried—in other words, that VTB

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  has a reasonable prospect of success—in respect of VTB's tort claims. The question where such claims are appropriately to be tried has to be answered in the light of all the circumstances, including the nature of the issues to be tried and the evidence which would be involved. The alleged torts were committed in England under English law, but the fundamental matters in dispute—whether there was any such deceit, whether the respondents were party to it, and what, if any, impact any falsely made representations had on
B  VTB are, as I have shown, heavily focused in this case on Russia and Russian witnesses.

### (f) Fair trial?

67  There is, as the Court of Appeal mentioned in para 167, no suggestion that this matter could not or would not receive a fair and proper
C  trial in Moscow.

### Conclusions

68  On the issues relating to the appropriate forum which the courts below addressed, the reasoning of Arnold J and the Court of Appeal was, subject to differences which I have identified, largely concurrent. The Court
D  of Appeal erred in its approach to the significance of the law governing the alleged torts, but Arnold J, although he erred in regarding the governing law as Russian, also, as I read para 194 of his judgment, expressed his view as to the appropriate exercise of his discretion on the assumed opposite basis, that English law applied. For reasons which I have set out in paras 54 and 55 above, neither Arnold J's error as to the governing law of the alleged torts,
E  nor the Court of Appeal's failure to recognise the potential significance of the governing law of such torts, can have been decisive in relation to the concurrent conclusions which they both reached.

69  In short, Arnold J's analysis and exercise of his discretion cannot in my view be faulted in any substantial respect, and I see no basis on which this court would be justified in setting aside his exercise of his discretion and
F  re-exercising the discretion for ourselves, still less in arriving at a different conclusion from his. The case is one in which an appellate court should refrain from interfering, unless satisfied that the judge made a significant error of principle, or a significant error in the considerations taken or not taken into account.

70  However, if it were incumbent on us to re-exercise the discretion regarding service out, I would myself arrive at the same conclusion as the
G  judge and the Court of Appeal. Once again in summary, the major part of the factual subject matter involves Russia, and it is clear that the great bulk of evidence on both sides will have to come from Russian witnesses. The location in law of the alleged torts is of much diminished relevance, on examination of their circumstances and place in which they are said to have originated, the process by which they are said to have reached and impacted
H  on VTB and the evidence which would be involved in undertaking such examination. The fact that any deceit was intended to induce an English law contract which provided for English jurisdiction is relevant, but cannot determine the appropriate forum in which to decide whether there was in fact any such deceit or conspiracy.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A

71   In my opinion, the Russian connection is of such strength and importance in this case that, despite the existence of some factors favouring England, VTB is quite unable to discharge the onus on it of showing that England is clearly or distinctly the appropriate forum for determination of the issues in this case.

*The proposed contractual claim based on piercing the corporate veil*

B

72   I agree with Lord Neuberger of Abbotsbury PSC's judgment on this aspect and would accordingly uphold the Court of Appeal's decision to refuse VTB permission to amend to raise a contractual claim based on piercing the corporate veil and treating the defendants liable for breach of the facility agreement and/or associated interest rate swap.

C

*The freezing order*

73   Like Lord Wilson JSC (paras 159–160), I am concerned that a freezing order should have been in force for some 14 months despite concurrent decisions below concluding that jurisdiction should not be exercised and, at least in the view of the judge, that, irrespective of whether jurisdiction should be exercised, the freezing order originally granted should not be continued.   On any view, this position reinforces Lord Neuberger PSC's comments in paras 81–93 with which I would associate myself.

D

*Conclusion*

74   I would in the light of my above conclusions dismiss this appeal on both the issues of jurisdiction and amendment and order that the freezing order be discharged.

E

**LORD NEUBERGER OF ABBOTSBURY PSC**

*Introductory*

F

75   This appeal raises two main questions which arise out of a claim brought in the High Court by VTB Capital plc ("VTB") against (i) Nutritek International Corpn ("Nutritek"), (ii) Marshall Capital Holdings Ltd, (iii) Marshall Capital LLC, and (iv) Konstantin Malofeev (together "the defendants"), based on the torts of deceit and conspiracy.  The first main question is whether the permission granted ex parte to VTB to serve the proceedings out of the jurisdiction on the defendants should be set aside. The second main question is whether VTB should be allowed to raise an additional claim, by way of amendment to its statement of case, based on piercing the corporate veil.

G

76   Arnold J [2011] EWHC 3107 (Ch) and the Court of Appeal [2012] 2 Lloyd's Rep 313 each concluded that the answer to the first question was yes, and to the second question was no.   VTB appeals against both conclusions.  The first question turns on whether the English court is the appropriate forum for the hearing of VTB's claim.  The second question turns on whether VTB has an arguable case on piercing the corporate veil.

H

77   The background facts have been fully set out in paras 165–180 of Lord Clarke of Stone-cum-Ebony JSC's judgment, in paras 19–40 of Lord

A   Mance JSC's judgment (as well as in paras 9–37 in the judgment of Lloyd LJ in the Court of Appeal, and in paras 4–56 of Arnold J's judgment).

78   I shall discuss both questions on the basis that they arise between VTB and Mr Malofeev, because (subject to the point that Marcap Capital LLC has not been served), it appears to be common ground that (i) the position of the other three defendants in relation to the first question is no different from his, (ii) the position of Marshall Capital Holdings Ltd and Marshall Capital LLC (together "Marcap") in relation to the second question is no different from his.

B

### The first question: the appropriate forum: three general points

79   In very summary terms: (i) VTB's substantive case is that it was induced by deceitful misrepresentations, for which the defendants were responsible, to enter into certain agreements ("the agreements") with various parties, in particular Russagropom LLC ("RAP"), under which VTB agreed to lend, and thereafter did lend, money to RAP; (ii) VTB obtained permission ex parte to effect service of proceedings, claiming damages for deceit and conspiracy, on the defendants out of the jurisdiction, and the defendants then applied to set aside service on the ground that Russia, rather than England, was the appropriate forum for the issues to be determined.

C

D

80   In a case such as this, permission to serve out of the jurisdiction should only be granted if the court is satisfied that England and Wales is "the proper place in which to bring the claim": see CPR r 6.37(3). It was common ground that this means that VTB could only succeed on the first question if it was able to establish that, in the words of Lord Goff of Chieveley in *Spiliada Maritime Corpn v Cansulex Ltd (The Spiliada)* [1987] AC 460, 481, the courts of England and Wales (hereafter "England") are "clearly" "the appropriate forum for the trial of the action".

E

81   When a court is called upon to decide whether an action should proceed in this, as opposed to another, jurisdiction, it is being asked to decide a procedural issue at a very early stage. Where, as is now the position in this case, it is common ground that the parties would have a fair trial in the competing jurisdiction, the exercise will normally involve the court weighing up a number of different factors, and deciding where the balance lies. Whilst the same considerations will not always apply to applications for permission to serve out and applications for stays of proceedings, the argument on this appeal has highlighted three general points in relation to each type of exercise.

F

82   The first point is that hearings concerning the issue of appropriate forum should not involve masses of documents, long witness statements, detailed analysis of the issues, and long argument. It is self-defeating if, in order to determine whether an action should proceed to trial in this jurisdiction, the parties prepare for and conduct a hearing which approaches the putative trial itself, in terms of effort, time and cost. There is also a real danger that, if the hearing is an expensive and time-consuming exercise, it will be used by a richer party to wear down a poorer party, or by a party with a weak case to prevent, or at least to discourage, a party with a strong case from enforcing its rights.

G

H

83   Quite apart from this, it is simply disproportionate for parties to incur costs, often running to hundreds of thousands of pounds each, and to spend many days in court, on such a hearing. The essentially relevant factors

© 2013 The Incorporated Council of Law Reporting for England and Wales

should, in the main at any rate, be capable of being identified relatively    A
simply and, in many respects, uncontroversially. There is little point in going
into much detail: when determining such applications, the court can only
form preliminary views on most of the relevant legal issues and cannot be
anything like certain about which issues and what evidence will eventuate if
the matter proceeds to trial.

84   This concern is not new. In *Cherney v Deripaska (No 2)* [2010] 2 All    B
ER (Comm) 456, paras 6, 7, Waller LJ said that whilst he "appreciate[d] that
litigants do often feel strongly about the place where cases should be
tried . . . disputes as to forum should not become state trials". He also
lamented the "mountain of material" the court faced in that case, and
suggested that it "would have been better for both parties and better use of
court time if they had expended their money and their energy on fighting the
merits of the claim".                                                         C

85   In *Friis v Colburn* [2009] EWHC 903 (Ch) at [3] and [5], having set
aside an order for service out of the jurisdiction, Peter Smith J referred to the
fact that the claimants' costs schedule was £215,280.50, following a hearing
which, he said, had been "strung out by unrealistic stances and unnecessarily
prolonged and complicated submissions which seem[ed] to achieve nothing
other than create fogs of irrelevancy".

86   In that connection, the present case is striking, as Arnold J explained    D
[2011] EWHC 3107 at [3]. The hearing before him lasted six days, after two
days' pre-reading. He was faced with more than 27 bundles of documents,
written evidence, and exhibits, and 14 bundles of authorities. One of the
witnesses had made twelve witness statements, and further materials were
added on a daily basis. (The hearing was not limited to the application to set
aside permission to serve out: it included an application to amend, and        E
applications to continue and to discharge a freezing order; however, no more
than half the material and time can have been devoted to those aspects.)

87   Since the hearing of this appeal, the Court of Appeal has given
judgment in *Alliance Bank JSC v Aquanta Corpn* [2013] 1 All ER (Comm)
819, a case involving similar issues to those in this appeal. At para 4 of
Tomlinson LJ's judgment in that case, he referred to the fact that the first
instance hearing of the application to set aside permission to serve out, on    F
the grounds that England was an inappropriate forum (as well as raising
some other points), lasted 11 days, and the hearing in the Court of Appeal
appears to have lasted four days.

88   In *The Spiliada* [1987] AC 460, 465, Lord Templeman expressed the
hope that in a dispute over jurisdiction,

   "the judge will be allowed to study the evidence and refresh his    G
   memory of [the principles] in the quiet of his room without expense to the
   parties; that he will not be referred to other decisions on other facts; and
   that submissions will be measured in hours and not days."

That was a rather optimistic aspiration, not least when one bears in mind the
understandable desire of lawyers to do, and to be seen by their clients to be
doing, everything they can to advance their clients' case, especially where the    H
dispute over jurisdiction may well be determinative of the outcome.

89   However, particularly with the benefit of procedural reforms, which
have been introduced, or are in the process of being introduced, following
reports from Lord Woolf and Jackson LJ, the judiciary is now encouraged to

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   exercise far greater case management powers than 25 years ago. Accordingly, judges should invoke those powers to ensure that the evidence and argument on service out and stay applications are kept within proportionate bounds and do not get out of hand.

90   The second point is, in a sense, a sub-set of the first point, and concerns the extent to which a defendant who is challenging the jurisdiction of the English court should identify the nature of his case. In my view, the position is reasonably clear. As a matter of principle, a defendant is entitled
B   to keep his powder dry: he can simply put the claimant to proof of its case. In general at least, that is true at any point of the proceedings. The mere fact that the defendant is challenging jurisdiction does not somehow impose a duty on him to specify his case. The onus is on the claimant to satisfy the court that there is a serious issue to be tried on the merits of the claim, and
C   not on the defendant to satisfy the court that he has a real prospect of successfully defending it.

91   However, if the defendant chooses to say nothing, then it would be quite appropriate for the court to proceed on the basis that there is no more (and no less) to the proceedings than will be involved in the claimant making, or trying to make, out its case. Of course, in many instances, the defendant will be able to say that, although he has not submitted a draft
D   statement of case, or produced a witness statement, setting out the details of his case, its nature is clear from correspondence, common sense, or even submissions. Consistent with my observations on the first point, I would not want to encourage a defendant to go into great detail as to his case in a long document with many exhibits, but if he is wholly reticent about his case, he can have no complaint if the court does not take into account what points he
E   may make, or evidence he may call, at any trial. I agree with Lord Clarke JSC that a defendant could exhibit draft points of defence, but in many cases, it may be disproportionate to expect him to incur the costs of doing so before it has been decided whether the claim is to proceed at all.

92   The third point was expressed by Lord Bingham of Cornhill in *Lubbe v Cape plc* [2000] 1 WLR 1545, 1556. He said, in the context of an application for a stay of proceedings on grounds of forum non conveniens,
F   that

> "This is a field in which differing conclusions can be reached by different tribunals without either being susceptible to legal challenge. The jurisdiction to stay is liable to be perverted if parties litigate the issue at different levels of the judicial hierarchy in the hope of persuading a higher court to strike a different balance in the factors pointing for and against a
G   foreign forum."

Precisely the same applies in many cases involving permission to serve out.

93   As Mr Mark Hapgood QC, who appeared for Mr Malofeev, said, appellate courts should be vigilant in discouraging appellants from arguing the merits of an evaluative interlocutory decision reached by a judge, who had to balance the various factors relevant to the appropriate forum, when
H   the complaint is, in reality, that the balance should have been struck differently.

94   Lord Templeman in *The Spiliada* [1987] AC 460, 465 said that the determination of the appropriate forum is "pre-eminently a matter for the trial judge", because "commercial court judges are very experienced in these

© 2013 The Incorporated Council of Law Reporting for England and Wales

matters", and "an appeal should be rare and the appellate court should be slow to interfere". This case was in the Chancery Division, whose judges entertain such issues less commonly than their commercial court colleagues, but their experience and expertise are such that the same conclusion applies. As Tomlinson LJ said [2013] 1 All ER (Comm) 819, para 117 of his judgment in *Alliance Bank*, an appellate court "should hesitate long before interfering with the judge's assessment" on such an issue.

*The first question: the appropriate forum: the instant appeal*

95    Lord Mance and Lord Clarke JJSC have each fully considered the first question in their respective judgments, and have come to different conclusions. Given that the first question is so fact-specific, and is the subject of two full judgments in this court (not to mention two full judgments below), it would not be appropriate for me to go into the facts and issues canvassed between the parties.

96    Lord Mance JSC in paras 41 and 42 of his judgment has set out the passages in the judgments of Arnold J and the Court of Appeal respectively, which contain the centrally relevant reasoning of those tribunals on the first question which we have to decide. At least on the face of it, those passages each involve a classical interlocutory weighing up exercise with which an appellate court should be slow to interfere. Of course, that does not detract from the point that the Court of Appeal will consider any argument that the judge took into account any irrelevant or mistaken material, or omitted some relevant material, which could well have influenced the conclusion reached, or that the case is one of those even more unusual cases where the judge's conclusion was one that no reasonable judge could have reached.

97    It is worth emphasising that, as Lord Wilson JSC says, the exercise carried out by the judge and by the Court of Appeal on the first question was not the exercise of a discretion but an evaluative, or a balancing, exercise, with which, as Lord Goff said in *The Spiliada* at p 465, an "appellate court should be slow to interfere" (also reflected in Lord Bingham's observation in *Lubbe* quoted in para 92 above).

98    In my view, there are no good grounds upon which this court should interfere with the decision of the Court of Appeal on the first question, and I also consider that there were no good grounds upon which the Court of Appeal could have interfered with the decision of Arnold J on that question. In that connection, there are one or two points worth mentioning.

99    First, were the Court of Appeal correct to hold that Arnold J went wrong in a way which justified them reconsidering his conclusion? In my view, they were right to say in paras 131 and 129 of their judgment that he should have asked himself the single question identified in para 80 above, whereas he approached the issue through two slightly different questions. However, I am unconvinced that this represented an error of significance. The nub of Arnold J's reasoning, quoted by Lord Mance JSC in para 41 above, shows, to my mind, that the judge ultimately adopted the right approach to the question which he had to resolve.

100    Secondly, there is the governing law. For the reasons given by Lord Clarke and Lord Mance JJSC, I agree that the law governing the alleged tort of deceit is English law. As for the alleged tort of conspiracy, this is less clear, because the conspiracy to commit the deceit was based on a common design allegedly formed in Russia. However, like Lord Mance JSC, I am content to

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   proceed on the basis that English law applies.   In connection with the relevant governing law, therefore, it is clear that Arnold J and the Court of Appeal went wrong in holding that Russian law was the governing law.

101   It seems to me, however, that that error cannot, at least of itself, justify this court interfering with the Court of Appeal's decision, or, indeed, with Arnold J's decision, on the first question.   That is because the Court of
B   Appeal said in terms in para 166 of its judgment that it would have reached the same decision even if the law governing the deceit and conspiracy claims was English law, and Arnold J in his judgment appears to me to have taken the same view at his para 194.

102   Thirdly, there is an argument based on the jurisdiction clauses contained in the agreements, which VTB contends it entered into as a result of the alleged deceits and conspiracy.   Clause 35 of the facility agreement
C   ("clause 35") provided, in clause 35.1, that "the courts of England have nonexclusive jurisdiction to settle any dispute arising out of or in connection with this agreement", that no party would argue that "the courts of England [were not] the most appropriate and convenient courts to settle" such disputes, but that clause 35.1 was "for the benefit of [VTB] only".   Clause 35.3 entitled VTB "to refer any dispute which may arise out of or in
D   connection with this agreement to final and binding arbitration in London".   The accompanying related agreements also contained jurisdiction clauses in favour of the English courts, and although their terms were not identical to clause 35, the differences are not significant for present purposes, so I shall confine my remarks to clause 35.

103   On behalf of VTB, Mr Mark Howard QC argued that the fact that the defendants had procured, by fraudulent misrepresentations, the entry of
E   VTB into a contract containing a provision such as clause 35, was "a powerful pointer to England being the proper place to bring [a] claim" that it was induced by deceit to do so, particularly as the individual alleged to be responsible for the deceit was also involved in negotiating the contract.

104   At the end of para 187 of his judgment, Arnold J described clause 35 as "a pointer to England, but not a strong one given that the claim
F   is a tort claim not a contract claim".   The Court of Appeal did not in terms address this point, as the approval in their para 167 of Arnold J's balancing exercise only refers to his paras 188 and 189.   However, by expressly agreeing with his approach, it seems unlikely that they did not take into account the point which he made at the end of his para 187.

105   In my view, Arnold J was right in his view that clause 35 was a
G   factor in favour of VTB's case on the first question, but he was also right to say that it was not a particularly strong factor.   As Rix J said in relation to a similar point in *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 All ER (Comm) 237, 252, it would be "far-fetched" to suggest that a provision such as clause 35 could be invoked by VTB to require a claim it brings solely against non-parties to be heard in London, even if the claim relates to the agreement containing the clause.   However, that is not a
H   reason for concluding that clause 35 cannot be a factor, or, to use Arnold J's word, a pointer, in connection with the first question.

106   There may well be circumstances in which such a factor is a powerful one.   An example is to be found in the decision of the New South Wales Court of Appeal in *Global Partners Fund Ltd v Babcock & Brown Ltd*

© 2013 The Incorporated Council of Law Reporting for England and Wales

380
VTB Capital plc v Nutritek International Corpn (SC(E))          [2013] 2 AC
Lord Neuberger of Abbotsbury PSC

(2010) 79 ACSR 383: see especially at paras 71–80. I do not consider that     A
that decision helps VTB: for a number of reasons, it was a very different case.

107   In this case, it is true that, at least on the unchallenged evidence on
behalf of VTB, Mr Malofeev was involved, and may have been instrumental
in, negotiating the agreements in question, and he can therefore be said to
have approved, or at least have had knowledge of, their terms, including
clause 35. It is also true, again on VTB's case, that Mr Malofeev can be said     B
to have encouraged VTB to enter into those agreements, which include
clause 35. To that extent, it can come as no surprise to him that VTB wish to
litigate a claim which, at least on its case, arises out of those agreements, in
London.

108   However, clause 35 is not an exclusive jurisdiction provision: it
merely gives VTB what is in effect an option to sue the other parties to the
agreements in England in respect of any claim arising out of or in connection     C
with those agreements. The present proceedings do not involve VTB suing
any party to the agreements, although it may be that they could fairly be said
to include any claim arising under the agreements. The fact that RAP was
content to be sued under the agreements in England does not mean that
Mr Malofeev would have been content to have been sued in tort here. The
fact that VTB apparently wanted to have the right to sue RAP here does not     D
mean that it would have wanted to have the same right against Mr Malofeev
(e g RAP may have been believed to have assets here).

109   I accept that it would be different if VTB had a claim under the
agreements against RAP to which its claim against Mr Malofeev was
somehow connected. There is obvious force in Mr Hapgood's point that, if
Mr Malofeev is to be treated as having had notice of clause 35 and its
implications, it goes no further than helping VTB in suing him in this     E
jurisdiction in proceedings which include a claim brought under the
agreements against one or more of the parties to the agreements. However,
I do not consider that the fact there are no such claims destroys VTB's
reliance on clause 35 of any validity, but it severely weakens it.

110   I acknowledge the authority of Professor Briggs and the force of his
views, as described by Lord Clarke JSC at paras 221 and 222. However, I do
not accept that Mr Malofeev "engineered" VTB entering into clause 35.     F
There is no evidence that he even knew of its existence, and, anyway, it is
plain from its terms that the clause was wanted by VTB and is purely for its
benefit. In so far as it is said that Mr Malofeev "engineered" VTB entering
into the agreement which happened to include clause 35, it seems to me
unsafe to proceed on the assumption that Mr Malofeev was guilty of deceit:
that would be the central substantive issue in these proceedings.     G

111   What I do accept is that the existence of the clause in an agreement,
in which Mr Malofeev was in some respects involved (to use a neutral word)
in negotiating, renders it hard for him to contend that England is an
inappropriate forum for the proceedings which are connected with the
agreement, but I do not see it going much further than that on its own. To
hold otherwise would, I think, involve effectively treating Mr Malofeev as
bound by the clause.     H

112   Finally, is this a case where the conclusion reached below on the
first question was outside the ambit of permissible decisions as canvassed by
Lord Bingham in *Lubbe* and quoted in para 92 above? In my view, it is not.
While there is a powerful case for saying that England is the appropriate

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   forum, as Lord Clarke JSC's judgment shows, I think that it is also clear there is a powerful argument to the contrary, as is demonstrated by Lord Mance JSC's judgment (supported by the reasoning of Arnold J and the Court of Appeal).

113   It is unnecessary to spend time on what is a hypothetical question, namely what decision I would have reached on this issue if I had been the appropriate decision-maker. It is sufficient for me to conclude, as I do,

B   essentially for the reasons given more fully by Lord Mance and Lord Wilson JJSC, that Arnold J and the Court of Appeal each reached a conclusion on the first question which (i) they were respectively entitled to reach on the basis of applying the relevant principles to the facts of this case, and (ii) was not vitiated by any error, because, to the extent that there was any error, it did not invalidate the conclusion, both because the error would

C   not have caused them to change their conclusions and because that would have been a reasonable view to take.

*The second issue: piercing the corporate veil: VTB's case*

114   VTB seeks to amend its pleaded case to contend that Mr Malofeev and Marcap should be treated as being jointly and severally liable with RAP for breaches of two of the agreements, namely the facility agreement and the

D   associated ISA ("the two agreements") and/or otherwise subject to remedies to enforce the two agreements.

115   On the documents, the parties to the two agreements were (i) RAP, (ii) "the original guarantors", namely, Migifa, owner of all the shares in RAP, and Brentville, owner of all the shares in Migifa, and (iii) VTB. It is (unsurprisingly) therefore common ground that Mr Malofeev was not party to

E   either of the two agreements. However, VTB's contention is that it is entitled to "pierce the veil of incorporation" of RAP, as a result of which Mr Malofeev (and Marcap) should be held liable under the two agreements together with RAP and/or otherwise subject to remedies to enforce the two agreements.

116   According to VTB's proposed amended particulars of claim, as expanded in the written and oral argument before us, its case on this issue may be summarised as follows: (i) Mr Malofeev controlled RAP and

F   Nutritek; (ii) RAP was specifically formed for the purpose of entering into the two agreements, which it duly did and thereby obtained the benefit of the loans of over US$225,050,000 made available to RAP by VTB thereunder; (iii) The two agreements appeared to involve, and were misrepresented to VTB to involve, a loan to RAP to enable it to purchase the shares in certain dairy companies owned by Nutritek, whereas their true purpose, as

G   Mr Malofeev knew, was to transfer those shares between the two companies at an inflated price; (iv) In particular, Mr Malofeev was responsible for inducing VTB to enter into the two agreements by virtue of Nutritek's misrepresentations as to the control, trading performance, and value of the dairy companies, and, in particular, representing that they were not controlled by Mr Malofeev or Marcap; (v) Mr Malofeev accordingly improperly used RAP "as the corporate vehicle to enter into" the two

H   agreements, "and obtain[ed] thereby" the loans, which "involved the fraudulent misuse of the company structure"; (vi) In particular, Mr Malofeev used RAP's "separate legal status to disguise the ownership and control ultimately exercised over RAP by [Mr Malofeev and Marcap]", which disguise duly misled VTB into believing that there was a genuine

© 2013 The Incorporated Council of Law Reporting for England and Wales

arm's length transaction at a genuinely negotiated price; (vii) In these    A
circumstances, "the corporate veil of RAP should be lifted, exposing . . .
Mr Malofeev . . . as the puppeteer . . . behind it to remedies to enforce the
terms of the [two agreements]", so that Mr Malofeev is "jointly and severally
liable with RAP" under the two agreements "in respect of VTB's losses".

117   For Mr Malofeev, it was contended that this line of argument is
bound to fail on two alternative grounds.  The first is that we should hold
that, whatever has been said about it in previous cases, the court cannot in    B
fact pierce the corporate veil, and that the cases which suggest it can are
wrong, although the decisions in those cases may often be justified on
another basis.  The second argument is that, even if the court can in principle
pierce the veil, it cannot do so in this case, because VTB's argument
represents an illegitimate and unprincipled extension of the circumstances in
which the veil can be pierced.                                                  C

*The second issue: piercing the corporate veil: the principle of piercing the
veil*

118   I turn first to consider the argument that there are no circumstances
in which the court should pierce, or lift, the veil.  The terms
"piercing" and "lifting" appear throughout the authorities, sometimes          D
interchangeably.  As Toulson J observed in *Yukong Line Ltd of Korea v
Rendsburg Investments Corpn of Liberia (No 2)* [1998] 1 WLR 294, 305, "it
may not matter what language is used as long as the principle is clear; but
there lies the rub".  Staughton LJ in *Atlas Maritime Co SA v Avalon
Maritime Ltd (No 1)* [1991] 4 All ER 769, 779G, expressly separated the
two, on the basis that "pierc[ing] . . . is reserve[d] for treating the rights or
liabilities or activities of a company as the rights or liabilities or activities of    E
its shareholders", whereas "lift[ing] . . . [is] to have regard to the
shareholding in a company for some legal purpose".  In *Ben Hashem v Al
Shayif* [2009] 1 FLR 115, a case which included a claim that a company was
no more than one man's alter ego, Munby J said, at para 150, that "in this
context the expressions are synonymous".

119   For present purposes, I shall use the phrase "piercing" in preference    F
to "lifting".  It is the more familiar expression and it is the expression which
all counsel have used.  It is unnecessary to decide whether, in truth, there is a
difference in this context between "piercing" and "lifting" the corporate veil.

120   We were referred to a number of cases where courts have either
granted relief on the basis of piercing the corporate veil, or where courts have
proceeded on the assumption, or concluded, that there is power to do so.  The
only case in that connection in the House of Lords, or Supreme Court, to       G
which we were referred, was *Woolfson v Strathclyde Regional Council*
1978 SC (HL) 90, a case where, on the facts, the House of Lords had no
difficulty in rejecting an argument that the corporate veil could be pierced.  At
1978 SC (HL) 90, 96, Lord Keith of Kinkel suggested that the court could
only take such a course "where special circumstances exist indicating that
[the involvement of the company] is a mere façade concealing the true facts".

121   There is obvious attraction in the proposition that the court can       H
pierce the veil of incorporation on appropriate facts, in order to achieve a
just result.  However, the spirited and sustained attack mounted against the
proposition by Mr Michael Lazarus, who appeared for Marshall Capital
Holdings Ltd, is worthy of serious consideration.  The brief discussion of the

A    principle in *Woolfson* does not justify the contention that it was somehow affirmed or approved by the House: Lord Keith's remarks were obiter, and the power of the court to pierce the corporate veil does not appear to have been in issue in that case. The most that can be said about *Woolfson* from the perspective of VTB is that the House was prepared to assume that the power existed.

B    122    The starting point for the argument that the principle does not exist is the well known decision in *Salomon v A Salomon & Co Ltd* [1897] AC 22. There is great force in the argument that that case represented an early attempt to pierce the veil of incorporation, and it failed, pursuant to a unanimous decision of the House of Lords, not on the facts, but as a matter of principle. Thus, at pp 30–31, Lord Halsbury LC said that a "legally incorporated" company

C        "must be treated like any other independent person with its rights and liabilities appropriate to itself . . . whatever may have been the ideas or schemes of those who brought it into existence."

He added that it was "impossible to say at the same time that there is a company and there is not".

D    123    The notion that there is no principled basis upon which it can be said that one can pierce the veil of incorporation receives some support from the fact that the precise nature, basis and meaning of the principle are all somewhat obscure, as are the precise nature of circumstances in which the principle can apply. Clarke J in *The Tjaskemolen* [1997] 2 Lloyd's Rep 465, 471 rightly said that "the cases have not worked out what is meant by 'piercing the corporate veil'. It may not always mean the same thing" (and to

E    the same effect, see *Palmer's Company Law* (looseleaf ed), para 2.1533). Munby J in *Ben Hashem's* case [2009] 1 FLR 115, seems to have seen the principle as a remedial one, whereas Sir Andrew Morritt V-C in *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177 appears to have treated the principle as triggered by the finding of a "façade".

124    The "façade" mentioned by Lord Keith is often regarded as something of a touchstone in the cases—e g per Munby J in *Ben Hashem's*

F    case, para 164, and per Sir Andrew Morritt V-C in *Trustor*, para 23. Words such as "façade", and other expressions found in the cases, such as "the true facts", "sham", "mask", "cloak", "device", or "puppet" may be useful metaphors. However, such pejorative expressions are often dangerous, as they risk assisting moral indignation to triumph over legal principle, and, while they may enable the court to arrive at a result which seems fair in the

G    case in question, they can also risk causing confusion and uncertainty in the law. The difficulty which Diplock LJ expressed in *Snook v London and West Riding Investments Ltd* [1967] 2 QB 786, 802, as to the precise meaning of "sham" in connection with contracts, may be equally applicable to an expression such as "façade".

125    Mr Lazarus argued that in all, or at least almost all, the cases where the principle was actually applied, it was either common ground that the

H    principle existed (*Gilford Motor Co Ltd v Horne* [1933] Ch 935, *In re H (Restraint Order: Realisable Property)* [1996] 2 All ER 391, and *Trustor*) and/or the result achieved by piercing the veil of incorporation could have been achieved by a less controversial route—for instance, through the law of agency (*In re Darby; Ex p Brougham* [1911] 1 KB 95, *Gilford*, and *Jones v*

© 2013 The Incorporated Council of Law Reporting for England and Wales

*Lipman* [1962] 1 WLR 832), through statutory interpretation (*Daimler Co Ltd v Continental Tyre and Rubber Co (Great Britain) Ltd* [1916] 2 AC 307, *Merchandise Transport Ltd v British Transport Commission* [1962] 2 QB 173, *Wood Preservation Ltd v Prior* [1969] 1 WLR 1077 and *In re A Company* [1985] BCLC 333), or on the basis that, as stated by Lord Goff in *Goss v Chilcott* [1996] AC 788, 798, money due to an individual which he directs to his company is treated as received by him: *Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734, and the *Trustor* case [2001] 1 WLR 1177.

126   In summary, therefore, the case for Mr Malofeev is that piercing the corporate veil is contrary to high authority, inconsistent with principle, and unnecessary to achieve justice.

127   I see the force of this argument, but there are points the other way. I am not convinced that all the cases where the court has pierced the veil can be explained on the basis advanced by Mr Lazarus. Further, as Mr Howard said, the fact is that those cases were decided on the basis of piercing the veil. More generally, it may be right for the law to permit the veil to be pierced in certain circumstances in order to defeat injustice. In addition, there are other cases, notably *Adams v Cape Industries plc* [1990] Ch 433, where the principle was held to exist (albeit that they include obiter observations and are anyway not binding in this court). It is also difficult to explain the first instance decision in *Kensington International Ltd v Republic of the Congo* [2006] 2 BCLC 296 on any basis other than the principle (but I am not at all sure that the case was rightly decided: see *Continental Transfert Technique Ltd v Federal Government of Nigeria* [2009] EWHC 2898 (Comm) at [27]–[29]. Further, the existence of the principle is accepted by all the leading textbooks: see *Palmer's Company Law* (looseleaf ed), para 2.1533, *Gore-Browne on Companies* (looseleaf ed), paras 7[3]–7[6], *Gower & Davies on Principles of Modern Company Law*, 9th ed (2012), paras 8-5–8-14, and *Farrar's Company Law*, 4th ed (1998), pp 69–78.

128   In answer to the contention that the approach of the courts to the issue of piercing the veil is unprincipled, there is real force, at least on the face of it, in the fact that it cannot be invoked merely where there has been impropriety. As Munby J put it in *Ben Hashem's* case [2009] 1 FLR 115, paras 163–164,

> "it is necessary to show both control of the company by the wrongdoer(s) and impropriety, that is, (mis)use of the company by them as a device or façade to conceal their wrongdoing . . . at the time of the relevant transaction(s)."

129   In its recent decision in *La Générale des Carrières et des Mines v FG Hemisphere Associates LLC* [2013] 1 All ER 409, para 24, the Judicial Committee of the Privy Council, in a judgment given by Lord Mance JSC, was prepared to assume that the appellant was right in contending that it was open to a court in this jurisdiction to pierce the corporate veil, but it is to be noted that this was not challenged by the respondent. In para 27, reference was made to *Case concerning Barcelona Traction, Light and Power Co Ltd (Second Phase) (Belgium v Spain)* [1970] ICJ 3, in which, it was said,

> "the International Court of Justice referred (para 56) to municipal law practice to lift the corporate veil . . . 'for instance, to prevent the misuse

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   of the privileges of legal personality, as in certain cases of fraud or
malfeasance, to protect third persons such as a creditor or purchaser, or
to prevent the evasion of legal requirements or of obligations'."

However, at para 27, Lord Mance JSC pointed out that the *Barcelona
Traction* case concerned "international legal considerations, indicating that
there may not always be a precise equation between factors relevant to the
B   lifting of the corporate veil under domestic and international law".

130    In my view, it is unnecessary and inappropriate to resolve the issue
of whether we should decide that, unless any statute relied on in the
particular case expressly or impliedly provides otherwise, the court cannot
pierce the veil of incorporation. It is unnecessary, because the second
argument raised on behalf of Mr Malofeev, to which I shall shortly turn,
persuades me that VTB cannot succeed on this issue. It is inappropriate
C   because this is an interlocutory appeal, and it would therefore be wrong
(absent special circumstances) to decide an issue of such general importance
if it is unnecessary to do so.

*The second issue: piercing the corporate veil: why it cannot succeed in this
case*

D   131    I therefore approach this question in the same way as the Court of
Appeal, namely by considering whether, assuming in VTB's favour that the
court can pierce the veil of incorporation on appropriate facts, the basis on
which VTB seeks to pierce the veil can be justified in the present case. I do so
on the basis that this issue is to be resolved by reference to English law. It
seems to me, however, that there may be a choice of law question to be
E   addressed in cases which concern the piercing of the veil of a foreign
incorporated company. That question is whether the proper law governing
the piercing of the corporate veil is the lex incorporationis, the lex fori, or
some other law (for example, the lex contractus, where the issue concerns
who is considered to be party to a contract entered into by the company in
question). The ultimate conclusion may be that there is no room for a single
choice of law rule to govern the issue: see Chee Ho Tham "Piercing the
F   corporate veil: searching for appropriate choice of law rules" [2007]
LMCLQ 22, 27. However, given that it has been common ground
throughout these proceedings that the issue is to be resolved pursuant to
English law, it is inappropriate to say more about this issue.

132    In so far as VTB invokes the principle of piercing the veil of
incorporation, its case involves what, at best for its point of view, may be
G   characterised as an extension to the circumstances where it has traditionally
been held that the corporate veil can be pierced. It is an extension because it
would lead to the person controlling the company being held liable as if he
had been a co-contracting party with the company concerned to a contract
where the company was a party and he was not. In other words, unlike
virtually all the cases where the court has pierced the corporate veil, VTB is
claiming that Mr Malofeev should be treated as if he were, or had been, a
H   co-contracting party with RAP under the two agreements, even though
neither Mr Malofeev nor any of the contracting parties (including VTB)
intended Mr Malofeev to be a party.

133    The notion that the principle can be extended to such a case
receives no support from any case save for a very recent decision of

© 2013 The Incorporated Council of Law Reporting for England and Wales

Burton J, *Antonio Gramsci Shipping Corpn v Stepanovs* [2011] 1 Lloyd's  A
Rep 647 (which he followed in his later decision in *Alliance Bank JSC v
Aquanta Corpn* [2012] 1 Lloyd's Rep 181, which was considered by the
Court of Appeal [2013] 1 All ER (Comm) 819). None of the other decisions
relied on by VTB in this connection is, on analysis, of assistance to his case.

134   In the *Gilford* case [1933] Ch 935, Mr Horne had undertaken not
to compete with his former employer, and a company, in which only he and  B
his wife were shareholders, and which he formed after leaving his
employment, was enjoined from competing. He effectively broke his
undertaking by trading through the company, in the same way as if it had
been carrying on the competing business through his wife—as indeed had
happened in *Smith v Hancock* [1894] 2 Ch 377, 385, a case relied on by the
Court of Appeal in *Gilford*. Thus, the decision in *Gilford* had nothing to do  C
with the fact that a company was involved, and therefore, as a matter of
logic, the decision cannot have been based on piercing the corporate veil—a
point made by Toulson J in the *Yukong Line* case [1998] 1 WLR 294, 308,
and rightly accepted by Arnold J and the Court of Appeal in this case.

135   The same point (as was said in the *Yukong Line* case) applies to
*Jones v Lipman* [1962] 1 WLR 832, which I do not find an entirely easy case.
After agreeing to sell a property to a purchaser, the vendor sold the same  D
property to a company owned by him and his wife, and the purchaser
obtained an order for specific performance against the company. On the
judge's reasoning, it would have equally been entitled to do so if, instead of
the company, the property had been transferred to the vendor's wife.
Another view of *Jones* is that the sale by the vendor to the company was
treated as a sham transaction.

136   In both *Gencor* [2000] 2 BCLC 734 and *Trustor* [2001] 1 WLR  E
1177, the court pierced the corporate veil in order to impose liability on a
company, effectively owned and controlled by the wrongdoer, for money
which he had misappropriated from the claimant and diverted to the
company. There was no question of the wrongdoer being treated as
contractually liable under a contract to which the company, rather than he,
was a party. Even the doubtful decision in the *Kensington* case [2006]  F
2 BCLC 296 did not involve going so far as to hold that the person sheltering
behind the veil was liable as if he was a contracting party under a contract
entered into by the company.

137   The fact that there has been no case (until the *Gramsci* case [2011]
1 Lloyd's Rep 647) where the power to pierce the corporate veil has been
extended in the way for which VTB contends in these proceedings does not
necessarily mean that VTB's case, in so far as it is based on piercing the veil,  G
must fail. However, given that the principle is subject to the criticisms
discussed above, it seems to me that strong justification would be required
before the court would be prepared to extend it. Once one subjects the
proposed extension to analysis, I consider that it is plain that it cannot be
sustained: far from there being a strong case for the proposed extension,
there is an overwhelming case against it.

138   First, it is not suggested by VTB that any of the other contracting  H
parties under the two agreements is not liable. Indeed, as mentioned above,
VTB's proposed pleaded case is that Mr Malofeev is "jointly and severally
liable with RAP". Even accepting that the court can pierce the corporate veil
in some circumstances, the notion of such joint and several liability is

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   inconsistent with the reasoning and decision in *Salomon*. A company should be treated as being a person by the law in the same way as a human being. The fact that a company can only act or think through humans does not call that point into question: it just means that the law of agency will always potentially be in play, but, it will, at least normally, be the company which is the principal, not an agent. On VTB's case, if the agency analogy is relevant, the company, as the contracting party, is the quasi-agent, not the quasi-principal.

B

139   Subject to some other rule (such as that of undisclosed principal), where B and C are the contracting parties and A is not, there is simply no justification for holding A responsible for B's contractual liabilities to C simply because A controls B and has made misrepresentations about B to induce C to enter into the contract. This could not be said to result in

C   unfairness to C: the law provides redress for C against A, in the form of a cause of action in negligent or fraudulent misrepresentation.

140   In any event, it would be wrong to hold that Mr Malofeev should be treated as if he was a party to an agreement, in circumstances where (i) at the time the agreement was entered into, none of the actual parties to the agreement intended to contract with him, and he did not intend to contract with them, and (ii) thereafter, Mr Malofeev never conducted himself as if, or

D   led any other party to believe, he was liable under the agreement. That that is the right approach seems to me to follow from one of the most fundamental principles on which contractual liabilities and rights are based, namely what an objective reasonable observer would believe was the effect of what the parties to the contract, or alleged contract, communicated to each other by words and actions, as assessed in their context: see e g *Smith v*

E   *Hughes* (1871) LR 6 QB 597, 607.

141   In his argument, Mr Howard relied by analogy with the law relating to undisclosed principals. In my view, the analogy tells against VTB's argument. The existence of the undisclosed principal rule has long been regarded as an anomaly, as discussed in *Bowstead & Reynolds on Agency*, 19th ed (2010), para 8-070, and as observed by Dillon LJ in *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148, 173. As

F   the Court of Appeal said in this case at para 89, it would be inappropriate to extend an anomaly—save where it would be unjust and unprincipled not to do so. To adapt what Lord Hoffmann said in *OBG Ltd v Allan* [2008] AC 1, paras 103, 106, "an anomaly created by the judges to solve a particular problem" is "an insecure base" on which to justify an extension to a principle, especially when that principle can itself be said to be anomalous.

G   142   Quite apart from this, it seems to me that the facts relied on by VTB to justify piercing the veil of incorporation in this case do not involve RAP being used as "a façade concealing the true facts". In my view, if the corporate veil is to be pierced, "the true facts" must mean that, in reality, it is the person behind the company, rather than the company, which is the relevant actor or recipient (as the case may be). Here, on VTB's case, "the true facts" relate to the control, trading performance, and value of the dairy

H   companies (if one considers the specific allegations against Mr Malofeev), or to the genuineness of the nature of the underlying arrangement (which involves a transfer of assets between companies in common ownership). Neither of these features can be said to involve RAP being used as a "façade to conceal the true facts".

© 2013 The Incorporated Council of Law Reporting for England and Wales

143   It was suggested, however, by Mr Howard that the case against     A
Mr Malofeev involves him "abusing the corporate structure", and that that
is sufficient to justify piercing the corporate veil.  However, in my view,
abuse of the corporate structure (whatever that expression means) adds
nothing to the debate, at least in this case.  It may be another way of
describing use of the company as a façade to conceal the true facts (in which
case it adds nothing to Lord Keith's characterisation in *Woolfson* 1978 SC
(HL) 90), or it may be an additional requirement before the corporate veil     B
will be pierced: otherwise, it seems to me that it would be an illegitimate
extension of the circumstances in which the veil can be pierced.

144   It is true that in many civil law systems, abuse of rights is a well
recognised concept, and it may be appropriate for a domestic court to apply
such a principle in relation to some areas of EU law.  However, it was not
suggested to us that it should be applied as a new or separate ground in     C
domestic law for treating Mr Malofeev as contractually liable to VTB, or
that it would assist VTB in this case.

145   Accordingly, in agreement with the Court of Appeal and for
substantially the same reasons, I consider that VTB's contention represents
an extension to the circumstances in which the court will pierce the
corporate veil, and on analysis it is an extension which is contrary to     D
authority and contrary to principle.

146   The proposed extension is all the more difficult to justify given that
it is not needed to enable VTB to seek redress from Mr Malofeev.  It is clear
that, if VTB establishes that it was induced to enter into the agreements by
the fraudulent statements which he is alleged to have made, then
Mr Malofeev will be liable to compensate VTB.  The measure of damages     E
may be different, but that is not a particularly attractive reason for extending
the principle in a new and unprincipled way.  And I am not at all attracted by
the notion that the principle should be invoked simply to enable VTB to
justify the proceedings being heard in this jurisdiction, if they otherwise
could not be.   That would be precious close to its application being
permitted to pull itself up by its own bootstraps.

147   It follows from this analysis that I doubt that the decision in     F
*Gramsci* [2011] 1 Lloyd's Rep 647 can be justified, at least on the basis of
piercing the corporate veil.  In agreement with the Court of Appeal and
Arnold J, I think that the reasoning in that case involved a misinterpretation
of the basis of the decisions in *Gilford* [1933] Ch 935 and *Jones* [1962]
1 WLR 832.  It seems to me that the conclusion in *Gramsci* was driven by an
understandable desire to ensure that an individual who appears to have been
the moving spirit behind a dishonourable (or worse) transaction, action, or     G
receipt, should not be able to avoid liability by relying on the fact that the
transaction, action, or receipt was effected through the medium (but not the
agency) of a company.  But that is not, on any view, enough to justify
piercing the corporate veil for the purpose of holding the individual liable for
the transaction, action, or receipt, especially where the action is entering into
a contract.                                                                      H

148   For these reasons, I agree with the Court of Appeal in concluding
that, assuming that there is jurisdiction to pierce the corporate veil on
appropriate facts, VTB's proposed pleaded case does not give rise to
arguable grounds for contending that this jurisdiction could be invoked in

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    the present case. I would therefore refuse VTB permission to amend its pleaded case to raise such a claim.

*Conclusion*

**149**    I would therefore dismiss VTB's appeal on both main issues.

**150**    I have referred to the issues I have been discussing as the main
B    issues, because there is another series of issues relating to a freezing order which VTB obtained. Following its discharge by Arnold J, VTB wishes this freezing order to be reinstated. There is also a temporary freezing order, which VTB obtained pending the determination of this appeal. In the light of the fact that this appeal is being dismissed, it seems to me clear that the discharged freezing order must remain discharged and the temporary
C    freezing order must now be discharged as well. I should add that I agree with what Lord Wilson JSC says about the freezing orders.

**LORD WILSON JSC**

**151**    I agree with Lord Mance JSC and Lord Neuberger of Abbotsbury PSC that the appeal should be dismissed.

**152**    As their judgments, and, on the other hand, those of Lord Clarke of
D    Stone-cum-Ebony and Lord Reed JJSC, well demonstrate, the rival arguments in relation to forum are evenly balanced.

**153**    VTB has three main points: (a) The location of the alleged torts in England. It is worthwhile to remember, however, that, in one sense, the bringing of the transactions into England was pure chance. In July 2007 VTB Moscow informed Mr Maloeev and MarCap that the proposed
E    lender would be either itself or VTB; and in October 2007 it informed them that it would be VTB. They had no objection; but the placement of the lending into the hands of its English subsidiary was effected entirely at the election of, and for the convenience of, VTB Moscow. (b) The English jurisdiction clause in the facility agreement and indeed also in the interest rate swap agreement. If Mr Maloeev controlled the borrowing party to the agreements, namely RAP, and so can be considered responsible for its
F    contractual concession that VTB should have the right to demand that disputes arising out of them be resolved in the courts of England, he can hardly complain if allegations of his and his companies' fraudulent inducement of VTB to enter into them are also resolved here. But two riders fall to be attached. The first is whether the court can at this stage proceed on the basis that Mr Maloeev controlled RAP. The court must not for this
G    purpose assume what VTB needs to prove; yet the fact is that, while not admitting control of RAP, Mr Maloeev has, to date, not actively challenged it. The second is that the test to be applied pursuant to the decision in *The Spiliada* [1987] AC 460, mandates a much wider inquiry than into whether Mr Maloeev would have no ground for complaint about the continuation of the proceedings in England. (c) The government by English law of VTB's claims in tort, as held unanimously by this court and as explained in
H    judgments above with which I agree. A spectre of considerable practical inconvenience is raised around the receipt by a Russian judge of evidence of English law and around his application of it to such facts as he were to find. On the other hand the legal framework of VTB's case does not appear to be complex or controversial and Arnold J was entitled to conclude [2011]

EWHC 3107 (Ch) that the key issues in the case were likely to be factual rather than legal.

154   Although, therefore, I discern a practical element in the third of VTB's main points, I have no doubt that, over all, considerations of practicality militate strongly in favour of a Russian forum. The apparently relevant witnesses are Russian, speak Russian and seem almost entirely to be resident in Russia and so beyond the reach of an English witness summons; and the relevant documentation, in particular relating to both the actual and the represented profitability of the dairy companies, was written in Russian.

155   On the one hand, therefore, there are VTB's points, which primarily go to theory, to policy and, yes, perhaps to a limited extent to justice. On the other hand there are the defendants' points, which primarily go to practicality.

156   The forum issue required Arnold J not (in my view) to exercise a discretion but, rather, to reach an evaluative judgment upon whether, in the light of these and the many other points pressed upon him by each side, England was clearly the more appropriate forum. "The appellate court should be slow to interfere" (Lord Goff in *The Spiliada* [1987] AC 460, 465); and I agree with Lord Mance JSC at para 68 and with Lord Neuberger PSC at para 98 that the errors which the Court of Appeal identified in the judgment of Arnold J (in particular his adoption of the two-part test apt to an application for stay), were, on analysis, of materiality insufficient to justify a re-evaluation of its own. Furthermore, notwithstanding its own error about the governing law of the torts, alongside which, however, one must weigh its assertion that an English governing law would not have led it to a different conclusion, I agree with Lord Neuberger PSC's alternative conclusion at para 96 that there are no grounds for interfering with the Court of Appeal's own evaluative conclusion.

157   To be honest, a disposal of the forum part of the appeal on the above basis is, in the light of this court's intended function in the resolution of controversial and important issues of law, a banal disposal; and, in retrospect, a question arises whether it is appropriate for there to have been a massive second appeal to this court on the forum issue. In its notice of appeal VTB identified the requisite issue of general public importance relative to the issue in one sentence: "the appellant says that if a defendant has committed a wrong in England, there is a presumption, and a strong one, that he ought to answer for that wrong in England." But, while he was careful not entirely to abandon his preference for the language of presumption, Mr Howard conceded, early in his opening address, that it was irrelevant whether such was a presumptive position, a starting point or a prima facie conclusion; a little later in his address, he added that the issue was not really about a label, such as that of presumption, but about approach; and he scarcely pressed the difficult suggestion that there was anything in the jurisprudence—even in *The Albaforth* [1984] 2 Lloyd's Rep 91—to raise a formal, legal presumption that the forum should follow the location of the tort. I am doubtful whether the committee would have granted permission to appeal on the forum issue if it had realised that VTB's case would develop into little more than an invitation to re-evaluate all the relevant factors for and against the English forum.

158   VTB's application for permission to amend its particulars of claim so as to include claims against Mr Malofeev and the two MarCap companies

391

A   as additional parties to the facility and interest rate swap agreements logically falls for consideration before that of the forum issue. For, had it been granted, the jurisdiction clauses in the agreements would have been directly in play. VTB frankly concedes that its primary purpose in making the proposed claims in contract was, by reference to such clauses, to establish the English jurisdiction pursuant to article 23(1) of Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the

B   recognition and enforcement of judgments in civil and commercial matters (OJ 2001 L12, p 1) ("the Judgments Regulation"); and that its secondary purpose was thereby to be enabled to claim more substantial sums, particularly by way of interest, than would be payable as damages in tort. In the event, however, for the reasons given by Lord Neuberger PSC in paras 126–143, the Court of Appeal was right to dismiss VTB's appeal

C   against the refusal of Arnold J to permit the amendment: for there was no good arguable case that the three specified defendants could be unveiled as additional parties to the agreements with VTB. In that this court welcomes blue sky thinking, I do not criticise Mr Lazarus for his over-arching attempt to persuade it that English law recognises no principle that the corporate veil may ever be lifted. In my view, however, and notwithstanding the difficulty of being able to define within one sentence the circumstances in which the

D   law will—perhaps—lift the corporate veil, such was a highly ambitious submission. But this is not the place at which to embark on an attempted subjection of it to critical examination.

    159   In that, by a majority, VTB's appeal is to be dismissed, the worldwide freezing order against Mr Malofeev must fall to be discharged. But the continuation of the order to date represents a highly unsatisfactory

E   state of affairs. The order was first made, without notice, in August 2011 and was continued, on notice, in September 2011. On 29 November 2011, in the light of his conclusion in favour of the Russian forum, Arnold J declined further to continue the order, save for one week in order to enable VTB to approach the Court of Appeal. But importantly, as Lord Clarke JSC has explained in para 163, Arnold J also ruled that, even had he allowed the English proceedings to continue by declining to set aside the order for service

F   out of the jurisdiction, it would have been wrong, for each of two reasons, for the freezing order to continue. VTB, to whom Arnold J had granted permission to appeal against his refusal to permit the amendment, secured permission from the Court of Appeal also to appeal against his decision in relation to forum and his independent refusal to continue the freezing order; and, on a holding basis, the court continued that order until determination

G   of the appeal. In the light of its dismissal of VTB's appeal in relation to forum, the Court of Appeal concluded that there was no basis on which the freezing order could continue in any event; and, although it expressed doubts about the first reason given by Arnold J for his independent refusal to continue the freezing order, it did not address his second reason and made no order on that part of VTB's appeal. It continued the freezing order for ten days only in order to enable VTB to approach this court, which further

H   continued it until its determination of this appeal.

    160   In the light of this court's dismissal, by a majority, of the appeal in relation to forum, it can now be seen that Mr Malofeev has continued to be subject to a worldwide freezing order for some 14 months beyond the time when it was proper for such an order to have continued. For in November

© 2013 The Incorporated Council of Law Reporting for England and Wales

2011 Arnold J rightly decided that the proceedings should take place in *A*
Russia; and the freezing order should then have expired. It was extended only
because of the pendency of two successive appeals which can now be seen both
to have failed. Such a state of affairs is bad enough. But what makes it worse is
that, as I have explained, Arnold J also ruled as long ago as November 2011
that, irrespective of its dependence on the continuation of the English
proceedings, the freezing order should not be continued; and his ruling has not
been set aside by the Court of Appeal. In retrospect the Court of Appeal should *B*
have determined VTB's appeal against that ruling. Had it, for example,
dismissed its appeal, this court would be unlikely to have permitted it to appeal
against the dismissal and so the freezing order would no doubt at last have
come to an end. One cannot quarrel with the logic behind the conventional
continuation of a freezing order pending an appeal against a refusal to make an
order upon which its continued existence depends. But what turns out to have *C*
been the protracted wrongful continuation of the freezing order is another
indication of the inappropriateness of a further appeal to this court in
circumstances such as the present. The degree of economic inhibition caused
to a person in the position of Mr Malofeev by a worldwide freezing order made
in England remains to be seen. At first sight, however, he is entitled to
complain that it was an oppressive restraint on his economic activities. *D*
Whether he is correct to say that it has caused considerable prejudice to him
will no doubt be the subject of inquiry in his application, already issued but so
far stayed, for VTB to be ordered to compensate him for his losses pursuant to
its cross-undertaking attached to the freezing order.

**LORD CLARKE OF STONE-CUM-EBONY JSC** (dissenting)

*E*

*Introduction*

    161   In this action the appellant claimant, VTB Capital plc ("VTB"),
which was formerly called VTB Bank Europe plc, sought and obtained
permission to serve proceedings out of the jurisdiction on the defendant
respondents on the ground that the defendants had committed the torts of
deceit and conspiracy in England. Save for the third defendant, which has not *F*
been served with the proceedings, the defendants applied to have that
permission set aside on the ground that VTB had failed to show that England
was in all the circumstances clearly and distinctly the appropriate forum to
determine the dispute. That application succeeded before Arnold J ("the
judge") [2011] EWHC 3107 (Ch). VTB's appeal to the Court of Appeal failed
[2012] 2 Lloyd's Rep 313. The Supreme Court subsequently gave permission
to appeal on that issue, which has (not entirely correctly) been described in *G*
argument as the jurisdiction issue. That is the first issue in this appeal.

    162   The second issue arises out of an application made by VTB to
amend its particulars of claim to add a claim for breach of contract. Its case
involves a consideration of the principles relevant to what is sometimes
called piercing the corporate veil. Both the judge and the Court of Appeal
refused that application. Although both courts accepted that it is possible in
some circumstances to pierce the corporate veil, they both held that VTB had *H*
no arguable case that this is such a case. Under this head the defendants seek
to uphold the decision of the Court of Appeal, not only on the particular
facts, but also on the basis that there are no circumstances in which the court
can pierce the corporate veil.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    163    The third issue arises out of a worldwide freezing order ("WFO") granted to VTB against Mr Malofeev on 5 August 2011 by Roth J. Mr Malofeev applied to discharge the order on the grounds (a) that there was no risk of dissipation of assets and (b) that there had been material non-disclosure before Roth J. Arnold J subsequently declared that the WFO should be discharged on the ground that the court had refused to exercise jurisdiction over the claim. He also said that he would in any event have discharged and refused to re-grant the WFO on the grounds relied upon by Mr Malofeev. The WFO was however renewed pending an appeal to the Court of Appeal and subsequently to this court.

B

*Jurisdiction*

*Service out of the jurisdiction—the principles*

C    164    The relevant principles are not in dispute. They have been stated and restated many times. They were correctly stated in the Court of Appeal in this case by Lloyd LJ, with whom Rimer and Aikens LJJ agreed, at paras 98–101. Lloyd LJ put them thus in paras 99–100:

"99. . . . The three basic principles were recently restated by Lord Collins of Mapesbury in giving the advice of the Privy Council in *AK*
D    *Investment CJSC v Kyrgyz Mobile Tel Ltd* [2012] 1 WLR 1804, paras 71, 81 and 88. They can be summarised as follows: first, the claimant must satisfy the court that, in relation to the foreign defendant to be served with the proceedings, there is a serious issue to be tried on the merits of the claim, i e a substantial question of fact or law or both. This means that there has to be a real, as opposed to a fanciful, prospect of success on the claim.
E    Secondly, the claimant must satisfy the court that there is a good arguable case that the claim against the foreign defendant falls within one or more of the classes of case for which leave to serve out of the jurisdiction may be given. These are now set out in paragraph 3.1 of Practice Direction 6B. 'Good arguable case' in this context means that the claimant has a much better argument than the foreign defendant. Further, where a question of law arises in connection with a dispute about service out of the jurisdiction
F    and that question of law goes to the existence of the jurisdiction (e g whether a claim falls within one of the classes set out in paragraph 3.1 of Practice Direction 6B), then the court will normally decide the question of law, as opposed to seeing whether there is a good arguable case on that issue of law.

"100. Thirdly, the claimant must satisfy the court that in all the circumstances England is clearly or distinctly the appropriate forum for the trial of the dispute and that in all the circumstances the court ought to
G    exercise its discretion to permit service of the proceedings out of the jurisdiction. This requirement is reflected in rule 6.37(3) of the CPR, which provides that 'The court will not give permission [to serve a claim form out of the jurisdiction on any of the grounds set out in paragraph 3.1 of Practice Direction 6B] unless satisfied that England and Wales is the proper place in which to bring the claim'."

H

*The facts*

165    The underlying facts and issues under this head are set out in the agreed statement of facts and issues ("the SFI"), from which I can take the salient events.

© 2013 The Incorporated Council of Law Reporting for England and Wales

394
VTB Capital plc v Nutritek International Corpn (SC(E))                [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

166   VTB's case is that the key step in the fraud was VTB's advancing a sum of US\$195,000,000 in London to the account of a borrower in London, which was in turn paid to a seller of a business to its account in London, all done subject to a loan agreement and other related agreements governed by English law and containing English jurisdiction clauses. VTB claims that it has suffered a loss in excess of US\$185,000,000.

167   The judge and the Court of Appeal both held that VTB has a good arguable case that its claims are claims in tort within paragraph 3.1(9)(a) of Practice Direction 6B supplementing CPR Pt 6, on the ground that damage was sustained within the jurisdiction and that VTB has a good arguable case in tort against Mr Malofeev. However they held that permission to serve out of the jurisdiction should be set aside because VTB has failed to show that England was clearly or distinctly the appropriate forum to determine the disputes. The first issue in this appeal is whether they were entitled so to hold.

168   VTB's case on the facts may be summarised in this way. VTB is a bank incorporated and registered in England. It is a member of the London Stock Exchange, and it is authorised and regulated by the Financial Services Authority for the conduct of investment business in the United Kingdom. It is majority owned by JSC VTB Bank ("VTB Moscow"), which is a state-owned bank. It is one of three strategic business arms of the VTB Group, the others being the corporate and retail businesses. It entered into a facility agreement, dated 23 November 2007 ("the facility agreement"), with a Russian company, Russagroprom LLC ("RAP"). Pursuant to the facility agreement, sums totalling US\$225,050,000 were advanced to RAP, primarily to enable RAP to buy six Russian dairy companies and three associated companies ("the dairy companies") from the first respondent ("Nutritek"), a company registered in the British Virgin Islands ("BVI"). After making three interest payments (and no payments of capital), RAP defaulted on the loan in November 2008. VTB's case is that the value of the security provided for the loan was no more than a figure in the region of US\$32m to US\$40m.

169   VTB's case is that it was induced in London to enter into the facility agreement and an accompanying interest rate swap agreement, by misrepresentations made by Nutritek, for which the other defendants are jointly and severally liable. The two alleged misrepresentations were: first, that RAP and Nutritek were not under common control, and second, that the value of the dairy companies was much greater than their true worth. It is VTB's case that the misrepresentations were fraudulent. The ostensible primary purpose of the facility agreement was to fund the acquisition of the dairy companies from Nutritek by RAP. RAP entered into a Share Purchase Agreement ("SPA") with Nutritek dated 27 November 2007, whereby RAP purchased shares in a newly incorporated BVI company, Newblade Ltd ("Newblade"), which in turn owned the dairy companies.

170   VTB put before the judge a structure chart, setting out in a diagram the complex web of offshore companies through which, on VTB's case, Mr Malofeev ultimately controlled each of Nutritek, the second respondent ("Marcap BVI"), the third defendant ("Marcap Moscow"), and RAP. Marcap Moscow has not been served with the proceedings, and has not taken part in any of the hearings to date. Mr Malofeev is an international businessman who resides in Moscow. The Court of Appeal found that there

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   was a good arguable case that Mr Malofeev "operated a complex web of companies in a number of jurisdictions". It is VTB's case that he was at all material times the controller and a principal beneficial owner of the BVI companies, Nutritek and Marcap BVI, as well as Marcap Moscow and RAP. RAP was incorporated in Russia on 21 May 2007 as a special purpose vehicle. In November 2007 its immediate parent company was Migifa Holdings Ltd ("Migifa"), a company incorporated in Cyprus. Migifa's

B   parent company was Brentville Ltd ("Brentville"), a company incorporated in the BVI. It is VTB's case that RAP was ultimately owned and controlled by Mr Malofeev, through a web of offshore companies. As the judge found at para 59, "this has not been the subject of challenge" by Mr Malofeev, who has advanced no positive case on the issue of the ultimate ownership and control of RAP. See also the Court of Appeal, at para 34.

C      **171**   It is VTB's case that, in July 2007 in Moscow, Mr Malofeev personally introduced the VTB Group to the scheme, whereby Nutritek sold its interests in the dairy companies to RAP under the SPA. He stated that a decision had been taken to sell Nutritek's interest in the dairy business and that a purchaser had been identified. He said that a purchaser would have to find banking facilities in order to make the purchase. Mr Tulupov of VTB Moscow was the project manager in respect of the proposed transaction,

D   where his role included liaising with VTB in respect of the project. At an early stage, it was contemplated that either VTB Moscow or VTB would become the lender in connection with the intended transaction. On 18 July 2007, he instructed the London office of Dewey LeBoeuf, Greene & Macrae ("DLGM") in relation to the proposed transaction. On the next day, a conference call took place between representatives of VTB Moscow, VTB

E   (Marina Bragina, in London) and Marcap Moscow (Mr Alexander Provotorov and Mr Yury Leonov).

      **172**   It is apparent from a draft term sheet of 8 October 2007 that by early October that year, the proposed structure of the transaction was that the lender was to be VTB (funded by a participation agreement with VTB Moscow) and the borrower was to be RAP. It is VTB's case that, from about this time it was VTB which was to be the particular target for the fraud. The

F   loan amount was to be in excess of US$220m towards an acquisition cost of US$250m. Work started to prepare the documentation for the transaction. The facility agreement was to be governed by English law and VTB was to be the lender in the transaction. Mr Tulupov explains in his statement that the attraction of the lender being VTB was that (i) VTB in the London market was able to provide more sophisticated lending structures than VTB

G   Moscow (owing to internal Russian banking requirements) and (ii) English law offered more protection in the case of default.

      **173**   On 31 October 2007, VTB Moscow's credit committee approved the proposed transaction. It is VTB's case that, separately from this, and in connection specifically with the ability of VTB to decide to enter into the facility agreement, VTB, as an FSA regulated entity, had its own processes and procedures before lending moneys. The key figures at VTB in this

H   process included (1) Konstantin Ryzhkov, who was VTB's Head of Acquisition and Leverage Finance from 1 September 2007 to 27 October 2008 and who was also a managing director at VTB Moscow, (2) Marina Bragina, who held the equivalent post in VTB to that held by Mr Tulupov in VTB Moscow, (3) Steve Thunem, Head of Debt Capital Markets, (4) Juliet

396
VTB Capital plc v Nutritek International Corpn (SC(E))          [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

Wooi, a credit risk analyst, (5) Peter Yates, Head of Credit Risk, (6) Peter   A
Manning, Chief Risk Officer, as per Board Approved Delegated Credit
Approval Authorities and (7) K Ianovski, Head of Structured Finance and
Syndication.

174   As regards the ownership of RAP, VTB relies upon two e-mails
dated 6 and 8 November 2007 by Ms Bragina of VTB to others within VTB
and VTB Moscow which recorded information from Nutritek or from
Marcap Moscow.  The first e-mail states that RAP was incorporated on   B
21 May 2007 (in error written as 2002) as an SPV for a Nutritek dairy
division acquisition and further states that RAP "has no other operations"
and that RAP's beneficiary is a Mr Vladimir Alginin.  The second e-mail was
in response to a list of questions put to Ms Bragina previously.  The key
passage states as follows, in the form of the question followed by the answer:
"Confirm that [RAP] is 100% owned by Alginin.  As per the info just received   C
from Nutritek management, Mr Alginin has a 90% share [RAP], the
remaining 10% share belongs to the management team."

175   As to the dairy companies, there was a valuation report produced
by the Moscow office of Ernst & Young Valuation LLC ("E & Y"), valuing
the dairy companies at US$366m.  This report, which is dated 5 September
2007 and is in Russian, was received by Mr Tulupov on 8 November 2007   D
and was discussed in several conversations with Ms Bragina and
Mr Ryzhkov.  Based on Mr Tulupov's evidence, VTB's case is that it
attached considerable importance to the report, as did VTB Moscow.  By a
document headed "Application for credit facilities", dated 13 November
2007, VTB approved the proposed transaction.  It was signed on
16 November 2007 by Ms Bragina and Mr Thunem, both of VTB.

176   VTB took the decision to enter into a separate interest swap   E
agreement ("the ISA"), by a further application for credit facilities, dated
15 November 2007, and signed by Juliet Wooi, Mr Yates and Mr Manning
on 19 November 2007.  Further particulars relating to VTB's case as to
reliance on the information provided by Nutritek concerning the ostensibly
arm's length relationship between Nutritek and RAP, and concerning the
value of the dairy companies, are found in the witness statement of
Mr Muraviev.  The transaction was completed over the period 23 to   F
28 November 2007, during which period a number of agreements were
entered into by the various parties.

177   The principal agreements entered into as part of the overall
transaction were thus as follows: the facility agreement, between VTB and
RAP, the SPA between RAP, Nutritek and Newblade dated 27 November
2007, the ISA between VTB and RAP dated 28 November 2007 and the   G
participation agreement between VTB and VTB Moscow dated
28 November 2007 ("the participation agreement").  The key provisions of
the facility agreement are set out by the Court of Appeal at appendix 1 of its
judgment.  They included that its governing law is English law (clause 34)
and that the courts of England and Wales have non-exclusive jurisdiction to
settle any dispute arising out of, or in connection with the facility agreement,
or, at VTB's option, arbitration in London: clauses 35.1.1 and 35.3.  It was   H
further expressly agreed in clause 35.1.2 that the courts of England and
Wales were the most appropriate convenient courts to settle such disputes
and that no party would argue otherwise: clause 35.1.2.  The other
agreements referred to above also contain both a choice of law clause in

© 2013 The Incorporated Council of Law Reporting for England and Wales

397
[2013] 2 AC                VTB Capital plc v Nutritek International Corpn (SC(E))
                                              Lord Clarke of Stone-cum-Ebony JSC

A  favour of English law, and a jurisdiction agreement in favour of the courts of England and Wales.

178  As stated above, both the judge and the Court of Appeal held that VTB had a good arguable case that it entered into the facility agreement in reliance on the two misrepresentations, the first relating to the representation that RAP and Nutritek were not under common control, and the second as to the value of the dairy companies.

B  179  On 28 November 2007, RAP's account with VTB in London was credited with US$208,700,000. This sum represented the "Tranche A" payment under the facility agreement. On the same day, US$195,000,000 of those moneys were transferred to Nutritek's account with VTB in London, at RAP's direction. The moneys were thereafter removed from Nutritek's account, so that by 7 December 2007 no funds remained in Nutritek's

C  account with VTB in London. Some of the moneys were transferred to various creditors of Nutritek, while at least US$62m went to a Nutritek bank account in Switzerland. VTB says that it does not know where the funds went after that, and none of the respondents has put forward evidence as to where the funds went thereafter. As noted by the judge at para 54, some further moneys lent by VTB as part of Tranche B under the facility agreement were utilised to pay interest due under it. This involved the use of

D  another BVI company Madinter Associates Ltd ("Madinter"), which enabled interest to be paid in respect of the principal loan until but not including the payment due in November 2008, since when no payment of interest or principal due under the facility agreement has been made.

180  VTB sent a first notice of default from its London office to RAP on 15 December 2008 and a second notice of default on 14 January 2009.

E  From August 2009, VTB began to enforce its security. In due course, VTB took control over Newblade, Migifa and eventually RAP. VTB currently estimates the value of the assets of the dairy companies as less than US$40m, and probably no more than US$32m.

*VTB's claims*

F  181  VTB's claims are concisely described by the judge at paras 57–63. It says that it was induced to enter into the facility agreement and the ISA, and to advance sums totalling US$225,050,000 to RAP, by two fraudulent misrepresentations. First, it claims that (together with VTB Moscow) it relied on representations made primarily by Nutritek to the effect that the SPA was a sale between companies that were under separate control. It contends that these representations were false and must have been known by

G  Nutritek to be false when made. VTB knew at the time that Mr Malofeev through MarCap Moscow had de facto control of Nutritek. As the judge put it, what it says it did not know at the time, but has since discovered, is that Mr Malofeev through MarCap BVI also controlled RAP. Thus RAP and Nutritek were under common control at the date of the facility agreement and of the SPA and it was not therefore a commercial transaction carried on at arm's length. The judge held at para 59 that it was not necessary to go

H  into detail concerning the basis of VTB's contention that Mr Malofeev ultimately controlled RAP as well as Nutritek, since it had not been the subject of challenge before him.

182  Secondly, VTB claims that both it and VTB Moscow relied upon the 2007 E & Y valuation of the dairy companies and that that valuation

© 2013 The Incorporated Council of Law Reporting for England and Wales

398
VTB Capital plc v Nutritek International Corpn (SC(E))                    [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

was based on false financial figures and unsupportable forecasts provided to    A
E & Y by Nutritek.  In this regard, VTB relies upon an opinion obtained
from Deloitte LLP dated 11 April 2011, which analysed the figures provided
by Nutritek to E & Y and compared them with the financial information
provided by the dairy companies from their own accounting records, which
represents the true trading position, as well as information from other
sources.  It is said that it is apparent from Deloitte's opinion that Nutritek    B
very substantially overstated the true performance figures for the dairy
companies.  It is VTB's case that the extent of the overstatement is such that
it could only have been deliberate.

184    The judge summarised the position in paras 61 and 62.  The false
representations are alleged to have been made principally by Nutritek.  It is
VTB's case that they were made pursuant to a conspiracy between a number
of persons including MarCap BVI, MarCap Moscow and Mr Malofeev.    C
Given the significant role they played in introducing the business
opportunity to VTB and the conduct of the negotiations, VTB says that
Mr Malofeev and MarCap Moscow were the prime movers in the
conspiracy to deceive VTB.

184    In this part of the case VTB pleaded causes of action against the
defendants in deceit and unlawful means conspiracy, the unlawful means
being the fraudulent misrepresentations.  In deceit, VTB's case against    D
MarCap BVI, MarCap Moscow and Mr Malofeev is that they are jointly
liable with Nutritek on the basis that the misrepresentations were made
pursuant to a common design between them.

185    As stated in his judgment at para 144, before the judge the
defendants accepted that, if English law is the applicable law, VTB has
established that VTB has a real prospect of success in its claims for deceit and    E
conspiracy and thus that there is a serious issue to be tried save in three
specific respects as follows.  The first, the no loss point, was that VTB had no
real prospect of establishing that it had suffered loss as a result.  The judge
discussed the no loss point in considerable detail between paras 145 and
169.  He rejected the defendants' case.  The defendants reargued the no loss
point in the Court of Appeal, again on the basis of English law.  They again
failed, for the reasons given in the judgment of the Court of Appeal at    F
paras 107–121.

186    The second point was that VTB has no real prospect of establishing
either that Marcap BVI was jointly liable in deceit or that it participated in
the alleged conspiracy.  The judge considered that submission between
paras 170 and 176 and accepted it.  However, the Court of Appeal held that
he was wrong to do so for the reasons they gave at paras 122–127.    G

187    The third point was that VTB has no real prospect of establishing
either that Mr Malofeev is jointly liable in respect of the deceit alleged or
that he participated in the alleged conspiracy.  The judge rejected that
submission between paras 177 and 183.  He therefore concluded that there
was a serious issue to be tried between VTB and Mr Malofeev.  The
defendants did not reargue this point in the Court of Appeal.

188    In this court the defendants did not seek to reopen these issues.  It    H
follows that, if English law is the relevant law, VTB has a real prospect of
succeeding against the defendants on the merits.

189    As summarised thus far, the position is that, at any rate on the basis
that English law is the applicable law, VTB has established the first and

© 2013 The Incorporated Council of Law Reporting for England and Wales

399
[2013] 2 AC                VTB Capital plc v Nutritek International Corpn (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A    second of the principles set out in para 164 above. There is a serious issue to be tried on the merits in the case of each of VTB's claims in tort and VTB has a good arguable case that it sustained damage within the jurisdiction within the meaning of paragraph 3.1(9)(a) of Practice Direction 6B, which is the relevant provision by reason of CPR r 6.36. It follows that the remaining question is whether the third principle is satisfied. I will consider that question under the heading forum conveniens.

B

*Forum conveniens*

    190   As stated above, the question is whether VTB has satisfied the court that England is clearly or distinctly the appropriate forum for the trial of the dispute and that in all the circumstances the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction on the

C    basis that England is the proper place in which to bring the claim. As the Court of Appeal noted at para 101, on the basis of Lord Goff's classic speech in *Spiliada Maritime Corpn v Cansulex Ltd (The Spiliada)* [1987] AC 460, 475–484, the underlying principle is that, the task of the court is to identify the forum in which the case can be suitably tried for the interests of all the parties and for the ends of justice: *Sim v Robinow* (1892) 19 R 665, 668.

D    191   Only two fora have been canvassed in this case; they are England and Russia. Both the judge and the Court of Appeal held that VTB had failed to discharge the onus of proof and that the centre of gravity of the case was Russia and not England. I recognise of course that this is an interlocutory appeal, that a comparison between England and Russia involves a number of different considerations and that, in these circumstances, an appellate court should not interfere with a decision of a

E    lower court unless satisfied that it has erred in principle. However, as appears below, it is my view that the Court of Appeal did make a number of errors of principle, which entitles, indeed requires, this court to reach its own independent conclusions.

    192   There are a number of points that seem to me to be relevant on this part of the case. First, it appears to me that it is important for the court to

F    know what issues are likely to arise at the trial of the action on the merits. Only when the issues are identified will it be possible to compare the two jurisdictions. This principle is now stated in *Dicey, Morris & Collins*, *The Conflict of Laws*, 15th ed (2012), para 11-143, in which, having stated the general principles much as above, the editors say that, in practice, the defendant should identify the issues which are appropriate to be tried in the foreign court. In the footnote to that sentence the editors referred to *Limit*

G    *(No 3) Ltd v PDV Insurance Co* [2005] 2 All ER (Comm) 347, para 73 and *Sawyer v Atari Interactive Inc* [2006] IL Pr 129, para 54. See also *Pakistan v Zadari* [2006] 2 CLC 667, para 138 and *Novus Aviation Ltd v Onur Air Tasimacilik AS* [2009] 1 Lloyd's Rep 576. Lawrence Collins J or Lawrence Collins LJ is the author of the relevant passage in each of those cases except the *Limit (No 3)* case, in which I admit to being the author.

H    193   I adhere to the view I expressed in that case, now supported by *Dicey*. As Eder J put it in *Mujur Bakat Sdn Bhd v Uni.Asia General Insurance Bhd* [2011] Lloyd's Rep IR 465, para 9:

      "in considering whether or not England is the most appropriate forum, it is necessary to have in mind the overall shape of any trial and, in

© 2013 The Incorporated Council of Law Reporting for England and Wales

400
VTB Capital plc v Nutritek International Corpn (SC(E))                [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

particular what are, or what are at least likely to be, the issues between    A
the parties and which will ultimately be required to be determined at any
trial.  These were originally set out in two letters . . ."

I stress that I do not mean that a defendant must set out his evidence in great
detail, whether of foreign law or of fact.  The purpose of the exercise is
simply to state what the issues of fact are likely to be, so that the court can
gauge whether England is clearly or distinctly the appropriate forum for the    B
trial of the issues.  This is of some importance in this case because no
evidence was put before the court on the merits of the claims by or on behalf
of Mr Malofeev.  Moreover, Mr Hapgood submitted to the court in the
course of the argument that Mr Malofeev was perfectly entitled to say and
he does say to VTB, "You are accusing me of being a swindler, you get on
and prove it."  Mr Hapgood added that the matter proceeded in both courts    C
below on the clear understanding that VTB will have to prove its case.  As he
put it, they will have to prove all five ingredients of a claim for fraudulent
misrepresentation and a sixth ingredient in the case of conspiracy.  It appears
from what Mr Hapgood said that, at any rate at present, he has no positive
case.  It is of course true that a defendant in the position of Mr Malofeev is
not bound to advance a positive case but, in the absence of a positive case,    D
the focus of the court can only be on the ingredients of the claim.  It should
not speculate about the nature of any positive case that might be advanced in
the future.

194   It was suggested in the course of the argument that the defendants
could not plead a case or put forward a positive case because of the risk that
they would submit to the jurisdiction.  There is, in my opinion, no such risk.    E
There is no reason why defendants should not put in a draft defence or
evidence on the express basis that they are doing so without prejudice to
their case on jurisdiction.  I note in passing that it is the duty of the parties
under CPR r 1.3 to help the court to further the overriding objective, which
is to deal with cases justly.

195   The second point is the question whether English law is the    F
applicable law.  It is common ground that the applicable law falls to be
determined by the provisions of the Private International Law
(Miscellaneous Provisions) Act 1995 and not by the European Parliament
and Council Regulation (EC) No 864/2007 on the law applicable to
non-contractual regulations, known as the Rome II Regulation.  This is
because the claims relate to damage which occurred after 20 August 2007    G
and before 11 January 2009.

196   Sections 11 and 12 of the 1995 Act provide, so far as relevant, as
follows:

"11 *Choice of applicable law: the general rule*
"(1) The general rule is that the applicable law is the law of the country
in which the events constituting the tort or delict in question occur.    H
"(2) Where elements of those events occur in different countries, the
applicable law under the general rule is to be taken as being— . . . (c) . . .
the law of the country in which the most significant element or elements
of those events occurred."

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    "12 *Choice of applicable law: displacement of general rule*

"(1) If it appears, in all the circumstances, from a comparison of—
(a) the significance of the factors which connect a tort or delict with the
country whose law would be the applicable law under the general rule;
and (b) the significance of any factors connecting the tort or delict with
another country, that it is substantially more appropriate for the
applicable law for determining the issues arising in the case, or any of
B    those issues, to be the law of the other country, the general rule is
displaced and the applicable law for determining those issues or that issue
(as the case may be) is the law of that other country.

"(2) The factors that may be taken into account as connecting a tort or
delict with a country for the purposes of this section include, in particular,
factors relating to the parties, to any of the events which constitute the
C    tort or delict in question or to any of the circumstances or consequences
of those events."

197   The judge discussed the question of applicable law between
paras 119 and 143 and concluded that the applicable law was Russian law.
He did so by reference to both section 11(2)(c) and section 12. In para 158,
the Court of Appeal expressed the tentative conclusion that, under
D    section 11(2)(c), the applicable law was English law but also said that they
were not convinced that VTB had "by far the better of the argument". They
held however that, under section 12, it was substantially more appropriate
for the applicable law for determining the issues concerned to be that of
Russia. VTB says that both the judge and the Court of Appeal were wrong
and that the applicable law is English law.

E    198   The question under section 11(2)(c) is in which country did the
events constituting the tort occur. In para 148, the Court of Appeal set out
six principles as reflecting the correct approach to section 11(2)(c) as
follows:

"(1) Section 11 of the 1995 Act sets out the general rule for
ascertaining the applicable law of a tort. It adopts a geographical
approach to that question. (2) Where the elements of the events
F    constituting the tort or delict occur in different countries and the cause of
action relates to something other than personal injury or damage to
property, then section 11(2)(c) requires an analysis of all the elements of
the events constituting the tort in question. (3) In carrying out that
exercise, it is the English law constituents of the tort that matter. (4) The
analysis requires examination of the 'intrinsic nature' of the elements of
G    the events constituting the tort. It does not, at this stage, involve an
examination of the nature or closeness of any tie between the element and
the country where that element was involved or took place. This latter
exercise is only relevant if section 12 is invoked. (5) Once the different
elements of the events and the country in which they occurred have been
identified, the court has to make a 'value judgment' regarding the
'significance' of each of those 'elements'. 'Significance' means the
H    significance of the element in relation to the tort in question, rather than
trying to judge which involves the most elaborate factual investigation.
(6) Under section 11(2)(c), (i e in relation to causes of action other than in
respect of personal injury or damage to property where the elements of
the events constituting the tort occur in different countries) the applicable

© 2013 The Incorporated Council of Law Reporting for England and Wales

402
VTB Capital plc v Nutritek International Corpn (SC(E))                [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

law of the tort in question will be that of the country where the   A
significance of one element or several elements of events outweighs or
outweigh the significance of any element or elements found in any other
country."

199   Those principles were derived from four cases: *Morin v Bonhams
& Brooks Ltd* [2004] 1 Lloyd's Rep 702 (CA); *Dornoch Ltd v Mauritius
Union Assurance Co Ltd* [2006] Lloyd's Rep IR 127 (Aikens J); [2006]   B
2 Lloyd's Rep 475 (CA); *Trafigura Beheer BV v Kookmin Bank Co* [2006]
2 Lloyd's Rep 455 (Aikens J); and *Fiona Trust & Holding Corpn v Privalov*
[2010] EWHC 3199 (Comm) (Andrew Smith J).   In this court those
propositions were rightly accepted as correct.  The Court of Appeal added at
para 150, in relation both to section 11(2)(c) and to section 12, that two
further and important points emerged from *Dornoch*.  The first was that, if,   C
as here, the exercise is being carried out at an interlocutory stage as part of
an overall exercise to determine whether the English court should have
jurisdiction to determine the claim in tort in question, the court cannot
finally determine the applicable law of the tort.  The second was that it is
"quintessentially" for the judge to make an assessment of the significance of
the elements of the events constituting the tort for the purposes of
section 11(2)(c) and that the Court of Appeal would not interfere with that   D
assessment unless it was satisfied that the judge made such an error in his
assessment as to require the Court of Appeal to make its own assessment.  It
referred to the judgment of Tuckey LJ at paras 46 and 47, with which Sir
Mark Potter P and May LJ agreed.

200   The Court of Appeal held at paras 154–157 that the judge had
made such an error in the case of section 11(2)(c) and reached a different   E
conclusion.  In my opinion, if the principles set out above are applied, the
Court of Appeal was entitled to interfere with the conclusion reached by the
judge.  As Mance LJ put it in *Morin* at para 21, section 11 directs attention to
the "intrinsic nature of the element(s) of the tort".  The Court of Appeal said
at para 157 that they judged that the most important elements of the facts
constituting the tort of deceit are, by their intrinsic nature, the reliance on
the misrepresentations by VTB and the loss suffered by VTB.  I agree.   F

201   The events constituting the tort of deceit are indeed the making of
the misrepresentations which were known to be untrue, reliance on the
misrepresentations and the loss sustained as a result.  All those occurred in
England.  The misrepresentations were made to VTB in England, VTB relied
upon them in England and incurred its loss in England.  In my opinion that is
plain.  It is true in the case of both misrepresentations: even though the dairy   G
representations were initially made in Russia, the critical representations
which induced VTB to enter into the facility agreement were made in
London and relied upon in London.  As to the alleged conspiracy, the essence
of the case is that the representations were made as part of a common design.
To my mind, it does not matter for the purposes of section 11(2)(c) because
the essence of VTB's case remains based upon the representations made to it
in London and relied upon in London by VTB entering into the facility   H
agreement, together with the loss sustained in London.

202   In *Dornoch* [2006] Lloyd's Rep IR 127 Aikens J was concerned
with alleged misrepresentations in a proposal form.  The proposal form was
completed in Mauritius and given to brokers in Mauritius and then sent to

© 2013 The Incorporated Council of Law Reporting for England and Wales

Case: 23-3085    Document: 22    Filed: 04/06/2023    Page: 188
**A-116**
403
[2013] 2 AC                    VTB Capital plc v Nutritek International Corpn (SC(E))
                                                   Lord Clarke of Stone-cum-Ebony JSC

A  London, where it was presented to reinsurers.   Aikens J held that the representation contained in the proposal form was made in Mauritius and London.  The presentation to the reinsurers was made and relied upon in London.  Aikens J held at para 106 that the intention that the reinsurers should rely upon the proposal form continued to operate in London and the reliance, which he regarded as the most significant element, took place in London.  The position is the same here.  The reliance by entering into the

B  facility agreement took place in London.  Para 107 is also of some assistance. Aikens J said:

"The antecedent facts concerning the true situation in MCB are important, but it is what is done with those facts that really matters so far as the tort of fraudulent misrepresentation or deceit is concerned.  In short, it is (on the assumptions I have made) MCB's decision not to tell

C  the facts as they are and to continue to mislead that matters most, not the true facts themselves."

In these circumstances there was in my opinion no room for a tentative conclusion that English law is the applicable law under the general rule set out in section 11.  It is plainly the applicable law under the general rule.

D  203    I turn to section 12.  At para 149, the Court of Appeal identified these further four principles:

"(7) The exercise to be conducted under section 12 is carried out after the court has determined the significance of the factors which connect a tort or delict to the country whose law would therefore be the applicable law under the general rule.  (8) At this stage there has to be a comparison between the significance of those factors with the significance of any

E  factors connecting the tort or delict with any other country.  The question is whether, on that comparison, it is 'substantially more appropriate' for the applicable law to be the law of the other country so as to displace the applicable law as determined under the 'general rule'.  (9) The factors which may be taken into account as connecting a tort or delict with a country other than that determined as being the country of the applicable

F  law under the general rule are potentially much wider than the 'elements of the events constituting the tort' in section 11.  They can include factors relating to the parties' connections with another country, the connections with another country of any of the events which constitute the tort or delict in question or the connection with another country of any of the circumstances or consequences of those events which constitute the tort

G  or delict.  (10) In particular the factors can include (a) a pre-existing relationship of the parties, whether contractual or otherwise; (b) any applicable law expressly or impliedly chosen by the parties to apply to that relationship, and (c) whether the pre-existing relationship is connected with the events which constitute the relevant tort or delict."

204    In every case to which the 1995 Act applies in which the court has considered the general rule under section 11, the court must consider

H  whether the general rule is displaced under section 12.   There is an illuminating discussion of the general approach in *Dicey, Morris & Collins, The Conflict of* Laws, 15th ed, para 35-148.   The editors say that the application of the displacement rule in section 12 first requires, taking account of all the circumstances, a comparison of the significance of the

© 2013 The Incorporated Council of Law Reporting for England and Wales

404
VTB Capital plc v Nutritek International Corpn (SC(E))              [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

factors which connect the tort with the country the law of which would be    A
applicable under the general rule (in this case English law) and the
significance of any factors connecting the tort with another country (here
Russia). The word tort is italicised in the text in *Dicey*. The editors say that
secondly, it then has to be asked, in the light of the comparison, whether it is
"substantially more appropriate for the applicable law for determining the
issues arising in the case, or any of those issues," to be the law of that other
country.    B

205   The editors note that the general rule has been displaced on very
few occasions. They further observe that, although section 12 applies in all
cases to which section 11 applies, it would seem that the case for
displacement is likely to be most difficult to establish in the case of
section 11(2)(c) because the application of that provision itself requires the
court to identify the country in which the most significant element or    C
elements of the tort are located. Importantly they stress the use of the word
"substantially", which they describe as the key word, and conclude that the
general rule should not be dislodged easily, lest it be emasculated. The party
seeking to displace the law which applies under section 11 must show a clear
preponderance of factors declared relevant by section 12(2) which point to
the law of the other country.    D

206   That approach is borne out by the cases. The idea that
"substantially" was the key word was derived from the judgment of
Waller LJ in *Roerig v Valiant Trawlers Ltd* [2002] 1 WLR 2304, at
para 12(v). The principles were considered in more detail by Brooke LJ in
*R (Al-Jedda) v Secretary of State for Defence* [2007] QB 621, at paras 103
and 104, where he noted that the 1995 Act derived from a report of the Law
Commission, from which he quoted. He added that Lord Wilberforce, who    E
was a member of the House of Lords Committee which considered the Bill,
had expressed the view that it would be a "very rare case" in which the
general rule under section 11 would be displaced: "Prima facie there has to
be a strong case."

207   In para 163, the Court of Appeal concluded that, if the applicable
law was English law under the general rule in section 11(2)(c), the factors    F
relied upon by the judge in his paras 188 and 189 led them to the conclusion
that English law was displaced by Russian law by section 12. In paras 188
and 189, the judge had said:

"188. Counsel for the defendants submitted that the following factors
pointed to Russia being the natural law. First, the connections of the
parties to Russia. VTB is controlled by VTB Moscow, which is Russian.    G
Furthermore, the litigation is being managed by VTBDC, which is also
Russian. MarCap Moscow and Mr Malofeev are Russian. It is common
ground that Nutritek was managed from Russia, and VTB's case is that
Mr Malofeev controls both Nutritek and MarCap BVI. Furthermore, it is
VTB's case that Mr Malofeev orchestrated the fraud, primarily through
MarCap Moscow.

"189. Secondly, the connections of the events constituting the torts to    H
Russia. The transaction was introduced to VTB Moscow at meetings
between Russian individuals in Russia. The negotiations mainly took
place in Russia. The misrepresentations were made and mainly received
in Russia. The more important misrepresentation concerned the

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    performance of the dairy companies, which are Russian companies. The 2007 E & Y valuation was a valuation by Ernst & Young's Moscow office and was based on information provided by Nutritek's Russian management. The misrepresentations were primarily relied upon by VTB Moscow acting through its credit committee and management board in Russia. It was VTB Moscow and VTBDC which primarily dealt with RAP's default and enforcing the security. The secured assets were in Russia. The discovery of the fraud took place in Russia. Although the loss was sustained by VTB in England, as discussed above the ultimate economic impact is in Russia."

208    The Court of Appeal recognised in para 163 that they had concluded at para 154 that the judge did not appear to have taken account of the fact that the representations were passed on to or confirmed to VTB in London, that VTB had its own procedures that had to be completed satisfactorily before it could enter into the facility agreement and that, although there was an "economic impact" on VTB Moscow, VTB suffered loss as soon as the transfer of funds by it to RAP was made in London. Notwithstanding those conclusions, the Court of Appeal reached these conclusions at para 163:

    "in our view the factors identified in the judgment at paras 188 and 189, even after discounting the point about primary reliance on the representations in Russia and the securities being in Russia, are of considerable significance. On the material that is before us, taking all those factors into account we have concluded that the centre of gravity of these torts lies in Russia. Therefore, for present purposes, we have decided that a comparison of the significance of the section 11(2)(c) factors, assuming that they would lead to the applicable law being English, with the significance of the other factors connecting the torts with Russia, leads to the conclusion that it is substantially more appropriate for the applicable law for determining the issues concerning the torts to be that of Russia."

209    It seems to me that in that paragraph the Court of Appeal did not pay sufficient regard to the fact that in his paras 188 and 189 the judge was not considering section 12 of the 1995 Act but the broader question of forum conveniens. Further, the Court of Appeal focused, not upon the particular tort or torts but upon much wider considerations. As *Dicey* observes, section 12(1) expressly focuses upon the particular torts. Here the tort or torts as a result of which VTB suffered loss in London were committed as a result of VTB entering into a contract or contracts in London in reliance upon representations made to it in London. I entirely accept that some of the other considerations were capable of being relevant under section 12(2), but I can see no basis upon which it can properly be held that the general rule, under which English law was plainly the applicable law, should be displaced by Russian law on the basis that it is "substantially more appropriate for the applicable law for determining the issues" to be the law of Russia. In short, the claimant here is an English entity which was induced to enter into the facility agreement in England and suffered loss in England when it discharged its obligations under it. The position would no doubt have been entirely different if the claimant had been VTB Moscow.

© 2013 The Incorporated Council of Law Reporting for England and Wales

406
VTB Capital plc v Nutritek International Corpn (SC(E))                [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

210    For these reasons, I would hold that the Court of Appeal erred in      A
principle in concluding that the applicable law was Russian law, that under
the general rule in section 11(2)(c) of the 1995 Act the applicable law was
English law and that the general rule was not displaced in favour of Russian
law by section 12.

211    I turn to consider what significance the conclusions that (a) the
torts were committed in England and (b) the applicable law is English law
have on the question whether England is "the proper place in which to bring      B
the claim".   As stated above, this involves asking whether England is clearly
or distinctly the appropriate forum for the trial of the dispute or (which
amounts to the same thing) the forum in which the case can be most suitably
tried for the interests of all the parties and for the ends of justice.

212    In my opinion neither consideration is conclusive but, together
with the terms of the facility agreement, they afford strong grounds for      C
concluding that the answer to those questions is in the affirmative.   It was
submitted by Mr Howard on behalf of VTB that there is a presumption that
that is the case where, in a tort case, the tort is committed within the
jurisdiction.   In my opinion, that is to put it too high.   It is undoubtedly a
relevant factor but how strong a factor will depend upon the circumstances.
It is true that courts have sometimes used the expression presumption.   On
the other hand they sometimes talk in terms of a prima facie case.   Yet other      D
expressions have been used.   For example, in *Distillers Co (Biochemicals)
Ltd v Thompson* [1971] AC 458 the alleged tort was a negligent failure to
warn a pregnant woman of the dangers of taking a drug which contained
thalidomide.   The tort was committed in New South Wales, where the
plaintiff had bought the drug.   In the Privy Council, Lord Pearson said,
at p 468, that it was "manifestly just and reasonable that a defendant should      E
have to answer for his wrongdoing in the country where he did the wrong".
As in all the cases, the particular phrase chosen depended upon all the
circumstances of the case.

213    In *The Albaforth* [1984] 2 Lloyd's Rep 91, which was much
discussed in the course of the argument, the claim was for damages for
negligent misrepresentation contained in a telex received and acted upon in
England.   Ackner LJ said that the jurisdiction in which a tort has been      F
committed is prima facie the natural forum for the determination of the
dispute.   The other member of the Court of Appeal was Robert Goff LJ.   It is
of some significance in the present case that he quoted with approval a
statement by Lord Denning MR in *Diamond v Bank of London and
Montreal Ltd* [1979] QB 333, 346 to the effect that the tort of negligent
misrepresentation was committed at the place where the representation was      G
received and acted upon.   Robert Goff LJ did not then use the expression
"prima facie forum" but said at p 96 that the cases showed that, where the
jurisdiction of the court is based on the fact that the tort was committed
within the jurisdiction, that court, "having jurisdiction, is the most
appropriate court to try the claim, where it is manifestly just and reasonable
that the defendant should answer for his wrongdoing".   He added that, that
being so, it was not easy to see what other facts could displace the conclusion      H
that the courts of that jurisdiction are the natural forum.   That is to my mind
so even if significant parts of the evidence derive from elsewhere.

214    *Berezovsky v Michaels* [2000] 1 WLR 1004 was a libel case in
which an internationally disseminated libel had been published in England.

© 2013 The Incorporated Council of Law Reporting for England and Wales

Case: 23-3085    Document: 22    Filed: 04/06/2023    Page: 192
A-120

407
[2013] 2 AC        VTB Capital plc v Nutritek International Corpn (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A    Lord Steyn, giving the principal judgment for the majority in the House of Lords, who were himself, Lord Nolan and Lord Hobhouse of Woodborough, quoted (at p 1013) the two passages from *The Albaforth* set out above and referred to *Distillers Co (Biochemicals) Ltd v Thompson* [1971] AC 458, 468E, per Lord Pearson, *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 QB 391 in the Court of Appeal (subsequently overruled in *Lonrho plc v Fayed* [1992] 1 AC 448 on other

B    aspects of the case) and *Schapira v Ahronson* [1999] EMLR 735. Lord Steyn added that the implied supposition in these cases was that the substance of the tort arose within the jurisdiction. He added, at p 1014:

"Counsel accepted that he could not object to a proposition that the place where in substance the tort arises is a weighty factor pointing to that jurisdiction being the appropriate one. This illustrates the weakness of

C    the argument. The distinction between a prima facie position and treating the same factor as a weighty circumstance pointing in the same direction is a rather fine one. For my part the *Albaforth* line of authority is well established, tried and tested, and unobjectionable in principle. I would hold that Hirst LJ correctly relied on these decisions."

D    **215** The Court of Appeal considered this issue at paras 140–144. They expressly referred to the statements of principle in *The Albaforth*, noting that neither Ackner nor Robert Goff LJJ referred to a presumption. They then referred to the statements of Lord Steyn in *Berezovsky v Michaels* noted above, adding that, although Lord Hope dissented (as did Lord Hoffmann), he agreed with the reasons given by Lord Steyn for accepting that Hirst LJ was right to rely on the *Albaforth* line of authority. They further noted that

E    Lord Hope said at p 103 that he would reject the argument that the application of the *Spiliada* test did not admit of the application in that case of the principle that the jurisdiction in which the tort is committed is prima facie the natural forum for the dispute.

**216** The Court of Appeal concluded at para 144 that the most that could be extracted from the House of Lords decision in *Berezovsky* was that, where a tort is committed within the jurisdiction, that jurisdiction is prima

F    facie the natural forum for the resolution of claims arising from it. However they added two points to which they attached importance. The first was that it had not been stated that this principle applies where the loss is sustained in the jurisdiction but other elements of the tort occur elsewhere. The second was that the statements made in the *Berezovsky* case can only describe, at best, a prima facie position, and that they cannot detract from the overall

G    test which has to be applied, namely that permission to serve out of the jurisdiction will only be granted if the claimant demonstrates that England is clearly or distinctly the appropriate forum for the resolution of the dispute. They concluded that there is no presumption in favour of England being either the natural or the appropriate forum in this case.

**217** I agree with the Court of Appeal that the cases do not go so far as to say that there is such a presumption but they do recognise that it is likely to

H    be a strong or weighty factor: see further paras 231–232 below. While it is true that the principle in *The Albaforth* has not been expressly stated to apply where the loss is sustained in the jurisdiction but other elements of the tort occur elsewhere, the application of the principle in that very case was in respect of the tort of negligent misrepresentation which was held to be

© 2013 The Incorporated Council of Law Reporting for England and Wales

408
VTB Capital plc v Nutritek International Corpn (SC(E))                    [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

committed in England as the place where the representation was received   A
and acted upon.  The same is true of the alleged fraudulent representations
here.

218   The second factor which seems to me to be of *real* significance is
that, for the reasons set out above, the applicable law under the 1995 Act is
English law.  It is not in dispute that it is a potentially relevant factor.  The
correct approach was, as ever, encapsulated by Lord Goff in *The Spiliada*   B
[1987] AC 460, 481:

> "the importance to be attached to any particular ground [of RSC
> Ord 11, r 1(1)] invoked by the plaintiff may vary from case to case.  For
> example, the fact that English law is the putative proper law of the
> contract may be of very great importance (as in *BP Exploration Co
> (Libya) Ltd v Hunt* [1976] 1 WLR 788, where, in my opinion, Kerr J   C
> rightly granted leave to serve proceedings on the defendant out of the
> jurisdiction); or it may be of little importance as seen in the context of the
> whole case."

See also *Dicey, Morris & Collins, The Conflict of* Laws, 15th ed, para 12·034.

219   The significance of the conclusion that English law is the applicable
law is that it is generally appropriate for a claim in tort governed by English
law to be adjudicated upon by an English court.  The same would of course   D
be true mutatis mutandis if the claim in tort were governed by Russian law.
In that case the natural court to determine liability would be a Russian court.
It was no doubt for that reason that the defendants have throughout
persisted in arguing that the applicable law is Russian law.  In the instant
case, it is not clear what, if any, role Russian law might play at a trial.  It
seems most unlikely to play a role if the action proceeds in England.   E
Although I recognise that it would be open to the defendants to reopen the
issue of applicable law for determination at trial, it is difficult to imagine
circumstances in which they would have a real prospect of persuading a
judge to reach a different conclusion from that arrived at in this court.  If the
action proceeds in Russia it is possible that Russian law will play a role
because the defendants have reserved their right to rely upon Russian law
but, since they have given no indication as to the nature of the case they   F
might wish to run, it is not possible to express a view as to its possible effect
on a trial in Russia.  In these circumstances it seems to me that, given that
VTB has shown that the applicable law of the tort is English law and that the
defendants have asserted no positive case to the contrary even if the action
were to proceed in Russia, this is a strong factor in favour of England as the
natural forum.   G

220   A further important factor is, as I see it, the fact that the facility
agreement which, on VTB's case, it was induced to enter into, contained, not
only clause 34, which provided that the agreement was governed by English
law, but also clause 35.1, which provided that the courts of England had
non-exclusive jurisdiction to settle any dispute arising out of the agreement,
that the English courts were the most appropriate and convenient to settle
the disputes, that no party would argue to the contrary and that the clause   H
was for the benefit of VTB alone.  Clause 35.3 also gave VTB the right to
refer a dispute to arbitration in London.

221   The fact that those clauses were included in the agreement which,
on VTB's case, it was fraudulently induced to enter into, seems to me to be a

© 2013 The Incorporated Council of Law Reporting for England and Wales

Case: 23-3085    Document: 22    Filed: 04/06/2023    Page: 194
**A-122**

409
[2013] 2 AC            VTB Capital plc v Nutritek International Corpn (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A    strong pointer to the conclusion that the natural forum for the resolution of the dispute is England. If VTB had not enforced its security by acquiring RAP, it would have been able to sue RAP in England and to add the present defendants as necessary or proper parties to the action against RAP. I appreciate that the defendants are not parties to the facility agreement and that it is therefore said that these clauses are irrelevant. However, VTB's submission derives support from Professor Briggs's recent article entitled

B    "The subtle variety of jurisdiction agreements" [2012] LMCLQ 364, in which he discusses the Court of Appeal decision in the present case, at pp 370–371:

> "In *VTB Capital plc v Nutritek International Corpn* . . . it appears to have been accepted without substantial argument that if the hidden person were not a party to the substantive contract containing the
> C    jurisdiction clause he could not be affected by a jurisdiction agreement contained in that contract. This conclusion, with respect, should not be accepted without further reflection. For even if the lifting of the veil does not allow a contractual claim, otherwise lying against the company, to be made against the veiled person, there may be other bases for seeking to establish his personal liability. Fraud will be the most likely one . . . That
> D    being so, the question becomes whether the jurisdiction clause in the company's contract may be utilised to establish or sustain jurisdiction against the alleged fraudster. This is a question which requires more of an answer than a simple assertion that a jurisdiction agreement is only ever effective in relation to a contracting party. For one thing, the jurisdiction clause is separable from the substantive contract, and the absence of a contractual claim against the fraudulent defendant need not entail the
> E    irrelevance of a jurisdiction agreement which he engineered. For another . . . even if he is not *contractually* bound to the jurisdiction, it should not be challenging to contend that the court which he signed his company up to, in circumstances of fraud, is also the proper place in which to assert any available claim of substantive liability against him."

F    222    I agree with Professor Briggs. In particular I agree with him that it is significant that where a person fraudulently engineers a contract, not only subject to English law but also subject to an English jurisdiction clause, the proper (or natural) place in which to assert a claim for substantive liability against him, whether in contract or tort, is England. The same would of course be true mutatis mutandis if the agreed law and jurisdiction were that of another state.

G    223    Mr Howard's submission on behalf of VTB is that the principal grounds for concluding that England is the natural forum for this action are therefore these. Although a significant number of preliminary events occurred in Russia, the critical ingredients of all the torts took place in England. In particular, the representations were made to VTB in England, where they were intended to be relied upon because it was VTB that was intended to enter into the facility agreement, which was governed by English
H    law and contained an English jurisdiction clause. VTB did enter into the agreement and, pursuant to its terms large sums of money were drawn down and, as the judge and the Court of Appeal held, VTB suffered its loss in England. As explained above, it is substantially for these reasons that English law is the law applicable to the torts. In these circumstances,

© 2013 The Incorporated Council of Law Reporting for England and Wales

410
VTB Capital plc v Nutritek International Corpn (SC(E))          [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

England is clearly or distinctly the appropriate forum for the trial of the   A
dispute. I would accept those submissions.

224   The judge and the Court of Appeal rejected that approach on the
basis that the centre of gravity of the torts lies in Russia. They did so on
the basis of the evidence that there was considerable activity in Moscow
before VTB was chosen as the lender. It is said that all the evidence referable
to that period would be in Russia. There is some force in that but the   B
difficulty facing the respondents is that they have not identified what
classes of evidence they might wish to adduce about what. It is therefore
appropriate, as counsel for the respondents himself indicated, to approach
the case on the basis that VTB will be put to proof of its claims.

225   The nature of VTB's claims is summarised in paras 181–184 above.
VTB hopes to be able to call Ms Bragina and others from VTB, although it is
right to say that Ms Bragina has left VTB and it is no longer in contact with   C
her. There is some documentary evidence available in London and Moscow.
I see no difficulty in any of the VTB witnesses who are now in Moscow or
elsewhere coming to London to give evidence. The evidence will no doubt
focus on the alleged representations. As to the allegation that it was
represented that Nutritek and RAP were not under common control, there is
evidence in the e-mails referred to in para 174 above. It is not known   D
whether it is said on behalf of the defendants that no such representations
were made or, if they were made, by whom they were made (and with whose
knowledge and on whose behalf) and whether they were true. Since the
defendants have not indicated the nature of their case, it is not known what
evidence they might wish to adduce on this part of the case. For example, it
is not known whether Mr Malofeev accepts that he controlled both Nutritek
and RAP as alleged, although (as stated at para 170 above), the judge found   E
that the allegation that RAP was ultimately owned and controlled by
Mr Malofeev through a web of offshore companies had not been the subject
of challenge by him. Mr Malofeev is an international business man who is
said to control a series of offshore companies. There is no evidence that
either he or any other witness could not readily come to London. It may
equally be said that there is no reason why any witness could not go to
Moscow.   F

226   So, on the first alleged misrepresentation, there seems to me to be
no reason to depart from the view expressed earlier, namely that the natural
forum for the resolution of the issues is England. The same is true of the
second alleged representation. The issues may essentially be whether the
facts relating to the dairy companies were fairly given to E & Y in Moscow.
Much of the information is no doubt in Russian and, if detailed evidence is   G
required, it may be in Russia. However, Deloittes LLP in London have made
a report in English on which VTB relies dated 11 April 2011, which analysed
the figures provided by Nutritek to E & Y and compared them with the
financial information provided by the dairy companies from their own
accounting records, which represent the true trading position, as well as
information from other sources. It is said that it is apparent from Deloitte's
opinion that Nutritek very substantially overstated the true performance   H
figures for the dairy companies. It is VTB's case that the extent of the
overstatement is such that it could only have been deliberate. It seems likely
to me that any issues under this head could be determined in England or
Russia.

© 2013 The Incorporated Council of Law Reporting for England and Wales

411

A  227  In all the circumstances, given that VTB is the claimant and not VTB Moscow, I do not agree with the Court of Appeal that the centre of gravity of the torts is in Russia. I would hold that VTB has shown that England is clearly or distinctly the appropriate forum for the reasons summarised in para 223 above. I would therefore allow the appeal on the forum non conveniens point.

B  228  I would only add this in the light of the judgments of Lord Mance JSC and Lord Neuberger of Abbotsbury PSC which I have seen since I prepared my own draft. Subject to the general point that one of the underlying principles of the CPR is that the parties should co-operate with each other and the court in order that cases are resolved justly, which must surely include the necessity for each party to put his cards on the table, I do not disagree with the general points made by Lord Neuberger PSC in the early parts of his judgment. None of the points I have made above is inconsistent with them. Thus, as I see it, even if the burden of proof is on the claimant, the defendant must indicate, at least in general terms what positive case he wishes to advance at a future trial, whether in England or elsewhere. This should be done shortly and concisely. In the instant case no attempt was made to do it at all.

D  229  I entirely agree with Lord Neuberger PSC that, where a judge has made no error of principle and the only challenge that can be advanced against his or her decision depends upon persuading an appellate court to balance the various factors differently, an appellate court should not interfere unless the balance struck by the judge can be shown to be plainly wrong. The question is whether this is such a case or whether this is a case in which, as VTB says, both the judge and the Court of Appeal made errors of principle and that, permission to appeal to this court having been granted, it becomes its responsibility to strike the balance. In my opinion, this case is in the second category.

230  As to the position before the judge, the Court of Appeal held that he had wrongly approached the question as a two-stage question. However I agree with Lord Mance JSC and Lord Neuberger PSC that, even if he did, he ultimately posed the correct question. The position as to choice of law is different. The judge erred in law in concluding that Russian law was the applicable law by reference to both section 11(2)(c) and section 12 of the 1995 Act. The Court of Appeal correctly held that he was wrong under section 11(2)(c) but it too was wrong in so far as it held that the applicable law was Russian law under section 12. In my opinion, as discussed in paras 195–210 above, those were errors of principle. Moreover, as explained in para 219, they were significant errors, as evidenced by the importance attached to the applicable law point by both sides. Both sides naturally took the view that whichever was the applicable law provided a strong pointer to the forum conveniens. As Lord Mance JSC puts it at para 46, it is generally preferable, other things being equal, that a case should be tried in the country whose law applies.

231  There are to my mind two other important respects in which the courts below failed to apply the correct principles. They are the correct approach to the significance of, first, the place where the tort was committed and, secondly, the fact that the facility agreement contained an English jurisdiction clause. As to the first, it is only fair to the judge to note that VTB did not refer to *The Albaforth* [1984] 2 Lloyd's Rep 91 or the other cases

© 2013 The Incorporated Council of Law Reporting for England and Wales

412
VTB Capital plc v Nutritek International Corpn (SC(E))        [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

following it which I have discussed in paras 212–217 above. Although there   A
is reference in the cases to the proposition that the place of the tort is prima
facie the natural forum and although of course (as ever) all depends upon the
circumstances, in the passage quoted from *The Albaforth* at para 213 above,
Robert Goff LJ expressed the view that, where the jurisdiction of the court
was based on the fact that the tort was committed within the jurisdiction,
that court was the most appropriate court to try the claim on the basis that it
was manifestly just and reasonable that the defendant should answer there   B
for his wrongdoing. Robert Goff LJ there echoed (at p 96) the expression
used by Lord Pearson in the *Distillers* case [1971] AC 458, 468: see para 212
above. Finally, as I read the speech of Lord Steyn in *Berezovsky* [2000]
1 WLR 1004 (quoted at para 214 above), the majority of the House of Lords
approved the proposition that there is no real distinction between treating
the place of the tort as a prima facie pointer and treating it as a weighty   C
factor.

232   It is in my opinion a weighty factor here, where the alleged
representations (if made) were deliberate acts which were committed within
the jurisdiction, which were intended to be relied upon within the
jurisdiction, which were in fact relied upon within the jurisdiction and which
caused VTB to sustain loss within the jurisdiction. I stress again that this is a   D
claim by VTB and not by VTB Moscow and VTB is not suing upon a tort
committed in Moscow.

233   Albeit for understandable reasons, this point was not considered by
the judge. It follows, as I see it, that he did not take it into account, even in
the alternative, in carrying out the balancing exercise. In the Court of
Appeal the effect of the authorities was in my judgment down played. It is
not to my mind a fair conclusion based on the authorities that the statements   E
made in *Berezovsky* can "only describe, at best, a prima facie position", at
any rate unless one keeps well in mind the reasoning of Lord Goff and Lord
Pearson referred to above. Although it is fair to say that the Court of Appeal
did refer to the passage from the speech of Lord Steyn in *Berezovsky* quoted
above, there is no hint that they treated this consideration as a weighty
factor. For the reasons I have given they should have done so.   F

234   The second respect in which in my opinion the courts below erred
in principle relates to the relevance of the English jurisdiction agreement in
the facility agreement. The judge merely said in para 187 that the English
jurisdiction and arbitration clauses are a pointer to England but not a strong
one, given that the claim is a tort claim not a contract claim. He does not
explain why the fact that the claim is a tort claim leads to the conclusion that
the pointer to England is not a strong one. He does not address the force of   G
the submissions made on behalf of VTB. For the reasons given in
paras 220–212 above, this is in my opinion a strong factor, on the basis that,
as Professor Briggs observed, where a person fraudulently engineers a
contract, not only subject to English law but also subject to an English
jurisdiction clause, the proper (or natural) place in which to assert a claim
for substantive liability against him, whether in contract or tort, is England.

235   The Court of Appeal did not expressly address this point. Lord   H
Neuberger PSC says that they must have agreed with the judge. That may be
so but, given that the judge gave no reasons for his view, it seems to me
to be of little assistance to the respondents. With respect to him, Lord
Neuberger PSC does not as I see it address this way of putting the case,

© 2013 The Incorporated Council of Law Reporting for England and Wales

Case: 23-3085    Document: 22    Filed: 04/06/2023    Page: 198
**A-126**

413
[2013] 2 AC          VTB Capital plc v Nutritek International Corpn (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A which is much narrower than that addressed by Lord Neuberger PSC in paras 105 and 106. In so far as he does address the point, I strongly prefer the opinion of Professor Briggs.

236   In all the circumstances I remain of the view that both the judge and the Court of Appeal erred in principle in more than one respect, that it is now for this court to reach its own conclusion on the question whether England is clearly or distinctly the appropriate forum for the trial of the dispute or
B (which amounts to the same thing) the forum in which the case can be most suitably tried for the interests of all the parties and for the ends of justice. For the reasons I have given, my conclusion is that it is.

237   In so far as it is suggested by Lord Neuberger PSC and Lord Wilson JSC that this approach is to assume what VTB has to prove, namely that Mr Malofeev was guilty of deceit, I respectfully disagree. The approach
C I favour does not assume that VTB will succeed but is based upon the fact that it has been held that VTB has at least a good arguable case on each of these factors: (1) the tort alleged was committed in England; (2) English law is the applicable law under the 1995 Act; (3) the respondents made fraudulent representations which induced VTB to enter into the facility agreement which is not only subject to English law but also subject to an
D English jurisdiction clause; and (4) the loss sustained as a result of lending money in England pursuant to the facility agreement was incurred in England. In all these circumstances England is clearly and distinctly the proper (or natural) place in which to assert a claim for damages for fraudulent representation against the respondents. I recognise that, as pointed out by Lord Mance JSC there are many factors which connect the underlying dispute with Russia but many of them are evidential and, indeed,
E many of them treat the claim as if it were a claim by VTB Moscow or the VTB Group, which it is not. As Lord Wilson JSC observes, the defendant's points primarily go to practicality, but it seems to me that a trial could perfectly well take place in England or Russia but that England is the natural forum for the reasons I have given. In all the circumstances I would allow the appeal on the forum non conveniens point.

F
*Piercing the corporate veil*

238   I agree with Lord Neuberger PSC that this is not a case in which it would be appropriate to pierce the corporate veil on the facts. I would however wish to reserve for future decision the question what is the true scope of the circumstances in which it is permissible to pierce the corporate
G veil. That includes the question whether *Antonio Gramsci Shipping Corpn v Stepanovs* [2011] 1 Lloyd's Rep 647 was correctly decided.

*The WFO*

239   Since the appeal is to be dismissed, I agree with Lord Neuberger PSC that the discharged freezing order should remain discharged and that the temporary WFO should be discharged as well.
H

**LORD REED JSC** (dissenting)
240   In relation to the first question in this appeal, namely whether the permission granted ex parte to VTB to serve the proceedings out of the jurisdiction should be set aside, I have reached the same conclusion as Lord

© 2013 The Incorporated Council of Law Reporting for England and Wales

414
VTB Capital plc v Nutritek International Corpn (SC(E))                    [2013] 2 AC
Lord Reed JSC

A

Clarke of Stone-cum-Ebony JSC. I do not question the general points made
by Lord Neuberger of Abbotsbury PSC at paras 79–93 of his judgment.
Nevertheless, it appears to me that the courts below erred in law in their
approach to this question. In particular, as explained by Lord Clarke JSC,
they erred (i) in concluding that the applicable law was Russian law rather
than English law and (ii) in failing to attach appropriate weight to the fact
that the alleged tort was committed in England, in accordance with the line
of authority including *The Albaforth* [1984] 2 Lloyd's Rep 91 and
*Berezovsky v Michaels* [2000] 1 WLR 1004.

B

241    These errors, particularly when considered cumulatively, appear to
me to have been material. I recognise that the Court of Appeal stated
(para 166) that, even if it had concluded that the applicable law was English
law, this would not have been a factor that would weigh heavily, "precisely
because if the defendants wished to allege and plead that the applicable law
was Russian law, both sides would have had to prepare for a trial on that
basis". The fact of the matter is however that the defendants have not
pleaded, or indicated any intention to plead, that the applicable law is
Russian law. Since the approach of the courts below was flawed in principle,
it appears to me that this court has no alternative but to reconsider the
question on a proper basis.

C

242    Having done so, I have reached the same conclusion as Lord
Clarke JSC, essentially for the reasons stated at paras 223–227 of his
judgment.

D

243    In relation to the second question, namely whether VTB should be
allowed to amend its statement of case so as to add a claim of damages for
breach of contract, based upon "piercing the corporate veil", I agree that
permission should be refused, for the reasons given by Lord Neuberger PSC.

E

244    Since the appeal is being dismissed, I also agree that the discharged
freezing order should remain discharged, and that the temporary freezing
order should also be discharged.

*Appeal dismissed.*
*Temporary freezing order discharged.*

F

DIANA PROCTER, Barrister

G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

doctrine of privity as a defence to claims by the injured parties themselves.[753] It is also now possible to draft the relevant agreements between the Bureau and the Secretary of State in such a way as to enable the victim to enforce them in their own right under s.1 of the Contracts (Rights of Third Parties) Act 1999.[754]

**20-146**  **Defective premises**    Under the Occupiers' Liability Act 1957, an occupier of premises who is bound by contract to permit persons who are strangers to the contract to enter or use the premises owes them (subject to any contrary provision in the contract) not only the common duty of care but also any stricter obligation they may undertake towards the other contracting party.[755] The Defective Premises Act 1972 imposes certain duties on a person who takes on work for or in connection with the provision of a dwelling. These duties are owed not only to the person to whose order[756] the dwelling is provided but also to any person who acquires an interest (whether legal or equitable) in the dwelling.[757] The Act also deals with the case where premises are let under a tenancy which puts on the landlord an obligation[758] to the tenant for the maintenance or repair of the premises. The landlord in such a case owes a duty to all persons, who might reasonably be expected to be affected by defects in the state of the premises, to take reasonable care to see that such persons are reasonably safe from personal injury or damage to their property caused by a relevant defect.[759]

### 5.  ENFORCEMENT AGAINST THIRD PARTIES

### (a)  General Rule: Third Party not Bound

**20-147**    The general rule is that a contract binds only the parties to it. This rule is regarded as an aspect of the doctrine of privity[760]; and in so far as A and B cannot by a

---

[753] *Hardy v M.I.B.*, above, at 757; *Randall v M.I.B.* [1968] 1 W.L.R. 1900; *Persson v London County Buses* [1974] 1 W.L.R. 569; *Porter v Addo* [1975] R.T.R. 503. As the Bureau is interested in the outcome of the litigation between the injured party and the driver it may, at the court's discretion, be added as a party to such litigation: see *Gurtner v Circuit*, above, and contrast *White v London Transport Executive* [1971] 2 Q.B. 721, 729; *White v White* [2001] UKHL 9, [2001] 1 W.L.R. 481. Notice of proceedings against the driver must be served on the Bureau: *Cambridge v Callaghan*, *The Times,* 21 March 1997; Uninsured Drivers Agreement 2015 (in force 1 August 2015). For the enforceability of the agreement by third parties, see also *Charlton v Fisher* [2001] EWCA Civ 122, [2002] Q.B. 578, at [25], [82] and next note.

[754] Above, para.20-092: see *Evans v Secretary of State for the Environment, Transport and the Regions* [2001] EWCA Civ 32, [2002] Lloyd's Rep. I.R. 1 at [4].

[755] Occupiers' Liability Act 1957 s.3(1).

[756] This order will generally give rise to a contract but the duty is imposed even where this is not the case.

[757] Defective Premises Act 1972 s.1.

[758] This will generally be contractual but might also be imposed (for example) by statute.

[759] Defective Premises Act 1972 s.4.

[760] This aspect of the doctrine is not affected by the Contracts (Rights of Third Parties) Act 1999: see above paras 20-002—20-003. Hence where a contract between A and B was held, on its true construction, to purport, not to confer a *benefit* on C, but to *restrict* C's rights, it was said that "no question arises under the Contracts (Rights of Third Parties) Act 1999": *Prudential Assurance Co Ltd v Ayres* [2008] EWCA Civ 52 at [42].

contract between them impose an obligation to perform duties arising under that contract on C, the rule may seem to be so obvious that it scarcely needs to be stated: if a contract between A and B provided that C was to pay £100 to A, no-one would suppose that this contract could oblige C to make the payment. The point is further illustrated by a case in which the Supreme Court held that a contract entered into by a company did not bind a third party merely because that person was the company's controlling shareholder.[761] Similar policy considerations account for the rule that C is not liable to A in restitution merely because A has, in the performance of a contract between A and B (to which C was not a party), conferred a benefit on C.[762] But the rule equally applies where the contract between A and B merely purports to deprive C of some right or to restrict their freedom of action, without imposing any obligation to perform on them:[763] for example, a person is not bound by an exclusion clause contained in a contract to which they are not a party,[764] unless one of the exceptions to the doctrine of privity can be invoked against them[765] or unless they can be held to be so bound by virtue of some relationship (such as a bailment or sub-bailment on terms to which they had consented, incorporating the clause) between themself and the wrongdoer.[766] Another illustration of the same point is provided by a case[767] in which A (the Crown) had granted a licence to B to "search, bore for and get" petroleum owned by A and lying partly under C's land. It was held that there was no:

"… common law principle that [B] can invoke … to regulate their position in relation to a landowner (C) who was not a party to that arrangement."[768]

Accordingly, B was liable to C for trespass to land in drilling and laying pipelines under C's land (pursuant to the licence) in order to extract the petroleum.

**Conditional benefits**   An apparent exception to the rule that A and B cannot by **20-148** a contract between them impose an obligation to perform duties arising under that contract on C arises under the so-called principle of "conditional benefit". Where a term in a contract between A and B confers a benefit to C but gives C a right to enforce the term only if a specified condition occurs, and where that condition is the performance of some act or abstention by C, C's benefit is rightly considered

---

[761] *VTB Capital Plc v Nutritek International Corp* [2013] UKSC 5, [2013] 2 A.C. 337 at [139]–[140] (the letters used in Lord Neuberger's judgment to designate the three parties are not the same as used in the text above for this purpose).

[762] *Macdonald v Costello* [2011] EWCA Civ 930, [2012] 1 All E.R. (Comm) 357.

[763] For further discussion of the tort under *Lumley v Gye*, see paras 20-151 et seq. below.

[764] *Leigh & Sillivan Ltd v Aliakmon Shipping Co Ltd (The Aliakmon)* [1986] A.C. 785. cf. *British American Tobacco Switzerland SA* [2012] EWHC 694 (Comm), [2012] 2 Lloyd's Rep. 1 at [10] (defendant not bound by a jurisdiction clause in a contract to which defendant was not a party: see above, para.20-009); *VTB Capital Plc v Nutritek International Corp* [2013] UKSC 5, where the underlying assumption was that an English Court jurisdiction clause would not bind a person who was not a party to the contract in which that clause was contained (see especially at [140]).

[765] Above, para.17-043; cf. *Herd v Clyde Helicopters Ltd* [1997] A.C. 473, where legislation limiting the liability of a party to the contract was held to be effective as against a third party.

[766] Above, para.17-057; e.g. *East West Corp v DKBS 1912* [2003] EWCA Civ 83, [2003] Q.B. 1509, at [69] (where the exemption clauses were held on other grounds not to protect the defendants); *Scottish & Newcastle International Ltd v Othon Ghalanos Ltd* [2008] UKHL 11, [2008] 1 Lloyd's Rep. 462 at [46], [47].

[767] *Bocardo SA v Star Energy UK Onshore Ltd* [2010] UKSC 35, [2011] 1 A.C. 380.

[768] *Bocardo SA v Star Energy UK Onshore Ltd* [2010] UKSC 35, [2011] 1 A.C. 380 at [32].